STEVEN G. KALAR
Federal Public Defender
GALIA AMRAM
Assistant Federal Public Defender
STEVEN J. KOENINGER
Research and Writing Attorney
DANIEL BLANK
Assistant Federal Public Defender
CANDIS MITCHELL
Assistant Federal Public Defender
ELLEN LEONIDA
Assistant Federal Public Defender
450 Golden Gate Ave, 19-6884
San Francisco, CA 94102
Telephone:  (415) 436-7700

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No: CR 14-643 EMC |
| Plaintiff, | **NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION** |
| v. | |
| DAVID MADLOCK,<br>MATTHEW MUMPHREY,<br>LATONYA CAREY,<br>CRYSTAL ANTHONY,<br>DARLENE ROUSE,<br>ACACIA MCNEAL,<br>ANITA DIXON,<br>AARON MATTHEWS,<br>NIJAH REED,<br>TIANA REDDIC,<br>TIFFANY CROSS,<br>SHOLANDA ADAMS,<br><div align="center">Defendants.</div> | |

1

2 **NOTICE OF MOTION**

3  TO BRIAN STRETCH, ACTING UNITED STATES ATTORNEY FOR THE
   NOTHERN DISTRICT OF CALIFORNIA, AND TO SARAH HAWKINS AND
4  LLOYD FARNHAM, ASSISTANT UNITED STATES ATTORNEYS:

5      NOTICE IS HEREBY GIVEN that on February 9, 2016 at 10:00 a.m., or as soon as this

6  motion may be heard, the above-captioned defendants will move the Court for an order to

7  compel discovery on selective prosecution and selective enforcement.

8      This motion is based upon the Memorandum of Points and Authorities in Support hereof,

9  the attached exhibits and declarations, the Fifth and Fourteenth Amendments of the United States

10 Constitution, applicable case law, records and files in the instant action, and such other matters

11 as may be adduced at the hearing of this cause.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

ii

# TABLE OF CONTENTS

NOTICE OF MOTION.................................................................................................. ii

TABLE OF AUTHORITIES ...................................................................................... vii

INTRODUCTION .........................................................................................................1

FACTUAL BACKGROUND.........................................................................................5

    I.      Operation Safe Schools.........................................................................5

          A.      Overview.........................................................................5

          B.      Geographic Area of the Tenderloin ..............................6

          C.      Types and Amounts of Drugs .......................................8

          D.      How the DEA/SFPD Conducted Operation Safe Schools...........................9

          E.      Officers .........................................................................10

          F.      Standards for Prosecution ...........................................11

          G.      Criminal History of Operation Safe School Defendants............................12

    II.     Racial Demographics of Drug Traffickers in the Tenderloin ................................13

          A.      Needle Exchange Survey ..............................................13

          B.      Interviews of Tenderloin Community Members.........................................15

    III.    Racial Demographics of Tenderloin Drug Traffickers Charged in State Court ..........................................18

    IV.   Law Enforcement Knowledge of Non-Black Drug Traffickers in the Tenderloin ........................................22

    V.    Law Enforcement Interaction With, and Arrests of, Non-Black Drug Traffickers in the Tenderloin ..........................24

          A.      John Doe-1 ....................................................................26

          B.      John Doe-2 ....................................................................26

          C.      John Doe-3 ....................................................................27

          D.      John Doe-4 ....................................................................29

          E.      Jane Doe-5 ....................................................................30

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO. CR 14-643 EMC

iii

F.      John Doe-6 ..................................................................................................31

G.      Jane Doe-7 ..................................................................................................32

H.      John Doe-8 ..................................................................................................32

I.      John Doe-9 ..................................................................................................33

J.      John Doe-10 ................................................................................................34

K.      John Doe-11 ................................................................................................36

L.      John Doe-12 ................................................................................................37

M.      John Doe-13 ................................................................................................37

N.      John Doe-14 ................................................................................................38

O.      John Doe-15 ................................................................................................39

P.      John Doe-16 ................................................................................................40

Q.      John Doe-17 ................................................................................................41

R.      John Doe-18 ................................................................................................41

S.      John Doe-19 ................................................................................................42

T.      John Doe-20 ................................................................................................42

U.      John Doe-21 ................................................................................................43

V.      John Doe-22 ................................................................................................43

W.      John Doe-23 ................................................................................................44

X.      John Doe-24 ................................................................................................45

Y.      John Doe-25 ................................................................................................45

Z.      John Doe-26 ................................................................................................46

AA.     John Doe-27 ................................................................................................47

BB.     John Doe-28 ................................................................................................47

CC.     John Doe-29 ................................................................................................48

DD.     John Doe-30 ................................................................................................49

EE.     John Doe-31 ................................................................................................49

FF.     John Doe-32 ................................................................................................50

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

GG.    Jane Doe-33 ..................................................................................51

HH.    John Doe-34 .................................................................................52

II.     John Doe-35 .................................................................................52

JJ.     John Doe-36 .................................................................................53

KK.    John Doe-37 .................................................................................54

LL.    John Doe-38 .................................................................................54

MM.   John Doe-39 .................................................................................55

NN.    John Doe-40 .................................................................................55

OO.    John Doe-41 .................................................................................56

PP.    John Doe-42 .................................................................................56

VI.    Incidents of Racial Bias by SFPD Generally ..........................................56

    A.    Racial disparity ..............................................................................56

    B.    Racist texts ...................................................................................57

VII.    Evidence of Racial Bias in Operation Safe Schools Officers and in
Tenderloin Policing ...........................................................................60

    A.    Evidence of Racial Bias Produced in Discovery in Operation
Safe Schools Cases .........................................................................60

    B.    Incidents of Racial Bias By SFPD Officers In The Tenderloin ................61

        1.    Use Of Racial Slurs By SFPD Officers In The
Tenderloin ..........................................................................62

        2.    Incidents of Sexually Inappropriate Behavior By SFPD
Officers Against Black Women ..................................................63

        3.    Acts Of Violence By SFPD Officers In The Tenderloin
Against Blacks .....................................................................67

ARGUMENT ..................................................................................................69

I.    Selective Prosecution ..............................................................................69

    A.    Legal Standard ..............................................................................69

        1.    United States v. Armstrong ......................................................69

        2.    Discriminatory Effect Prong Of A Selective
Prosecution Claim .................................................................71

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

v

a.    Definition of Similarly Situated ................................................72

       i.    First Circuit ................................................73

       ii.    Fourth Circuit ................................................73

       iii.    Seventh Circuit ................................................74

       iv.    Eleventh Circuit ................................................75

b.    The Defendants Have Made A Prima Facie Showing Of Discriminatory Effect ................................................75

3.    Discriminatory Intent Prong Of A Selective Prosecution Claim ................................................78

a.    The Defense Has Shown A Prima Facie Case Of Discriminatory Intent ................................................82

       i.    Comparative analysis. ................................................82

(a)    Recidivism ................................................84

(b)    Trafficking Drugs Near "Schools" ................................................85

(c)    Strength of the Evidence ................................................87

       ii.    Use of a policy susceptible to abuse ................................................87

II.    Selective Enforcement ................................................90

    A.    A Selective Enforcement Claim is Cognizable ................................................90

    B.    Standard for Selective Enforcement ................................................94

    C.    The Defense Has Established a Prima Facie Case of Selective Enforcement ................................................96

       1.    The Defense Has Made a Prima Facie Showing of Discriminatory Effect With Respect to Selective Enforcement ................................................96

       2.    The Defense Has Made a Prima Facie Case of Discriminatory Intent in Regards to Selective Enforcement ................................................97

CONCLUSION ................................................98

DISCOVERY REQUEST ................................................99

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

vi

1

**TABLE OF AUTHORITIES**

2

**Cases**

*Arlington Heights v. Metro. Hous. Dev. Corp.*,
　429 U.S. 252 (1977) ................................................................ 78, 98

*Armstrong v. Daily*,
　786 F.3d 529 (7th Cir. 2015) ................................................ 96

*Batson v. Kentucky*,
　476 U.S. 79 (1986) ................................................................ 82, 88

*Carrasca v. Pomeroy*,
　313 F.3d 828 (3d Cir. 2002) ................................................ 79

*Castaneda v. Partida*,
　430 U.S. 482 (1977) ............................................................ 84, 89

*Chavez v. Ill. State Police*,
　251 F.3d 612 (7th Cir. 2001) ..................................... 71, 74, 75, 79, 98

*Connecticut v. Teal*,
　457 U.S. 440 (1982) ............................................................ 96

*Crittenden v. Ayers*,
　624 F.3d 943 (9th Cir. 2010) ............................................ 82

*Crittenden v. Chappell*,
　804 F.3d 998 (9th Cir. 2015) ......................................... 83, 85, 87

*Curtis v. Rodriguez v. California Highway Patrol*,
　No. 99cv20895 JF, (N.D. Cal. Aug. 1, 2001) [Docket No. 211] ............................................ 88

*Farm Labor Org. Comm. v. Ohio State Highway Patrol*,
　308 F.3d 523 (6th Cir. 2002) ............................................ 78, 95

*Franks v. Delaware*,
　438 U.S. 154 (1978) ............................................................ 96

*Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety-Div. of State Police*,
　411 F.3d 427 (3d Cir. 2005) ............................................ 92

*Glob.-Tech Appliances, Inc. v. SEB S.A.*,
　563 U.S. 754 (2011) ............................................................ 90

*Gomillion v. Lightfoot*,
　364 U.S. 339 (1960) ............................................................ 80

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

vii

*Hudson v. Michigan,*
   547 U.S. 586 (2006) ................................................................................. 94

*Hunter v. Underwood,*
   471 U.S. 222 (1985) ................................................................. 72, 78, 98

*Lacey v. Maricopa County,*
   693 F.3d 896 (9th Cir. 2012) (en banc) ........................................ 92, 95

*Marshall v. Columbia Lea Reg'l Hosp.,*
   345 F.3d 1157 (10th Cir. 2003) .........................................  79, 82, 93, 95

*Miller-El v. Dretke,*
   545 U.S. 231 (2005) ................................................................................. 83

*Newsome v. McCabe,*
   256 F.3d 747 (7th Cir. 2001) ................................................................. 96

*Pitchess v. Superior Court,*
   11 Cal. 3d 531 (1974) .......................................................................... 100

*Rodriguez v. Cal. Highway Patrol,*
   89 F. Supp. 2d 1131 (N.D. Cal. 2000) ................................................. 96

*Rosenbaum v. City & Cty. of S.F.,*
   484 F.3d 1142 (9th Cir. 2007) ............................................................. 92

*Teamsters v. United States,*
   431 U.S. 324 (1977) ................................................................................. 80

*United States v. Aguilar,*
   883 F.2d 662 (9th Cir. 1989) ................................................................. 72

*United States v. Al Jibori,*
   90 F.3d 22 (2d Cir. 1996) ............................................................. 70, 71

*United States v. Alameh,*
   341 F.3d 167 (2d Cir. 2003) ..................................................................79

*United States v. Alcaraz-Arellano,*
   441 F.3d 1252 (10th Cir. 2006) ............................................. 79, 93, 95

*United States v. Alexander,*
   No. 11-CR-148, 2013 WL 6491476 (N.D. Ill. Dec. 10, 2013) ............. 93

*United States v. Arenas-Ortiz,*
   339 F.3d 1066 (9th Cir. 2003) ..............................................................72

*United States v. Armstrong,*
   517 U.S. 456 (1996) ..................................................................... *passim*

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

viii

*United States v. Armstrong*,
   No. 95-157, 1996 WL 67650 (U.S.Reply.Brief, filed Feb. 15, 1996). ............................... 71

*United States v. Armstrong*,
   No. 95-157, 1996 WL 88550 (Oral. Arg. Trans, Feb. 26, 1996) ........................................... 80

*United States v. Barlow*,
   310 F.3d 1007 (7th Cir. 2002) .................................................................... 79, 93, 95

*United States v. Bell*,
   86 F.3d 820 (8th Cir. 1996) ........................................................................ 93, 95

*United States v. Buford*,
   632 F.3d 264 (6th Cir. 2011) ........................................................................... 94

*United States v. Davis*,
   766 F.3d 722 (7th Cir. 2014), *rev'd and remanded en banc,* 793 F.3d 712
   (7th Cir. 2015) ........................................................................................ 71, 73

*United States v. Davis*,
   793 F.3d 712 (7th Cir. 2015) (en banc) ............................................................ 92, 96

*United States v. Dixon*,
   486 F. Supp. 2d 40 (D.D.C. 2007) ..................................................................... 95

*United States v. Duque-Nava*,
   315 F. Supp. 2d 1144 (D. Kan. 2004) ...................................................... 71, 79, 93, 96

*United States v. Erne*,
   576 F.2d 212 (9th Cir. 1978) ...........................................................................91

*United States v. Gomez-Lopez*,
   62 F.3d 304 (9th Cir. 1995) ............................................................................ 91

*United States v. Gonzalez–Torres*,
   309 F.3d 594 (9th Cir. 2002) ........................................................................... 72

*United States v. Greene*,
   698 F.2d 1364 (9th Cir. 1983) ..........................................................................91

*United States v. Hare*,
   308 F. Supp. 2d 955 (D. Neb. 2004) ................................................................... 93

*United States v. Harmon*,
   785 F. Supp. 2d 1146 (D.N.M. 2011) .................................................................. 94

*United States v. Hayes*,
   236 F.3d 891 (7th Cir. 2001) ........................................................................... 75

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

ix

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*United States v. Henthorn,*
   931 F.2d 29 (9th Cir. 1991) ............................................................... 100

*United States v. James,*
   257 F.3d 1173 (10th Cir. 2001) ..................................................... 93, 95

*United States v. Lamar,*
   No. 14-CR-726, 2015 WL 4720282 (S.D.N.Y. Aug. 7, 2015) ............ 93

*United States v. Lewis,*
   517 F.3d 20 (1st Cir. 2008) ........................................................... 70, 73

*United States v. Monsoor,*
   77 F.3d 1031 (7th Cir. 1996) ............................................................. 91

*United States v. Montero-Camargo,*
   208 F.3d 1122 (9th Cir. 2000) (en banc) .......................................... 92

*United States v. Nichols,*
   512 F.3d 789 (6th Cir. 2008) ............................................................. 94

*United States v. Olvis,*
   97 F.3d 739 (4th Cir. 1996) .................................................... 70, 74, 81

*United States v. Paxton,*
   No. 13 CR 103, 2014 WL 1648746 (N.D. Ill. Apr. 17, 2014) ...................... 70, 79, 90, 93, 98

*United States v. Smith,*
   231 F.3d 800 (11th Cir. 2000) ................................................ 75, 76, 80

*United States v. Tuitt,*
   68 F. Supp. 2d 4 (D. Mass. 1999) ................................................. *passim*

*United States v. Turner,*
   104 F.3d 1180 (9th Cir. 1997) ...................................... 72, 74, 91, 92

*United States v. Venable,*
   666 F.3d 893 (4th Cir. 2012) .................................................. 70, 74, 81

*United States v. Whitfield,*
   29 F. Supp. 3d 503 (E.D. Pa. 2014) .................................................. 93

*Washington v. Davis,*
   426 U.S. 229 (1976) ......................................................................... 80

*Wayte v. United States,*
   470 U.S. 598 (1985) ................................................................... 79, 88

*Whren v. United States,*
   517 U.S. 806 (1996) ................................................................... 91, 94

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

x

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886) .................................................................................................. 72, 91

**Federal Statutes**

21 U.S.C. § 860(a) .................................................................................................................. 6

**State Statutes**

Cal. Health & Safety Code § 11350................................................................................................56

Cal. Health & Safety Code § 11351................................................................................31, 52, 57

Cal. Health & Safety Code § 11351.5 ......................................................................... *passim*

Cal. Health & Safety Code § 11352................................................................................ *passim*

Cal. Health & Safety Code § 11353.6 .................................................................. 6, 43, 44

Cal. Health & Safety Code § 11359............................................................................. 34, 41

Cal. Health & Safety Code § 11360............................................................................ 19

Cal. Health & Safety Code § 11366..............................................................................28, 29, 41

Cal. Health & Safety Code § 11375...............................................................................19, 57

Cal. Health & Safety Code § 11377...............................................................................30, 41

Cal. Health & Safety Code § 11378................................................................................ *passim*

Cal. Health & Safety Code § 11378.5 ........................................................................ 19

Cal. Health & Safety Code § 11379............................................................................ *passim*

Cal. Penal Code § 1291............................................................................................ 36

Cal. Penal Code § 12022.1............................................................................................ 49

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

xi

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

On December 5, 2014, San Francisco Police Department ("SFPD") officers were conducting a "buy bust" operation focused on the intersection of Hyde Street and Golden Gate Avenue. This area of the Tenderloin not only was "well known to officers due to the high level of narcotics activity" that takes place there, but SFPD and the Tenderloin community also knew it was controlled by Latino narcotics traffickers. The intersection of Hyde and Golden Gate is located approximately a block and a half from the DeMarillac Academy, a school for young children. According to one officer participating in the December 5 "buy bust," "[p]arents who have no other option, but to walk their children to and from this school must endure walking through what seems like a narcotics flea market on a daily basis."[1]

During the December 5 operation, one undercover officer "observed a Hispanic male," (John Doe-1), who was standing on the corner and had previously been identified by citizen informants "as one of the people who is out on a daily basis selling suspected base rock cocaine during morning hours."[2] The officer approached Doe-1 and purchased a rock of crack cocaine from him; Doe-1 was then arrested by other SFPD officers. This was not Doe-1's first arrest for selling crack at the corner of Golden Gate and Hyde. Rather, Doe-1 was arrested at that same location for the same crime less than three months before, on September 10, 2014.[3] At the time of his September 10 arrest, Doe-1 also had an outstanding warrant based on yet another drug-trafficking violation under California Health & Safety Code section 11352, which prohibits the

---

[1] Ex. 1, Declaration of Steven J. Koeninger in Support of Motion to Compel Discovery on Selective Prosecution and Enforcement ("Koeninger Disco. Mtn. Decl."), Att. A at Ex.00420.

[2] *Id.*

[3] *Id.* at Ex.00486-90.

transportation and sale of a controlled substance.[4]

Later that same day, an officer involved in Doe-1's arrest returned to the area of Hyde and Golden Gate and "used a roll-a-tape" to confirm that the distance between where Doe-1's narcotics transaction took place and the front Gate of the DeMarillac Academy was less than 1,000 feet.[5]  While the officer was in the process of measuring the distance between DeMarillac Academy and Doe-1's drug transaction**,** he encountered yet *another* crack cocaine transaction "in progress" between "a Latin male" and two other men in front of 288 Golden Gate Avenue – a location even closer to DeMarillac Academy than 101 Hyde Street.[6]  The officer arrested the "Latin male," (John Doe-2) and found "twelve individually wrapped pieces" of crack cocaine and two knives on his person.  As SFPD transported Doe-2 to Tenderloin Station for booking, he told officers that he was a "Sureno from the south side."[7]

While booking Doe-2, SFPD also determined that he had an even more extensive history of drug-trafficking in the Tenderloin than Doe-1.  A records check revealed that Doe-2 was currently on felony probation for a prior conviction under H&S Code section 11352(a) and also had an outstanding, no-bail warrant related to that conviction.  The incident underlying the conviction occurred in June 2010 "at 370 Turk Street."[8]  The SFPD records check also revealed that Doe-2 had an open case pending in Superior Court based on a May 2014 violation of section 11352(a) and a no-bail warrant related to that case, too.  The arrest underlying that incident

---

[4] *See id.* at Ex.00489; Cal. H&S Code § 11352.  The text of this motion makes numerous references to the California Health & Safety Code, which herein is abbreviated as "H&S Code."

[5] *See id.* at Ex.00421; *id.* at Ex.00426 (incident report stating that on December 5, 2014, "I was conducting an investigation pertaining to Case# 141024755 [Doe-1's incident number] which involved measuring the distance between 175 Golden Gate Avenue [DeMarillac Academy] and 101 Hyde Street with a roll-a-tape measurement device").

[6] *See* Ex. 1, Koeninger Disco. Mtn. Decl. at Ex.00426.

[7] *Id.*

[8] *Id.* at Ex.00427.  *see also* Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02209.1 (listing prior cases filed against Doe-2 in San Francisco Superior Court, including arrest date and location).

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

2

1   occurred "at 101 Hyde Street."   Finally, the records check also revealed that Doe-2 had a March

2   2009 conviction – again for violating section 11352(a), and again based on an incident that

3   happened in the Tenderloin.[9]

4        Although Doe-1 and Doe-2 *both* were arrested while trafficking crack cocaine within

5   1,000 feet of the DeMarillac Academy, and although *both* had been repeatedly arrested by SFPD

6   for drug-trafficking in the Tenderloin, *neither* of these Hispanic/Latino individuals were

7   prosecuted in federal court under Operation Safe Schools – a program, jointly undertaken by the

8   United States Attorney's Office ("USAO"), the Drug Enforcement Administration ("DEA"), and

9   the SFPD.[10]   Pursuant to Operation Safe Schools, SFPD/DEA taskforce officers arrested

10   Tenderloin-based drug traffickers for prosecution in federal court under a statute prohibiting

11   drug-trafficking within 1,000 feet of educational institutions and playgrounds – a statute that also

12   provides for mandatory-minimum sentences.   Unlike Doe-1 and Doe-2 – and hundreds of other

13   similarly situated individuals[11]– all thirty-seven people prosecuted under Operation Safe Schools

14   were **Black**.   Moreover, eight of the thirty-seven Operation Safe Schools defendants were

15   charged federally based on incidents that occurred within a mere five days of December 5,

16   2014[12] – that is, the day of Doe-1 and Doe-2's arrests described above.

17        Race, and not some other factor, explains the failure to include any of the non-Black drug

18   _____

19   [9] Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00427; *see also* Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02209.1.

20   [10] Instead, both were charged in San Francisco Superior Court.  *Id.* at Ex.02202, 02209.1; *see also* Ex. 2, Declaration of Rob Ultan in Support of Motion to Compel Discovery on Selective Prosecution and Enforcement ("Ultan Disco. Mtn. Decl."), Att. B at Ex.02519-21 (felony complaint for Doe-2).

21
22

23   [11] More than 40 similarly-situated individuals (non-Black drug traffickers in the Tenderloin) are described in detail in this brief.  *See* Section V *infra*.  Hundreds more Tenderloin-based drug-trafficking arrests, involving non-Black individuals, are listed in Attachments to the Koeninger Declaration.  *See* Ex. 1, Koeninger Disco. Mtn. Decl., Atts. B, G.

24

25   [12] *See* Ex. 3, Declaration of Sheree Cruz-Laucirica in Support of Motion to Compel Discovery on Selective Prosecution and Enforcement ("Cruz Disco. Mtn. Decl."), Att. A at Ex.02851-52.

26

27

28   NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

traffickers in Operation Safe Schools.  This fact is borne out by a varied and compelling array of evidence including:

- The statistical disparity between the racial demographics of Tenderloin drug traffickers charged in state court (61.4% Black) and those charged federally in Operation Safe Schools (100% Black) is so large that a sociologist concludes: "there is virtually no chance that this difference is the result of chance."[13]

- Police reports in which Tenderloin SFPD officers admit that: "I have participated in hundreds of buy busts and surveillances in this area. I know that many of the drug dealers in the Hyde Street area are of Honduran descent. I have seen the described behavior hundreds of times."[14]

- Declarations from community members, including a former AUSA and current law professor, a security guard for the federal courthouse, and managers from GLIDE and the Tenderloin Housing Clinic, attesting to the diversity of the drug selling population and law enforcement awareness of it.

- Hundreds of police reports in which SFPD officers arrest non-Black Tenderloin drug traffickers.

- Over 30 declarations describing a pattern of racial animus by Tenderloin police officers including the use of racial slurs ("nigger," "black bitch," "boy"), sexual misconduct against Black women, acts of violence against Black men and women, and a disparate focus on Black drug dealers.

- Use of racially inappropriate language and conduct in videos of Operation Safe Schools' investigations.

- The fact that not all the Black defendants charged federally in Operation Safe Schools met the charging criteria set forth by the AUSAs, while similarly-situated non-Black persons do meet the charging criteria.

The evidence of racial animus by Tenderloin police officers that is detailed in this motion is provided against a backdrop of longstanding concern with racial bias in the SFPD.  Moreover,

---

[13] Declaration of Galia Amram Phillips In Support Of Motion to Compel Discovery on Selective Prosecution and Enforcement ("Amram Disco. Mtn. Decl."), Att. M at Ex.04220.

[14] Ex. 1, Koeninger Disco. Mtn. Decl., Att. D at Ex.00773.  *See also id.* at Ex.00736 (officer reporting in April 2015 that "[b]ased off prior arrests and contacts, I know that the corner of Eddy Street and Hyde Street is primarily controlled by Honduran national drug dealers").

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

4

the strength of the evidence of racial bias amongst the law enforcement officers in Operation Safe Schools, and the public nature of it, raises concerns with the U.S. Attorney's Office as well. The race-neutral reasons provided by the AUSAs for their charging decisions (outlined in their July 2015 Declarations) do not hold up – both because not all the Operation Safe School defendants met the charging criteria, and also because a comparative analysis of the 37 Operation Safe Schools defendants with the similarly-situated persons shows that the race-neutral reasons are pre-textual.  It also appears from the AUSAs declarations and other information described below, that at the time these prosecutions were authorized, the USAO knew, or should have known, about the racial diversity of drug sellers in the Tenderloin and, at least by the 2014 sweep, knew, or should have known, that there were serious problems with racism in SFPD, and that the only people charged so far in Operation Safe Schools were Black.

This begs the question of what the USAO did to insure that the people law enforcement presented for prosecution in Operation Safe Schools actually met the charging criteria (since not all of them did), and what the USAO did to make sure that non-Black individuals not presented for prosecution did not meet the charging criteria (as many, many non-Black individuals did). None of the AUSAs Declarations state that there was any policy in place for this, and it remains unclear if the decision about whom to target was left to law enforcement – law enforcement officers whom the government had reason to suspect were racially biased.

## FACTUAL BACKGROUND

### I.      Operation Safe Schools

#### A.      <u>Overview</u>

Operation Safe Schools is a partnership between the United States Attorney's Office, the SFPD and the DEA.  Declaration of Galia Phillips In Support Of Notice Of Related Case ("Phillips Related Case Decl."), Att. C [2.12.15 USAO Press Release], *United States v. Chrystal Anthony*, No. 15cr005 (N.D. Cal. filed 03/31/15) [Docket No. 11].  The stated goal of Operation

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

5

Safe Schools is to "use the law enforcement tools available to [the government] to make neighborhoods like the Tenderloin safe, and to ensure that children who live and go to school in these neighborhoods are not exposed to crime and drug dealing." *Id.* Thus far, Operation Safe Schools consists of two sweeps of the Tenderloin neighborhood in San Francisco, CA. The first sweep was between approximately August and November 2013, and the second sweep was between approximately October and December 2014. Ex. 3, Cruz Disco. Mtn. Decl., Att. A at Ex.02851-52.

The people arrested pursuant to Operation Safe Schools were charged in the San Francisco division of the United States District Court for the Northern District of California. Each defendant was charged with selling drugs within 1,000 feet of a school, playground, or college in violation of 21 U.S.C. §§ 841 and 860.[15] They face a one-year mandatory-minimum sentence under § 860 and a six-year mandatory minimum term of supervised release.[16] The DEA/SFPD taskforce arrested fourteen people pursuant to Operation Safe Schools in the 2013 sweep, and twenty-three people in the 2014 sweep. Ex. 3, Cruz Disco. Mtn. Decl., Att. A at Ex.02851-52. All thirty-seven people arrested by the DEA/SFPD and charged federally under Operation Safe Schools are **Black**. *Id*

B.    Geographic Area of the Tenderloin

Press releases by the USAO stated that Operation Safe Schools focused on San Francisco's Tenderloin neighborhood. Phillips Related Case Decl., Att. C [12.09.13 USAO

---

[15] Section 860 applies to drug-trafficking crimes occurring within 1,000 feet of "the real property comprising a public or private elementary, vocational, or secondary school or a public or private college, junior college, or university, or a playground or housing facility owned by a public housing authority." 21 U.S.C § 860(a). It also applies to drug-trafficking crimes occurring "within 100 feet of a public or private youth center, public swimming pool, or video arcade facility." *Id.*

[16] California law similarly provides an enhanced sentence for persons trafficking drugs within 1,000 feet of an educational institution ("elementary, vocational, junior high, or high school"). Cal. H&S Code § 11353.6. Section 11353.6, however, does **not** provide a mandatory minimum sentence. *See* Cal. H&S Code § 11353.6(f).

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

6

1   Press Release]; Att. D [2.12.15 USAO Press Release].  There are a number of different ways to

2   define the Tenderloin neighborhood.  SFPD's Tenderloin police district is currently bounded by

3   the area between Geary Street, Powell Street (between Geary and Market), Market Street, 3rd

4   Street, Mission Street, South Van Ness Avenue, Larkin Street (between Market and Golden Gate

5   Ave., and Polk St. (between Golden Gate and Geary).  Ex. 6, Declaration of August Sommerfeld

6   in Support of Motion to Compel Discovery on Selective Prosecution and Enforcement

7   ("Sommerfeld Disco. Mtn. Decl."), Att. A at Ex.02868, 02874 (map of Tenderloin police

8   district).  Prior to July 2015, SFPD's Tenderloin District was bounded by Larkin Street, Geary

9   Street, and Market Street.  *See id.* at Ex.02868-73, 02875 (prior map and SFPD General Order

10  1.02).  Both before and after July 2015, the Northern police district included the area north of

11  Geary Street.  *See id.*  Before July 2015, the border between the Tenderloin and Southern police

12  districts ran along Market Street; it now runs primarily along Mission St.  *See id.*

13          In court proceedings for Operation Safe Schools cases, the USAO has defined the

14  Tenderloin neighborhood as the "area bounded by Geary Blvd., Van Ness Ave., Howard Street,

15  Fifth Street and Powell Street."  Order Setting Conditions of Release as to Matthew Mumphrey

16  [Docket No. 4].  This area encompasses parts of the Tenderloin, Northern and Southern police

17  districts.  *Cf.* Ex. 6, Sommerfeld Disco. Mtn. Decl., Att. A at Ex.02869-73.  Based on the SFPD

18  District boundaries in effect when the incidents underlying the thirty-seven Operation Safe

19  School cases occurred (*i.e.*, 2013-14), thirty-five such defendants were arrested for selling drugs

20  in the Tenderloin District, and two were arrested for selling drugs in the Southern District.  *See*

21  Ex. 6, Sommerfeld Disco. Mtn. Decl., Att. F.  For the purposes of this motion, however, the

22  defense has defined the Tenderloin neighborhood in the same manner as the USAO has defined

23  it in Court:  the area bounded by Geary Street, Van Ness Ave. (south and north of Market Street),

24  Howard Street, Fifth Street and Powell Street.  Based on the foregoing definition of the

25  Tenderloin, the incidents underlying all thirty-seven Operation Safe Schools cases occurred in

26  the Tenderloin.  *See id.*

27

28  NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
    ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
    CASE NO.  CR 14-643 EMC

Further, as illustrated by a map created by the Federal Public Defender's Office ("FPD"), almost every area of the Tenderloin falls within 1,000 feet of a playground or educational institution (elementary, secondary, vocational, and post-secondary) that apparently would be subject to 21 U.S.C. § 860(a).  *See* Ex. 6, Sommerfeld Disco. Mtn. Decl. ¶ 10 & Att. D at Ex.02931 (describing and displaying map that contains pins marking the locations of various playgrounds and educational institutions and 1,000-foot-radii circles drawn around those locations).  The only exception appears to be an approximately one-block-wide area that runs along 8th Street from just north of Mission to Howard Street.  *See id.*

As noted above, the defense mapped the location for each of the incidents underlying the charges against the thirty-seven Operation Safe Schools defendants.  *See* Ex. 6, Sommerfeld Disco. Mtn. Decl., Atts. E & F at Ex.02932-34.  The defense has also created a map displaying the arrest location for all non-Black individuals charged with drug-trafficking crimes in San Francisco Superior Court between January 1, 2013 and February 28, 2015 – as contained in a dataset obtained from the Court Management System ("CMS") for the San Francisco Superior Court.[17]  *See* Ex. 6, Sommerfeld Disco. Mtn. Decl. ¶ 9 & Att. C at Ex.02926-30.  As a comparison of the two maps makes clear, the arrest locations for non-Black individuals charged with drug-trafficking crimes in San Francisco Superior Court are intermingled extensively with the locations of the incidents underlying the charges against the thirty-seven Operation Safe Schools Defendants.

C.    Types and Amounts of Drugs

The focus of Operation Safe Schools was on very low-level street drug dealers.  The drugs sold include cocaine base, heroin, oxycodone, roxicodone and methamphetamine.  Ex. 3, Cruz Disco. Mtn. Decl., Att. A at Ex.02851-52.

The quantity of drugs involved in Operation Safe Schools cases was minimal.  For

---

[17] A description of the CMS dataset is set forth in Section III *infra*.

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

example, of the 2013 Operation Safe Schools cases in which the client was represented by the Federal Public Defender (and thus the defense was able to examine the PSR or the plea agreement), the Base Offense Level used for the natural guideline calculations was the lowest possible level, level 12 - reflecting the lowest possible quantity of drugs (less than 1.4 grams in the case of crack cocaine).[18]  Declaration of Megan Wallstrum In Support Of Notice Of Related Case ("Wallstrum Related Case Decl."), Att. L, ¶ 2, *United States v. Chrystal Anthony*, No. 15cr005 (N.D. Cal. filed 03/31/15) [Docket No. 11-4].  This is also true for the 2014 cases in which sentencing has occurred and for which the FPD is able to examine the PSR.  Ex. 4, Declaration of Megan Wallstrum in Support of Motion to Compel Discovery on Selective Prosecution and Enforcement ("Wallstrum Disco. Mtn. Decl."), ¶ 2, Att. A at Ex.02855.

Typically, drug cases involving this small quantity of drugs are not charged in federal court, and - prior to Operation Safe Schools - rarely charged in the Northern District of California.  Statistics from the United States Sentencing Commission show that nationally only 2.4% of crack offenders had a Base Offense Level of 12 in 2013.  In the Ninth Circuit, that rate was 2.5%.  In the five years preceding Operation Safe Schools, only two people in the Northern District of California, who were sentenced for trafficking in crack cocaine, had base offense levels of 12 (for a rate of 1.2% of offenders).  Phillips Related Case Decl., Att. E.[19]

D.   How the DEA/SFPD Conducted Operation Safe Schools

The facts underlying all the Operation Safe Schools cases are similar.[20]  For the 2013

---

[18] In some of the PSRs, the Base Offense Level was calculated at Level 14 because the two-point increase in § 2D1.2 for selling drugs within 1,000 feet of a protected location was included in the Base Offense Level.  However, the level corresponding to the amount of drugs was always 12. Wallstrum Related Case Decl., ¶2.

[19] In fact, the Central District of California and the District of Columbia have both stated that they generally do not prosecute crack cases involving less than 50 grams of crack.  Phillips Related Case Decl., Att. J at 16.  The Operation Safe School cases which, as explained above, have a Base Offense Level of 12, involve less than 1.4g of crack cocaine.  Wallstrum Related Case Decl., Att. L; U.S.S.G. § 2D1.1.

[20] The reports from the above-captioned Operation Safe Schools cases are appended as Attachment H of the Phillips Related Case Decl.

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

1   sweep, the majority of the cases used an undercover informant named "Jimmy" who bought

2   drugs from targets.  The transactions were recorded using a body camera.  For the 2014 sweep,

3   the DEA/SFPD used video surveillance of the designated target.  In the videos, it appears the

4   officers were stationed on either a nearby rooftop or a building, observing, and video-recording a

5   specific area of the Tenderloin in which drug selling was allegedly occurring.  The officers can

6   oftentimes be heard on the video pointing out the target of the operation.  Declaration of Cary

7   Davalos In Support Or Notice Of Related Case, ("Davalos Related Case Decl."), ¶ 2, *United*

8   *States v. Chrystal Anthony*, No. 15cr005 (N.D. Cal. filed 03/31/15) [Docket No. 11-5].

9   　　　　Once the target of the operation was identified on video, the officers executed one of two

10   approaches.  Either an undercover officer, sometimes wearing a body camera, bought a small

11   amount of narcotics from the target, or the officers videotaped a few apparent hand-to-hand

12   transactions between the target and alleged drug buyers, stopped an alleged buyer soon after an

13   apparent hand-to-hand transaction, and seized illegal narcotics from the buyer.  Davalos Related

14   Case Decl., ¶ 2.  The majority of the targets were not arrested on the day of these operations.

15   Rather, the DEA/SFPD typically made no contact with the targets, but instead arrested them on a

16   later date on federal arrest warrants and brought them directly to federal court.  Declaration of

17   Sheree Cruz-Laucirica In Support of Notice of Related Case ("Cruz Related Case Decl."), ¶4,

18   *United States v. Chrystal Anthony*, No. 15cr005 (N.D. Cal. filed 03/31/15) [Docket 11-3].

19   　　　　E.　　　Officers

20

21   　　　　At least forty-six law enforcement officers were involved in Operation Safe Schools.

22   Thirty-four were SFPD officers and 1 was a Daly City officer; ten were DEA officers, and one

23   was a U.S. Marshal assigned to the DEA.  Declaration of Rob Ultan In Support of Notice Of

24   Related Case ("Ultan Related Case Decl."), ¶¶ 2-3, *United States v. Chrystal Anthony*, No.

25   15cr005 (N.D. Cal. filed 03/31/15) [Docket No. 11-6]; Declaration of August Sommerfeld In

26   Support Of Notice Of Related Case ("Sommerfeld Related Case Decl."), Att. A (graphs showing

27   officer involvement), *United States v. Chrystal Anthony*, No. 15cr005 (N.D. Cal. filed 03/31/15)

28
NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

10

[Docket No. 11-1].  At least some of the SFPD officers involved in Operation Safe Schools were cross-designated as federal agents.  Declaration of Galia Amram Phillips In Support Of Reply to Motion to Preserve Evidence, ("Preservation Reply Decl.") Exs. A-B, *United States v. Chrystal Anthony*, No. 15cr005 (N.D. Cal. Filed 07/13/15) [Docket No. 42]; Phillips Related Case Decl., Att. H.

Most of the Operation Safe Schools cases were generated by the same DEA and SFPD officers.  For example, seven officers were involved in at least twenty of the thirty-seven cases.  One officer was involved in thirty of the thirty-seven cases, while a second officer was involved in twenty-nine cases.  Ultan Related Case Decl., ¶¶ 2-3; Sommerfeld Related Case Decl., Att. A.

F.    Standards for Prosecution

On July 16, 2015, the U.S. Attorney's Office filed declarations from five Assistant United States Attorneys ("AUSAs") regarding the charging criteria and process for Operation Safe Schools.  The government stated that "Operation Safe Schools grew out of [the prosecutor who initiated the Operation's] long-term familiarity with the Tenderloin, its residents, and the drug dealing that occurred there."  United States' Motion Seeking Ruling On Defendants' Claim That The Government Engaged In Selective Enforcement and Prosecution at 6:14-16 ("Mtn. Seeking Ruling.") [Docket No. 51].  The government said they told law enforcement to "target recidivist, repeat offenders who were selling drugs near schools and to concentrate on the criminal history of the defendants."  *Id.* at 6:20-22.

The government further claims that the two supervisory AUSAs were not aware of the race of any defendant before authorizing prosecution.  *Id.* at 7:1-6.  AUSA Hasib, who initiated Operation Safe Schools, says he too did "not know of the race of most of the defendants prosecuted in Operation Safe Schools."  *Id.* at 6:18-19.  However the rap sheet – and often the police incident report – state the race of the defendant.  *See* Phillips Related Case Decl., Attachment H (police reports of Operation Safe Schools defendants); Ex. 41, Declaration of Galia Amram Phillips in Support of Motion to Compel Discovery on Selective Prosecution and

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION CASE NO.  CR 14-643 EMC

11

Enforcement ("Amram Disco. Mtn. Decl."), Att. A at Ex.03094-04144.

The two line AUSAs for the 2014 sweep, Sarah Hawkins and Lloyd Farnham, do not claim that were unaware of the race of the defendants before prosecuting them.  Declaration of Sarah Hawkins In Support Of United States' Motion ("Hawkins Decl.") [Docket No. 51-1]; Declaration of Lloyd Farnham In Support Of United States' Motion ("Farnham Decl.") [Docket No. 51-2].  The Government did not provide declarations for the line AUSAs from the 2013 sweep.  Moreover, the line AUSAs who brought the cases in the 2014 sweep declare that for each of the cases they brought, they were "provided an account of the individual's conduct memorialized in a Drug Enforcement Administration Form 6, surveillance video of the drug buys taken by the San Francisco Police Department, and the criminal history of each defendant."  Hawkins Decl., ¶ 5; Farnham Decl., ¶ 5.

G.    Criminal History of Operation Safe School Defendants

The criminal history of the thirty-seven Operation Safe School defendants is a wide range.  While there are certainly defendants with substantial criminal history, others have minimal criminal history.[21]  Jahnai Carter has no adult criminal convictions.  Ex. 41, Amram Disco. Mtn. Decl., ¶¶ 2-4.   Darlene Rouse has one adult conviction, for misdemeanor petty theft, for which she got a fine and possibly one day in jail.  *Id.* at Att. A, Ex.03416; Ex. 2, Ultan Disco. Mtn. Decl., ¶ 2, Att. A at Ex.02234-43.  William Brown and Ashley Pharr both have one prior drug-trafficking conviction, but they are out of Alameda County, not the Tenderloin.  *Id.* at Ex.04134-44, Ex.03094-3105.  Darrell Powell has criminal history, but none of it is for drug trafficking.  *Id.* at Ex.03383-03407.  Matthew Mumphrey has one prior drug-trafficking

---

[21] All of the Operation Safe Schools defendants' rap sheets in possession of the Office of the Federal Public Defender are attached as Att. A to the Amram Disco. Mtn. Declaration (Exhibit 41).   Attachment A to the Ultan Disco. Mtn. Declaration (Exhibit 2) is a chart summarizing their criminal history.

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION CASE NO.  CR 14-643 EMC

12

conviction, for which he received six months in jail, but it is thirteen years old.  His only other

conviction is eight years old, and it is for possession of an opium pipe.  *Id.* at Ex.03739-64.

Jamella Jules falls within Criminal History Category (CHC) II of the U.S. Sentencing

Guidelines, with only one prior drug trafficking conviction from 2002.  *Id.* at Ex.03548-91.

Shavon Gibson is CHC I, with only one prior conviction of any kind, a drug-trafficking

conviction from 2005.  *Id.* at Ex.03969-95.  Shaneka Clay is CHC II based on one prior drug-

trafficking conviction from 2002 (a 1998 conviction was too old to count).  *Id.* at Ex.03937-68.

## II.     Racial Demographics of Drug Traffickers in the Tenderloin

### A.     Needle Exchange Survey

In the spring of 2015, two experts hired by the Federal Public Defender's Office, Sheigla

Murphy[22] and Katherine Beckett[23] designed a survey to be administered to active drug users

accessing services in the Tenderloin.  The surveys were administered at the Tenderloin Needle

Exchange site of the San Francisco AIDS Foundation's Needle Exchange Program with the help

and supervision of Lisa Morelli, Tenderloin Site Coordinator.  The site provides needle exchange

supplies as well as equipment used by crack-smoking clients.  A variety of services are also

offered at the site.  Dr. Murphy was responsible for training surveyors to conduct the survey and

supervised the administration of survey for the first three weeks of data collection.  Ex. 41,

---

[22] Dr. Sheigla Murphy is the Director of the Center for Substance Abuse Studies for the Institute for Scientific Analysis in San Francisco.  She received her B.A. from San Francisco State University in Interdisciplinary Social Sciences, and received her Ph.D. in Medical Sociology from the University of California, San Francisco. She has received over 25 research grants and published several books and numerous articles on sociological aspects of drug use.  *See* Ex. 41, Amram Disco. Mtn. Decl., Att. M at Ex.04194-04211.

[23] Dr. Katherine Beckett is a professor in the Law, Societies & Justice Program and Department of Sociology at the University of Washington in Seattle.  She received her B.A. degree from University of California, San Diego, and earned a Master's Degree and her Ph.D. from the University of California, Los Angeles.  She has taught at the University of Washington since 2000, and previously taught in several other undergraduate programs around the country. Dr. Beckett has also published books and numerous articles regarding sociological aspects of crime and punishment.  *See* Ex. 41, Amram Disco. Mtn. Decl., Att. L at Ex.04177-92.

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION CASE NO.  CR 14-643 EMC

13

1   Amram Disco. Mtn. Decl., Att. M at Ex.04216.

2       The survey was conducted on seven consecutive weeks and was administered by research

3   assistants currently assisting Dr. Murphy with other ongoing research projects.  Nicholas Lau,

4   Sye Ok Sato, Fiona Murphy, and Sheigla Averill were trained extensively in human subject

5   protections prior to conducting these surveys and were trained specifically for the Tenderloin

6   needle exchange surveys by Dr. Murphy.  *Id.*  The purpose of the survey was to acquire

7   additional information regarding the race/ethnicity of those who buy and sell illicit substances in

8   the Tenderloin neighborhood.  In the survey, respondents were asked to recall up to six recent

9   drug transactions that took place in the Tenderloin neighborhood and to identify the

10  race/ethnicity of the person from whom they obtained those drugs.  Respondents were allowed to

11  identify up to three racial categories for each drug seller.  If the respondent identified either the

12  first or second race of a drug dealer as "black," that dealer was included in the Black category.

13  In total, survey respondents provided information about 440 drug transactions.  FPD staff then

14  mapped each intersection/location provided by the respondents to verify that the reported drug

15  transaction described occurred in the Tenderloin neighborhood.  Through this process, fifteen

16  surveys were excluded from the analysis.  *Id.* at Ex.04217.

17      The data analysis showed that fifty-six percent of the Tenderloin drug transactions

18  identified by survey respondents involved Black drug sellers.  One-fifth (20%) of these drug

19  transactions involved Latino drug sellers and about one in six (16.8%) involved White drug

20  sellers.  Because 100% of Operation Safe School defendants are Black, this results in a Z-score

21  of 13.7%.[24]  *Id.* at Ex.04221.  As a result, Dr. Beckett concludes:  "Statistical analyses indicates

22  _____

[24] Conventionally, social scientists consider a difference between two proportions to be
statistically significant if there is a 5 percent or smaller probability that the observed difference is
23  the result of chance.  To measure the statistical significance of such differences, researchers often
calculate a Z score that can be translated into a probability.  Z scores are an appropriate measure
24  of the statistical significance of differences between means when the sample sizes are large (*i.e.*,
over 30).  The formula used to calculate Z scores takes into account both the magnitude of the
25  difference between proportions and the sample size.  Amram Disco. Mtn . Decl., Att. M at
Ex.04217.  Z scores with an absolute value of 2 or more are considered statistically significant,
26  meaning that the observed difference is very unlikely to be the result of chance.  *Id.* at Ex.04219.

27

28  NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

14

that these differences are highly statistically significant and extremely unlikely to be the product of chance." *Id.* at Ex.04222.

B.     Interviews of Tenderloin Community Members

The results of the Needle Exchange Survey are consistent with declarations from people who work and live in the Tenderloin.  Leo Martinez is the Albert Abramson Professor of Law at U.C. Hastings College of Law, where he has been employed since 1985.  Ex. 25, Declaration of Leo Martinez, ¶ 1 [Ex.03013-19].  Prior to joining U.C. Hastings, Professor Martinez served his country as both a member of the U.S. Army JAG Corps and as an AUSA.  *Id.* at ¶ 2.  From his current office, Professor Martinez has windows facing out on Golden Gate Avenue and its intersection with Hyde Street.  *Id.* at ¶ 6-7.  Based upon his observations, "the races of those engaged in what appears to be drug activity on this corner are two-thirds African American and one-third Hispanic.  This has remained pretty much constant over the years of my observations." *Id.* at ¶ 8.  Professor Martinez has also noticed San Francisco Police Department officers in the hallway outside of his current office location (and on a few occasions they have used his office) looking through the windows in the direction of the drug sales activity occurring on the northwestern corner of Golden Gate Avenue and Hyde streets.  *Id.* at ¶ 9.

Arthur Sandoval is a security guard at this federal courthouse at 450 Golden Gate Ave., and at 50 U.N. Plaza, where the majority of his shifts take place.  As part of his job, he walks around the perimeter of the building to ensure that it is safe and secure.  The building is in close proximity to Civic Center BART station and U.C. Hastings College of the Law.  Mr. Sandoval has observed substantial drug trafficking occur directly in front of, and around, 50 U.N. Plaza.  "The drug trafficking is constant there."  Ex. 26, Declaration of Arthur Sandoval, ¶¶ 1-3 (Ex.03020-25).  Based on his own observations while working at 50 U.N. Plaza:

> the vast majority of drug dealers in the area are Hispanic.  They've dominated the drug trafficking there for the entirety of the time that I have worked at this location.  In addition, Hispanics appear to dominate the drug trafficking within a three to four block radius of the federal building.  The majority of these drug

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

15

> dealers are young and consist of both men and women.  Some of them appear
> organized in that they work in pairs and they use the physical landscape such as
> bushes to hide their drugs in.  I have also observed drug dealers conceal narcotics
> inside of their mouths.  Crack cocaine is one of the more popular drugs that is
> sold there.… The San Francisco Police Department is aware of the drug
> trafficking that takes place near 50 UN Plaza.  They conduct surveillance of the
> drug trafficking from inside the building.  They have access to a room that is
> located on the first floor.  The room has two large windows with a clear view of
> the courtyard that is directly in front of the building.  The courtyard is where the
> majority of the drug trafficking takes place near the building.

*Id.* at ¶¶ 4-5.

Paul Harkin is the program manager for GLIDE Health Services HIV and Hepatitis C programs.  He has worked in the Tenderloin for fifteen years.  As part of his job, he runs street outreach in the Tenderloin, checking on participants and offering sterile syringes.  Ex. 32, Declaration of Paul Harkin, ¶¶ 1-3 (No. Ex.03047-52).  He declares that "there has always been, and continues to be, a diversity in the racial and ethnic makeups of the persons I have witnessed dealing controlled substances in the Tenderloin.  Some are white, some black, some Latino, some Asian and some Pacific Islanders."  *Id.* at ¶ 5.  Moreover, Harkin has "found that drug dealers of the same ethnic group tend to work the same areas of the Tenderloin.  For example, most recently, Leavenworth has Honduran and Mexican drug dealers, Golden Gate Avenue has Whites and African Americans above Jones Street and just African Americans at Jones Street and below, and Hyde Street has Mexicans regularly dealing there."  *Id.* at ¶ 7.

Deanna Brown has worked in the Tenderloin for over ten years.  She currently works at the Elk Hotel at 670 Eddy Street.  Ex. 27, Declaration of Deanna Brown, ¶ 1 (Ex.03026-28).  She states:

> While employed at the Elk Hotel, I have observed substantial drug trafficking
> activity in front of and near the hotel.  Specifically, for the past five years or
> more, I have witnessed Latino men and women sell drugs in front of and near the
> hotel on a daily basis … The Latino men and women who sell drugs near the Elk
> Hotel appear to be organized in shifts.  That is, during the day time, there is a
> particular group of seven to eight males and three to four women that sell drugs in
> front of and near the hotel.  Towards the evening, a different group of
> approximately twelve males and two females replaces that day time group and

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

16

continue to engage in drug trafficking.  I have also witnessed at least two Caucasian individuals regularly sell methamphetamine to white patrons or residents of the Elk Hotel.  I have contacted the San Francisco Police Department on numerous occasions to report drug activity in front of the Elk Hotel, because hotel management understandably does not want drug activity to occur in front of or near the premises. Because the Elk hotel has a video surveillance system focused on Eddy Street, I have regularly been able to witness drug trafficking activity and safely report it to the San Francisco Police Department. In the past, I have asked the various Latino drug dealers to please move away from the Elk Hotel and to sell their drugs elsewhere. In response to this and my repeated telephone calls to the police, condiments and trash was placed or thrown on my car.  The drug activity and race of persons who sell drugs near the Elk Hotel has not changed significantly since the fall of 2013. Latino drug dealers have dominated the drug trafficking in that area for the entirety of the time that I have worked at the Elk Hotel.

Ex. 27, Declaration of Deanna Brown, ¶¶ 2-7.

Tabitha Allen has been employed at the Tenderloin Housing Clinic (THC) in San Francisco, California since 2009, where she is currently the Director of Programs at THC. Initially, she worked at THC's office at 398 Eddy Street but in 2001, she moved to working in THC's office space at 449 Turk Street.  Ex. 28, Declaration of Tabitha Allen, ¶¶ 2-6 (Ex.03029-33).  She declares:

Throughout my many years in the Tenderloin I have observed that there are different racial groups involved in the local drug trade.  They do not mix with one another, often African American dealers control one block while Hispanic dealers control another.

While working at THC's Eddy Street office I typically walked up from the BART station via Leavenworth Street.  During my walk up Leavenworth I was aware that drug dealers were selling drugs.  These blocks were primarily occupied by African American people selling drugs.

When I moved to THC's Turk Street location in 2011 I began walking up Hyde Street to get to work.  There are a lot of Hispanic dealers on the blocks between BART and Turk Street.

THC has managed the Edgeworth Hotel on O'Farrell Street since 2013.  We have managed the Elk Hotel at Polk Street since 2006.  During my time at THC, Hispanic dealers have been present in both these areas.

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

17

> Enforcement of the drug trade in the Tenderloin varies based on who is placing pressure on the police.  THC has tried to build good relationships with the police in order to receive attention when we need policing in front of our buildings.  Typically, they will be responsive and present for a week or some period of time, until things return to normal and then we ask for help again.

Ex. 28, Declaration of Tabitha Allen, ¶¶ 2-6.

## III.    Racial Demographics of Tenderloin Drug Traffickers Charged in State Court

In addition to analyzing the needle exchange survey discussed at section II.A *supra*, Dr. Beckett analyzed charging data from San Francisco County Superior Court with respect to drug-trafficking crimes between January 1, 2013 and February 28, 2015.  The data Dr. Beckett analyzed was provided by the FPD, which obtained the data from the Court Management System ("CMS") for the San Francisco County Superior Court.  The CMS is a database which serves as the repository for all data related to the processing of criminal cases, filed in San Francisco County Superior Court, from the time of arrest until the time of disposition.  Ex. 40, Declaration of William Roth ("Roth Decl.") ¶ 1 at Ex.03084-88.  Among other things, the CMS includes data regarding the race of each defendant.  *See id.* ¶ 3.  With the sponsorship of the San Francisco Public Defender's Office, the FPD requested a CMS report/spreadsheet listing drug-trafficking cases charged in San Francisco (citywide) between January 2009 and April 2015.  *Id.* ¶ 4-5; Ex. 1, Koeninger Disco. Mtn. Decl. ¶ 6.  For purposes of the report/spreadsheet, the FPD defined "drug-trafficking case" as any case charging any of the following code sections:

- California Health & Safety Code section 11351
- California Health & Safety Code section 11351.5
- California Health & Safety Code section 11352
- California Health & Safety Code section 11358
- California Health & Safety Code section 11359
- California Health & Safety Code section 11360
- California Health & Safety Code section 11375

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION CASE NO.  CR 14-643 EMC

18

- California Health & Safety Code section 11378
- California Health & Safety Code section 11378.5
- California Health & Safety Code section 11379

Ex. 40, Roth Decl. ¶ 4; Ex. 1, Koeninger Disco. Mtn. Decl. ¶ 6.  These code sections prohibit trafficking of various controlled substances, including possession of a controlled substance for sale.  The CMS report/spreadsheet requested by the FPD also included data, for each case, regarding the following:

- Court Number
- Arrest Date
- Arrest Location
- SFPD Incident Number
- Defendant's Name
- Defendant's Race
- Filed Charge
- Current Charge

Ex. 40, Roth Decl. ¶ 4; Ex. 1, Koeninger Disco. Mtn. Decl. ¶ 6.

The FPD received the completed CMS report/spreadsheet in September 2015.  *See* Ex. 40, Roth Decl. ¶ 5; Ex. 1, Koeninger Disco. Mtn. Decl. ¶ 7.  In order to combine the CMS data with important information about the arrests underlying each drug-trafficking case reflected therein, FPD staff obtained SFPD incident data from the City of San Francisco's "SF OpenData" website, which is self-described as "the central clearinghouse for data published by the City and County of San Francisco."[25]  *See* Ex. 6, Sommerfeld Disco. Mtn. ¶ 4.   FPD staff downloaded data regarding all drug/narcotic incidents that occurred between January 1, 2013 and February 28, 2015; included in the downloaded data was the SFPD incident number for each incident, as

---

[25] *See* https://data.sfgov.org/ (lasted visited November 25, 2015)

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

19

well as its geographic coordinates.  *See id.* ¶¶ 4-6.  Using software designed for statistical

analysis (SPSS), FPD staff then used the SFPD incident number to merge the CMS data and the

SFPD incident data.  *See id.*

        After merging these datasets, FPD staff first removed from the CMS data all cases that

were not associated with incidents occurring between January 1, 2013 and February 28, 2015

(because unlike the data downloaded from the SF OpenData website, the CMS data was not

limited to these dates).  *Id.* ¶ 7.  Next, to isolate cases that stemmed from incidents that took

place in the Tenderloin neighborhood, FPD staff removed all data entries that fell outside of the

relevant geographic coordinates (using the northernmost, easternmost, southernmost and

westernmost points of the Tenderloin).[26]  *See id.* (detailing this process).  FPD staff then

imported the resulting dataset into a computer program named Tableau, which allowed the FPD

to see each data point on a map (and, therefore, in relation to Tenderloin street boundaries).  *See*

*id.*  FPD staff manually eliminated any data point that fell outside of the street boundaries of the

Tenderloin.  *Id.*  Finally, FPD staff identified 248 entries contained in the CMS data that did not

have a corresponding match in the SF OpenData (and, therefore, were not paired with the

geographic-coordinate data from the SF OpenData website).  *See id.* ¶ 8.  However, the CMS

data did contain arrest-location data; using this data, FPD staff manually researched the arrest

location for each of the 248 entries using Google Maps.  *Id.*  If the arrest location fell within the

geographic area of the Tenderloin (as defined above), that case was retained.  *See id.*

        The result of the foregoing was a dataset that included information regarding CMS drug-

trafficking cases that were: (a) charged in San Francisco Superior Court between January 1, 2013

and February 28, 2015; and (b) based on SFPD incidents that occurred in the Tenderloin.  This

dataset/spreadsheet of CMS data was provided to Dr. Beckett, who analyzed the data.  *See* Ex. 1,

---

[26] For the reasons explained *supra* at Background Section I.B, FPD staff defined the
"Tenderloin" as the area bounded by the following: Van Ness Avenue (north and south of
Market Street); Geary Boulevard; Powell Street; 5th Street; and Howard Street. FPD staff used
Google maps to find the northern, southern, western, and eastern most points of the above-
described boundaries (37.787924, 37.770202, -122.422042, -122.404582).

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

20

1    2013 and February 28, 2015.  *Id.*  A discussion of Dr. Beckett's analysis follows.

2        The racial categories employed by the CMS data include: Black, White, Japanese,

3    Chinese, Mexican, Filipino, Other and Unknown.  *Id.*; *see also* Ex. 40, Roth Decl. ¶ 3 at

4    Ex.03084-88 (describing common race codes contained in CMS).  The race of the suspect was

5    not identified (i.e. unknown) in a non-trivial number of arrests (56, or 6.9% of all arrests).  Ex.

6    41, Amram Disco. Mtn. Decl., Att. M at Ex.04215.  In order to identify Hispanics that were

7    racially classified as White, Other or Unknown, Dr. Beckett employed Hispanic Surname

8    Analysis (HAS) to estimate the proportion of SFPD arrestees in these racial categories who

9    identify as Latino.  This program utilizes the U.S. Census Spanish Surname database and assigns

10   a numeric value between 0 and 1 to all surnames in that database.  These numeric values

11   represent the probability that a given surname corresponds to persons who identified themselves

12   as Hispanic/Latino in the 1990 U.S. Census.[27]  The list used to identify defendants of Hispanic

13   origin here contains 12,497 different Spanish surnames that are classified by the Census Bureau

14   as "Heavily Hispanic."  The resulting Latino category includes two groups of people: 1) people

15   who were racially classified by SFPD as Mexican; and 2) people who were racially identified as

16   White, Other, or unknown, but were identified as Hispanic through HSA.  *Id.*

17       Data analysis indicates that a majority (61.4%) of those arrested in the Tenderloin in the

18   relevant time period and subsequently charged in Superior Court with drug trafficking are Black.

19   Approximately one-fourth (24.7%) of these arrestees were Latino, and just over one in ten (10.7

20   percent) were White.  Thus, while approximately six of ten arrestees charged with drug

21   trafficking in San Francisco County Superior Court were Black, all of those arrested through

22   Operation Safe Schools and facing federal charges were Black.  Table 1 below assesses the

23   statistical significance of this difference in proportions.

24   //

25   ─────────────────────
     [27] Word, David L., & R. Colby Perkins Jr., BUILDING A SPANISH SURNAME LIST FOR THE 1990S
26   (A NEW APPROACH TO AN OLD PROBLEM), Technical Working Paper No.13. Washington, D.C.:
     Population Division, U.S. Census Bureau, 1996.
27

28   NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
     ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
     CASE NO.  CR 14-643 EMC

| Table 1. Statistical Significance of Difference between the Proportion of Operation Safe Schools Arrestees and SFPD Arrestees Charged in Superior Court who are Black | | | |
|---|---|---|---|
| | Operation Safe School Arrestees | SFPD Arrestees Charged in Superior Court | Absolute Difference in Percent Black | **Z-Score** |
| Black Proportion | 100% (37/37) | 61.4% (489/796) | 38.6% (100%-61.4%) | **17.5\*** |

*Indicates a statistically significant disparity (Z>2 or Z<-2).

Beckett explained that Z scores with an absolute value of 2 or more are considered statistically significant, meaning that the observed difference is very unlikely to be the result of chance. The Z –Score shown in Table 1. (17.5) means that the difference in the proportion of Operation Safe School and Superior Court drug trafficking arrestees who are Black is highly statistically significant, and that there is virtually no chance that this difference is the result of chance. *Id.* at Ex.04217-19.

## IV.     Law Enforcement Knowledge of Non-Black Drug Traffickers in the Tenderloin

In addition to the above-discussed evidence demonstrating the racial diversity of drug traffickers in the Tenderloin, there is substantial evidence that SFPD was aware of the consistent presence of non-Black drug traffickers in the Tenderloin. This is particularly true with respect to Hispanic/Latino drug traffickers. Indeed, various incident reports obtained by the FPD demonstrate SFPD's particular awareness of the presence, behavior, and specific geographic locations frequented by Hispanic/Latino dealers.

For example, multiple SFPD incident reports describe drug-trafficking along Hyde Street as generally controlled by Hispanic dealers. As explained by one officer working an April 2013 plainclothes detail in "the 200 block of Hyde Street":

> I have participated in hundreds of buys [sic] busts and surveillances in this area. I know that many of the drug dealers in the Hyde Street area are of Honduran descent. I have seen the described behavior hundreds of times. I know the drug dealers in the area keep the dope in their mouth in order to conceal and protect it.

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION CASE NO.  CR 14-643 EMC

22

Ex. 1, Koeninger Disco. Mtn. Decl., Att. D at Ex.00773.  *See also id.* at Ex.00736 (officer reporting in April 2015 that "[b]ased off prior arrests and contacts, I know that the corner of Eddy Street and Hyde Street is primarily controlled by Honduran national drug dealers").

While describing his September 2013 investigation of a "group of five Hispanic men" standing at the corner of  Eddy and Hyde Streets, another SFPD officer described the area as follows:

> Over the last three years I have personally witnessed numerous Hispanic individuals that stand on that street corner for hours at a time.  I have personally witnessed the same individuals stand on that street corner from the time I start work at 2100 hrs and the same individuals are there at 0400 hrs in the morning.  I have directed Tenderloin officers to focus their attention on the drug dealers on that corner and the officers have made numerous drug arrests there.

Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00539.

The corner of Golden Gate Avenue and Hyde Streets was similarly known to SFPD for the presence of Hispanic drug dealers.  As one officer explained in August 2014:

> I responded to the area of Golden Gate and Hyde St. on a report of multiple drug dealers in the area.  Tenderloin Police Station receives several complaints everyday [sic] regarding narcotics sales and use in this area.  Officer Celis and I have made multiple arrests in this area for narcotics sales in specific to [sic] base rock cocaine.  Officer Celis and I have also spoken to multiple business owners and residents in the area who have complained that they feel threatened by Latin drug dealers who blatantly sell "Crack" on the streets.

*Id.* at Ex.00272.  Hispanic drug dealers were known to frequent other nearby areas, too:

> We traveled by a donut store located on the northeast corner of Golden Gate Avenue and Larkin Street. The area of Golden Gate Avenue and Larkin Street is an area that is well known for narcotics sales. Northern Station receives numerous complaints regarding Hispanic males selling crack cocaine on Golden Gate Avenue between Polk Street and Van Ness Avenue.  Officer Peterson and I have seen many of the suspected narcotics dealers loitering inside the donut shop located on the northeast corner of Golden Gate Avenue and Larkin Street.

Ex. 41, Amram Disco. Mtn. Decl., Att. O at Ex.04267.  *See also* Ex. 1, Koeninger Disco. Mtn.

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

23

Decl., Att. A at Ex.00643-44 (officer detailing narcotics surveillance at Civic Center Plaza focusing on "several Latin males who all appeared to know each other and pace back and forth along the sidewalk").

In addition to incident-report references to Hispanic drug traffickers in the Tenderloin, it is beyond dispute that SFPD was generally aware of the presence non-Black drug traffickers in this area.  Based on the CMS data described above, the FPD has identified hundreds of Superior Court cases that involve non-Black individuals who were arrested for drug-trafficking crimes in the Tenderloin between January 2013 and February 2015 (and subsequently charged in Superior Court).  *See* Ex. 1, Koeninger Disco. Mtn. Decl., Att. G at Ex.02210-31.  Via public records requests, the FPD also obtained numerous SFPD incident reports detailing the arrest of non-Black individuals for drug-trafficking crimes in the Tenderloin in 2013 and 2014 – a significant number of whose arrests did not result in Superior Court charges.  *Cf. id. with* Ex. 1, Koeninger Disco. Mtn. Decl., Att. B.  This data, obtained from criminal-justice-related entities in San Francisco, shows that the presence of non-Black drug-traffickers in the Tenderloin is anything but an anomaly.

**V.      Law Enforcement Interaction With, and Arrests of, Non-Black Drug Traffickers in the Tenderloin**

In light of the substantial evidence demonstrating the consistent and established presence of non-Black drug traffickers in the Tenderloin, it is unsurprising that SFPD arrested numerous non-Black persons for committing drug-trafficking crimes in the Tenderloin in recent years. Indeed, focusing on the time-period between January 1, 2013 and February 28, 2015, defense counsel has identified hundreds of such drug-trafficking arrests made by SFPD.  First, the CMS data obtained by the FPD identifies more than 300 instances in which a non-Black individual was charged with a drug-trafficking crime in San Francisco Superior Court (along with

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION CASE NO.  CR 14-643 EMC

24

1    corresponding arrest dates and the SFPD incident numbers underlying those criminal cases).  *See*

2    Ex. 1, Koeninger Disco. Mtn. Decl. ¶¶ 9-10 & Att. G.  Second, through public records requests

3    directed at SFPD, the defense obtained incident reports detailing more than 100 instances in

4    which non-Black individuals were arrested for drug-trafficking crimes in the Tenderloin.  *See*

5    Ex. 1, Koeninger Disco Mtn. Decl. ¶¶ 2-4, Att. A-C.  At least fifty of these incidents did not

6    result in Superior Court charges (as reflected in the CMS data).  *Compare* "Name" and "Incident

7    Number" reflected in Ex. 1, Koeninger Disco. Mtn. Decl., Att. B *with* "Defendant Name" and

8    "Incident Number" reflected in Ex. 1, Koeninger Disco. Mtn. Decl., Att. G.[28]

9           As discussed in the Argument section *infra*, the defense contends that all of these non-

10   Black, Tenderloin-based drug traffickers constitute "similarly situated" persons for purposes of

11   the constitutional guarantee of equal protection.  Nevertheless, to illustrate the disparate

12   treatment experienced by the thirty-seven Operation Safe Schools defendants, the defense has

13   selected approximately forty non-Black, Tenderloin-based drug traffickers for a more detailed

14   discussion here.  Many of these individuals have extensive histories of drug-trafficking in the

15   Tenderloin (and San Francisco generally) and/or were well-known to SFPD officers in the area.

16   Moreover, in numerous instances, the investigating SFPD officers actually made specific

17   reference to the fact that the drug transactions at issue occurred in close proximity to a school or

18   children's recreation center.[29]  *See, e.g.,* discussion of Doe-1, Doe-2, Doe-7, Doe-10, Doe-20,

19   Doe-21, Doe-22 *infra* and in Introduction *supra*.  Of course, none of these non-Black drug

---

20   [28] There is good reason to believe that additional public records requests to SFPD would reveal
21   additional incidents in which non-Black individuals were arrested for drug trafficking in the
     Tenderloin.  This is because the FPD's initial public records request was limited to those
22   incidents identified by the SF OpenData website as involving the Tenderloin police district.  Ex.
     1, Koeninger Disco. Mtn. Decl. ¶ 2.  However, the geographic area of the Tenderloin is larger
23   than the SFPD District.  *See* Ex. 6, Sommerfeld Disco. Mtn. Decl. ¶ 3 & Att. A.  The FPD's
     public records request was also limited by timeframe (August-to-December 2013 and August-to-
24   December 2014).

     [29] While some incident reports actually discuss a transaction's proximity to a school, nearly
25   every portion of the Tenderloin in which the various non-Black drug traffickers were arrested
     falls within 1,000 feet a playground or educational institution covered by 21 U.S.C. § 860.  *See*
26   Ex. 6, Sommerfeld Disco. Mtn. Decl. ¶ 10 & Att. D.

27

28   NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
     ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
     CASE NO.  CR 14-643 EMC

traffickers were charged federally under Operation Safe Schools.

A.   John Doe-1

As detailed in the Introduction, *supra*, the December 5, 2014 arrest of ███████████
("John Doe-1") was not the first time that SFPD had arrested Doe-1 for selling crack cocaine in
the Tenderloin.  Just three months earlier, on September 10, 2014, SFPD officers arrested Doe-1
after observing him sell crack cocaine to at least three different people near the corner of Hyde
Street and Golden Gate Avenue.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00489.
Further, the officers who arrested Doe-1 that day "recognized [Doe-1] from a prior Base Cocaine
Sales arrest" from March 2013.  *Id.*  Indeed, after booking Doe-1 at Tenderloin Station, the
officers' "further investigation showed" that Doe-1 had an outstanding warrant based on a prior
drug sales violation under H&S Code section 11352.  *Id.*

B.   John Doe-2

SFPD's December 5, 2014 arrest of █████████████████████████
█████████████ ("John Doe-2") – discussed above in the Introduction – represented
one of the more recent[30] in Doe's lengthy history of drug-trafficking crimes in the Tenderloin.
When arrested in December 2014, Doe-2 had an open court case related to his May 27, 2014
drug-trafficking arrest at 101 Hyde Street.  *Id.* at Ex.00427.  On that occasion, an SFPD officer
engaged in a "buy bust" operation approached an "unknown latin male" (Doe-2) and purchased
crack cocaine from him.  Ex. 41, Amram Disco. Mtn., Att. O at Ex.04243.  During booking,
officers discovered that Doe-2 "was on active probation . . . for selling narcotics" based on a
2010 conviction under H&S Code section 11352.  *Id.*  Doe-2 was later charged under H&S Code

---

[30] Doe-2 was arrested again on July 3, 2015, after officers encountered him and discovered he
had "three active felony warrants."  *Id.* at Ex.00430.

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

26

sections 11351.5 and 11352(a).  Ex. 2, Ultan Disco. Mtn. Decl., Att. B at Ex.02529.

The incident underlying Doe-2's 2010 conviction also took place in the Tenderloin.

Specifically, on June 29, 2010, SFPD officers conducting a "buy bust" operation saw Doe-2

engage in a hand-to-hand narcotics transaction at 370 Turk Street.  Ex. 41, Amram Disco. Mtn.

Att. O at Ex.04234.  An undercover officer then approached Doe-2 and bought a rock of crack

cocaine from him.  *Id.*  Doe-2 was subsequently charged in Superior Court with violating H&S

Code section 11352(a).  Ex. 2, Ultan Disco. Mtn. Decl., Att. B at Ex.02538.  The felony

complaint also alleged that Doe-2 committed the offense after a prior section 11352(a)

conviction from March 2009.  *Id.*

The incident which lead to Doe-2's 2009 drug-trafficking conviction also occurred in the

Tenderloin – specifically, at 416 Turk Street on March 11, 2009.  Ex. 1, Koeninger Disco. Mtn.

Decl., Att. F at Ex.02209.1; Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00427.  Based on

that arrest, Doe-2 was charged with violating H&S Code section 11352(a).  Ex. 2, Ultan Disco.

Mtn. Decl., Att. B at Ex.02550-01.  Doe-2 subsequently pleaded guilty to a felony violation of

section 11352(a).  *Id.* at Ex.02548.

C.    John Doe-3

SFPD officers arrested "a white male named ████████████ ("John Doe-3") in

November 2013 and December 2014.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00357;

*see also id.* at Ex.00185-00194; Ex.00349-00358.  Both arrests occurred in the Tenderloin (284

Golden Gate Avenue and the corner of Hyde and Fulton Streets, respectively).  *Id.* at Ex.00185-

00194; Ex.00349-00358.  On both occasions, Doe-3 was found in possession of a substantial

amount of methamphetamine.  *Id.* at Ex.00185-00194; Ex.00349-00358.

The first arrest occurred on November 3, 2013.  *Id.* at Ex.00185.  Leading up to that

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

27

incident, officers had received a tip that Doe-3 "was staying at the Earle Hotel" and "was selling a large amount of methamphetamine." *Id*. at Ex.00192. The officers "knew [Doe-3] from prior methamphetamine investigations" and learned that he was on "CDC parole" for a previous conviction under section "11378 H&S (Possession for Sales of a Controlled Substance)." *Id*. Additionally, the officers learned that Doe-3 was "on felony probation out of San Francisco for 11378 H&S . . . with a warrantless search and seizure condition." *Id*. The officers traveled to 284 Golden Gate Avenue, confirmed that Doe-3 was staying at the Earle Hotel, and went to his room to "conduct a probation/parole search." *Id*. During their search, officers discovered: 263.4 grams (gross) of methamphetamine; 4.3 grams (gross) of "MDMA/Ecstasy"; unknown miscellaneous pills; sandwich bags; a digital scale; two cell phones; and $6,728. *Id*. at Ex.00187-00193. Doe-3 was booked and later charged in Superior Court with violating H&S Code sections 11366 and 11378. Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02159.

Doe-3's second arrest occurred approximately one year later on December 18, 2014. Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00349-00358. SFPD had again received a tip that Doe-3 "was selling methamphetamine in the city and county of San Francisco," and a records check revealed that he was "on PRCS [post release community supervision]" with a warrantless search condition "for the possession for sales of methamphetamine." *Id*. at Ex.00357. From an address in the Bayview, undercover officers followed Doe-3 as he boarded a MUNI train and traveled to the Civic Center. *Id*. Officers then detained Doe-3 at Hyde and Fulton Streets, searched his backpack, and found: 53.3 grams (gross) of methamphetamine; plastic baggies; and a digital scale. *Id*. At that time, Doe-3 told officers that he had additional methamphetamine in a "black case" at the residence where he was staying. *Id*. After obtaining a warrant, officers went to the residence, searched the black case, and found an additional 38.5 grams (gross) of methamphetamine, packaging materials, and $4,980. *Id*. at Ex.00357-00358. Based on this arrest, Doe-3 was again charged in Superior Court with violating H&S Code sections 11366 and 11378. Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02159.

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION CASE NO. CR 14-643 EMC

28

Prior to the above-described incidents, Doe-3 had previously faced drug-trafficking charges in S.F. Superior Court on at least two separate occasions: June 2012 (H&S Code section 11378) and November 2010 (H&S Code sections 11378 and 11379). *Id.*

D.    John Doe-4

In 2014 alone, the SFPD arrested ███████ ("John Doe-4") on at least three occasions for trafficking crack cocaine in the Tenderloin. The most recent arrest occurred on September 12, 2014. Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00300. While patrolling that day, officers saw Doe-4,[31] and at least one officer recognized Doe-4 because he had previously arrested Doe-4 on May 19, 2014 for "11351.5 H&S – possession of cocaine base for sales." *Id.* The officer further noted that "earlier that day," Doe-4 had been in court for "another cocaine base sales case, case number 140141700." *Id.* That case was based on a February 17, 2014 arrest. Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02139.

Doe-4's September 2014 arrest occurred after officers observed him engaged in narcotics trafficking near the intersection of Hyde and Fulton Streets. Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00300. While being detained, Doe-4 spat three plastic-wrapped bindles of crack cocaine from his mouth. *Id.* Doe-4 was subsequently booked and charged with violating section 11351.5. *Id.*; Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02139.

Doe-4 was arrested by SFPD on May 19, 2014 as well. Ex. 1, Koeninger Disco. Mtn. Decl., Att. D at Ex.00781-2. This arrest occurred in the Tenderloin at United Nations Plaza. *Id.* Suspecting that Doe-4 was selling crack cocaine, officers detained him, and Doe-4 spit twelve individually wrapped crack rocks from his mouth. *Id.* at Ex.00784. The reporting officer further noted that Doe-4 "was in court earlier today for an arrest for selling cocaine base which occurred on 2/17/14 at a nearby intersection, Hyde St and Golden Gate Ave, case 140141700." *Id.* Doe-4 was subsequently booked and charged under section 11351.5. *Id.* at Ex.00782; Ex. 1, Koeninger

---

[31] The police incident report identifies Doe-4 as Hispanic ("H").

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION CASE NO. CR 14-643 EMC

29

Disco. Mtn. Decl., Att. F at Ex.02139.

Finally, Doe-4 was also charged with violating section 11351.5 based on the February 17, 2014 arrest referenced above.  Ex. 2, Ultan Disco. Mtn. Decl., Att. B at Ex.002762.  This arrest occurred in the Tenderloin, too (the intersection of "Hyde St and Golden Gate Ave").  Ex. 1, Koeninger Disco. Mtn. Decl., Att. D at Ex.00784; Ex.00741.  After observing Doe-4 sell a woman one rock of crack, officers arrested him; they recovered ten crack rocks from Doe-4's mouth and $132 from his pocket.  *Id.* at Ex.00741.  The officers also detained the woman who purchased crack from Doe-4.  *Id.* at Ex.00746.  She described Doe-4 as the "'Honduran male wearing a base ball [sic] hat'" who "'looks like Bruno Mars'"; the woman stated that she buys "'from Bruno Mars all the time.'"  *Id.*

E.   Jane Doe-5

On August 15, 2014, SFPD officers received a tip from a "citizen informant" stating that "there is narcotics activity coming from 120 Hyde Street #16 in the City and County of San Francisco."  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00659.  The resident of that address was ▓▓▓▓▓▓ ("Jane Doe-5"),[32] and her identity was confirmed by the informant.  *Id.*

SFPD officers learned that Doe-5's "rap sheet indicated prior methamphetamine related arrests and convictions," both for trafficking (H&S Code section 11378) and for simple possession (H&S Code section 11377(a)).  *Id.*  Doe-5 also was "on felony probation" based on a section 11378 conviction, and the officers called her probation officer to confirm her probationer status and her residence at 120 Hyde Street.  *Id.*  SFPD then traveled to Doe-5's residence and knocked on her door.  *Id.*  In response to the officers' inquiries, Doe-5 admitted to having "an eight ball on [her] bed."  *Id.*  A subsequent search of Doe-5's person and apartment yielded the following: seven press-lock baggies of methamphetamine totaling 31.4 grams (gross); a prescription bottle (in another person's name) containing twenty suspected oxycodone pills; a

---

[32] The relevant SFPD incident report identifies Doe-5 as White ("W").

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION CASE NO.  CR 14-643 EMC

30

1  digital scale; packaging materials (ninety-three smaller press-lock baggies); and $893.  *Id*. at

2  Ex.00659-00660.  Doe-5 was arrested and transported to Tenderloin Station for booking.  *Id*. at

3  Ex.00659.

4         As a result of the foregoing, Doe-5 was charged in Superior Court with violating, *inter*

5  *alia*, H&S Code section 11378.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02141.  This

6  was not the first occasion on which Doe-5 faced drug-trafficking charges in San Francisco.  In

7  both September 2011 and December 2005, Doe-5 was charged in S.F. Superior Court with

8  violating H&S Code sections 11351 and 11378.  *Id.*

9         F.      John Doe-6

10        When SFPD officers arrested ███████████ ("John Doe-6") on November 19, 2013 for

11  selling crack cocaine near the intersection of Hyde and Grove Streets, it represented Doe-6's

12  third arrest in less than four months for dealing crack in the Tenderloin.  Ex. 1, Koeninger Disco.

13  Mtn. Decl., Att. A at Ex.00229.  The other two arrests occurred on August 1, 2013 (O'Farrell and

14  Larkin Streets) and July 27, 2013 (Polk and Olive Streets), and both resulted in state court

15  charges.  *Cf. id.* (identifying court case numbers) *with* Ex. 1, Koeninger Disco. Mtn. Decl., Att. F

16  at Ex.02174 (listing court case numbers, dates of arrest, and location of arrest).

17        In the moments leading up to Doe-6's November 2013 arrest, an officer surveilling the

18  area of Hyde and Grove saw Doe-6 and recognized him "from prior police contacts, which

19  include arrests for sales of base cocaine, and possession of base cocaine for sale" (the August

20  2013 and July 2013 arrests).  *Id.*  "[F]rom these two prior arrests," the officer knew that Doe-6

21  "dealt off white rocks of base cocaine from his mouth."  *Id.*  The officer then saw Doe-6 engage

22  in a suspected drug transaction with another male by bringing "his right hand to his mouth and

23  spit[ting] out an unknown object."  *Id.*  When approached by the SFPD "arrest team," Doe-6 had

24  "numerous individually wrapped off white rocks" of crack in his mouth which he then spit to the

25  ground.  *Id.*  In total, Doe-6 spat forty-one individually wrapped rocks of crack cocaine from his

26  mouth.  *Id*. at Ex.00229-00230.  Officers also found a baggie of marijuana and $29 in Doe-6's

27

28

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

31

front pant pocket.  *Id*. at Ex.00229.

SFPD booked Doe-6 at Tenderloin Station where a records check revealed that he was on felony probation and also had a no bail felony warrant for his arrest.  *Id.*

G.      Jane Doe-7

On October 15, 2013, SFPD conducted a surveillance operation in the Tenderloin near Turk and Taylor Streets.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00051.  There, an officer saw ██████ ("Jane Doe-7"), "a Hawaiian female" who he knew "from numerous prior contacts."  *Id*. at Ex.00054.  The officer watched as Doe-7 made a suspected drug transaction near 144 Taylor Street.  *Id*. at Ex.00054-00055.  Officers then arrested the buyer, who dropped a rock of crack cocaine to the sidewalk when they approached.  *Id*. at Ex.00054.  When Doe-7 was subsequently arrested, officers found her $371 "crumpled in her purse."  *Id*. at Ex.00055.  Doe-7 was booked at Tenderloin station.  *Id.*  The officers who arrested Doe-7 noted that the location at which she sold crack "was within 1000 yards of" "the San Francisco City Academy," a school located at 230 Jones Street.  *Id.*  One officer measured the distance between the school and the site of Doe-7's drug transaction: "approximately 737 feet."  *Id.*

At the time of her October 2013 arrest, Doe-7 was on felony probation for a prior conviction under H&S Code section 11352(a), and she was known to "frequent[] the Tenderloin District."  *Id*. at Ex.00055.  The conviction for which Doe-7 was on probation (court number 12017792) was based on an arrest made in the Tenderloin, too (at 132 Eddy Street).  Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02199.  Additionally, Doe-7 had at least two other prior drug-trafficking arrests in the Tenderloin: first, a December 2010 arrest at 64 Turk Street which lead to a charge under H&S Code section 11352(a); second, a May 2012 arrest at 29 Mason Street which lead to a charge under H&S Code section 11351.5.  *See id.*

H.      John Doe-8

████████ ("John Doe-8") was arrested on December 26, 2013 for narcotics

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION CASE NO.  CR 14-643 EMC

32

trafficking near 353 Turk Street.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00249.

According to the relevant incident report, Doe-8 is White ("W").  *Id.* at Ex.00244.  When he was

subsequently charged in Superior Court for various drug-trafficking violations, it represented at

least the fifth time that drug-trafficking charges were filed against Doe-8 in San Francisco.  *See*

Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02181 (detailing cases in March 2013, July

2011, February 2011, and June 2008).  In at least two of his previous cases, Doe-8 was arrested

in the Tenderloin.  *See id.*

Doe-8's December 2013 arrest occurred after SFPD officers observed him engage in a

suspected narcotics transaction with another White male.  Ex. 1, Koeninger Disco. Mtn. Decl.,

Att. A at Ex.00249.  When the officers approached Doe-8 to investigate, they saw money and

two pieces of heroin in his open hand.  *Id.*  After detaining Doe-8, officers ran a records check

and learned that he was "on active felony probation with a search condition."  *Id.*  During a

search of Doe-8's person, the officers found: 110 pills of oxycodone; twenty-two pills of

buprenorphine/naloxone; twenty-nine pills of clonazepam; one alprazolam pill; five morphine

pills; and $117.  *Id.* at Ex.00247-00249.

## I.   John Doe-9

In early September 2013, the SFPD received information that ██████████████

("John Doe-9") was selling methamphetamine from his apartment on O'Farrell Street in the

Tenderloin (near the intersection of Jones Street).  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at

Ex.00077.  Using a telephone number provided by an informant, an undercover officer contacted

Doe-9 on September 9 seeking to buy methamphetamine.  *Id.*  Doe-9 said he "was out of Ice but

had 'Molly,'" which "is a mixture of methamphetamine and ecstasy."  *Id.*  The officer later met

Doe-9 in a laundromat at 517 O'Farrell Street where he purchased "four quarters" of Molly from

Doe-9 (1.8 grams gross).  *Id.*  According to the SFPD incident report, Doe-9 is a White ("W")

male.  *Id* at 00075.

Eleven days later, the same officer contacted Doe-9 and asked to buy "Ice" or "Molly."

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

33

1    Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00019.  Prior to the call, the officer had already

2    obtained a search warrant to search Doe-9's apartment.  *Id.*  Doe-9 said he only had ecstasy and

3    marijuana, but would try to locate some methamphetamine.  *Id.*  When he next spoke with the

4    officer, Doe-9 explained that he could not find any methamphetamine, but he agreed to sell

5    another "quarter of 'Molly'" to the officer at the same laundromat.  *Id.*  Doe-9 was arrested after

6    he arrived at the laundromat and sold the officer ecstasy.  *Id.*  During execution of the search

7    warrant at Doe-9's apartment, SFPD recovered nineteen baggies of marijuana and a digital scale.

8    *Id.* at Ex.00019-00020.

9        Doe-9 was booked at Northern Station where officers learned that he "had two

10   outstanding warrants."  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00020.  Doe-9 was

11   subsequently charged in Superior Court with violating H&S Code section 11359.  Ex. 1,

12   Koeninger Disco. Mtn. Decl., Att. F at Ex.02201.  According to the CMS data obtained by the

13   FPD, Doe-9 was previously charged with drug-trafficking crimes in (at least) January 2010,

14   August 2009, and November 2008.  *See id.*

15       J.    John Doe-10

16       During 2013, the SFPD arrested ███████████████████ (John Doe-10) at least

17   three times for trafficking crack cocaine in the Tenderloin – including an arrest for selling within

18   1,000 feet of a school on November 18, 2013.  On that occasion, officers were engaged in a

19   "spotting operation" near the corner of Hyde Street and Golden Gate Avenue.  Ex. 1, Koeninger

20   Disco. Mtn. Decl., Att. C at Ex.00676.  There, an officer saw Doe-10,[33] "a subject that [he had]

21   made contact with in the past."  *Id.* at Ex.00676.  The officer watched as Doe-10 engaged in a

22   narcotics transaction with a woman by spitting a "white object" from his mouth, showing it to

23   the woman, and exchanging it for cash.  *See id.*  The woman was later arrested with one crack

24   rock in her possession.  *See id.*  Officers then arrested Doe-10 and found $582 on his person.  *Id.*

25

26   [33] The relevant incident report identifies Doe-10 as Hispanic ("H").  *Id.* at Ex.00674.

27

28   NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
     ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
     CASE NO.  CR 14-643 EMC

1   The officers also noted that the observed drug transaction took placed within 1,000 feet of the

2   "DeMarillac Academy located at 175 Golden Gate Ave." *Id.*  While Doe-10 was being booked

3   at Tenderloin Station, the officers learned that he had "an open case" and a stay-away order from

4   the area in which they arrested him.  *Id.*  The open case was based on Doe-10's arrest on August

5   22, 2013.  *Cf. id.* (listing court case number for "open case") *with* Ex. 1, Koeninger Disco. Mtn.

6   Decl., Att. F at Ex.02186 (listing same court case number, "8/22/2013" arrest date, and SFPD

7   incident number).  Based on his November 2013 arrest, Doe-10 was charged in Superior Court

8   with selling and offering to sell crack cocaine in violation of H&S Code section 11352(a).  Ex. 2,

9   Ultan Disco. Mtn. Decl., Att. B at Ex.02465.  Moreover, the complaint alleged that Doe-10

10  committed the his offense within 1,000 feet of a "public or private elementary, vocational, junior

11  high, or high school, to wit: DEMARILLAC ACADEMY."  *Id*. at Ex.02466.

12          As noted above, Doe-10's August 22, 2013 arrest also led to Superior Court charges, and

13  it likewise was the result of crack cocaine sales in the Tenderloin (in particular, the corner of

14  Eddy and Hyde Streets).  Ex. 1 Koeninger Disco. Mtn. Decl., Att. A at Ex.00528-00531.

15  Specifically, Doe-10 sold two crack rocks directly to an undercover officer.  *Id*. at Ex.00531.

16  When SFPD arrested Doe-10, officers recovered four more crack rocks from his mouth and $93

17  from his person.  *Id.*  Following this August 2013 arrest, Doe-10 was charged in a three-count

18  felony complaint with violating H&S Code section 11351.5 and 11352.  Two counts in the

19  complaint were based on the events described above, but one count was predicated on yet

20  another arrest that occurred eight months earlier on January 29, 2013.  Ex. 2, Ultan Disco. Mtn.

21  Decl., Att. B at Ex.02512-13.

22          Doe-10's January 2013 arrest also occurred at the corner of Eddy and Hyde Streets,

23  where officers saw him speaking with two other individuals.  Ex. 1, Koeninger Disco. Mtn.

24  Decl., Att. D at Ex.00728.  After Doe-10 "spit numerous objects into his hand," officers

25  suspected that they "were witnessing a narcotics transaction."  *Id.*  They detained Doe-10 and the

26  two other persons, one of whom admitted to buying six crack rocks from Doe-10.  *Id.*.  Doe-10

27

28
NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

35

1   had $316 in his possession.  *Id.*  The officers transported Doe-10 to Tenderloin Station and

2   booked him under H&S Code section 11352(a).

3       Finally, Doe-10 was most recently arrested on April 29, 2015 for trafficking crack

4   cocaine at 255 Hyde Street in the Tenderloin.  Doe-10 was again charged in Superior Court with,

5   *inter alia*, possession of crack cocaine for sale in violation of H&S Code section 11351.5.  Ex. 2,

6   Ultan Discovery Decl., Att. B at Ex.02424.  He also was charged with loitering while carrying a

7   concealed weapon (a knife) in violation of Penal Code section 1291(b).  *Id.*

8       K.    John Doe-11

9
10      On October 23, 2013, three plainclothes SFPD officers were driving southbound on Hyde

    Street near its intersection with Eddy Street.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at

11  Ex.00506.  From their patrol car, one of the officers saw "a Latin male" who he recognized as

12  ███ ("John Doe-11").  *Id.*  According to the officer, Doe-11 "frequents the 200 block of

13  Hyde Street" and was "known to numerous Tenderloin Officers [sic]."  *Id.*  The officer reported

14  that he saw Doe-11 "on Hyde Street almost every day that I work."  *Id.*  The officer also knew

15  that Doe-11 had been arrested at 255 Hyde Street less than three weeks earlier for resisting

16  arrest, and was arrested on July 16, 2013 for selling crack cocaine to an undercover officer at 232

17  Hyde Street.  *Id.*  Doe-11 also was arrested on June 2, 2011 for trafficking crack cocaine near

18  496 Eddy Street.  *See* Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02152.

19
20      From his patrol car, the officer watched as Doe-11 engaged in a "a hand-to-hand

    narcotics transaction" with a Black male.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at

21  Ex.00506.  The officers stopped their car, and Doe-11 fled when he saw them.  *Id.*  The buyer

22  dropped three individually wrapped crack rocks to the sidewalk as the officers approached and

23  was subsequently arrested.  *Id.*  The officers eventually caught up to Doe-11, who was arrested.

24  Doe-11 was booked at Tenderloin Station and eventually charged in Superior Court with

25  violating H&S Code section 11352(a).  *See* Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at

26  Ex.02152.

27
28  NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
    ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
    CASE NO.  CR 14-643 EMC

Doe-11 was previously charged with drug-trafficking violations in June 2011 based on an arrest at 496 Eddy Street.  *Id.*

L.     John Doe-12

On November 26, 2014, SFPD Officers responded to Hyde and Fulton Streets "on a call of a group of Hispanic males selling drugs."  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00148.  Officers encountered ███████████ ("John Doe-12"), and while detaining him, Doe-12 spat out "twenty four plastic twists" containing crack cocaine.  Doe-12 was booked for violating H&S Code section 11351.5 and identified at the station by his fingerprint.  *Id.*  The SFPD incident report identifies Doe-12's race as Hispanic ("H").

According to the Superior Court file, Doe-12's November 2014 arrest resulted in felony complaint alleging a violation of section 11351.5.  Ex. 2, Ultan Discovery Decl., Att. B at Ex.02811.  Doe-12 apparently was also arrested on July 12, 2014 for trafficking crack cocaine, because the felony complaint separately alleges a section 11352(a) violation on that date.  *Id.*

San Francisco Superior Court records also show that Doe-12 was convicted in February 2009 for violating H&S Code section 11351.5.  Ex. 2, Ultan Disco. Mtn. Decl., Att. B at Ex.02772.  As a result of that conviction, Doe-12 was ordered to stay away from the intersection of Eddy and Hyde streets.  *Id*. at Ex.02773.

Finally, Doe-12 was again arrested for drug-trafficking in the Tenderloin (Hyde and Fulton) on January 29, 2015.  *See* Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02175 (indicating section 11352(a) charge).

M.     John Doe-13

On both October 23, 2014 and November 12, 2014, SFPD officers arrested ██████ ("John Doe-13")[34] for selling crack cocaine near the intersection of Hyde Street and

---

[34] The S.F. Superior Court documents spell ███████ name both as ██████ and ███████.

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

37

Golden Gate Avenue.  During the October 23 incident, officers were engaged in a "spotting operation" when they "observed a Hispanic male" (Doe-13) engage in a hand-to-hand drug transaction with another person.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00137.  When Doe-13 was subsequently arrested, officers recovered forty-four individually wrapped crack rocks from Doe-13's mouth.  *Id.*  Doe-13 was charged in Superior Court with violating H&S Code sections 11351.5 and 11352.

While the above case was pending, Doe-13 again was arrested by SFPD for trafficking crack cocaine at the corner of Hyde Street and Golden Gate Avenue.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00106.  In particular, officers patrolling the area on November 12 observed Doe-13 offering to sell crack cocaine to woman in front of the U.S. post office at 101 Hyde Street.  *Id.*  When they detained Doe-13, the officers seized five plastic-wrapped bindles of crack from his hand.  *Id.*  Doe-13 was again charged in Superior Court with violating H&S Code section 11351.5.  Ex. 2, Ultan Disco. Mtn. Decl., Att. B at Ex.02269-02270; Ex. 1, Koeninger Disco. Mtn. Dec., Att. F at Ex.02165.  He also was charged with violating a stay-away order imposed after his October arrest.  Ex. 2, Ultan Disco. Mtn. Decl., Att. B at Ex.02269-02270.

N.    John Doe-14

Between August 2014 and November 2014, SFPD officers arrested ███████████ ("John Doe-14") at least three times – all for narcotics trafficking near the corner of Larkin and O'Farrell Streets.  *See* Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02160.  Doe-14 had two additional drug-trafficking arrests at the same corner in March and April 2015.  *See id.*  All five arrests led to charges in Superior Court.  *Id.*

Defense counsel has not yet obtained the incident reports underlying Doe-14's November 2014, March 2015 and April 2015 drug-trafficking arrests.  On October 2, 2014, however, Doe-14 was arrested during a narcotics "spotting operation."  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00326.  Officers saw "a Hispanic male" (Doe-14) engage in a hand-to-hand narcotics transaction with a "Black male"; when officers detained the buyer (the "Black male"),

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

38

they found a rock of crack cocaine in his possession.  *Id.*  Doe-14 was later arrested with $92 and booked at Tenderloin station under H&S section 11352(a).  *Id.* at Ex.00323

Two months earlier, SFPD had arrested Doe-14 at the same corner when an undercover officer purchased a rock of crack cocaine directly from Doe-14.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00290.  Officers found $351 in his possession and booked him Tenderloin Station under H&S Code section 11352(a).  *Id.* at Ex.00289.

O.    John Doe-15

The SFPD began investigating ██████████ ("John Doe-15") in October 2013 after an informant told officers that Doe-15 was "selling large amounts of methamphetamine throughout the City and is living at the Winton Hotel at 445 O'Farrell."  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00048.[35]  SFPD officers knew Doe-15 "from prior narcotics investigations as a known methamphetamine trafficker" and also knew that he was "currently on felony probation with a warrantless search condition."  *Id.* at Ex.00048.

On October 18, 2013, officers followed Doe-15 to the fourth floor of the Winton Hotel and detained him in the hallway outside his room.  *Id.*.  Officers found $2,146 on Doe-15's person.  *Id.* at Ex.00045-00048.  During a search of Doe-15's room, the officer encountered Doe-15's roommate, who said that Doe-15 had lived there with him for about a year, "except for the time that [Doe-15] was incarcerated earlier [that] year."  *Id.* at Ex.00048.  During a probation search of Doe-15's "area of the apartment," officers found 12.6 grams (gross) of methamphetamine on a shelf along with a digital scale and sandwich baggies.  *Id.* at Ex.00048-00049.  Inside a safe in the same area, officers found fourteen "individually packaged large amounts" of methamphetamine – weighing 405.5 grams (gross) – and an additional $2,800.  *Id.* at Ex.00045-00048.

Based on the October 2013 arrest, Rivas was charged in S.F. Superior Court with

---

[35] The relevant SFPD incident report identifies Doe-15 as White ("W").  *Id.* at Ex.00044.

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION CASE NO.  CR 14-643 EMC

39

1    violating H&S Code section 11378.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02187.

2    Rivas had previously been arrested on at least three other occasions for violating section 11378

3    (November 2009, March 2009, and April 2007), each of which resulted in state charges.  *Id.*

4         P.    John Doe-16

5         In October 2014, SFPD received ███████ ("John Doe-16")'s phone number from an

6    informant in relation to a narcotics-trafficking investigation.  Ex. 1, Koeninger Disco. Mtn.

7    Decl., Att. A at Ex.00342.  SFPD described Doe-16[36] as "a notorious methamphetamine

8    trafficker" who is "currently on felony probation with a warrantless search condition out [of] San

9    Mateo County for [a] narcotics offense" (a violation of H&S Code section 11378).  *Id.* at

10   Ex.00380.  On December 3, 2014, an undercover officer telephoned Doe-16 and arranged to buy

11   an "8Ball" of methamphetamine from him; Doe-16 said he was currently in the area of Turk and

12   Taylor Streets and would meet the officer in the area of Jones Street and Golden Gate Avenue.

13   *Id.* at Ex.00342.   Doe-16 and the officers rendezvoused at 55 Golden Gate, and Doe-16 sold the

14   officer 4 grams (gross) of methamphetamine.  *Id.*  The officer then drove away.  *Id.*

15        About four weeks later, on December 30, the officer again called Doe-16 and arranged to

16   buy "two 8balls" of methamphetamine near 50 Golden Gate Avenue.  Ex. 1, Koeninger Disco.

17   Mtn. Decl., Att. A at Ex.00380.  Doe-16 arrived with the methamphetamine and was arrested.

18   *Id.*  Upon searching Doe-16 and the contents of his car, officers found (in addition to the meth)

19   marijuana and a meth pipe.  *Id.*  Doe-16 was taken to Tenderloin Station while some officers

20   traveled to his Oakland residence to conduct a probation search.  *Id.* at Ex.00381.  There, they

21   found marijuana, liquid GHB, a digital scale, numerous ziplock baggies and envelopes.  *Id.*

22        Doe-16 was subsequently charged in Superior Court based on the foregoing events.  *See*

23   Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02207.  This was not the first time Doe-16

24   faced drug-trafficking charges in San Francisco.  In January 2010, Doe-16 was also charged with

25

26   _____
     [36] The incident report identifies Doe-16 as White ("W").  Ex.00341.

27

28   NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
     ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
     CASE NO.  CR 14-643 EMC
                                                                                          40

violating H&S Code sections 11359, 11366, 11377, 11378, and 11379.  *See id.*

Q.     <u>John Doe-17</u>

As they conducted a narcotics surveillance operation at Larkin and O'Farrell Streets on September 1, 2014, SFPD officers saw ██████████ ("John Doe-17") standing on the corner. Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00450.  Doe-17, identified as Hispanic ("H"), *id.*, was well-known to the officers.  One officer "recognized [Doe-17] from a prior base cocaine sale arrest that occurred in the [same] area."  *Id.*  A surveilling officer saw "[Doe-17] sell base cocaine."  *Id.*  Another officer involved in the operation added:

> [Doe-17] was also arrested during another surveillance operation in this area on 09-05-2013 for selling base cocaine . . . .  In addition to his two prior arrests in this area, myself, and the other plain clothes officers I work with, observe [Doe-17] loitering in the area of O'[F]arrell Street and Larkin Street on a daily basis.  I observe [Doe-17] in this area when I am on patrol and when I conduct surveillance in the area of Larkin and O'[F]arrell Street.  On many occasions, [Doe-17] appears to take the role of a supervisor in this area, directing 'buyers' to other 'sellers.'  I have observed [Doe-17] conduct suspected hand to hand narcotics transactions in this area.

Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00450.

SFPD officers watched Doe-17 for about an hour on September 1, during which time he engaged in a drug transaction.  *Id.*  Officers arrested the buyer at another location and found him in possession of a glass pipe with "rocks/crumbs" of crack cocaine "stuffed in one end."  *Id.* Officers arrested Doe-17 and booked him at Tenderloin Station.  *Id.* at Ex.00450-00451.

R.     <u>John Doe-18</u>

On June 11, 2014, SFPD officers were conducting a "buy bust" operation in the Tenderloin.  Ex. 41, Amram Disco. Mtn. Decl., Att. O at Ex.04248-54.  While walking on Hyde Street near Fulton, an officer "observed (3) Latino males engaging in numerous hand to hand narcotic sales of suspected cocaine base."  *Id.* ██████████ ("John Doe-18") was one of the three "Latino males" and appeared to be "managing the drug sales between the three of

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

41

them." *Id.*  After an undercover officer purchased drugs from one of the "Latino males," all three were arrested.  During his arrest, Doe-18 spit 16 rocks of crack cocaine from his mouth.  *Id.*  Doe-18 was booked under Cal. H&S Code sections 11351.5 and/or 11352.  *Id.*

In addition to the June 11 arrest, the SFPD arrested Doe-18 on at least two other occasions in 2014 for drug-trafficking in the Tenderloin.  *See* Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02203.  First, Doe-18 was arrested near Hyde Street and Golden Gate Avenue on March 11, 2014 for violating H&S Code section 11352(a).  *Id.*  He also was arrested April 3, 2014 at 330 Golden Gate Avenue for violating H&S Code section 11351.5.  *Id.*

S.      John Doe-19

While conducting a "Buy Bust" operation on September 9, 2013, an undercover SFPD officer working at the corner of Hyde Street and Golden Gate Avenue purchased three rocks of crack cocaine from "a Latin male" named ████████████████ ("John Doe-19").  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00571-73.  According to SFPD, Doe-19 "has had numerous prior narcotics related arrests," and he also "had an 11352(a) H&S conviction" from April 2009 in San Francisco Superior Court.  *Id.* at Ex.00574.  In that case, Doe-19 was charged under the name ██████████.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02200 (listing same case number with March 2009 arrest date).  In addition to the April 2009 conviction, ██████████ was charged in December 2009 with one count of violating H&S Code section 11352(a) based on an arrest at 537 Hyde Street in San Francisco.  *Id.*

T.      John Doe-20

On October 31, 2013, SFPD "organized a 'Buy Bust' operation in the Tenderloin District."  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00519.  "[S]everal children in Halloween costumes … appeared to be 'trick or treating'" nearby while officers in plainclothes surveilled the corner of Hyde Street and Golden Gate Avenue.  *Id.* at Ex.00520.  Near that corner, officers saw "a Latin male," ██████████████ ("John Doe-20").  *Id.* at Ex.00519.  At least

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

42

one of the officers "recognized [Doe-20] from a prior surveillance operation" during which the officer "observed [Doe-20] engage in several suspected hand to hand narcotics deals in this same area." *Id*. at Ex.00520.

An undercover officer approached Doe-20 and purchased one rock of crack cocaine from him. Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00520. Afterwards, other officers arrested Doe-20 and seized $112 from his person. *Id*. at Ex.00519-00520. Later, the officers measured the distance between the location where Doe-20 sold the crack rock and "175 Golden Gate Avenue, the DeMarillac Academy" (a nearby school). *Id*. at Ex.00519. Because the distance was "approximately 715.1 feet," Doe-20 was "in violation of 11353.6(b) H&S" as well as H&S Code section 11352(a). *Id*. at Ex.00517-00519. Doe-20 was later charged in S.F. Superior Court under both statutes. Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02134.

U.     John Doe-21

While conducting a "'Buy Bust Operation'" in the Tenderloin on October 22, 2013, an SFPD officer purchased one rock of crack cocaine from "a Hispanic male" at the corner of Larkin and O'Farrell Streets. Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00500. They then arrested the seller, ████████████ ("John Doe-21"), and found $401 on his person. *Id*. The officers also noted that the place at which the narcotics transaction took place was "971 feet in distance" from the "Tenderloin Recreation Center" located at 570 Ellis Street. *Id*. Accordingly, Doe-21 was booked at Tenderloin station for violating H&S Code sections 11352(a) and 11353.6(b). *Id*. at Ex.00498.

V.     John Doe-22

On September 16, 2014, SFPD officers arrested ████████ ("John Doe-22"), a "Hispanic male," at the corner of Hyde Street and Golden Gate Avenue after he sold crack cocaine to an undercover officer. Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00310. According to the incident report:

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION CASE NO.  CR 14-643 EMC

43

The DeMarillac Academy is a half a block away from where all these narcotics transactions are taking place [at Hyde and Golden Gate]. The Academy is a school for students ranging from Kindergarten to 8th grade. The narcotics dealers in this area have the audacity to continue their open air narcotics deals while students are being walked to and from school.

*Id.* The location at which Doe-22 sold crack to the undercover officer was "720 feet" from the "front gate of DeMarillac Academy." *Id.* Doe-22 was booked at Tenderloin Station under H&S Code section 11352(a), and a "charge of selling narcotics within 1000 feet of a school." *Id.*

Doe-22's September 2014 was not his first drug-trafficking charge from the Tenderloin. *See* Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02144. He also was charged in February 2010 for drug sales, and that case arose from an arrest in the Tenderloin at Geary and Hyde Streets. *Id.*

W.    John Doe-23

On November 2, 2014, SFPD officers were conducting a "spotting operation" in the Tenderloin at Larkin and O'Farrell Streets, an area "well known to officers due to the abundant levels of narcotics activity that take place" there. Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00163. Officers "observed a Latin male later identified as ▮▮▮▮▮▮ ("John Doe-23"). *Id.* One officer "immediately recognized [Doe-23] as a subject that we have arrested in the past for narcotics sales" and "noted that [Doe-23] currently ha[d] an open case pending as well as a stay away order from the area of Larkin and O'Farrell St." *Id.* After observing Doe-23 engage in what they believed was a "street level hand to hand narcotics transaction," the officer detained the buyer and recovered one rock of crack cocaine from his person. *Id.* The officers then arrested Doe-23, on whose person they found $278. *Id.*

The "open pending case" and "stay away order" referenced above was based on Doe-23's February 11, 2014 arrest by the same SFPD officers at the same location (Larkin and O'Farrell). Ex. 1, Koeninger Disco. Mtn. Decl., Att. D at Ex.00704-09. On that occasion, the officers saw Doe-23 engage in a hand-to-hand drug transaction; when they arrested him moments later, the

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

44

officers seized eleven individually wrapped rocks of crack cocaine from Doe-23's left hand.  *Id.*
at Ex.00709.  Doe-23 was later charged in Superior Court with violating H&S Code sections
11351.5 and 11352(a).  Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02135.

X.     John Doe-24

On November 4, 2014, while conducting a "Buy Bust" operation "at the intersection of
Hyde Street and Golden Gate Avenue," an SFPD officer using binoculars "observed a Latin male
who [he] recognized from a prior arrest." Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at
Ex.00183.  The "Latin male" was ███████ ("John Doe-24").  The officer noted that Doe-
24 had "an open matter" in Superior Court for another drug-trafficking arrest in "the area of
Hyde Street and Golden Gate Avenue."  *Id.*

The officer saw Doe-24 standing near the entrance to the U.S. post office, where he was
approached by a man who gave Doe-24 money in exchange for crack cocaine (a "small off-white
object" that Doe-24 spat from his mouth).  *Id.*  The buyer was arrested and officers seized a crack
rock and glass pipe from his person.  *Id.* at Ex.00183-00184.  Doe-24 was later charged in
Superior Court for violating H&S Code section 11352(a).  *See* Ex. 1, Koeninger Disco. Mtn.
Decl., Att. F at Ex.02145.  It was the third time Doe-24 faced drug-trafficking charges in 2014
alone.  *See id.* (identifying October 2014 and February 2014 cases charging section 11352(a)
violations).

Y.     John Doe-25

SFPD officers arrested ███████████ "John Doe-25") on September 13, 2013 while
conducting a narcotics surveillance operation at the area of Hyde and Eddy Streets.  While
watching the 200 block of Hyde, one officer saw Doe-25, who he knew "from prior contacts."
Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00580.  Doe-25 was approached by a female
who gave him money in exchange for an object that Doe-25 retrieved from his mouth.  *Id.*
Believing that Doe-25 had just engaged in "a street level hand to hand narcotics transaction," the

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

45

officers arrested the buyer and recovered two individually wrapped crack rocks and a glass pipe. *Id.* Doe-25 was arrested, too, and the officers found "numerous amounts" of "rolled and crumpled" currency in his possession totaling $228. *Id.*

Doe-25 was booked at Tenderloin Station where a records check "revealed that he [was] currently on felony probation with a warrantless search condition for 11352(a)." *Id.* According to CMS, Doe-25 also was charged with drug-trafficking crimes in August and September 2011. Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02156.

Z.      John Doe-26

During a three-week period in 2013, SFPD officers twice arrested ███████████ ("John Doe-26") for selling crack cocaine along Hyde Street in the Tenderloin. Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00558-00564; Ex.00565-00569. The first arrest occurred on August 11, 2013, after officers observed "a Hispanic male" (Doe-26) spit crack cocaine from his mouth and sell it to another man at the corner of Eddy and Hyde Streets. *Id.* at 00561. The officers arrested the buyer and found three crack rocks and a glass pipe on his person. *Id.* The buyer said that he bought the crack from Doe-26. *See Id.* When the officers arrested Doe-26 and searched his person, they found "two wads of currency" totaling $683. Doe-26 was booked at Tenderloin Station and later charged with violating H&S Code section 11352. *Id.* at Ex.00561-00564; Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02142.

The SFPD again arrested Doe-26 for selling crack on September 4, 2013. Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00565-00569. On that date, an undercover officer purchased two crack rocks from "a Hispanic male" (Doe-26) at 245 Hyde Street. *Id.* Ex.00568. Doe-26 was arrested with $206 in his possession (including $40 in police-marked funds) and booked. *Id.* Ex.00569. Doe-26 was again charged with violating H&S Code section 11352. Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02142. Approximately two months later, while trying to locate Doe-26, SFPD officers found him "in custody with the Alameda County Sheriff's Department (ACSD) on an unrelated matter." Ex. 1, Koeninger Disco. Mtn. Decl., Att.

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

46

A at Ex.00564.

### AA.   John Doe-27

During the autumn of 2013, the SFPD twice arrested ██████████ ("John Doe-27") for selling crack cocaine in the Tenderloin.  First, on October 25, Doe-27 was observed in near Larkin and O'Farrell Streets attempting to avoid detection by the officers, manipulating objects in his mouth, and eventually fleeing.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00510.  Believing that Doe-27 was attempting to destroy contraband, the officers detained him, and Doe-27 subsequently spit fourteen crack rocks from his mouth.  *Id.* Doe-27 was booked under H&S Code sections 11351.5 and 11352.  *Id.*  The police incident report identifies him as Hispanic ("H").

On November 13, 2013 (approximately two weeks later), SFPD officers again arrested Doe-27 for trafficking crack cocaine, this time near the corner of Hyde and Turk Streets.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00205.  On that occasion, Doe-27 sold one crack rock to an undercover officer, and additional rocks were recovered after Doe-27 was arrested.  *Id.* Following this second arrest, Doe-27 was charged in Superior Court with two counts of violating H&S Code section 11351.5 (presumably based on his October and November arrests) and one count of violating H&S Code section 11352.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02204.

### BB.   John Doe-28

At the same time that SFPD officers arrested Doe-27 for selling crack cocaine on November 13, 2013, *see supra*, they also arrested "another Hispanic male" named ██████████ ("John Doe-28").  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00202.  Doe-28 was standing "right next to" Doe-27 at the corner of Turk and Hyde Streets when officers approached to arrest Doe-27; Doe-28 then fled.  *Id.*  One of the officers grabbed Doe-28 by his sweatshirt, and Doe-28 spit six rocks of crack cocaine onto the sidewalk.  *Id.*  Upon searching Doe-28, officers found

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

47

$159 and no paraphernalia for ingesting crack.  *Id.*

Doe-28 was transported to Tenderloin Station where officers learned that he had an outstanding felony warrant based on his failure to appear in Superior Court for case number 13022119.  *Id.*  In that case, Doe-28 was charged with violating H&S Code section 11352(a) based on an arrest that occurred just three months earlier at another location in the Tenderloin (the corner of Polk and Olive Streets).  *See* Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02178.

Doe-28 was again arrested for drug trafficking in the Tenderloin (Larkin and O'Farrell Streets) just a few months after his November 2013 arrest.  *See id.*  That arrest, on March 11, 2014, also led to charges under H&S Code section 11352(a).  *Id.*

CC.     John Doe-29

On September 10, 2014, SFPD officers arrested ██████████ "(John Doe-29") for the third time in the past two months – all for drug-trafficking crimes, and all near Hyde Street in the Tenderloin.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00495; Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02171.  According to the reporting officer, he was surveilling the intersection of Hyde and Fulton Streets for "narcotics dealings" when he "observed a Latin male" (Doe-29) whom the officer recognized "as a suspected cocaine base dealer who we have arrested on two prior occasions in the past two months."  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00495.  After Doe-29 reportedly sold crack to a White male, both Doe-29 and the buyer were arrested.  *Id.*  One crack rock was recovered from the buyer, and Doe-29 was found in possession of $149.  *Id.* at Ex.00496.  When Doe-29 was later booked at Tenderloin Station, the officers confirmed that he had two open court cases in S.F. Superior Court, both for drug-trafficking charges.  *Id.*  Doe-29's open cases were based on a July 28, 2014 arrest, and an arrest five days earlier on July 23, 2014.  *Id.*

Defense counsel has not yet obtained the incident report related to Doe-29's July 28 arrest, but the report detailing his July 23 arrest indicates that Doe-29 was arrested for selling

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

48

crack in the area of Hyde Street and Golden Gate Avenue.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. D at Ex.00763-00768.  While searching Doe-29, the SFPD officers found one crack rock in Doe-29's pant pocket.  Many of the same officers were involved in Doe-29's September 10 and July 23 arrests.  *Compare id.*; Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00492-00493.

Ultimately, Doe-29 was charged in three separate cases in Superior Court, all of which alleged drug-trafficking crimes.  *See* Ex.1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02171. The latter two of Doe-29's cases also charged him under Cal. Penal Code section 12022.1(a), which prohibits the commission of a felony while released on bail.  *Id.*

DD.   John Doe-30

On December 2, 2014, SFPD officers arrested ██████████ ("John Doe-30") at the intersection of Larkin and O'Farrell Streets for selling crack cocaine to an undercover officer.[37] Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00413-00416.  At the time of his arrest, Doe-30 was in possession of $435.  *Id.* at *Id.* at Ex.00761.  This was not Doe-30's first arrest for trafficking crack cocaine.  Doe-30 was also arrested by SFPD on January 15, 2013 near the corner of Larkin Street and Golden Gate Avenue.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. D at Ex.00761.  During that incident, officers recovered twelve rocks of crack cocaine.  *Id.*

Doe-30's December 2014 and January 2013 arrests both led to charges being filed in Superior Court.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02143.

EE.   John Doe-31

When SFPD officers arrested ██████████ ("John Doe-31") on July 3, 2014, it was third time he had been arrested for trafficking crack cocaine in the preceding six-month period. Ex. 1, Koeninger Disco. Mtn. Decl., Att. D at Ex.00678-00683; Ex.00684-00690; Ex.00691-00697.  All three arrests took place near the corner of Larkin and O'Farrell Streets, an "area

---

[37] The SFPD incident report identifies Doe-30 as Hispanic ("H").  *Id.* at Ex.00413.

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION CASE NO.  CR 14-643 EMC

49

notorious for round the clock sales of narcotics." *Id.* at Ex.00690.  During the July 3 incident, one SFPD officer approached "a Hispanic male" (Doe-31) at 781 O'Farrell Street and purchased one crack rock from him.  *Id.* at Ex.00694.  SFPD recovered twenty-four more crack rocks from Doe-31's mouth as he was being arrested.  *See id.*  During booking, officers "confirmed that [Doe-31] had two local felony narcotics warrants for his arrest," that he had an active stay-away order for the intersection of Larkin and O'Farrell, and that he "ha[d] been arrested this year on two prior occasions for cocaine base sales in the area" of Larkin and O'Farrell Streets.  *Id.* at Ex.00694-00695.  As a result of the July 2014 arrest, Doe-31 was charged in Superior Court with violating H&S Code sections 11351.5 and 11352(a), as well as a contempt of court charge related to the stay-away order.  Ex. 2, Ultan Disco. Mtn. Decl., Att. B at Ex.02321.

Doe-31's two prior crack cocaine arrests occurred on April 16, 2014 and January 9, 2014.  During the April incident, Doe-31 sold two crack rocks to an undercover officer and was found in possession of ten more upon his arrest.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. D, Ex.00681-00682.  During the January incident, Doe-31 was observed selling one rock to an individual, and he was later arrested with fourteen individually wrapped crack rocks in his mouth.  *Id.* at Ex.00681.

FF.    John Doe-32

█████████ ("John Doe-32") was twice arrested by SFPD officers for selling crack cocaine in the Tenderloin during a two-week span in 2013.  The first arrest occurred on September 27, 2013 near the corner of Hyde and Eddy Streets.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A, Ex.00536-00540.  Two officers became suspicious of a "group of five Hispanic men" (including Doe-32) who were standing at the corner of Hyde and Eddy, and their investigation ultimately resulted in Doe-32's arrest.  *Id.* at Ex.00536-00539.  During that arrest, officers recovered eight individually wrapped baggies of crack cocaine from Doe-32's front pant pocket.  *Id.* at Ex.00539.

Next, on October 10, 2013, Doe-32 was arrested near the corner of Larkin and O'Farrell

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION CASE NO.  CR 14-643 EMC

50

Streets after officers observed him sell two rocks of crack cocaine to another person.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. D, Ex.00753-00757.  The officers arrested both Doe-32 and the purchaser; they recovered $176 from Doe-32 and two crack rocks from the purchaser.  *Id*. at Ex.00752.

Doe-32 was ultimately charged in S.F. Superior Court with one count of violating H&S Code section 11351.5 (based on the September arrest) and one count of violating H&S Code section 11352(a) (based on the October arrest).  Ex. 41, Amram Disco. Mtn. Decl., Att. O at Ex.04257-58.

GG.   Jane Doe-33

After observing the driver of a parked vehicle engage in a suspected drug transaction with a passerby, SFPD officers approached the vehicle, parked at 205 Eddy Street, to investigate.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A, Ex.00624.  The driver of the vehicle identified himself, and the officers learned he was on felony probation with an arrest warrant.  *Id.*  The officers ordered the driver from the car and arrested him; to conduct a search of the vehicle, the officers also ordered a female passenger, ██████  ███████  ("Jane Doe-33"),[38] from the car.  *Id.* at Ex.00624.  As Doe-33 exited the vehicle, she grabbed a pouch from the car's front seat and "shoved it into her front waistband."  *Id.*  The officers directed her to remove the pouch and leave it in the vehicle.  *Id.*  Inside the pouch, officers found $800.  *Id.*

The officers also found a black purse in the vehicle; inside the purse, they found: 5.8 grams (gross) of methamphetamine; 4.9 grams (gross) of crack cocaine; 5.3 grams (gross) of heroin; twenty-four clonazepam pills; twenty-five hydrocodone pills; thirty methadone pills; five oxycodone pills; two alprazolam pills; and one codeine pill.  *Id*. at Ex.00619-25.  Because the purse contained medicine bottles in Doe-33's name, the officers believed it belonged to her.  *Id.* at Ex.00624.  When Doe-33 was later booked at Tenderloin Station, officers found $103 inside

---

[38] The SFPD incident report identifies Doe-33 as Asian ("A").  Ex.00617.

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

51

her bra.

Based on the foregoing, Doe-33 was charged in Superior Court with violating H&S Code sections 11351, 11351.5, and 11378.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02169. Prior to this incident, Doe-33 had been arrested for drug-trafficking in the Tenderloin on at last three other occasions, all of which resulted in state court charges.  *See* Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02169 (August 2008 arrest at 420 Eddy Street; November 2007 arrest at 6th and Stevenson Streets; July 2006 arrest at 433 Ellis Street).

HH.    John Doe-34

On July 5, 2014, SFPD officers arrested ███████████ ("John Doe-34") for selling crack cocaine near the corner of Larkin and O'Farrell Streets.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. D, Ex.00701.  Doe-34 had "36 individually wrapped off white rocks" of crack cocaine in his possession.  *Id.*  Doe-34 was booked at Tenderloin Station, and the officers learned that he "ha[d] an open case in San Francisco for 11352(a) HS and 11351.5 H&S."  *Id.*  The arrest underlying that case happened February 26, 2014 – also at Larkin and O'Farrell Streets.  *Id.* Because of that open case, Doe-34 also had a stay-away order for the corner of Larkin and O'Farrell streets.  *Id.*; *see also* Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02150.

On September 13, 2014, Doe-34 was once again arrested near the corner of O'Farrell and Larkin Streets for drug-trafficking.  *See id.*  That arrest, too, led to Superior Court charges under H&S Code section 11352(a).  *Id.*

II.    John Doe-35

On September 2, 2014, ███████████ "John Doe-35") was arrested by SFPD officers at the corner of Hyde Street and Golden Gate Avenue.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A, Ex.00455.  Moments earlier, the officers had seen Doe-35[39] sell crack cocaine to another

---

[39] The SFPD incident report identifies Doe-35 as Hispanic ("H").

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

52

individual.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A, Ex.00455.  After detaining the buyer and recovering two individually wrapped crack rocks from his person, the officers arrested Doe-35. *Id.*  During his arrest, Doe-35 spat fourteen individually wrapped rocks of crack cocaine from his mouth, and officers found $181 on his person.  *Id.*  Doe-35 was charged with violating H&S Code sections 11351.5 and 11352.  Ex. 2, Ultan Disco. Mtn. Decl., Att. B at Ex.02410-11.

One week later, on September 10, the SFPD arrested Doe-35 again for trafficking crack cocaine in the Tenderloin (933 Geary Street).  Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02133.  Doe-35 was again charged in Superior Court with violating H&S Code section 11351.5.  Ex. 2, Ultan Disco. Mtn. Decl., Att. B at Ex.02415-16.

On January 14, 2015 (four months after the above-described arrests), Doe-35 was arrested at the corner of Fulton and Hyde Streets for trafficking crack cocaine.  Ex. 2, Ultan Disco. Mtn. Decl., Att. B at Ex.02402-03.  He was again charged in Superior Court with violating H&S Code sections 11351.5 and 11352.  *Id.*

JJ.    John Doe-36

When ████████████████████████ ("John Doe-36") was charged on March 3, 2014 with violating H&S Code section 11351.5, it was the third time that he had been charged in Superior Court for dealing crack cocaine near Larkin and O'Farrell Streets.  Ex. 2, Ultan Disco. Mtn. Decl., Att. B at Ex.02655-56; Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02155.[40] Doe-36 was previously charged with trafficking crack at the same location in January 2013 and in August 2008.  *See* Ex. 2, Ultan Disco. Mtn. Decl., Att. B at Ex.02686-87; Ex.02723; Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02155.  When Doe-36 was charged in 2014 and 2013, both cases alleged his 2009 prior conviction under H&S Code section 11352 (the result of his 2008 case).  Ex. 2, Ultan Disco. Mtn. Decl., Att. B at Ex.02686; Ex.02655.

---

[40] The CMS data indicates that Doe-36 is either White ("W") or "Other" ("O").

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

53

KK.   <u>John Doe-37</u>

██████████ ers responded to 421 Ellis Street on August 7, 2014 and found ███████ ("John Doe-37").  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00277.  As officers approached him, Doe-37[41] threw an unidentified object to the ground.  *Id.* at Ex.00277.  The officers ordered him to "stop and get against the wall," purportedly in order to issue him a citation for littering.  *Id.*  Upon inspecting the thrown object, the officers saw it was a bag containing multiple rocks of crack cocaine (4.9 grams gross).  *Id.*  Doe-37 was arrested and found with marijuana and $512.  *Id.* at. Ex.00275-77.

Doe-37 was taken to Tenderloin Station and booked for violating H&S Code section 11351.5.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00277.  A records check also revealed Doe-37 "was on Supervised Pretrial Release" from another case and "that he had an outstanding warrant."  *Id.*  Prior to the foregoing arrest, Doe-37 had at least twice faced drug-trafficking charges in S.F. Superior Court: once in February 2006 and again in November 2009.  *See* Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02168.

LL.   <u>John Doe-38</u>

On October 15, 2013, SFPD officers patrolling the 700 block of O'Farrell Street (between Larkin and Hyde Streets) saw ████████ ("John Doe-38"),[42] who they knew "from prior police contacts."  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00059.  The officers also "knew that [Doe-38] is a methamphetamine dealer"[43] and was "on active CDC parole [] with a warrantless search and seizure condition."  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00059.

---

[41] The SFPD incident report identifies Doe-37 as Hispanic ("H").  *Id.* at Ex.00275.

[42] The SFPD incident report identifies Doe-38 as Hispanic ("H").  Ex.00059.

[43] According to the CMS system for San Francisco Superior Court, Doe-38 previously had been prosecuted under H&S Code section 11378 in July 2010 and June 2011.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02157.  He also was prosecuted under section 11378 in May 2014.  *Id.*

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

54

As the officers approached Doe-38, he ran westbound on O'Farrell Street and dropped a cigarette box to the ground. Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00059. Doe-38 was detained and a search of the cigarette box yielded 19.6 grams (gross) of methamphetamine. *Id.* The officers also found $465 on Doe-38's person and a California identification card belonging to the victim of a battery four months earlier. *Id.* Based on the quantity of the meth and the absence of any paraphernalia with which Doe-38 could ingest it, he was booked for violating H&S Code section 11378 and parole. *Id.*

MM.   John Doe-39

On August 16, 2014, SFPD officer responded to Hyde Street at UN Plaza regarding a report of illegal narcotics activity in the area. Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00664. There, they saw ███████ ("John Doe-39")[44] illegally riding his bicycle on the sidewalk. *Id.* The officers detained Doe-39 to issue a traffic citation, and a computer search revealed that "he was on active probation." *Id.* The officers conducted a probation search of his person and found 4.9 grams (gross) of powder cocaine in fourteen "individually wrapped bindles." *Id.*

NN.   John Doe-40

While conducting a surveillance operation on December 5, 2013 at the intersection of Hyde and Turk Streets, SFPD officers observed ███████ ("John Doe-40") engage in a suspected narcotics transaction. Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00605.[45] The officers arrested Doe-40 and found two crack rocks on his person. *Id.* The officers found one crack rock on the person of the woman to whom he sold. *Id.* Doe-40 was subsequently charged in S.F. Superior Court under H&S Code sections 11352(a), 11351.5, and 11350(a). Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02182.

---

[44] The SFPD incident report identifies Doe-39 as Hispanic ("H").

[45] The SFPD incident report identifies Doe-40 as Hispanic ("H"). *Id.*

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

55

OO.    <u>John Doe-41</u>

While "conducting a narcotics surveillance operation in the area of Golden Gate/Hyde Street" on December 26, 2013, SFPD officers "observed a Hispanic male," ███████ ("John Doe-41"), standing on the street corner.  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00254. The officers were aware that Doe-41 was "a known narcotics dealer in the area."  *Id.*  In fact, two months earlier, two of the same officers "placed [Doe-41] under arrest at the same intersection for cocaine base sales."  *Id.*

The officers saw Doe-41 spit two "off white rocks" and give them to man who had just given him "U.S. currency."  *Id.*  After arresting the buyer, the officers recovered two rocks of crack cocaine from his pocket.  *Id.*  Their arrest of Doe-41 yielded $217.  *Id.*

PP.    <u>John Doe-42</u>

On December 10, 2013, an SFPD officer was patrolling the Tenderloin on a motorcycle. Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00609.  At the intersection of Turk and Hyde, the officer saw a Hispanic male, ████████ ("John Doe-42"), riding his bicycle against traffic on Hyde Street.  *Id.*  The officer conducted a traffic stop, and during a subsequent search of Doe-42's person, the officer found five pills, "three packages of methamphetamine . . . packaged for sales" and an "amount of heroin" that was "not for personal use."  *Id.* at Ex.00609-610.

Doe-42 was booked at Tenderloin Station for violating H&S Code sections 11351, 11375(b)(2), and 11378.  According to San Francisco's CMS, Doe-42 has previously been charged with drug-trafficking crimes on six prior occasions:  January 2012; April 2011; December 2010; February 2010; November 2009; and March 2001.  *See* Ex. 1, Koeninger Disco. Mtn. Decl., Att. F at Ex.02158.

## VI.    **Incidents of Racial Bias by SFPD Generally**

A.    <u>Racial disparity</u>

A study by the Haywood Burns Institute that was commissioned by the Reentry Council of

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

56

the City and County of San Francisco shows that Black adults are 7.1 times as likely as White adults to be arrested, 11 times as likely to be booked into County Jail and 10.3 times as likely to be convicted of a crime in San Francisco.  Declaration of Galia Amram Phillips In Support of July 2015 Case Management Statement ("July CMC Decl."), Exh. A. [Docket. No. 44].  The study also showed that despite a significant reduction in arrest rates in San Francisco, the disparity gap – the relative rate of arrest for Black adults compared to White adults – is increasing, including for drug offenses.  *Id.* at 15.  The data is particularly stark for Black women.  They represent 5.8% of the city's female population but account for 45.55% of all female arrests in 2013, and 68.8% of narcotics arrests.  Ex. 41, Amram Disco. Mtn. Decl., Att. B.  Blacks in San Francisco are also cited for resisting arrest at a rate eight times greater than Whites even when serious crimes are not involved.  Ex. 41, Amram Disco. Mtn. Decl., Att. C.  "Data and sentiment shows that women and men of color are disproportionately stopped or questioned by police."  Ex. 41, Amram Disco. Mtn. Decl., Att. D (quoting SF Supervisor Malia Cohen when explaining her proposed ordinance to require SFPD officers to collect data on the race of all people stopped by law enforcement).

B.     Racist texts

On February 25, 2014, the USAO filed criminal charges, including drug charges, civil rights violations and fraud charges, against three SFPD officers: Ian Furminger, Edmond Robles and Reynaldo Vargas.  Indictment, *United States v. Edmond Robles et al,* No. 14cr102 (N.D. Cal. filed 02/25/14) (Docket No. 1); Superseding Indictment, *United States v. Edmond Robles et al,* No. 14cr102 (N.D. Cal. filed 10/30/14) (Docket No. 113).   In November 2014, the case went to trial, and both Furminger and Robles were convicted of various counts.  Minute Order, *United States v. Edmond Robles et al,* No. 14cr102 (N.D. Cal. filed 12/01/14) (Docket No. 174); Verdict Form, *United States v. Edmond Robles et al,* No. 14cr102 (N.D. Cal. filed 12/05/14) (Docket No. 180).  On March 31, 2015, the USAO filed a declaration in the Robles/Furminger case from FBI Agent Tyler Nave ("Nave Declaration").  The Nave Declaration was in response to Furminger's

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION CASE NO.  CR 14-643 EMC

57

motion for bail pending the appeal of his conviction.  The Nave Declaration revealed racist text messages involving at least four SFPD officers including Furminger.  Phillips Related Case Decl., Att. I [Docket No. 247-1 in *United States v. Furminger,* No. 14-102 CRB].

Although Nave did not state the exact date that he obtained the text messages, Nave did declare that the FBI obtained the test messages "[d]uring the investigation that led to this case." *Id.* at ¶ 2.[46]  Moreover, on November 5, 2014, SFPD Officer Robles filed a Motion In Limine to exclude a test message from trial in which Robles texted the word "nigga" to SFPD Officer Furminger.  Defendant Edmond Robles' Motion To Exclude Evidence Of Text Messages at 1, *United States v. Edmond Robles et al,* No. 14cr102 (N.D. Cal. filed 11/05/14) (Docket No. 122). So presumably, the USAO was aware of the text messages at least before the 2014 Operation Safe Schools sweep.

In the text messages, the officers use the phrase "White Power!"  They also state:

1) "We got two blacks at my boys school and they are brother and sister!  There cause dad works for school district and I am watching them like hawks."

2) "Do you celebrate quanza at your school?  Yeah we burn the cross on the field! Then we celebrate Whitemas."

3) "Its worth every penny to live here away from the savages."

4) "Those guys are pretty stupid!  Ask some dumb ass questions you would expect from a black rookie!"

5) "The buffalo soldier was why the indians Wouldn't shoot the niggers that fought for the confederate They though they were sacred buffalo and not human."

6) "They were not far off Marley was a nigger."

7) "the indians never had shit Columbus thought he landed where he headed India So HE named them indians They never had a name of their own And the n re is evidence that the

---

[46] There is an allegation that the supervisors in the SFPD knew about the texts as early as 2012. Ex. 41, Amram Disco. Mtn. Decl., Att. E.

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

58

moors niggers were here first."

8)  "Gunther Furminger was a famous slave auctioneer."

9)  "I cant imagine working At Costco and hanging out with filthy flips.  hate to sound racist but that group is disgusting."

10) "He would be so much better off had he married a white chick with a brain he would have a nice house with white kids that were not as ghetto as his are."

11) "Just saw on news there was a peace march in oakland.  everyone marching was white."

12) "My wife has 2 friends over that dont know each other the cool one says to me get a drink nigger not knowing the other is married to one just happened right now LMFAO."

13) "[name redacted] walked up to [name redacted] and said Break yo-self nigga!  Then [name redacted] said, dont make me go old school on yo bitch ass nigga!"

14) White Power Family, [Furminger home address redacted]

15) "All good, I still hate black people!"

16) "Niggers should be spayed."  "I saw one an hour ago with 4 kids.  See. That would be four less."

17) "I am just leaving it like it is, painting KKK on the sides and calling it a day!"

18) "Cross burning lowers blood pressure!  I did the test myself!"

19) "So do I.  Every camping trip i burn an image of the prez."

20) "At his school! Multi purpose room! Their shouldnt be any blacks!"

21) "All niggers must fucking hang."

22) "Just boarded train at Mission/16th."  "Ok, watch out for BM's."  "Too late.  I'm surrounded.  And the only gun I have is broken!"  "Your fucked."  "Dumb nig nugs."

23) "20,000 bees are in Vacaville near School but they are not dangerous like black people."

24) "You are a total homo! And your gay!"

25) "We decided to chill but ended up going to BC house for first half of fight!  Home around 9 ish."  "Cool…who won that…cotto..not"  "No, the nigger!"

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

59

26) "I hate to tell you this but my wife friend is over with their kids and her husband is black! If is an Attorney but should I be worried." "Get ur pocket gun.  Keep it available in case the monkey returns to his roots.  Its not against the law to put an animal down." "Well said!"  "U may have to kill the half breed kids too.  Don't worry.  Their an abomination of nature anyway."

27) "Dude.  Your boy made Q50.  Sgt. Aj Holder." "Fuckin nigger." "Lol and Yolanda Williams." "Or my." "Nigger bitch."

28) "Your sister lies more than any nigger I have ever met in my life.  You awake?"

Phillips Related Case Decl., Att. I [Docket No. 247-1 in *United States v. Furminger,* No. 14-102 CRB].

## VII.   Evidence of Racial Bias in Operation Safe Schools Officers and in Tenderloin Policing

### A.   Evidence of Racial Bias Produced in Discovery in Operation Safe Schools Cases

In the video produced in *United States v. Acacia McNeal,* No. 15-028 CRB, while the camera is trained on a group of two Black women and two Black men, a law enforcement officer is heard loudly stating "fucking BMs." Phillips Related Case Decl., Att. F, 20141201163257.MTS, at 00:45.  Immediately after this exclamation, another officer warns, in an apparent reference to the running video, "shh, hey, I'm rolling." *Id.*   In response to a defense request, the government revealed which officer made the "fucking BM" comment, and which officer said "shh, hey, I'm rolling."  Ex. 5, Under Seal Declaration of Galia Amram Phillips in Support of Motion to Compel Discovery on Selective Prosecution and Enforcement, ¶ 5 at Ex.02857.   Those officers worked on at least 17 other Operation Safe School cases.  Ex. 2, Ultan Related Case Decl., ¶¶ 2-3 at Ex.02232-33.

In the video produced in discovery in *United States v. Cassie Roberts,* No. 13-760 CRB, the undercover informant tries to buy drugs from Ms. Roberts, a Black woman.  Ms. Roberts,

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

60

who is on the phone, doesn't respond initially.  An Asian woman approaches the confidential

informant and offers to sell drugs, but the informant declines and waits for Ms. Roberts to get off

of the phone.  Phillips Related Case Decl., Att. G at 06:45 and 13:15 (recording the informant

explaining to the agents that Ms. Roberts was not paying attention to him [the informant], but he

got her attention and avoided the "Asian chick" by saying he wants the "good shit.").

B.      Incidents of Racial Bias By SFPD Officers In The Tenderloin

These specific incidents described above, caught on videotape, mirror years of poor

treatment of Blacks by law enforcement officers in the Tenderloin.  Dominique Leslie, who has

worked in the Tenderloin area for 15 years, notes that:

> I have lived and worked in the Tenderloin area for fifteen (15) years and have
> personal experience interacting with and observing police officers in San
> Francisco's Tenderloin neighborhood.  In July of 2015, we moved our office from
> 472 Turk Street to 233 Eddy Street.  At our Turk Street address, most of the hand
> to hand street drug transactions I observed were being conducted by Hispanics,
> with seemingly very little police activity. At our Eddy Street location most hand
> to hand street drug transactions I witness are conducted by African Americans,
> where I have observed a large and seemingly disproportionate presence of police
> activity as compared to our Turk Street location.  The amount of hand to hand
> transactions I observe are every bit as frequent now as they were a year ago, and
> the police focus on African American drug dealers over other ethnic group drug
> dealers seems to be the same as a year ago.

Ex. 36, Declaration of Dominique Leslie, ¶¶ 1-3 at Ex.3066-70.

In addition, Operation Safe Schools defendants – including some who are not part of this

motion – have signed and submitted sworn declarations concerning the treatment they have

experienced by police officers in the Tenderloin.  Like Dominique Leslie, the Operation Safe

School defendants are aware that law enforcement officers in the Tenderloin routinely give more

attention to Blacks than individuals of other races.  Ex. 37, Declaration of Erwin Mackey, ¶ 3 at

Ex.03071-72; Ex. 31, Declaration of Shavon Gibson, ¶ 2 at Ex.03044-46; Ex. 29, Declaration of

Wendell Johnson, ¶ 2 at Ex.03034-38; Ex. 7, Declaration of Saquita Nash, ¶ 3 at Ex.02935-39;

Ex. 8, Declaration of Aaron Mathews, ¶ 2 at Ex.02940-41; Ex. 9, Declaration of Acacia McNeal,

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

61

¶ 2 at Ex.02942-46; Ex. 10, Declaration of Angela Jones, ¶ 2 at Ex.02947-51; Ex. 11, Declaration of Anita Dixon, ¶ 2 at Ex.02952-56; Ex. 12, Declaration of Crystal Anthony, ¶ 2 at Ex.02957-61; Ex. 13, Declaration of Darrell Powell, ¶ 2 at Ex.02962-63; Ex. 14, Declaration of Darlene Rouse, ¶ 2 at Ex.02964-68; Ex. 15, Declaration of Hobert Lee, ¶ 2 at Ex.02969-73 (noting that when he is accompanied by his Caucasian wife, officers do not question her as they do him); Ex. 16, Declaration of Lakeysha White, ¶ 2 at Ex.02974-78; Ex. 17, Declaration of Matthew Mumphrey, ¶ 2 at Ex.02979-83; Ex. 18, Declaration of Mellina Williams, ¶ 2 at Ex.02984-88;  Ex. 19, Declaration of Nijah Reed, ¶ 2 at 02989-90; Ex. 20, Declaration of Sholanda Adams, ¶ 2 at 02991-95; Ex. 21, Declaration of Tiana Reddic, ¶ 2 at Ex.02996-03000; Ex. 22, Declaration of William Brown, ¶ 2 at Ex.03001-02; Ex. 35, Declaration of Ebony Wallace, ¶ 2 at Ex.03060-65.

As Erwin Mackey explained:  "Police patrols and arrests in the Tenderloin primarily occur on blocks occupied by African American individuals … In my experience, the police do not harass, arrest or conduct raids on the Honduran dealers that sell within blocks of the Federal Building.  They also do not appear to harass the Hondurans that sell drugs on Hyde Street or the Filipino dealers that are concentrated on Leavenworth Avenue between Turk and Eddy Streets."  Ex. 37, Mackey Decl., ¶ 4 at Ex.03071-72.  As described in detail below, police harassment of Blacks in the Tenderloin has taken many forms.

### 1.   Use Of Racial Slurs By SFPD Officers In The Tenderloin

Defendants have also heard law enforcement officers in the Tenderloin use racial slurs.  Shavon Gibson, Wendell Johnson, Latoya Jackson, David Madlock, Lakeysha White, Acacia McNeal, Jamella Jules and Anita Dixon have all heard officers refer to Black females as "black bitches."  Ex. 31, Gibson Decl., ¶ 4 at Ex.03044-46; Ex. 29, Johnson Decl., ¶ 3 at Ex.03034-38; Ex. 34, Jackson Decl., ¶ 2 at Ex.03055-59; Ex. 16, White Decl., ¶ 3 at Ex.02974-78; Ex. 24, Jules Decl., ¶ 2 at Ex.03008-12; Ex. 23, Madlock Decl., ¶ 2 at Ex.03003-07; Ex. 9, McNeal Decl., ¶ 3 at Ex.02942-46; Ex. 11, Dixon Decl., ¶ 3 at Ex.02952-56.  Tiana Reddic has been

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

62

called "little black girl" by Officer Ryan.  Ex. 21, Reddic Decl., ¶ 5 at Ex.02996-03000.  *See also*
Ex. 30, Cross Decl., ¶ 2 at Ex.03039-43; Ex. 35, Wallace Decl., ¶ 3 at Ex.03060-65; Ex. 7, Nash
Decl., ¶ 5 at Ex.02935-39; Ex. 9, McNeal Decl., ¶ 3 at Ex.02942-46; Ex. 12, Anthony Decl., ¶ 3
at Ex.02957-61; Ex. 19, Reed Decl., ¶ 3 at Ex.02989-90  (describing being referred to, or hearing
a Tenderloin officer refer to a Black woman, as "bitch").  SFPD Officer Crosby made a comment
to Crystal Anthony like "you stuffing shit in your pussy bitch."  Ex. 12, Anthony Decl., ¶ 3 at
Ex.02957-61.  Angela Jones has heard SFPD officers "refer to people as 'bitches' and use
phrases such as 'sit your black ass down' when speaking to African-American people."  Ex. 10,
Jones Decl., ¶ 4 at Ex.02947-51.

David Madlock has been referred to as "boy," by Caucasian police officers in the
Tenderloin.  Ex. 23, Madlock Decl., ¶ 3 at Ex.03003-07.  And three others have heard SFPD
officers in the Tenderloin refer to Black men as "boy."  Ex. 35, Wallace Decl., ¶ 3 at Ex.03060-
65; Ex. 29, Johnson Decl., ¶ 3 at Ex.03034-38; Ex. 24, Jules Decl., ¶ 2 at Ex.03008-12.  Five
people have heard officers in the Tenderloin use the word "nigger."  Ex. 29, Johnson Decl., ¶ 3 at
Ex.03034-38; Ex. 34, Jackson Decl., ¶ 2 at Ex.03055-59; Ex. 16, White Decl., ¶ 3 at Ex.02974-
78; Ex. 24, Jules Decl., ¶ 2 at Ex.03008-12; Ex. 22, Brown Decl., ¶ 3 at Ex.03001-02.  An SFPD
officer whom Erwin Mackey knows "as Darren yelled that I 'better get [my] black ass off the
block.'"  Ex. 37, Mackey Decl., ¶ 3 at Ex.03071-72.  Moreover, in 2014, Ebony Wallace
witnessed Officers Goff, Scafani and another SFPD officers harass a small group of Black
teenagers.  One of the officers told the group, "Hands up, don't shoot!"  Wallace believed the
comment was intended to make fun of the Black Lives Matter Movement.  Ex. 35, Wallace
Decl., ¶ 7 at Ex.03060-65.

### 2.  Incidents of Sexually Inappropriate Behavior By SFPD Officers Against Black Women

Many of the defendants have also witnessed San Francisco police officers act sexually
inappropriately toward Black females.  Ex. 30, Declaration of Tiffany Cross, ¶ 3 at Ex.03039-43;

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

63

1   Ex. 35, Wallace Decl., ¶ 4 at Ex.03060-65; Ex. 7, Nash Decl., ¶ 3 at Ex.02935-39; Ex. 18,

2   Williams Decl., ¶ 3 at Ex.02984-88; Ex. 17, Mumphrey Decl., ¶ 3 at Ex.02979-83; Ex. 8,

3   Mathews Decl., ¶ 3 at Ex.02940-41;  Ex. 12, Anthony Decl., ¶ 4 at Ex.02957-61; Ex. 23,

4   Declaration of David Madlock, ¶ 4 at Ex.03003-07; Ex. 24, Declaration of Jamella Jules, ¶ 3 at

5   Ex.03008-12; Ex. 16, White Decl., ¶ 4 at Ex.02974-78; Ex. 19, Reed Decl., ¶ 4 at Ex.02989-90;

6   Ex. 21, Reddic Decl., ¶ 3 at Ex.02996-03000; Ex. 34, Declaration of Latoya Jackson, ¶ 3 at

7   Ex.03055-59.   There is a well-documented connection between racism and sexual violence

8   against Black women.  Ex. 41, Amram Disco. Mtn. Decl., Att. P  (Article from the National

9   Resource Center on Domestic Violence on Sexual Violence in the Lives of African-American

10  Women); Danielle McGuire, *At the Dark End of the Street:  Black Women, Rape and Resistance*

11  *– A New History of the Civil Rights Movement from Rosa Parks to the Rise of Black Power*, New

12  York: Knopf (2010).[47]

13          Officer Ryan, who worked on Operation Safe Schools, is a particular problem.  In or

14  around 2008, while transporting Acacia McNeal to the San Francisco County Jail, Ryan said "I

15  just got married and you better be glad . . . or I'll take some black pussy."  Ex. 9, McNeal Decl.,

16  ¶ 5 at Ex.02942-46.  In February 2013, Ryan made a comment to Angela Jones during an arrest

17  that "You should be doing something else with that body, you could making that money doing

18  something else other than selling drugs."  Ex. 10, Jones Decl., ¶ 5 at Ex.02947-51.  Darlene

19  Rouse has heard Ryan "make statements such as, 'I like big titties,' and 'you look just like my

20  wife.'"  Ex. 14, Rouse Decl., ¶ 4 at Ex.02964-68.  Ryan has made statements to Jamella Jules

21  about the size of his penis.  He implied that it was large.  In 2009, while talking to Jules, Ryan

22  pointed to a woman and said, "Do you see the girl back there?  If you suck dick like her then

23  you'll get out of trouble too."  Ex. 24, Jules Decl., ¶ 3 at Ex.03008-12.  Tiffany Cross has also

24

_____

25  [47] In addition, some officers who mistreated Black women also used racial slurs.  *See e.g. supra*

26  and *infra* (noting that Officer Ryan used the term "little black girl," and "I'll take some black
    pussy.")

27

28

1    had disturbing interactions with Ryan.  On one occasion, as Cross was walking with a friend, Ms.

2    Turner, Ryan approached while driving his police vehicle.  He rolled down the window and

3    asked Ms. Turner, "When are you going to suck my dick?"  Ex. 30, Cross Decl., ¶ 3 at Ex.03039-

4    43.  Another time, Ryan made sexually inappropriate comments to Cross about her tongue ring.

5    He told other officers who were standing nearby, "Leave her alone, she has a tongue ring.

6    There's something that I can do with her later."  *Id.*

7           Ryan has physically searched Mellina Williams on occasions, rather than having a female

8    officer do so, and has repeatedly made comments to her like, "Oh yeah, you looking good today"

9    and "You've got a big butt."  Ex. 18, Williams Decl., ¶ 5 at Ex.02984-88.  Ryan has also made

10   several sexually inappropriate comments to Nijah Reed.  On one occasion he told her, "let me

11   take you out."  On another occasion he said, "you probably have some good stuff" which she

12   thought meant that he wanted to have sex with her.  Ryan also requested to smell her hands

13   because he believed that she had placed drugs in her genital area and that her hands smelled like

14   her vagina.  Ex. 19, Reed Decl., ¶ 5 at Ex.02989-90.  In 2012, while Saquita Nash was detained

15   at the Tenderloin Police Station, several unknown female police officers attempted to conduct a

16   vaginal cavity search of her.  She resisted the search.  Later, Ryan came into the room where she

17   was being held and screamed at her, "Quit fucking around Ms. Nash!"  Ex. 7, Nash Decl., ¶ 4 at

18   Ex.02935-39.  "While I continued to be handcuffed, he turned me around and forcibly spread my

19   legs from behind. While another female officer held me down, Ryan attempted to remove a bag

20   of drugs from my vagina.  I screamed "help me, help me!" Ryan ultimately extracted the drugs

21   from my vagina, but I felt extremely violated in the process."  Ex. 7, Nash Decl., ¶ 4 at

22   Ex.02935-39.[48]  *See also* Ex. 20, Adams Decl., ¶ 3 at Ex.02991-95 (noting that Ryan is known in

23   the Tenderloin neighborhood for harassing Blacks and that Ryan made her uncomfortable

24   because he made comments to her that made her feel that he was speaking to her in a sexually

25   _____

      [48] Nash also heard Ryan make comments that women who are confidential informants for him
26   are "bitches that work for me."  Ex. 7, Nash Decl., ¶ 5 at Ex.02935-39.

27

28   NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
     ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
     CASE NO.  CR 14-643 EMC

inappropriate manner.)  In another instance, Ryan made inappropriate comments and gestures to Ebony Wallace while he was on duty.  Wallace witnessed Ryan pulling at his crotch while he said, "Hey girls, get it up there!"  Ex. 35, Wallace Decl., ¶ 5 at Ex.03060-65.

Ebony Wallace also witnessed Officer Goff flirt with some of her friends while he was working in the Tenderloin.  In 2014, he told Wallace and a few of her female friends, "I saw your pictures on Instagram and they looked real real nice."  The tone in his voice and the way he delivered the statement "made us feel uneasy.  He seemed to take pleasure in being able to look at our personal photographs online."  Ex. 35, Wallace Decl., ¶ 4 at Ex.03060-65.  Officer Crosby has also sexually harassed Black females.  In 2013, Crosby, dressed in street clothing, approached Lakeysha White on Sixth Street and said, "I want to handcuff you to a bed and fuck you."  Ex. 16, White Decl., ¶ 5 at Ex.02974-78.  On other occasions, he has referred to her as his "girlfriend" and told other people to "stop talking to my girl."  *Id.*

Inappropriate searches of Black women in the Tenderloin by other male law enforcement officers are also an issue.  This happened to Acacia McNeal on two separate occasions within the last five years.  "On both occasions, the most recent having occurred approximately two years ago, a male officer searched me, touched my breasts and unclasped my bra.  I objected to the search, but the officer continued."  Ex. 9, McNeal Decl., ¶ 4 at Ex.02942-46.  David Madlock has "witnessed police officers take pleasure in conducting physical searches of their genitals and buttocks.  Some of the officers will show their pleasure by smiling and/or spending an unusually long time to search this area of the body.  On multiple occasions, I've witnessed male officers put their hands inside of a woman's pants instead of waiting for a female officer to conduct the search."  Ex. 23, Madlock Decl., ¶ 4 at Ex.03003-07.

Latoya Jackson was the victim of an inappropriate search by SFPD Officer Goff.  In 2012, Goff performed a probation search of her.  "While performing the search, Officer Goff touched my breasts.  His search did not feel like a typical pat-down search that I would receive from a female officer, it was more like he groped me.  Officer Goff told me that he didn't mean

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION CASE NO.  CR 14-643 EMC

66

to do it but I sensed that it was intentional."  Ex. 34, Jackson Decl., ¶ 4 at Ex.03055-59.  Jackson then discovered that Goff had been looking at her photographs on Instagram after he made comments about her pictures.  *Id.* at ¶ 5.  Shavon Gibson has been arrested many times in the Tenderloin and as part of the arrest she is often searched.  "One day a male policeman, of Arab descent, decided he was going to search me rather than wait for a female officer.  The man pat me down very aggressively, patting my behind and reaching around to pat down my crotch area."  Ex. 31, Gibson Decl., ¶ 6 at Ex.03044-46.

### 3.  Acts Of Violence By SFPD Officers In The Tenderloin Against Blacks

Some defendants have witnessed SFPD officers commit acts of violence against Blacks, or had acts of violence committed against them.  *See* Ex. 37, Mackey Decl., ¶ 5 at Ex.03071-72 ("While out in the neighborhood I have seen brutal interactions between the police and African Americans.")   Officer Hope was particularly rough with Sholanda Adams.  "I was just going to work as an in-home care worker in September 2014.  At the time I was pregnant. The officers detained me, grabbed my arms, and were forceful with me. They also harassed my client, an African-American gentleman who was at the time using a cane and recovering from a stroke who had come over to where I was. They pushed him against a car and roughed him up."  Ex. 20, Adams Decl., ¶ 4 at Ex.02991-95.[49]  In 2014, Ebony Wallace witnessed Officer Goff and two other SFPD officers driving in the Tenderloin neighborhood in a burgundy/deep cherry Malibu.  "The officers appeared to be playing around while on patrol.  They drove around the neighborhood with their firearms hanging outside the windows of the car.  The look on their faces made it clear that they were having a good time." This incident made Wallace feel very unsafe and uneasy.  Ex. 35, Wallace Decl., ¶ 6 at Ex.03060-65.  Aaron Mathews watched Officer

---

[49] *See also* Ex. 33, Declaration of Leonard Amedee, ¶¶ 1-3 at Ex.03053-54 (confirming that he was walking with Sholanda Adams in the fall of 2014 when SFPD officers "grabbed her out of nowhere.").

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

67

Nocetti place a man in a chokehold until "blood vessels in his eyes appeared to pop, turning Joe's eyes red." Ex. 8, Mathews Decl., ¶¶ 4 at Ex.02940-41. Anita Dixon's foot was stomped on by an SFPD officer trying to wake her up. Ex. 11, Dixon Decl., ¶ 4 at Ex.02952-56.

William Brown was choked, kicked and punched by officers in the area of Taylor and Market Streets. Ex. 22, Brown Decl., ¶ 4 at Ex.03001-02. Darrell Powell was hit by five or six officers in the fall of 2014. Ex. 13, Powell Decl., ¶ 4 at Ex.02962-63. David Madlock has "witnessed at least thirty separate occasions where the police have beaten or been physically aggressive towards African-Americans. Some of the beatings occurred even after the person had been in handcuffs." Ex. 23, Madlock Decl., ¶ 5 at Ex.03003-07. Tiffany Cross watched Officers Ryan and Razz run their car into an Black woman who was attempting to avoid arrest. Ex. 30, Cross Decl., ¶ 4 at Ex.03039-43. Erwin Mackey saw Tenderloin police officers punch a heroin addict who did not move quickly enough when the police told him to get off the block. Ex. 37, Mackey Decl., ¶ 5 at Ex.03071-72.

In 2013, near the corners of Eddy and Mason Streets in the Tenderloin, Officer Ryan stopped Tiana Reddic and her girlfriend, Tierra Santalucia:

> He suspected that we were in possession of drugs. He and another officer patted us down. Ryan then made a comment, referring to me, that he was "gonna send this bitch back to prison where I sent her before." Ryan then made another comment to his fellow officer and said, "Make it easier, how about I just handcuff them and put them in the police car and drive them to Candlestick and put a bullet in their heads." He further stated, "next time I see you, I'm going to give you a case and send you the fuck back to prison."

Ex. 21, Reddic Decl., ¶ 4 at Ex.02996-03000.

Officer Ryan has also threatened Shavon Gibson. Ryan said he would take Gibson to jail if she did not leave the area. "He has also told me that even if I did not have drugs on me he would plant some on me and then take me to jail." Ex. 31, Gibson Decl., ¶ 5 at Ex.03044-46. Wendell Johnson likewise had a deeply traumatic experience with Ryan:

> In November 2012, Officer Shaughn Ryan passed me while driving his police

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO. CR 14-643 EMC

vehicle in the Tenderloin neighborhood.  Officer Ryan abruptly stopped his vehicle and exited the car.  He drew his gun and pointed it directly at me.  He yelled, "who are you?"  I quickly provided him with my name.  Officer Ryan placed me under arrest, handcuffed me and then he escorted me across the street to a police vehicle.  I asked Officer Ryan multiple times why I was being arrested.  He responded, "shut your mouth."  I continued to ask him why I was being arrested.  I wanted clarification about what was happening because I had not done anything wrong.  Officer Ryan appeared agitated by my questioning and he became even more upset when he discovered that I didn't know his name or who he was in the neighborhood.  For some reason he expected me to know him or at least know of him.  At this point he began to threaten me.  He said, "I'm going to kill you mother fucker and shoot you in your head."  I was terrified that he was going to kill me especially since it was dark and late at night.  Two other San Francisco police officers were present when he made these statements; I did not recognize the other officers and I do not know their names.

Ex. 29, Johnson Decl., ¶ 4 at Ex.03034-38.


# ARGUMENT

## I.     Selective Prosecution

### A.     Legal Standard

#### 1.  United States v. Armstrong

In *United States v. Armstrong,* 517 U.S. 456, 469 (1996), the Supreme Court determined the standard for selective prosecution claims.  Noting that the "requirements for a selective prosecution claim draw on ordinary equal protection standards," the Court held that a claimant "must demonstrate that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose."  *Id.* at 465 (internal citations omitted).

In order to obtain discovery, the defense must produce "some evidence tending to show the existence of the discriminatory effect element."  *Id.* at 469.  Notably, the Supreme Court never stated that a defendant needs to produce "some evidence" of the discriminatory intent element to obtain discovery of a selective prosecution claim.  *See id.*[50]  To show "some

---

[50] Despite this, some courts have held that a defendant needs to produce "some evidence" of both discriminatory effect and discriminatory intent to receive discovery on selective prosecution. *See United States v. Venable,* 666 F.3d 893, 900 (4th Cir. 2012); *United States v. Lewis,* 517 F.3d

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

69

1    evidence" of the discriminatory effect prong, the defense must "produce some evidence that

2    similarly situated defendants of other races could have been prosecuted, but were not."  *Id.*  This

3    "rigorous standard," the Supreme Court concluded, "adequately balances the Government's

4    interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution."

5    *Id*. at 470.

6            Applying the standard to the case before it, the Supreme Court found that the proffered

7    evidence failed to pass the necessary threshold.  The study proffered by the Federal Public

8    Defender's office in that case — which indicated that every one of the twenty-four cocaine cases

9    closed by the office in 1991 involved defendants who were Black — "failed to identify

10   individuals who were not black and could have been prosecuted for the offenses for which

11   respondents were charged, but were not so prosecuted."  *Id*.  The Court also found that a

12   proffered newspaper article, "which discussed the discriminatory effect of federal drug

13   sentencing laws, was not relevant to an allegation of discrimination in decisions to prosecute."

14   *Id*.  Finally, the Court explained that affidavits, "which recounted one attorney's conversation

15   with a drug treatment center employee and the experience of another attorney defending drug

16   prosecutions in state court, recounted hearsay and reported personal conclusions based on

17   anecdotal evidence." *Id*.

18           Overall, the *Armstrong* court made clear that the main failure of the defense was in not

19   identifying similarly-situated persons of other races who could have been prosecuted but were

20   not.  *Id.* at 470.  Relatedly, *Armstrong* explained that the defense could have met its burden by

21   identifying members of other races who were charged in state court for the crime at issue in the

22   selective enforcement litigation, but not charged federally.  *Id.* at 470.  In fact, in its reply brief in

23   the *Armstrong* case, the Solicitor General argued that the defendants had failed to avail

24
_____
     20, 25 (1st Cir. 2008); *United States v. Sepulveda,* 952 F.Supp.94, 96 (D.R.I. 1997); *United*
25   *States v. Olvis*, 97 F.3d 739, 743 (4th Cir.1996).  Other cases have required only "some
     evidence" of discriminatory effect.  *United States v. Al Jibori*, 90 F.3d 22, 25 (2d Cir. 1996);
26   *United States v. Paxton,* 2014 WL 1648746 (N.D. Ill., Apr. 17, 2014).

27

28   NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
     ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
     CASE NO.  CR 14-643 EMC

themselves of California state court records that were open to inspection and could provide

supporting data.  *See United States v. Armstrong*, No. 95-157, 1996 WL 67650, at *16–17

(U.S.Reply.Brief, filed Feb. 15, 1996).  Despite this, case law subsequent to *Armstrong* shows

that when *Armstrong* motions are meritorious, it is often because lower courts have ordered the

government to provide discovery even when the defense has not identified similarly-situated

individuals of other races.  *See United States v. Davis,* 766 F.3d 722, 731 (7th Cir. 2014), *rev'd

and remanded en banc,* 793 F.3d 712 (7th Cir. 2015) (discussing the stash-house cases in the

Northern District of Illinois in which numerous district courts granted discovery based on

statistics); *United States v. Tuitt,* 68 F. Supp. 2d 4 (D. Mass. 1999); *United States v. Al Jibori*, 90

F.3d 22, 25-26 (2d Cir. 1996).

## 2.   Discriminatory Effect Prong Of A Selective Prosecution Claim

"To establish a discriminatory effect in a race case, the claimant must show that similarly

situated individuals of a different race were not prosecuted."  *Armstrong,* 517 U.S. at 465.

Courts have held that the discriminatory effect prong may be shown by statistical evidence.

*Chavez v. Illinois State Police,* 251 F.3d 612, 638 (7th Cir. 2011); *Davis,* 766 F.3d at 731

(discussing the stash-house cases in the Northern District of Illinois in which numerous district

courts granted discovery based on statistics); *Tuitt,* 68 F. Supp. 2d 4; *United States v. Duque-

Nava*, 315 F.Supp.2d 1144, 1156 (D. Kan. 2004) ("While helpful, purely statistical evidence is

rarely sufficient to support an equal protection claim, but can be sufficient to establish

discriminatory effect.")  *Cf. United States v. Turner,* 104 F.3d 1180, 1185 (9th Cir. 1997) (noting

that the statistics in *Armstrong* did not "advance a defense of selective prosecution without

further consideration of the sociological factors affecting the pattern of crime and without a

showing that similarly-situated defendants of other races had been left unprosecuted").

In *Yick Wo v. Hopkins,* 118 U.S. 356 (1886), for example, discriminatory effect was

proved by showing that all 200 applications by Chinese launderers were denied, while only 1 of

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

71

90 applications by White launderers was denied.  Similarly, in *Hunter v. Underwood*, 417 U.S. 222, 228 (1985), the Supreme Court was satisfied with a showing that the law at issue made disenfranchisement of Blacks at least 1.7 times more likely than disenfranchisement of Whites. In using statistics, the defense must not assume that members of a particular racial group commits crimes at a rate proportionate to their representation in the overall population.  *United States v. Arenas-Ortiz,* 339 F.3d 1066, 1069 (9th Cir. 2003) (citing *Armstrong,* 517 U.S. at 469-70.)

a.   <u>Definition of Similarly Situated</u>

The Supreme Court did not define "similarly situated" in *Armstrong*, nor in any case since.  In *Turner,* the Ninth Circuit did not provide an overall definition of similarly-situated but did hold that the statistics presented by the defense were unimpressive because there was "no showing at all that the crack cocaine sellers prosecuted by California were gang members who sold large quantities of crack; so the principal characteristic of the federal defendants is omitted." *Turner,* 104 F.3d at 1185.[51]  In so holding, the Ninth Circuit explained "that such gangs should be targeted is a neutral, nonracial law enforcement decision; the distribution of cocaine by gang members inclined to violence makes the distribution more heinous and more dangerous than the

---

[51] In a case decided before *Armstrong, United States v. Aguilar,* 883 F.2d 662, 706 (9th Cir. 1989), *superseded by statute on other grounds,* P.L. No. 99–603, 100 Stat. 3359, as stated in *United States v. Gonzalez–Torres,* 309 F.3d 594 (9th Cir. 2002). 1989), the Ninth Circuit stated that:

> The goal of identifying a similarly situated class of law breakers is to isolate the factor allegedly subject to impermissible discrimination.  The similarly situated group is the control group.  The control group and defendant are the same in all relevant respects, except that defendant was, for instance, exercising his first amendment rights.  If all other things are equal, the prosecution of only those persons exercising their constitutional rights gives rise to an inference of discrimination.  But where the comparison group has less in common with defendant, then factors other than the protected expression may very well play a part in the prosecution.

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

72

single sale of cocaine by individuals."[52]  *Cf. Tuitt,* 68 F.Supp.2d at 14 (noting that the government was defining "similarly situated" too narrowly as "similarly situated" does not mean "identically situated").  Other Circuits have defined "similarly situated" as follows.

### i.     First Circuit

The First Circuit defines similarly situated as: "A similarly situated offender is one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced."  *United States v. Lewis,* 517 F.3d 20, 25 (1st Cir. 2008).  The First Circuit also explained that:

> In configuring the pool of similarly situated offenders, 'no fact should be omitted to make it out completely.'  To be sure, this statement cannot be taken literally. The focus of an inquiring court must be on factors that are at least arguably material to the decision as to whether or not to prosecute.  Material prosecutorial factors are those that are relevant-that is, that have some meaningful relationship either to the charges at issue or to the accused-and that might be considered by a reasonable prosecutor.  Unrelated, irrelevant, or trivial factors cannot meet the materiality requirement and, therefore, cannot be built into the configuration of the pool.

*Id.* (citing *Armstrong,* 517 U.S. at 466).

### ii.     Fourth Circuit

The Fourth Circuit defines similarly situated as: "Defendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them."  *Olvis,* 97 F.3d at 744.  *Cf. Chavez,* 251 F.3d at 636 ("The relevant inquiry is whether a similarly situated individual was treated differently than the plaintiff, not whether one white motorist was subjected to the same

---

[52] All of the cases in Operation Safe School concern the single sale of a controlled substance by an individual.  Notice of Related Case at 5, *United States v. Tiana Reddic, No.* 15cr52 (N.D. Cal. filed Mar. 31, 2015) (Docket No. 16-2).

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

73

unlawful treatment. Allowing defendants to escape liability for discriminating against Hispanics simply because they occasionally mistreat white motorists would dismantle our equal protection jurisprudence.").

The Fourth Circuit also identified the following factors as relevant to the issue of whether someone is similarly situated: (1) a prosecutor's decision to offer immunity to an equally culpable defendant because that defendant may choose to cooperate and expose more criminal activity; (2) the strength of the evidence against a particular defendant; (3) the defendant's role in the crime; (4) whether the defendant is being prosecuted by state authorities; (5) the defendant's candor and willingness to plead guilty; (6) the amount of resources required to convict a defendant; (7) the extent of prosecutorial resources; (8) the potential impact of a prosecution on related investigations and prosecutions; and (9) prosecutorial priorities for addressing specific types of illegal conduct." *Olvis*, 97 F.3d at 744. The 6th through 9th factors relate to whether the same law enforcement officers were involved. *See Venable*, 666 F.3d at 902 (noting that factors 6-9 are "are all affected by Project Exile's role in this case," and that "it bears note that in order to prosecute Turner and Zechman, the United States Attorney's Office for the Eastern District of Virginia would have had to reach outside the Project Exile referral process, outside the geographic reach of Project Exile, and outside its own district").

### iii.    Seventh Circuit

Under Seventh Circuit law, the "similarly situated" comparison group is defined by the government's purported selection criteria.   In *United States v. Hayes*, 236 F.3d 891 (7th Cir. 2001), for example, the court focused on comparing "African-Americans falling within the Operation Triggerlock guidelines [who] were prosecuted in federal court" to "persons of another race who fell within the Operation Triggerlock guidelines and were not federally prosecuted." *Id.* at 895–896 (7th Cir. 2001); *see also Chavez*, 251 F.3d at 640-45 (defining similarly situated comparison group as white drivers on Illinois highways who met the requirements of law

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

74

enforcement's "Operation Valkyrie").

### iv.   Eleventh Circuit

The Eleventh Circuit defines similarly situated as:

> In light of those legitimate factors, we define a "similarly situated" person for selective prosecution purposes as one who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant—so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan—and against whom the evidence was as strong or stronger than that against the defendant.

*United States v. Smith,* 231 F.3d 800, 810 (11th Cir. 2000).

In addressing "similarly situated," the Eleventh Circuit also noted that though the Supreme Court has not "definitively explained what constitutes a 'similarly situated' individual in this context, [] the definition is informed by the Supreme Court's recognition of legitimate factors that may motivate a prosecutor's decision to bring a case against a particular defendant. Those factors include 'the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan.'" *Id.* at 810 (citing *Armstrong,* 517 U.S. at 465).  Finally, the Eleventh Circuit explained that the "government can legitimately place a higher priority on prosecuting someone who commits an offense three, six or seven times, than someone who commits an offense once or twice, especially when the offense is a non-violent one.  Likewise, the willingness of a jury to convict a defendant of a crime may increase with the number of times that defendant has committed the crime." *Id.* at 812.

### b.   The Defendants Have Made A Prima Facie Showing Of Discriminatory Effect

As an initial matter, this Court need not select a specific definition of a "similarly situated" individual because, under any definition used by any court, the defense has identified

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION CASE NO.  CR 14-643 EMC

75

1    numerous similarly situated individuals who could have been charged in Operation Safe Schools

2    but were not.  Indeed, the evidence of Operation Safe Schools' discriminatory effect is

3    overwhelming.

4            First, the expert report prepared by Dr. Beckett compellingly demonstrates that the racial

5    composition of persons charged with drug-trafficking under Operation Safe Schools (100%

6    Black) is significantly at odds with both (a) the racial composition of Tenderloin-based drug-

7    traffickers arrested and charged in San Francisco County Superior Court; and (b) the racial

8    composition of drug providers in the Tenderloin as described by drug users in the Tenderloin.

9    *See* Ex. 41, Amram Disco. Mtn. Decl., Att. M.  As Dr. Beckett found, during the relevant time

10   period, 61.4% of those arrested in the Tenderloin and charged with drug-trafficking crimes in

11   Superior Court were Black, while 24.7% were Latino and 10.7% were White.  *Id.* at Ex.04218-

12   20.  According to Dr. Beckett, when compared to the 100% Black arrest/charging rate of

13   Operation Safe Schools, the difference in these racial proportions is "highly statistically

14   significant, and there is virtually no chance that this difference is the result of chance."[53]  *Id.* at

15   Ex.04219-20.  A comparison between Operation Safe Schools and Dr. Beckett's study of the

16   racial composition of drug providers in the Tenderloin (56% Black, 20% Latino, 16.8% White)

17   leads to the same conclusion.  *Id.* at Ex.04220.

18           Next, almost every area of the Tenderloin falls within 1,000 feet of a playground or

19   educational institution covered by 21 U.S.C. § 860, the statute under which the Operation Safe

20   Schools defendants were prosecuted.[54]  *See* Ex.6, Sommerfeld Disco. Mtn. Decl. ¶ 10 & Att. D;

21   ─────────────
   [53] In addition to the CMS data, the defense has identified more than fifty non-Black drug

22   traffickers who were arrested in the Tenderloin between August-December 2013 and August-
   December 2014, but were not charged in either state or federal court.  *See* Ex. 1, Koeninger

23   Disco. Mtn. Decl., Att. A-B; *cf. id.* Att. G.  There is good reason to believe that additional public
   records requests would reveal even more such arrests.  *See* n.16 *supra*.

24   [54] As noted above, the Operation Safe Schools defendants were indicted under various provisions
   of § 860.  While many were indicted for activity within 1,000 feet of a school, one defendant

25   (Lakeysha White) was charged with drug-trafficking within 1,000 feet of a playground, while
   another (William Brown) was charged with drug-trafficking within 1,000 feet of the Downtown

26   Campus of San Francisco State University.

27

28   NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
     ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
     CASE NO.  CR 14-643 EMC

1  Ex. 38, Declaration of Loana Dominguez in Support of Motion to Compel Discovery on

2  Selective Prosecution and Enforcement ¶¶ 2-4 at Ex.03073-75.  Accordingly, of the hundreds of

3  drug-trafficking arrests that were made in the Tenderloin between January 2013 and February

4  2015 and involved non-Black individuals, almost *all* could have been charged under § 860.[55]

5  *See* Ex. 1, Koeninger Disco. Mtn. Decl., Atts. B & G (listing hundreds of non-Black drug-

6  trafficking arrests in the Tenderloin); *id.*, Att. A (incident reports underlying various Tenderloin

7  arrests of non-Black drug-traffickers).  In fact, in multiple instances involving similarly situated,

8  non-Black drug-traffickers, the SFPD officers were actually investigating whether a particular

9  drug transaction occurred less than 1,000 feet from a school.  *See* discussion *supra* at Section V.

10      Finally, the defense has specifically identified numerous non-Black individuals who were

11  trafficking the same types of drugs as the Operation Safe Schools defendants, during the same or

12  similar time period as the Operation Safe Schools defendants, and whose criminal histories are

13  the same or similar to the Operation Safe Schools defendants (some of whom have **no** adult

14  convictions, **one** misdemeanor, non-drug-related adult conviction, or only **one** drug-trafficking

15  conviction).  *See* Ex. 1, Koeninger Disco. Mtn. Decl., Att. A-D, F-G.[56]  Further, many of these

16  non-Black individuals identified by the defense would constitute "recidivists" or "repeat

17  offenders" under nearly any definition the government could possibly seek to employ.  Because

18  numerous examples of these similarly situated non-Black, Tenderloin-based drug-traffickers are

19  discussed in detail in the Background Section V *supra*, the defense will not revisit those facts

20  again here.  However, the defense emphasizes that those non-Black, Tenderloin-based drug-

21  traffickers include people who: were arrested while on parole or felony probation for previous

22  [55] The defense has identified two non-Black individuals charged in Superior Court whose arrests
23  appear to fall more than 1,000-feet from a covered playground or educational institution.  *See* Ex.
   1, Koeninger Disco. Mtn. Decl., Att. G at Ex.02212 (████████ arrest at Mission and Julia
24  Streets); *id.* at Ex.02220 ███████████ arrest at 8th and Minna Streets).

25  [56] By identifying these individuals, the defense does not concede that someone must meet all of
   these criteria to qualify as similarly situated.  In fact, the defense believes that such a ruling
26  would define similarly-situated too narrowly.  However, given the volume of "similarly situated"
   persons identified by the defense, the Court need not decide the precise contours of that phrase.

27

28  NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
   ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
   CASE NO.  CR 14-643 EMC

drug-trafficking convictions; otherwise had previous drug-trafficking convictions or charges; had

been repeatedly arrested by SFPD for drug trafficking in the Tenderloin; had open drug-

trafficking cases in S.F. Superior Court; or were otherwise well-known to SFPD as notorious

drug traffickers, some of whom could be found in the Tenderloin almost every day.  Moreover,

because some of the defendants targeted by Operation Safe Schools had little-to-no adult

criminal history, *see* Background section I.G *supra*, the defense contends that every non-Black

individual who was arrested for trafficking drugs in the Tenderloin during the relevant time

period constitutes a person similarly situated to the Operation Safe Schools defendants.  *See* Ex.

1, Koeninger Disco. Mtn. Decl. Atts. A-D, F-G.

      In view of the foregoing, the discriminatory effect of Operation Safe Schools is beyond

cavil.

### 3.   Discriminatory Intent Prong Of A Selective Prosecution Claim

      Because "[p]roving the motivation behind official action is often a problematic

undertaking," *Hunter v. Underwood,* 471 U.S. 222 (1995), "[d]etermining whether official action

was motivated by intentional discrimination 'demands a sensitive inquiry into such

circumstantial and direct evidence of intent as may be available.'"  *Farm Labor Organizing

Committee v. Ohio State Highway Patrol,* 308 F.3d 523, 534 (6th Cir. 2003) (citing *Village of

Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)); *United States v.

Alcaraz-Arellano,* 441 F.3d 1252, 1264 (10th Cir. 2006) ("Discriminatory intent can be shown

by either direct or circumstantial evidence.").  Courts often look to the use of racially derogatory

language. "Such language is strong evidence of racial animus, an essential element of any equal

protection claim."  *Chavez,* 251 F.3d at 646.  *See also Carrasca v. Pomeroy,* 313 F.3d 828, 834

(3d Cir. 2002) (reference to Plaintiffs as "Mexicans," arguably stated as a pejorative racial slur,

demonstrates that the Rangers acted with a racially discriminatory purpose).

      Moreover, courts must take into account whether the selection criteria used by the

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

78

government was subject to abuse or otherwise not neutral.  *Wayte v. United States,* 470 U.S. 598, 626 (1985).  *See also id.* at 629 ("Adherence to a particular policy or practice, with full knowledge of the predictable effects of such adherence ... is one factor among others which may be considered by a court in determining whether a decision was based on an impermissible ground.") (internal citations omitted).  The Seventh Circuit has explained that a defendant can satisfy the discriminatory intent prong by coming forward with evidence showing that the government had an "actual or de facto" policy "encouraging racial profiling."  *United States v. Barlow*, 310 F.3d 1007, 1012 (7th Cir. 2002).  And the conduct of police officers, including their awareness of a defendant's race before arrest, is relevant.  *See Duque-Nava,* 315 F.Supp.2d at 1161 (finding no discriminatory intent where there was no evidence the officer had treated, spoke to, or otherwise exhibited discriminatory behavior and where there was no evidence the officer knew the defendant's race before the stop); *Marshall v. Columbia Lea Regional Hospital*, 345 F.3d 1157, 1168 (10th Cir. 2003) ("Similarly, a police officer's pattern of traffic stops and arrests, his questions and statements to the person involved, and other relevant circumstances may support an inference of discriminatory purpose in this context").

Some courts find that statistics, if compelling, provide sufficient evidence of intent, and thus the discriminatory intent prong often overlaps with discriminatory effect.  *United States. v. Alameh*, 341 F.3d 167, 173 (2d Cir. 2003) ("Such purpose may, however, be demonstrated through circumstantial or statistical evidence."); *United States v. Paxton*, No. 13 CR 103, 2014 WL 1648746, at *5 (N.D. Ill. Apr. 17, 2014) (finding that statistical data on the races of defendants charged in phony-stash cases in the Northern District of Illinois was sufficient to show both discriminatory effect and intent); *Smith,* 231 F.3d at 810 ("We recognize that the nature of the two prongs of a selective prosecution showing are such that they will often overlap to some extent...."); *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 n. 20 (1977) ("Statistics showing racial or ethnic imbalance are probative ... because such imbalance is often a telltale sign of purposeful discrimination."); *Tuitt,* 68 F.Supp.2d at 10 (citing *Gomillion v.*

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

79

*Lightfoot*, 364 U.S. 339, (1960) ("A discriminatory effect which is severe enough can provide sufficient evidence of discriminatory purpose."). *See also Washington v. Davis*, 426 U.S. 229, 242 (1976) ("[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [practice] bears more heavily on one race than another."). This is especially true in cases involving the "inexorable zero." *See United States v. Paxton*, No. 13 CR 103, 2014 WL 1648746, at *5 (finding that defendants had presented evidence of discriminatory effect and intent where "[t]he defense has demonstrated that no white defendants have been indicted for phony stash house cases since 2009, despite the diverse makeup of the Northern District of Illinois. Because 'the inexorable zero' may be evidence of discriminatory intent, *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886), the court finds that defendants have produced 'some evidence' tending to show discriminatory intent.").

In fact, in the oral argument for *Armstrong,* the Solicitor General conceded that a large enough statistical disparity between the race of those charged in state court with those charged in federal court would itself be sufficient to warrant a response from the government. *United States v. Armstrong*, No. 950157, 1996 WL 88550, at *7 (Oral.Arg.Trans., Feb. 26, 1996). Specifically, Justice Stevens questioned the Solicitor General as to whether discovery would be warranted if the state court files showed that 50 percent of the prosecutions were of Blacks whereas 100 percent of the federal prosecutions were of Blacks. *United States v. Armstrong*, 1996 WL 88550, at *3 (U.S.Oral.Arg.1996). After some back and forth, Justice Ginsburg returned to the question originally posed by Justice Stevens; the Solicitor General responded as follows: "Well, I think that the example that Justice Stevens gave, and you gave, would be going a very long way toward showing that there was a selection. There would be people similarly situated. At least presumably that would require the Government to say something in response to that, but we certainly don't have that in this case…. We think in a situation such as you describe the Government would have a responsibility to come forward and show, in some fashion or another, that there was an absence of comparability…." *Id.* at *7.

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

80

Other courts have also found statistics sufficient.  In *Tuitt,* for example, the court found the defense made a sufficient showing to obtain discovery based only on the statistical disparity between the race of defendants charged in federal court with selling crack cocaine (all Black) and those charged in state court (57% Black).  In so holding, the court noted that the "evidence more than speaks for itself," that even the government acknowledged "that the evidence could 'raise an eyebrow,'" and that "more importantly, the information provided by Defendant, unlike that provided in *Armstrong*, is not anecdotal or confined to statistics arising out of the federal district itself.  Rather, Defendant has also undertaken a comprehensive survey of the local state courts in order to provide an appropriate comparison."  *Tuitt,* 68 F.Supp.2d at 9.

In contrast, in *Olvis,* the Fourth Circuit held that the defendant's statistics did not provide "some evidence" of discriminatory intent because "the study provide[d] no statistical evidence on the number of blacks who were actually committing crack cocaine offenses or whether a greater percentage of whites could have been prosecuted for such crimes."  *Olvis,* 97 F.3d at 745. "Without an appropriate basis for comparison, the percentage of African American crack cocaine defendants proved nothing, unless it could be presumed that crack cocaine violations were committed proportionately by all races, an assumption rejected by the Supreme Court in *Armstrong*."  *Venable,* 666 F.3d at 903.  *See also id.* (finding insufficient evidence of discriminatory intent because the statistical evidence provided "contains no appropriate basis for comparison.  It provides no statistical evidence about the number of blacks who were actually committing firearms offenses or whether a greater percentage of whites could have been prosecuted for such crimes.  It does not even provide any evidence regarding the proportion of blacks residing within the relevant geographical area").

In *Marshall*, the Tenth Circuit approved the use of statistics because:

 In general, the absence of an overtly discriminatory policy or of direct evidence of police motivation results in most claims being based on statistical comparisons between the number of black or other minority Americans stopped or arrested and their percentage in some measure of the relevant population.  This requires a

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

81

reliable measure of the demographics of the relevant population, a means of telling whether the data represent similarly situated individuals, and a point of comparison to the actual incidence of crime among different racial or ethnic segments of the population.

345 F.3d at 1168 (citing *Armstrong,* 517 U.S. at 469-70).

a.   The Defense Has Shown A Prima Facie Case Of Discriminatory Intent

The statistical disparity present here is so dramatic that it alone should suffice for making a prima facie case of discriminatory intent based on the cases cited above.  However, the Court need not decide whether statistics alone are sufficient because there are at least two other bases supporting a prima facie case of discriminatory intent.  They are:

- A comparative analysis of the thirty-seven Operation Safe Schools defendants with the similarly-situated persons shows that the government's race neutral reasons for prosecuting the thirty-seven Operation Safe Schools defendants, outlined in their declarations filed in July 2015, are pretextual.  *See Batson v. Kentucky,* 476 U.S. 79 (1986); *Crittenden v. Ayers,* 624 F.3d 943, 956 (9th Cir. 2010).  ("Comparative juror analysis is an established tool at step three of the Batson analysis for determining whether facially race-neutral reasons are a pretext for discrimination … comparative juror analysis may be employed at step one to determine whether the petitioner has established a prima facie case of discrimination.").

- The government put in place a policy for charging decisions for Operations Safe Schools that was subject to abuse.  *Castaneda v. Partida,* 430 U.S. 482, 494 (1977) (stating a "procedure that is susceptible to abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing").

i.   **Comparative analysis.**

The government has stated that, in implementing Operation Safe Schools, it directed law enforcement to "target recidivist, repeat offenders who were selling drugs near schools and to concentrate on the criminal history of the defendants."  Mtn. Seeking Ruling at 6:20-22.  The government also said that "the decision to charge each defendant in Operation Safe Schools was

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION CASE NO.  CR 14-643 EMC

82

1   based on the nature and number of the defendant's prior offenses, the proximity of the

2   defendant's drug sales to a school, the number of times each defendant sold drugs in and around

3   the Tenderloin, and the strength of the evidence against each defendant."  Mtn. Seeking Ruling at

4   7:8-11.  However, a critical review of these stated directives shows that they are invalid (and,

5   therefore, pretextual) – both because the thirty-seven defendants charged in Operation Safe

6   Schools include individuals who do *not* meet the stated criteria, and because the various non-

7   Black, Tenderloin-based drug traffickers identified above were not charged even though they *do*

8   meet the government's stated criteria.

9         When evaluating Equal Protection Clause claims in the context of a prosecutor's decision

10   to strike a prospective juror – *i.e.*, that a prosecutor struck a juror on account of their race – both

11   the Supreme Court and the Ninth Circuit have consistently endorsed a comparative analysis to

12   evaluate whether a prosecutor's facially race-neutral explanation for his or her actions actually

13   amounted to pretext, and therefore, evidence supporting a finding of purposeful discrimination.

14   *See, e.g., Miller-El v. Dretke*, 545 U.S. 231, 241 (2005) ("More powerful than these bare

15   statistics, however, are side-by-side comparisons of some black venire panelists who were struck

16   and white panelists allowed to serve.  If a prosecutor's proffered reason for striking a black

17   panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is

18   evidence tending to prove purposeful discrimination to be considered at *Batson's* third step.");

19   *Crittenden v. Chappell*, 804 F.3d 998, 1012 (9th Cir. 2015) (observing that "[c]omparative juror

20   analysis is an established tool at step three of the *Batson* analysis for determining whether

21   facially race-neutral reasons are a pretext for discrimination" and concluding that because non-

22   Black jurors who were "comparable in their death penalty views and otherwise" to a stricken

23   Black juror "were selected for the jury, the comparative juror analysis significantly weakens the

24   government's race-neutral explanation" for the prosecutor's challenge and constitutes "strong

25   evidence in support" of a finding that the challenge "was substantially motivated by race").[57]

---

26   [57] In *Armstrong,* respondents argued that *Batson* cut against any absolute requirement that

27

28   NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

83

The comparative analysis employed by courts to evaluate *Batson*-type claims under the Equal Protection Clause is instructive in the context of selective-prosecution-based equal protection claims, and such a comparative analysis finds ready application here.  Indeed, when subjected to comparative analysis, the government's claim that Operation Safe Schools targeted "persistent, recidivist, and repeat offenders selling drugs near schools in the Tenderloin neighborhood of San Francisco," Gov't Mtn. Seeking Ruling at 7:10-11, appears to be pretextual.

(a)  Recidivism

The government's assertion that Operation Safe Schools targeted "persistent, recidivist, and repeat offenders" does not withstand scrutiny under a comparative analysis of all of the thirty-seven Black defendants charged under the Operation.  As discussed *supra* at Background Section I.G, the criminal history of the thirty-seven defendants varied significantly.  In fact, not all of them were "persistent, recidivist, and repeat offenders."  Rather, Jahnai Carter has no adult criminal convictions; Darlene Rouse has one adult conviction (for misdemeanor petty theft); William Brown and Ashley Pharr have only one prior drug-trafficking conviction (from another county); Matthew Mumphrey has only one prior drug-trafficking conviction, but it is thirteen years old, and his only other conviction is an eight-year-old drug paraphernalia conviction; Darrell Powell has no criminal history of drug trafficking; Jamella Jules falls within Criminal History Category (CHC) II of the U.S. Sentencing Guidelines, with only one prior drug trafficking conviction from 2002; Shavon Gibson is CHC I, with only one prior conviction of any kind, a drug-trafficking conviction from 2005; and Shaneka Clay is CHC II based on one

---

defendants must show that similarly-situated people were not prosecuted.  *Armstrong*, 517 U.S. at 467.  The Supreme Court held that *Batson* did not do away with the similarly-situated requirement.  That does not mean, however, that *Batson* is not instructive on the issue of whether a prosecutor's facially race-neutral explanation for a particular decision is a pretext for discrimination.  The Supreme Court has not addressed whether a comparative-juror-analysis framework is applicable in the context of a selective prosecution claim when a defendant has presented evidence of similarly situated people (as opposed to using comparative juror analysis alone to avoid a showing of similarly-situated individuals).

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

84

1  prior drug-trafficking conviction from 2002 (a 1998 conviction was too old to count).  Ex. 41,

2  Amram Disco. Mtn. Decl., ¶¶ 2-4, Att.  A at Ex.03094-04144; Ex. 2, Ultan Disco. Mtn. Decl., ¶

3  2, Att. A at Ex.02234-43.

4  While it may be true that other defendants charged under Operation Safe Schools could

5  fairly be described as "persistent, recidivist, and repeat offenders," the fact that the government

6  nevertheless charged individuals who do not fairly meet these criteria "significantly weakens the

7  government's race-neutral explanation" for why all of the thirty-seven defendants it charged

8  under Operation Safe Schools are Black.  *Crittenden*, 804 F.3d at 1017.

9  Moreover, many of the non-Black, Tenderloin-based drug traffickers identified by the

10 defense could fairly be characterized as "persistent, recidivist, and repeat offenders" who were

11 similarly trafficking drugs in the Tenderloin.  *See* discussion *supra*.  That none of these non-

12 Black drug-traffickers were prosecuted under Operation Safe Schools tends to undermine the

13 government's assertion that recidivism was a "priority" for deciding whom to prosecute.  Indeed,

14 although the declarations submitted by the government assert that the DEA and SFPD were

15 instructed to target "persistent, recidivist, and repeat offenders selling drugs near schools in the

16 Tenderloin neighborhood of San Francisco," see [Barry Decl. ¶ 7, Docket 51-3; Kelaba Decl. ¶

17 6, Docket 51-4], and also assert (in various forms) that race was not considered during the

18 determination of which individuals to prosecute under Operation Safe Schools, it appears that

19 none of the AUSAs who submitted declarations were willing to state unequivocally that only

20 Black individuals were arrested and presented for prosecution by the DEA and/or SFPD.  In

21 other words, none of the government's declarations deny that non-Black drug-traffickers were

22 arrested by the DEA/SFPD and presented for federal prosecution under Operation Safe Schools –

23 but nevertheless were not prosecuted because they did not satisfy the Operation's priorities.

24

25  (b)  Trafficking Drugs Near "Schools"

26  The government also asserts that Operation Safe Schools targeted repeat offenders

27

28
NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

85

1   "selling drugs near *schools* in the Tenderloin neighborhood of San Francisco."  Gov't Mtn.

2   Seeking Ruling at 7:10-11 (emphasis added).  Although this would constitute a race-neutral basis

3   for prosecution, a comparative analysis also undermines this assertion and suggests that it is

4   pretextual.  Significantly, while the Operation purportedly targeted persons selling drugs "near

5   schools" in the Tenderloin, and even though a press-release from the USAO stated that a goal of

6   Operation Safe Schools was "to ensure that *children* who live and go to school in these

7   neighborhoods are not exposed to crime and drug dealing,"[58] the government nonetheless

8   indicted one of the Operation Safe Schools defendants – William Brown – for trafficking crack

9   cocaine within 1,000 feet of "the Downtown Campus of San Francisco State University."

10  Indictment, *United States v. Brown*, Case No. CR-15-00069 (Docket 1).  Therefore, when

11  indicting Mr. Brown, the government did not adhere to own stated bases for prosecution (and the

12  defense is unaware of any instance in which the government has claimed that one of the goals of

13  Operation Safe Schools was to protect adult students studying at local colleges).[59]  Accordingly,

14  because a comparative analysis shows that not all Operation Safe Schools defendants were

15  charged consistent with the government's claimed bases for prosecution, this fact "significantly

16  weakens the government's race-neutral explanation" for why all of the thirty-seven defendants it

17  charged under Operation Safe Schools are/were Black.  *Crittenden*, 804 F.3d at 1017.

18       The defense also has demonstrated that nearly all of the non-Black drug traffickers

19  arrested in the Tenderloin and charged in Superior Court during the relevant period were also

20  with 1,000 feet of an educational institution or playground covered by 21 U.S.C. § 860.  *See* Ex.

21

---

22  [58] See Phillips Decl. In Support Of Notice Of Related Case ("Phillips Related Case Decl."), Att.
    C [2.12.15 USAO Press Release], United States v. Crystal Anthony, No. 15cr005 (N.D. Cal.
23  filed 03/31/15) [Docket No. 11].

24  [59] Lakeysha White was indicted for trafficking drugs within 1,000 feet of a playground rather
    than a school.  *See* Indictment, *United States v. White*, Case No. CR-15-00029 (Docket 1).
25  Although the defense acknowledges that Ms. White's indictment is somewhat more consistent
    with the government's stated goal of targeting those persons selling drugs near schools (because
26  children play at playgrounds), this additional lack of symmetry among Operation Schools
    defendants further supports an inference that this basis for prosecution was pretextual.

27

28  NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
    ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
    CASE NO.  CR 14-643 EMC

6, Sommerfeld Disco. Mtn. Decl. ¶ 10 & Att. D at Ex.02931.  When the arrest locations for these non-Black individuals is compared with the locations of the incidents underlying the charges against the thirty-seven Operation Safe Schools Defendants, *cf.* Ex. 6, Sommerfeld Disco. Mtn. Decl. ¶ 9 & Att. C at Ex.02926-30 *with* Ex. 6, Sommerfeld Disco. Mtn. Decl., Atts. E & F at Ex.02932-34, it is plain that the two groups were extensively intermingled.  Notwithstanding this comparative similarity, not one non-Black individual was charged federally – a fact that also undermines the assertion that Operation Safe Schools was a race-blind operation targeting only those who dealt drugs near schools.

(c) <u>Strength of the Evidence</u>

The government additionally claims that its charging decisions were based in part on the "strength of the evidence against each defendant"; however, this was a sting operation organized by the DEA/SFPD taskforce, in which the same tactics were used for the 2013 operation, and then one of two tactics used for the 2014 operation.  *See supra* at section I(D).  The "strength of the evidence" was therefore entirely based on whom the DEA/SFPD chose to target and how they chose to conduct the sting operation.  The government has never stated that the DEA/SFPD taskforce targeted any non-Blacks.  If it didn't, the government cannot credibly claim that its law enforcement officers can collect evidence only against Blacks, and that, as a result, because there is only "strong evidence" against a Black person, a prosecutor's subsequent decision to charge that Black person is race neutral.

ii.    **Use of a policy susceptible to abuse**

If the USAO established policies that permitted racial profiling to occur by law enforcement (or failed to put into place any polices to prevent racial profiling), that is sufficient evidence of discriminatory intent whether or not the prosecutors are themselves motivated by racial animus.  *See Wayte,* 470 U.S. at 626 (courts must take into account whether the selection

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION CASE NO.  CR 14-643 EMC

87

criteria used by the government was subject to abuse or otherwise not neutral). *See also id.* at 629 ("Adherence to a particular policy or practice, with full knowledge of the predictable effects of such adherence ... is one factor among others which may be considered by a court in determining whether a decision was based on an impermissible ground.") (internal citations omitted).  Courts have recognized, for example, that a policy that is susceptible to abuse or allows for excessive officer discretion can lead a factfinder to conclude that the decision makers were motivated by race.  *Casteneda v. Partida,* 430 U.S. 482, 494 (1977) (a "procedure that is susceptible to abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing"); *Rodriguez v. California Highway Patrol,* No. 99cv20895 JF, (N.D. Cal. Aug. 1, 2001) [Docket No. 211] (discussing a policy that permits excessive officer discretion).  In fact, in the *Batson* context, the Supreme Court recognized that statistical disparities may raise a presumption of discrimination when the procedure at issue presents "the opportunity for discrimination." *Batson,* 476 U.S. at 95.

Here, the line AUSAs who brought the cases in the 2014 declare that for each of the cases they brought, they were "provided an account of the individual's conduct memorialized in a Drug Enforcement Administration Form 6, surveillance video of the drug buys taken by the San Francisco Police Department, and the criminal history of each defendant."  Hawkins Decl., ¶ 5; Farnham Decl., ¶ 5.[60]  In other words, it appears from the declarations that the AUSAs became involved after the DEA/SFPD taskforce had chosen the targets, conducted the operations, and written the report.  The AUSAs did not state that they participated in the decision about who should be targeted for Operation Safe Schools.  Moreover, the declarations do not claim that the AUSAs ever inquired whether any persons who had not been presented for prosecution met the charging criteria set forth by the USAO.  Nor do the declarations state that the AUSAs turned down any persons presented for prosecution by the DEA/SFPD taskforce.  Rather, the

---

[60] The Government did not provide declarations for the line AUSAs from the 2013 sweep.

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

88

1  declarations indicate that once the DEA/SFPD taskforce had completed the operation and a

2  report was prepared, the AUSA reviewed it to determine whether to prosecute.  Such a procedure

3  is "susceptible to abuse" in that there is no system to insure that the law enforcement actors are

4  not engaging in racial profiling.

5          The government cannot defend itself by claiming that it was unaware of the similarly-

6  situated persons identified in this motion.  The government has already conceded that the

7  AUSAs were "familiar[] with the Tenderloin, its residents, and the drug dealing that occurred

8  there," at the time they began Operation Safe Schools.  *See supra* at I.F.  Considering the

9  overwhelming evidence from multiple sources that the Tenderloin drug-selling population is

10  racially diverse, that different races control different areas in the Tenderloin, and that Latinos

11  control the public areas near Hastings Law School, the U.S. post office, and U.N. plaza, it is

12  inconceivable that a person "familiar with the Tenderloin, its residents, and the drug dealing that

13  occurred there, could reasonably believe that Blacks are the only race that sells in the Tenderloin.

14  *See* supra, at sections II, III and IV.  As to the government's claim that the two supervisory

15  AUSAs were not aware of the race of any defendant before authorizing prosecution, Mtn.

16  Seeking Ruling at 7:1-6,[61] the rap sheet – and often the police report – state the race of the

17  defendant.  Phillips Related Case Decl., Attachment H; Ex. 41 Amram Disco. Mtn. Decl., Att. A

18  at Ex.03094-04144.  Moreover, Operation Safe Schools consisted of two sweeps – one in 2013

19  and one in 2014.  Once the first fourteen people were arrested and arraigned in the 2013 sweep,

20  the government must have been aware that they all appeared to be Black.  Likewise, once the

21  defendants for the 2014 sweep were brought into court, the government must also have noticed

22

---

[61] AUSA Hasib, who initiated Operation Safe Schools, says he, too, did "not know of the race of most of the defendants prosecuted in Operation Safe Schools."  *Id.* at 6:18-19.  The two line AUSAs for the 2014 sweep, Sarah Hawkins and Lloyd Farnham, do not claim that they were unaware of the race of the defendants before prosecuting them.  Declaration of Sarah Hawkins In Support Of United States' Motion ("Hawkins Decl.") [Docket No. 51-1]; Declaration of Lloyd Farnham In Support Of United States' Motion ("Farnham Decl.") [Docket No. 51-2].

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

89

1  that they appeared to be all Black as well.  Finally, the filings in the *Furminger* case show that

2  the government appears to have received the racist text messages before Fall 2014.  *See* Phillips

3  Related Case Decl., Att. I [Docket No. 247-1 in *United States v. Furminger,* No. 14-102 CRB]

4  (saying that the government received the messages while investigating the case).

5       Thus, before the 2014 sweep, the government was, or should have been, on notice that: 1)

6  the drug traffickers in the Tenderloin were racially diverse; 2) all defendants from the 2013

7  sweep were Black, and 3) that there were issues regarding racism in the SFPD.  Considering that

8  both civil litigants and criminal defendants cannot escape liability by "deliberately shielding

9  themselves from clear evidence of critical facts that are strongly suggested by the

10  circumstances," *Global-Tech Appliances, Inc. v. SEB S.A*., 563 U.S. 754, 756 (2011) (applying

11  the willful blindness doctrine to civil cases), the government cannot avoid responsibility by

12  claiming that it lacked awareness of facts that should have put it on notice of the need to insure

13  racial bias was not effecting law enforcement officers' decisions on whom to present for

14  prosecution.  Yet the government's declarations do not indicate any such procedures were put in

15  place – even after the 2013 sweep netted only Black defendants.

16

17  **II.      Selective Enforcement**

18       A.      A Selective Enforcement Claim is Cognizable

19

20       In *Whren v. United States,* 517 U.S. 806 (1996), the Supreme Court confirmed that an

21  officer's discriminatory motivations for pursuing a course of action can give rise to an Equal

22  Protection claim, even when there is no Fourth Amendment violation.  The "Constitution

23  prohibits selective enforcement of the law based on considerations such as race.  But the

24  constitutional basis for objecting to intentionally discriminatory application of laws is the Equal

25  Protection Clause, not the Fourth Amendment."  *Whren,* 517 U.S. at 813.  *See also Yick Wo v.*

26  *Hopkins,* 118 U.S. 356 (1886) ("Though the law itself be fair on its face, and impartial in

27

28
NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

90

1    appearance, yet, if it is applied and administered by public authority with an evil eye and an

2    unequal hand, so as practically to make unjust and illegal discriminations between persons in

3    similar circumstances, material to their rights, the denial of equal justice is still within the

4    prohibition of the constitution.").[62]

5         Since the Supreme Court's decision in *Whren* and *Armstrong,* the defense has not found a

6    citable decision in which the Ninth Circuit addressed either, in a criminal case, a selective

7    prosecution claim based solely on the actions of law enforcement, or a selective enforcement

8    claim.[63]  The Ninth Circuit has, however, plainly recognized the viability of an Equal Protection

9    claim based on selective enforcement in the civil rights (§ 1983) context.  *Lacey v. Maricopa*

10   *County,* 693 F.3d 896, 920 (9th Cir. 2012) (en banc) (citing *Armstrong,* 517 U.S. at 465);

11   *Rosenbaum v. City and County of San Francisco,* 484 F.3d 1142, 1153 (9th Cir. 2007) (citing

12   *Armstrong,* 517 U.S. at 465).  There is no logical reason for why dismissal of a criminal charge

13   would be the appropriate remedy for an Equal Protection violation caused by the prosecutor, but

---

[62] Before the Supreme Court's rulings in *Armstrong* and *Whren*, the Ninth Circuit held that "the proper focus in discriminatory prosecution cases is on the ultimate decision-maker."  *United States v. Gomez-Lopez,* 62 F.3d 304, 306 (9th Cir. 1995).  Therefore the Ninth Circuit denied selective prosecution claims when "the ultimate decision to prosecute is several steps removed from the [] officer," and [t]here is no evidence that the decision to prosecute [] was made by anyone other than the USAO . . . ." *Id.*  (citing *United States v. Erne,* 576 F.2d 212, 216 (9th Cir. 1978; *United States v. Greene,* 698 F.2d 1364 (9th Cir. 1983)).  None of these cases addressed a selective enforcement claim.  However, as discussed *supra* at pp. 87-89, if discovery shows that for Operation Safe Schools, the USAO in effect delegated the decision to prosecute to the law enforcement agents (by, for example, not declining anyone presented for prosecution nor inquiring who else met the charging criteria but had not been presented for prosecution) then the racial bias of the law enforcement officers results in selective prosecution as well as selective enforcement.  *See United States v. Monsoor,* 77 F.3d 1031, 1035 (7th Cir. 1996) (explaining that in the vindictiveness context, the animus of the investigating agency will be imputed to the prosecutors if a defendant shows that the agency prevailed upon the prosecutor in making the decision to seek an indictment).

[63] However, in *Turner,* the Ninth Circuit's opinion took into account the actions of law enforcement: "appellees have offered no evidence whatsoever of an intent on the part of the prosecutors to prosecute them on account of their race, and the prosecutors **and FBI investigators** have under oath denied such motivation. No reason was given by the district court to doubt the "background presumption" that United States Attorneys are properly discharging their duties, no reason given to doubt the integrity of prosecutors **and investigators** whose honesty, good faith, and absence of racial bias are unimpaired by anything in evidence before the court."  *Turner,* 104 F.3d at 1185 (emphasis added).

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

1   unavailable when caused by law enforcement.  Under either circumstance, the defendant's

2   prosecution is the result of an unconstitutional application of the law.  *See United States v. Davis*,

3   793 F.3d 712 (7th Cir. 2015) (en banc) ("If the [law enforcement] agencies do [discriminate],

4   they have violated the Constitution – and the fact that the United States Attorney may have

5   prosecuted every case the agencies presented, or chosen 25% of them in a race-blind lottery,

6   would not matter, since the constitutional problem would have preceded the prosecutor's role

7   and could not be eliminated by the fact that things didn't get worse at a later step.").

8          Moreover, every other circuit that has addressed a motion to dismiss for selective

9   enforcement has addressed the merits of the claim – no circuit has held that selective

10  enforcement cannot result in dismissal.[64] *Davis*, 793 F.3d 712; *Gibson v. Superintendent*, 411

11  F.3d 427, 441 (3d Cir. 2005) ("*Whren* and *Carrasca* stand for the proposition that, even though

12  the Fourth Amendment reasonableness standard is not influenced by the subjective intentions of

13  the person making the search or seizure, if a person can demonstrate that he was subjected to

14  selective enforcement in violation of his Equal Protection rights, his conviction will be

15  invalid."); *Alcaraz-Arellano*, 441 F.3d at 1264; *United States v. Barlow*, 310 F.3d 1007, 1012

16  (7th Cir. 2002); *United States v. Bell*, 86 F.3d 820, 822-23 (8th Cir. 1996); *United States v.*

17  *James*, 257 F.3d 1173, 1179 (10th Cir. 2011); *See also United States v. Lamar*, 2015 WL

18  4720282 (S.D.N.Y. Aug. 7, 2015) (motion denied but no argument raised that selective

19  enforcement is not cognizable); *Duque-Nava*, 315 F.Supp.2d at 1152; *Tuitt*, 68 F.Supp.2d at 15

20  (noting that if "the investigators and police authorities exercised discriminatory intent in

21  Defendant's arrest and/or their referral to the United States Attorney's Office, his selective

22

---

23  [64] In addition, as the Ninth Circuit recognized in *United States v. Montero-Camargo*, 208 F.3d
    1122, 1134 (9th Cir. 2000) (en banc), there have been "significant changes in the law restricting
24  the use of race as a criterion in government decision-making.  The use of race and ethnicity for
    such purposes has been severely limited."  *See also id.* at 1135 ("Stops based on race or ethnic
25  appearance send the underlying message to all our citizens that those who are not white are
    judged by the color of their skin alone. Such stops also send a clear message that those who are
26  not white enjoy a lesser degree of constitutional protection-that they are in effect assumed to be
    potential criminals first and individuals second.")

27

28  NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
    ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
    CASE NO.  CR 14-643 EMC

    92

1    prosecution claim may be meritorious even without a showing of the prosecutor's intent when

2    deciding to seek an indictment"); *United States v. Whitfield,* 29 F.Supp.3d 503, 511 (E.D. Pa.

3    2014); *Marshall*, 345 F.3d at 1167 ("Racially selective law enforcement violates this nation's

4    constitutional values at the most fundamental level; indeed, unequal application of criminal law

5    to white and black persons was one of the central evils addressed by framers of the Fourteenth

6    Amendment."). *Cf. United States v. Hare,* 308 F.Supp.2d 955, 96 n.2 (D. Neb. 2004) (noting

7    that there is no Supreme Court or Eighth Circuit authority for dismissal or suppression for

8    selective enforcement).

9           It bears noting that a large selective enforcement challenge is currently pending in the

10   Northern District of Illinois regarding the phony-stash-house cases brought by the ATF.   The

11   cases have not been consolidated and a number of district judges have issued discovery orders

12   for selective enforcement.  One discovery order was appealed to a three-judge panel of the

13   Seventh Circuit and then appealed again to an *en banc* panel.  In all courts in which the selective

14   enforcement challenge is pending – the district courts and the Seventh Circuit – the government

15   has not even raised the argument that dismissal is not an appropriate remedy for selective

16   enforcement. *United States v. Paxton,* 2014 WL 1648746 (N.D. Ill., Apr. 17, 2014);  *United*

17   *States v. Brown et al*., 12-CR-632 (N.D. Ill., Nov. 8, 2013) [Docket No. 171]; *United States v.*

18   *Alexander*, 2013 WL 6491476 (N.D. Ill. Dec. 10, 2013).  In fact, the government's repeated

19   motions for a continuance of the briefing in the *en banc* appeal show that the U.S. Attorney's

20   Office for the Northern District of Illinois consulted with the Solicitor General's Office on the

21   briefing for the selective enforcement challenge, and still no argument was raised that selective

22   enforcement is not a cognizable claim in a criminal case.  Government's Motion For Extension

23   of Time Within Which To File A Petition For Rehearing *En Banc*, No. 14-1124, *United States v.*

24   *Davis*, (7th Cir. Filed 9.15.04) [Docket Nos. 43, 45 and 47].

25          Nevertheless, the USAO in this District has taken the position that, even where a criminal

26   defendant proves an equal protection violation based on selective enforcement, dismissal of the

27

28
NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

93

1    indictment is not an appropriate remedy for that constitutional violation.  *See* Gov't Mtn. Seeking

2    Ruling at 2-6.  Rather, the government claims that the *exclusive* remedy for such a violation is a

3    civil rights action under 42 U.S.C. § 1983.  *Id.* at 2.  In so doing, the government cites to a Sixth

4    Circuit opinion, *United States v. Nichols*, 512 F.3d 789 (6th Cir. 2008) *overruled on other*

5    *grounds as recognized in United States v. Buford*, 632 F.3d 264, 269 (6th Cir. 2011).[65]  The

6    government's heavy reliance on *Nichols* is misplaced.  Most importantly, the defendant in

7    *Nichols* sought the suppression of evidence based on a racially motivated traffic stop – **not** the

8    dismissal of an indictment.  *See id.* at 792-95.  Thus, the court in *Nichols* addressed only whether

9    the exclusionary rule was "the proper remedy" for an equal protection violation, *id.* at 794, not

10   whether dismissal of the indictment would be an appropriate remedy when a prosecution is

11   predicated on an equal protection violation.  *Nichols*, therefore, is of no moment here.  The

12   government's citation to *Hudson v. Michigan*, 547 U.S. 591 (2006), is similarly unavailing, as

13   the Court there was considering the applicability of the exclusionary rule to a Fourth Amendment

14   knock-and-announce violation – not the "intentionally discriminatory application" of the law as

15   discussed in *Whren*, 517 U.S. at 813.

16         B.    <u>Standard for Selective Enforcement</u>[66]

17

18         Most courts that have addressed selective enforcement have applied the *Armstrong*

19   standard.[67]  *See Alcaraz-Arellano,* 441 F.3d at 1256; *Farm Labor Org. Comm.*, 308 F.3d at 534,

---

[65] The government also cites two district court orders, but those cases simply cite *Nichols* with minimal, if any, analysis.  *See United States v. Harmon*, 785 F.Supp.2d 1146, 1170 (D.N.M. 2011); *United States v. Foster*, 2008 WL1927392, at *5 (M.D. Ala. 2008).

[66] As the Seventh Circuit explained:  "Law enforcement has a racially discriminatory effect when members of a protected racial group – in this case African Americans – receive less favorable treatment than nonmembers."  *Barlow*, 310 F.3d at 1010 (holding that to obtain discovery on a selective enforcement claim, defendant had to show that the DEA agents chose not to approach whites to whom he was similarly situated).

[67] Though the Ninth Circuit has not addressed a selective enforcement claim in a criminal case, it has held in the civil rights context that "[e]nforcement may be shown through a variety of actual or threatened arrests, searches and temporary seizures, citations, and other coercive conduct by the police."  *Lacey,* 693 F.3d at 920.

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION CASE NO.  CR 14-643 EMC

94

538, 542; *Marshall*, 345 F.3d at 1167; *Barlow,* 310 F.3d at 1012; *Bell,* 86 F.3d at 822-23; *United States v. Dixon,* 486 F.Supp.2d 40, 44 (D.D.C. 2007).  *See also James,* 257 F.3d at 1179 ("While the legal standards for examination of the issue of selective prosecution and enforcement are the same, the factual analysis is distinct.  To prove discriminatory effect in a race or ethnicity-based selective prosecution claim, a defendant must make a credible showing that a similarly-situated individual of another race could have been prosecuted for the offense for which the defendant was charged.  If such a claim is based on the investigative phase of the prosecution, however, the defendant must instead make a credible showing that a similarly-situated individual of another race could have been, but was not, arrested or referred for federal prosecution for the offense for which the defendant was arrested and referred.").

However, in *Davis,* an *en banc* panel of the Seventh Circuit decided that the *Armstrong* presumption of regularity does not apply to selective enforcement:

> To the extent that Davis and the other six defendants want information about how the United States Attorney has exercised prosecutorial discretion, *Armstrong* is an insuperable obstacle (at least on this record).  But the defendants' principal targets are the ATF and the FBI.  They maintain that these agencies offer lucrative-seeming opportunities to black and Hispanic suspects, yet not to those similarly situated in criminal background and interests but of other ethnicity. If the agencies do that, they have violated the Constitution—and the fact that the United States Attorney may have prosecuted every case the agencies presented, or chosen 25% of them in a race-blind lottery, would not matter, since the constitutional problem would have preceded the prosecutor's role and could not be eliminated by the fact that things didn't get worse at a later step.  *Cf. Connecticut v. Teal*, 457 U.S. 440, (1982) (rejecting a "bottom-line defense" in an employment-discrimination suit).
>
> Agents of the ATF and FBI are not protected by a powerful privilege or covered by a presumption of constitutional behavior.  Unlike prosecutors, agents regularly testify in criminal cases, and their credibility may be relentlessly attacked by defense counsel.  They also may have to testify in pretrial proceedings, such as hearings on motions to suppress evidence, and again their honesty is open to challenge.  Statements that agents make in affidavits for search or arrest warrants may be contested, and the court may need their testimony to decide whether if shorn of untruthful statements the affidavits would have established probable cause.  *See Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).  Agents may be personally liable for withholding evidence from prosecutors and thus causing violations of the constitutional requirement that

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION CASE NO.  CR 14-643 EMC

95

> defendants have access to material, exculpatory evidence.  *See, e.g., Armstrong v. Daily*, 786 F.3d 529 (7th Cir.2015); *Newsome v. McCabe*, 256 F.3d 747, 752 (7th Cir.2001).  Before holding hearings (or civil trials) district judges regularly, and properly, allow discovery into nonprivileged aspects of what agents have said or done.  In sum, the sort of considerations that led to the outcome in *Armstrong* do not apply to a contention that agents of the FBI or ATF engaged in racial discrimination when selecting targets for sting operations, or when deciding which suspects to refer for prosecution.

*Davis*, 793 F.3d at 721.

Two other courts have similarly held that *Armstrong* does not apply to selective enforcement:  *Rodriguez v. California Highway Patrol,* 89 F.Supp.2d 1131, 1141 (N.D. Cal. 2000) (the "presumption of regularity" that supports prosecutorial decisions and results in "special deference to the prosecutorial office," does not apply to selective enforcement); *Duque-Nava,* 315 F.Supp.2d at 1152 ("This case presents no issue of federalism.  Nor is the deference accorded to the executive branch's power to prosecute accorded to law enforcement to the same degree.  In the civil context, prosecutors are bestowed with absolute immunity for decisions and actions that are within a prosecutor's scope of responsibility; law enforcement officers are bestowed with only qualified immunity.").

C.  The Defense Has Established a Prima Facie Case of Selective Enforcement

1.  **The Defense Has Made a Prima Facie Showing of Discriminatory Effect With Respect to Selective Enforcement**

In section I.A.2.(b) above, the defense compellingly demonstrated a prima facie case of discriminatory effect with respect to selective prosecution.  For the same reasons articulated there, the defense likewise has shown discriminatory effect with respect to selective enforcement.

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

96

### 2. The Defense Has Made a Prima Facie Case of Discriminatory Intent in Regards to Selective Enforcement

The defense has provided over 30 declarations from community members and Operation Safe School defendants showing explicit racial animus by law enforcement officers involved in Operation Safe Schools against the Operation Safe Schools defendants - including the use of racial slurs ("nigger," "boy," "little black bitch"), violence, sexual misconduct and inappropriate searches of Black females by male officers.  The defense has also identified the use of racially derogatory language deployed during an Operation Safe Schools undercover operation ("Fucking BM"), and evidence of systemic racial bias, and racial animus, within the SFPD generally.

The defense has provided Declarations from community members, including a law professor and a security guard, attesting to the racial diversity of drug sellers in the Tenderloin and law enforcement's awareness of it.  In addition, the police reports the defense obtained through the public records requests show law enforcement knowledge of hundreds of non-Black drug sellers operating in the Tenderloin.  Finally, the defense has provided police reports obtained through public records requests in which SFPD officers says such things as: "I have personally witnessed numerous Hispanic individuals that stand on that street corner for hours at a time … I have directed Tenderloin officers to focus their attention on the drug dealers on that corner and the officers have made numerous drug arrests there."  Ex. 1, Koeninger Disco. Mtn. Decl., Att. A at Ex.00539.

Though "[p]roving the motivation behind official action is often a problematic undertaking,"[68] *Hunter,* 471 U.S. at 228, here, the evidence, both direct and circumstantial, of discriminatory intent is overwhelming.  *See Village of Arlington Heights,* 429 U.S. at 266, 97 S. Ct. 555, 564, 50 L. Ed. 2d 450 ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of

---

[68] In fact, the use of racially derogatory language is sufficient -"[s]uch language is strong evidence of racial animus, an essential element of any equal protection claim."  *Chavez,* 251 F.3d at 646.  But the defense has provided far more than racial slurs.

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

97

1   intent as may be available.")[69]

2                                  **CONCLUSION**

3

4           The Supreme Court's rejection of the evidence proffered in *Armstrong* convinced some

5   commentators that the decision renders many meritorious claims of selective prosecution

6   impossible to prove.  *See, e.g.*, Richard H. McAdams, *Race and Selective Prosecution:*

7   *Discovering the Pitfalls of Armstrong*, 73 Chi. Kent L.Rev. 605, 606 (1998); Melissa L. Jampol,

8   *Goodbye to the Defense of Selective Prosecution*, 87 J.Crim.L. & Crimonology 932 (1997);

9   Note, *Race–Based Selective Prosecution*, 110 Harv.L.Rev. 165 (1996).  *See also* Randall

10  Kennedy, RACE CRIME AND THE LAW 357–59 (1997).  In this case, the defense has done

11  everything required by every standard established by every Court that has ever addressed either

12  selective prosecution or selective enforcement since *Armstrong*.  The defense has identified not

13  just one, but hundreds of similarly-situated persons – and described 42 in detail.  The defense has

14  provided evidence of a statistical disparity – between state and federal prosecutions, and between

15  the offender population and the federal targets – that is so vast that "there is virtually no chance

16  that this difference is the result of chance."[70]  The defense provided dozens of declarations

17  attesting to explicit racial animus by the law enforcement officers involved.

18  _____

19  [69] Moreover, district courts have granted similar discovery requests on lesser showings than the
    defendants have made here.  For example, the Chief Judge in the Northern District of Illinois

20  ordered the Government to provide discovery where "[t]he defendants' motion has specifically
    identified 17 phony stash house rip off cases [whose] data shows that the overwhelming targets

21  of these investigations were African Americans [and] none of the defendants … were
    nonminorities." Order Compelling Discovery, *United States v. Antonio Williams et al.*, 12 Cr.

22  887 (N.D. Ill. July 31, 2013), ECF No. 70; *see also Paxton*, 2014 WL 1648746, at *5 (ordering
    discovery where "[a]ll of the cases identified by defendants have involved undercover operations

23  by ATF agents in circumstances largely similar to the instant case [and where] the statistics
    appear to be reliable because they are corroborated, in part, by the lists of cases provided by the

24  government, and there is no assertion that the information collected by defendants as to race is
    inaccurate").

25
    [70] Ex. 41, Amram Disco. Mtn. Decl., Att. M.
26

27

28  NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
    ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
    CASE NO.  CR 14-643 EMC

This evidence, and the prosecutors own declarations, raise serious questions regarding whether the prosecutors failed in their obligation to put in place policies to insure that racial bias did not impact law enforcement's decisions on whom to present for prosecution despite knowing (or being in possession of facts that would obligate one to know) about the problems with racism in SFPD.  As a result, this Court is faced with the strongest prima facie case of selective prosecution and selective enforcement since the Supreme Court decided *Armstrong*.  And this Court must decide whether the commentators are correct that *Armstrong* makes selective prosecution impossible to prove or whether, if, as has been done here, a defendant does everything required by *Armstrong,* she will get discovery and have her claim heard on the merits.

## DISCOVERY REQUEST

The defense requests the following discovery:

1.  A list of all cases prosecuted pursuant to Operation Safe Schools (*see* Phillips Related Case Decl., Att. C [12.09.13 USAO Press Release]; Att. D [2.12.15 USAO Press Release]), and the race of each defendant charged in those cases.

2.  A list of all persons who were considered for prosecution pursuant to Operation Safe Schools, but for whom prosecution was declined, and the race of those persons.

3.  All writings, records, and/or memorializations setting out the real-time reasons the DEA and/or the SFPD gave for pursuing—or not pursuing— an individual defendant or case in Operation safe Schools.

4.  The charging selection criteria for Operation Safe Schools.

5.  Issuance of a Rule 17 subpoena to the DEA and the SFPD for the personnel files for all DEA agents and SFPD officers involved in Operation Safe Schools.  Or, in the

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

alternative, the defense will agree that the USAO review the personnel files of all the law

enforcement officers involved and disclose any documents discoverable under *Pitchess v.*

*Superior Court*, 11 Cal.3d 531 (1974) and *United States v. Henthorn*, 931 F.2d 29 (9th

Cir. 1991), including: all records of any and all complaints; any known history of

misconduct as a law enforcement officer; past instances where an officer's veracity or

candor has been called into question; formal or informal reprimands from the DEA or

SFPD or other known law enforcement agencies; pending or resolved internal

investigations and/or substantiated reports of corruption and/or other improper conduct;

and any allegations of racial bias (generally) or sexually inappropriate behavior (directed

toward Black civilians).

6.  Issuance of a Rule 17 subpoena to SFPD for: (a) all Field Interview Cards and incident

reports relating to the investigation, arrest or prosecution of narcotics offenses by

Tenderloin police station (Company J), Southern Police Station (Company B), Northern

Police Station (Company E) and Narcotics Division from January 1, 2013 to August 4,

2015; and (b) rap sheets for any person identified in such Field Interview Cards or

incident reports who was investigated, arrested, or prosecuted for a narcotics offense.

7.  Rap sheets and SFPD incident reports for all individuals identified in Attachment B to

Exhibit 6, Declaration of August Sommerfeld.  Rap sheets for all persons identified in

Attachment B to Exhibit 1, Declaration of Steven J. Koeninger.

8.  Issuance of a Rule 17 subpoena for all incident reports from the 2009 through 2013

Operation Safe Schools initiatives, based in the Tenderloin, by SFPD and the San

Francisco District Attorney's Office, as referenced in Attachments G through J to the

Amram Discovery Motion Decl. at Ex.04167-76.  Rap sheets for any person considered

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

100

for prosecution pursuant to the Operation Safe Schools initiatives described in this paragraph.

9. All documents and communications, including all emails, memos, text messages, press releases, voicemail messages, audio and video recordings, between: (a) any persons employed by the USAO; (b) any persons employed by the DEA; (c) any persons employed by the SFPD; (d) the USAO (and any person employed by the USAO) and the DEA (and any person employed by the DEA); (e) the USAO (and any person employed by the USAO), and the SFPD (and any person employed by the SFPD); and (f) the DEA (and any person employed by the DEA) and the SFPD (and any person employed by the SFPD), related to: the investigation of any individuals pursuant to Operation Safe Schools; the decision to investigate (or not investigate) anyone pursuant to Operation Safe Schools; the charging criteria for Operation Safe Schools; the decision to charge (or not charge) anyone in Operation Safe Schools;  the race of any Operation Safe Schools defendant; and the decision to decline charging someone in Operation Safe Schools. Such documents and communications includes those made on personally owned devices and/or personally maintained email accounts or social media accounts.

10. For each Operation Safe Schools case, a statement of the prior criminal investigations, if any, that the DEA and/or SFPD conducted into each defendant before initiating the Operation Safe Schools prosecution.

11. All SFPD Manuals, circulars, field notes, correspondence, or any other material which discusses Operation Safe Schools including protocols and/or directions to officers and confidential informants regarding how to conduct such operations, how to determine which persons to pursue as potential targets or ultimate defendants, and how to ensure

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION CASE NO.  CR 14-643 EMC

101

that officers are not targeting persons for such operations on the basis of their race, color, ancestry, or national origin.

12. All national and California Divisions of the DEA Manuals, circulars, field notes, correspondence, or any other material which discusses Operation Safe Schools including protocols and/or directions to agents and confidential informants regarding how to conduct such operations, how to determine which persons to pursue as potential targets or ultimate defendants, and how to ensure that agents are not targeting persons for such operations on the basis of their race, color, ancestry, or national origin.

13. All documents containing information on how supervisors and managers of the DEA were to ensure and/or did ensure that their agents were not targeting persons on the basis of their race, color, ancestry, or national origin for these Operation Safe Schools cases, and what actions those supervisors and managers took to determine whether agents were in fact targeting persons for those reasons.

14. All documents containing information on how supervisors and managers of the SFPD were to ensure and/or did ensure that their officers were not targeting persons on the basis of their race, color, ancestry, or national origin for these Operation Safe Schools cases, and what actions those supervisors and managers took to determine whether officers were in fact targeting persons for those reasons.

15. The number of confidential informants that the DEA has used in Operation Safe Schools cases and the number of those confidential informants that had access to non-Black persons who could be targeted for a phony-stash case.

16. What, if anything, any confidential informant was told about the criteria being used to target individuals for Operation Safe Schools.

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND
ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

102

17. The number of confidential informants that the SFPD has used in Operation Safe Schools cases and the number of those confidential informants that had access to non-Black persons who could be targeted for a phony-stash case.

18. Discovery from, and other information pertaining, to Operation Safe Schools cases where the USAO, and/or the DEA, and/or the SFPD targeted non-African American persons.

19. All documents that contain information about actions taken by the USAO to ensure that defendants in Operation Safe Schools cases brought by the USAO had not been targeted due to their race, color, ancestry, or national origin.

20. A Rule 17 subpoena to ABC 7 News for any and all footage (including outtakes and unpublished footage) pertaining to Operation Safe Schools, as well as all documents and communications between ABC 7 News and the USAO, the DEA, and/or SFPD regarding Operation Safe Schools.  *See* Ex. 41, Amram Disco. Mtn. Decl., Att. Ex.04228.

NOTICE OF MOTION AND MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
CASE NO.  CR 14-643 EMC

103

Dated:  December 02, 2015


By: */s/ Galia Amram*
GALIA AMRAM
Attorney for Defendants Carey, Reed,
Reddic and Rouse

Dated:  December 02, 2015


By: */s/ Ellen Leonida*
ELLEN LEONIDA
Attorney for Defendants Mumphrey and
Matthews

Dated:  December 02, 2015


By: */s/ Candis Mitchell*
CANDIS MITCHELL
Attorney for Defendant Adams

Dated:  December 02, 2015


By: */s/ Daniel P. Blank*
DANIEL P. BLANK
Attorney for Defendants Anthony, Dixon
and McNeal

Dated:  December 02, 2015


By: */s/ Randy Sue Pollock*
RANDY SUE POLLOCK
Attorney for Defendant Madlock