BRIAN J. STRETCH (CABN 163973)
Acting United States Attorney

DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

LLOYD FARNHAM (CABN 202231)
SARAH K. HAWKINS (CABN 257723)
J. DOUGLAS WILSON (DCBN 412811)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6973
    FAX: (415) 436-7207
    Lloyd.farnham@usdoj.gov

Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR 14-643 EMC |
| Plaintiff, | UNITED STATES' OPPOSITION TO MOTION TO COMPEL DISCOVERY ON SELECTIVE PROSECUTION AND ENFORCEMENT |
| v. | |
| DAVID MADLOCK, MATTHEW MUMPHREY, LATONYA CAREY, CRYSTAL ANTHONY, DARLENE ROUSE, ACACIA MCNEAL, ANITA DIXON, AARON MATTHEWS, NIJAH REED, TIANA REDDIC, TIFFANY CROSS, SHOLANDA ADAMS, | |
| Defendants. | |

# TABLE OF CONTENTS

BACKGROUND ....................................................................................................................2

ARGUMENT .......................................................................................................................3

I.  SELECTIVE ENFORCEMENT BY LAW ENFORCEMENT OFFICERS IS NOT A
    GROUND TO DISMISS A CRIMINAL CASE. ...........................................................3

    A.  In the absence of a prosecutor's knowledge of law enforcement officers'
        targeting decisions, selective enforcement is not a ground for dismissal. ...........3

    B.  Precedent from other circuits makes clear that selective enforcement is not a
        ground for dismissing a criminal case. ..............................................................8

II.  DECLARATIONS FROM LAW ENFORCEMENT PERSONNEL ESTABLISH
     THAT NO SELECTIVE ENFORCEMENT OCCURRED. ........................................11

III.  DEFENDANTS HAVE FAILED TO IDENTIFY ANY PERSON WHO IS
      SIMILARLY SITUATED TO THE DEFENDANTS CHARGED IN OPERATION
      SAFE SCHOOLS..................................................................................................13

    A.  Standards for selective prosecution ..................................................................13

    B.  Because the government has a stronger case against the charged Operation
        Safe Schools defendants, other defendants are not similarly situated. ..............16

    C.  None of the individuals cited by defendants are similarly situated because
        none was presented to the United States Attorney's Office for prosecution. ...................18

    D.  Individuals cited by defendants are not similarly situated for other reasons. ...................18

IV.  MOST OF DEFENDANTS' SHOWING OF RACIAL DISCRIMINATION DOES
     NOT SHOW DISCRIMINATORY EFFECT OR INTENT. ......................................20

V.  DEFENDANTS HAVE FAILED TO SHOW THAT THE PROSECUTORS LIED IN
    THEIR DECLARATIONS WHEN THEY STATED UNDER OATH THAT THEY
    DID NOT ENGAGE IN RACIAL DISCRIMINATION. ...........................................27

# TABLE OF AUTHORITIES

**Federal Cases**

*Batson v. Kentucky*, 476 U.S. 79 (1986) ........................................................................ 32, 33

*Belmontes v. Brown*, 414 F.3d 1094 (9th Cir. 2005) ...................................................... 28, 31

*Bordenkircher v. Hayes*, 434 U.S. 357 (1978) ...................................................................... 14

*Chavez v. Ill. State Police*, 251 F.3d 612 (7th Cir. 2001) ............................................... 22, 31

*Colon v. U.S. Att'y for Dist. Puerto Rico*, 576 F.2d 1, (1st Cir. 1976) ...............................9, 11

*Crittenden v. Chappell*, 804 F.3d 998 (9th Cir. 2015) .......................................................... 33

*Heckler v. Chaney*, 470 U.S. 821 (1985) ............................................................................. 14

*Herring v. United States*, 555 U.S. 135 (2009) ...................................................................... 9

*Hudson v. Michigan*, 547 U.S. 586 (2006) ............................................................................ 9

*Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012) (en banc) .................................... 10

*Lafler v. Cooper*, 132 S. Ct. 1376 (2012) .............................................................................. 7

*McCleskey v. Kemp*, 481 U.S. 279 (1987) ........................................................................ 28, 29

*Miller-El v. Dretke*, 545 U.S. 231 (2005) .............................................................................. 33

*Oyler v. Boles*, 368 U.S. 448 (1962) ..................................................................................... 15

*Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979) ..........................................................29

*Rosenbaum v. City & Cty. of S.F.*, 484 F.3d 1142 (9th Cir. 2007) ........................................ 10

*United States v. Alcaraz-Arellano*, 441 F.3d 1252 (10th Cir. 2006) ................................. 8, 31

*United States v. Alexander*, 2015 WL 1523910 (N.D. Ohio Apr. 3, 2015) ........................... 11

*United States v. Alexander*, 2013 WL 6491476 (N.D. Ill. Dec. 10, 2013) ............................ 11

*United States v. Arenas-Ortiz*, 339 F.3d 1066 (9th Cir. 2003) ........................................ 14, 15

*United States v. Armstrong*, 517 U.S. 456 (1996) ........................ 5, 11, 14, 15, 18, 21, 28, 29, 32, 33, 34

*United States v. Barlow*, 310 F.3d 1007 (7th Cir. 2002) ........................................................ 8

*United States v. Bass*, 536 U.S. 862 (2002) (per curiam) ................................................. 14, 21

*United States v. Buford*, 632 F.3d 264 (6th Cir. 2011) ........................................................... 8

*United States v. Chemical Foundation, Inc.*, 272 U.S. 1 (1926) ........................................ 14, 29

*United States v. Colon*, 71 F. Supp. 3d 269 (D. Conn. 2014) ............................................... 11

*United States v. Cousins*, 2014 WL 5023485 (N.D. Ill. Oct. 7, 2014) ............................. 11, 31

*United States v. Cousins*, 2010 WL 338087 (E.D. Tenn. 2010).............................................9

*United States v. Davis*, 793 F.3d 712 (7th Cir. 2015) (en banc) ................................. 8, 11, 13

*United States v. Delacruz*, 2015 WL 2211943 (S.D.N.Y. May 12, 2015) ............................ 11

*United States v. Erne*, 576 F.2d 212 (9th Cir. 1978) ............................................................. 5

*United States v. Fares*, 978 F.2d 52 (9th Cir. 1992) ............................................................ 22

*United States v. Foster*, 2008 WL 1927392 (M.D. Ala. April 28, 2008) ................................ 8

*United States v. Gilbert*, 266 F.3d 1180 (9th Cir. 2001) ............................................................ 5

*United States v. Gomez-Lopez*, 62 F.3d 304 (9th Cir. 1995) ........................................................ 5

*United States v. Greene*, 698 F.2d 1364 (9th Cir. 1983) ............................................................. 5

*United States v. Harmon*, 785 F. Supp. 2d 1146 (D.N.M. 2011) ................................................ 8

*United States v. Hastings*, 126 F.3d 310 (4th Cir. 1997) ............................................................ 5

*United States v. Hayes*, 231 F.3d 891, 895 (7th Cir. 2001) .......................................................21

*United States v. Haynes*, 216 F.3d 789 (9th Cir. 2000) ............................................................. 7

*United States v. Ibarra*, 345 F.3d 711 (9th Cir. 2003) .............................................................. 9

*United States v. James*, 257 F.3d 1173 (10th Cir. 2001) ................................................... 20, 22

*United States v. Lamar*, 2015 WL 4720282 (S.D.N.Y. Aug. 7, 2015) ............................... 11, 24

*United States v. Lewis*, 517 F.3d 20 (1st Cir. 2008) ............................................................... 15

*United States v. Lin Lyn Trading*, 149 F.3d 1112 (10th Cir. 1998) ........................................... 9

*United States v. Michael*, 2007 WL 2712964 (D.N.M. June 27, 2007) ................................... 21

*United States v. Monsoor*, 77 F.3d 1031 (7th Cir. 1996) ......................................................... 6

*United States v. Morrison*, 449 U.S. 361 (1981) ..................................................................... 7

*United States v. Nelson*, 137 F.3d 1094 (9th Cir. 1998) .................................................. 15, 16

*United States v. Nichols*, 512 F.3d 789 (6th Cir. 2008) ...................................................... 8, 9

*United States v. Olvis*, 97 F.3d 739 (4th Cir. 1996) ......................................................... 16, 31

*United States v. Park*, 2006 WL 3085701 (N.D. Cal. Oct. 30, 2006) ........................................ 5

*United States v. Smith*, 231 F.3d 800 (11th Cir. 2000) ..................................................... 15, 19

*United States v. Spears*, 159 F.3d 1081 (7th Cir. 1998) ....................................................... 6, 8

*United States v. Stoltz*, 720 F.3d 1127 (9th Cir. 2013) ........................................................... 7

*United States v. Sutcliffe*, 505 F.3d 944 (9th Cir. 2007) ........................................................ 14

*United States v. Turner*, 104 F.3d 1180 (9th Cir. 1997) ....................................... 12, 13, 15, 20, 28, 31

*United States v. Viera*, 2015 WL 3833797 (S.D.N.Y. June 19, 2015) ..................................... 11

*United States v. Washington*, 2014 WL 2959493 (E.D. Pa. June 30, 2014) ............................ 11

*United States v. Whitfield*, 29 F. Supp. 3d 503 (E.D. Pa. 2014) ..................................... 11, 21

*United States v. Williams*, 504 U.S. 36 (1992) ...................................................................... 11

*United States v. Williams*, 431 F.3d 296 (8th Cir. 2005) ......................................................... 8

*Wayte v. United States*, 470 U.S. 598 (1985) ............................................... 14, 15, 29, 34

*Whitus v. Georgia*, 385 U.S. 545 (1967) .............................................................................. 28

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ........................................................................... 14

**Federal Statutes**

21 U.S.C. § 860(b) (2012) ................................................................................................ 24

21 U.S.C. § 841(a)(1) ........................................................................................................ 27

21 U.S.C. § 860 ................................................................................................................. 27

42 U.S.C. § 1983 (2012) ........................................................................................... 8, 9, 10

**Other**

Fed. R. Crim. P. 17 ........................................................................................................ 1, 3

By motion filed on December 2, 2015, defendants, through the Federal Public Defender, sought discovery from the United States on their claim that law enforcement officers engaged in selective enforcement and that Assistant United States Attorneys engaged in selective prosecution during Operation Safe Schools.  Docket 116.  In particular, defendants claim that (1) investigators targeted for federal prosecution only African-Americans; and (2) prosecutors prosecuted only African-American defendants in federal court.  According to defendants, investigators and prosecutors did not seek federal prosecution of similarly situated members of other racial and ethnic groups.  In addition to seeking discovery from the United States Attorney's Office, the defendants sought permission to serve subpoenas under Federal Rule of Criminal Procedure 17 on the Drug Enforcement Administration (DEA) and the San Francisco Police Department (SFPD).  The Motion should be denied.

First, in the absence of any evidence that the United States Attorney's Office participated in the selection of targets by law enforcement officers, selective enforcement is not a ground for dismissal of a criminal case.  Second, and in any event, declarations from the two DEA agents who supervised both phases of Operation Safe Schools foreclose a selective prosecution claim.  Third, defendants cannot establish an entitlement to discovery on a selective enforcement or selective prosecution claim because they have failed to meet the fundamental requirement of showing that any individual is similarly situated to the defendants prosecuted in federal court in Operation Safe Schools.  Fourth, defendants' showing is flawed in numerous respects and is insufficient to show discriminatory effect and intent in a selective prosecution motion.  Fifth, even if defendants' statistics could show discriminatory effect, defendants have wholly failed to prove that, as they allege, the Assistant United States Attorneys lied in declaring under oath that they did not rely on any defendant's race in the Operation Safe Schools prosecutions in declarations submitted in connection with its Motion Seeking Ruling on Defendants' Claim that the Government Engaged in Selective Enforcement and Selective Prosecution.

As the United States Attorney's Office has repeatedly made clear, it does not tolerate racial discrimination in the enforcement or prosecution of any criminal or civil case, and race is an impermissible consideration in deciding whether to charge a defendant.  *See* U.S. Attorney's Manual 9-27.260.  But the defendants have failed to establish a racial discrimination claim by the prosecutors or law enforcement agents in Operation Safe Schools, and, as stated above, they cannot raise selective

1   enforcement in a motion to dismiss a criminal indictment.  Moreover, defendants are seeking to employ

2   allegations of racism in San Francisco and among members of the San Francisco Police Department that

3   have no bearing on the defendants' prosecution.  As set forth in the remainder of this opposition,

4   defendants must show selective enforcement and prosecution in the cases against them, not racism in

5   San Francisco or its Police Department.  Defendants cannot do so, and, accordingly, the motion is

6   without merit and should be denied.

7                                    **BACKGROUND**

8          As the government has explained, Operation Safe Schools is an effort to "prosecute drug dealing

9   around schools and playgrounds in the Tenderloin district" of San Francisco.  Declaration of S. Waqar

10  Hasib in Support of United States' Motion Seeking Ruling on Defendants' Claim that the Government

11  Engaged in Selective Enforcement and Selective Prosecution ¶ 3.[1]  Docket 51.  The Tenderloin contains

12  both families with children and drug users, and the children and families who live in the Tenderloin are

13  regularly exposed to street-corner drug dealing and violence.  In fact, the Tenderloin is one of the largest

14  open-air drug markets in the United States.  *See generally* Hasib Decl. ¶ 3.

15         The purpose of Operation Safe Schools is to promote public safety, to deter drug trafficking and

16  violence in neighborhood school zones, and to punish drug dealers by ensuring that they spend at least a

17  year in custody and six years on supervised release.  *See* Declaration of Katie Dorais ¶ 1 (attached to this

18  Opposition in Exhibit 3); Hasib Decl. ¶ 3.  As the 42 examples cited in defendants' motion make clear,

19  many of those selling drugs in the Tenderloin have gone through the revolving door of the state criminal

20  justice system.  In addition, many of those selling drugs in the neighborhood do not live in the

21  Tenderloin, but instead commute into the area from other parts of the Bay Area to conduct their

22  business.  For example, Ivan Speed, who was the lead defendant in this motion but has elected to be

23  sentenced, gave an address in Oakland when he was arrested.

24         The Operation has had two phases in San Francisco.  The first part of the Operation culminated

25  in the arrest of 14 defendants between November 2013 and January 2014.  The second phase of the

26  Operation resulted in the arrest of 23 defendants in 20 charged cases.  The charges in Operation Safe

27  _____

28          [1] The declarations submitted with the United States Motion Seeking Ruling on Defendants'
    Claim that the Government Engaged in Selective Prosecution are included as Exhibit 1.

UNITED STATES' OPPOSITION TO DISCOVERY MOTION
NO. CR 14-643 EMC                              2

Schools resulted from drug sales that involved either undercover officers or confidential informants or drug sales in which the drugs were seized from the buyers as they left the sale.  *See* Dorais Decl. ¶ 4; Declaration of Charles Atakora ¶ 3 (attached to this Opposition in Exhibit 3).  None of the drug sales was prosecuted unless officers made a videotape of that drug sale.  *Id.*; *see* Supplemental Declarations of Assistant United States Attorney Lloyd Farnham ¶ 2; Supplemental Declaration of Assistant United States Attorney Sarah Hawkins ¶ 2 (both attached to this Opposition in Exhibit 2).  Moreover, as the supplemental declarations of AUSAs Farnham and Hawkins state, the defendants in Phase II of Operation Safe Schools were not prosecuted all at once; instead, the decision to prosecute all 23 defendants was spread out over about six weeks.  Farnham Supp. Decl. ¶ 2; Hawkins Supp. Decl. ¶ 2.

Finally, as the Supplemental Declarations of AUSAs Kevin Barry and Daniel Kaleba explain, the government ceased Operation Safe Schools when defendants announced that they would claim that law enforcement officers and the government engaged in racial discrimination during Operation Safe Schools.  If defendants had not claimed racial discrimination during Operation Safe Schools, the government would have pursued additional efforts in the Tenderloin to prosecute in federal court persons dealing drugs near schools or playgrounds.  *See* Supplemental Declaration of Assistant United States Attorney Kevin Barry ¶ 3; Supplemental Declaration of Assistant United States Attorney Daniel Kaleba ¶ 3 (both attached to this Opposition in Exhibit 2).

## ARGUMENT

### I. SELECTIVE ENFORCEMENT BY LAW ENFORCEMENT OFFICERS IS NOT A GROUND TO DISMISS A CRIMINAL CASE.

#### A. In the absence of a prosecutor's knowledge of law enforcement officers' targeting decisions, selective enforcement is not a ground for dismissal.

Defendants argue that the actions of law enforcement officers, standing alone, can result in the dismissal of the indictments against them.  Mot. at 90-94.  The evidence shows, however, that the Assistant United States Attorneys who recommended or authorized prosecution of the Operation Safe Schools defendants did not know that, as defendants allege, law enforcement officers targeted only African-American drug dealers.  In the absence of any such knowledge or participation in the officers' selection of targets, the officers' alleged selective enforcement should not result in the dismissal of defendants' cases or otherwise be imputed to the Assistant United States Attorneys.  In fact, the Ninth

1  Circuit has held that selective enforcement by law enforcement officers without guidance or input from

2  prosecutors should not be the basis for dismissal of an indictment.

3  The Assistant United States Attorneys who recommended prosecution of the defendants in the

4  second phase of Operation Safe Schools and the Assistant United States Attorneys who authorized the

5  prosecution of all defendants in both phases of Operation Safe Schools have declared under oath that the

6  race of the persons selected by the law enforcement agents for prosecution did not affect the prosecution

7  decision.  *See* Declarations of Lloyd Farnham ¶¶ 4-5, Sarah Hawkins ¶¶ 4-5, and Waqar Hasib ¶¶ 4-5 in

8  Support of United States' Motion Seeking Ruling on Defendants' Claim that the Government Engaged

9  in Selective Enforcement and Selective Prosecution.  In addition, the supervisory AUSAs who

10  authorized the presentation of the second phase of Operation Safe Schools to the grand jury have stated

11  that they were "unaware" of the defendant's race.  *See* Barry Decl. ¶¶ 4-5, Kaleba Decl. ¶¶ 4-5.

12  Similarly, the supervisory AUSA who authorized the prosecutions in the first phase of Operation Safe

13  Schools has stated under oath that he was "unaware of any particular individual's race when [he]

14  authorized presentation to the grand jury."  Hasib Decl. ¶ 4; *see* Declaration of Matthew L. McCarthy

15  ¶ 3 (stating that AUSA McCarthy reviewed AUSA Hasib's indictments and did not consider race).  Each

16  AUSA has confirmed that he or she did not consider race in Operation Safe Schools in declarations filed

17  with this Opposition.  *See* Supp. Decls. of Farnham ¶ 4, Hawkins ¶ 4, Hasib ¶ 2, Barry ¶ 2, Kaleba ¶ 2;

18  McCarthy Decl. ¶ 3.  Finally, the DEA agents responsible for Operation Safe Schools have declared

19  under oath that the AUSAs did not tell them to consider race during the Operation Safe Schools

20  investigations.  *See* Dorais Decl. ¶ 3; Atakora Decl. ¶ 2.

21  Nor, contrary to defendants' assertion (Mot. 82), was there any policy within the United States

22  Attorney's Office that resulted in law enforcement officers targeting a single race or ethnicity or

23  otherwise engaging in racist conduct.  *See* Hasib Supp. Decl. ¶ 5; *see also* U.S. Attorney's Manual 9-

24  27.260 (stating that race may never be considered in a prosecution decision).  Moreover, as defendants

25  appear to concede (Mot. at 88), no one in the United States Attorney's Office supervised the law

26  enforcement officers' selection of the drug dealers who would be federally prosecuted, and the Assistant

27  United States Attorneys' direction to those officers extended only to giving the officers general criteria

28  for prosecution.  In addition, as the supplemental declarations of AUSAs Farnham and Hawkins state, in

1   many cases, the prosecutors responsible for the prosecution recommendations in the second phase of

2   Operation Safe Schools did not know of the race of the persons whom the other prosecutor

3   recommended for prosecution.[2]  *See* Farnham Supp. Decl. ¶ 5; Hawkins Supp. Decl. ¶ 5.

4   Under these circumstances, the Ninth Circuit has made clear – both before and after the Supreme

5   Court's decision in *United States v. Armstrong*, 517 U.S. 456 (1996) – that the decisions of law

6   enforcement officers will not support an equal protection claim in a criminal case.  In *United States v.*

7   *Gomez-Lopez*, 62 F.3d 304 (9th Cir. 1995), the court reversed dismissal of the indictment when the law

8   enforcement agents engaged in alleged ethnic discrimination.  The court relied on two earlier cases in

9   which the defendant alleged that a law enforcement agent referred a case for prosecution based on a

10  discriminatory motive.  The court noted that in one earlier case it had "held that even if the agent's role

11  in referring the matter for prosecution involved an improper discriminatory motive, it would be

12  insufficient because 'the ultimate decision to prosecute is several steps removed'" from the actions of

13  the law enforcement agent.  *Id.* at 306 (quoting *United States v. Greene*, 698 F.2d 1364, 1368 (9th Cir.

14  1983)); *see United States v. Erne*, 576 F.2d 212, 216-217 (9th Cir. 1978) (same).  The Ninth Circuit has

15  continued to state this principle after *Armstrong*, *see United States v. Gilbert*, 266 F.3d 1180, 1187 (9th

16  Cir. 2001) ("In all but the most extreme cases, it is only the biases and motivations of the prosecutor that

17  are relevant."), and a district court in this district relied on *Gomez-Lopez* to reject a claim that a criminal

18  cases should be dismissed because San Francisco Police Department officers allegedly displayed racial

19  bias during a prosecution.  *See United States v. Park*, 2006 WL 3085701, at *1 (N.D. Cal. Oct. 30, 2006)

20  (Illston, J.).

21  As *Gomez-Lopez* makes clear, defendants cannot argue that the law enforcement officers'

22  alleged discriminatory intent be imputed to the prosecutors.  Courts have stated explicitly that the

23  actions of law enforcement cannot be ascribed to prosecutors.  In *United States v. Hastings*, 126 F.3d

24  310, 314 (4th Cir. 1997), a selective prosecution case, the court refused to "impute the unlawful biases

25

26  _____

27  [2]  In other words, as the supplemental declarations explain, AUSA Hawkins did not see all the videotapes or reports that AUSA Farnham reviewed prior to recommending prosecution, and AUSA

28  Farnham did not see all the videotapes or reports that AUSA Hawkins reviewed prior to recommending prosecution.  For that reason, neither AUSAs Farnham nor Hawkins knew the race of every person whom the other AUSA was recommending for prosecution.

of the investigating agents to the persons ultimately responsible for the prosecution."  Similarly, in *United States v. Spears*, 159 F.3d 1081, 1087 (7th Cir. 1998), the court made clear that "it is well settled that the actions of an investigating agency will not be imputed to a federal prosecutor."  *See also United States v. Monsoor*, 77 F.3d 1031, 1035, (7th Cir. 1996) ("the animus of a referring agency is not, without more, imputed to federal prosecutors").

Contrary to defendants' contention (Mot. at 91), the Ninth Circuit's refusal to hold prosecutors accountable for the actions of law enforcement officers makes sense, both generally and in this case.  A selective enforcement claim rests on alleged violations of the Equal Protection Clause by law enforcement officers.  In a federal court, a law enforcement officer does not make the decision to prosecute.  Instead, as the declarations submitted with the government's earlier Motion show, an AUSA makes that decision based on the admissible evidence.  *See* United States Attorney's Manual 2-27.220. Here, there is no dispute that probable cause (if not proof beyond a reasonable doubt) supports the defendants' drug sales, because each of the defendants was captured on videotape selling drugs, and each defendant was properly charged with distributing drugs.  Accordingly, allowing the defendants to pursue dismissal of their indictments based on the alleged racially discriminatory actions of law enforcement officers would penalize prosecutors for actions that the prosecutors were unaware of, that have no bearing on the defendants' guilt, and that did not result in the decision to prosecute the defendants in federal court.

To reiterate, each of the prosecutors involved at all levels of Operation Safe Schools has stated under oath that he or she did not engage in racial discrimination.  Nor did the prosecutors supervise the law enforcement agents' selection of targets, and no single prosecutor knew the race of all of the drug dealers being presented for prosecution.  In addition, if, as defendants suggest (Mot. at 5) the Assistant United States Attorneys had taken steps to ensure that the agents presented "non-Black" defendants for prosecution, they would have engaged in overt racial discrimination in selecting the defendants to be prosecuted.  In other words, the prosecutors could not exercise discretion as to the race of possible defendants without themselves engaging in racial discrimination.  For example, if the prosecutors had known that all of the defendants presented for federal prosecution were African-American (as defendants allege (Mot. at 5)), it would be racist for the prosecutor to say to the law enforcement

1   officers, "Bring some Hispanic [or Asian or Caucasian] drug dealers for prosecution."  Similarly,

2   defendants argue (Mot. 5, 88-89) that prosecutors should have put in place a policy "to insure that the

3   law enforcement actors are not engaging in racial profiling," but they fail to explain how the government

4   could impose such a policy without specifying the race of the potential targets of law enforcement

5   agents.

6        Two other facts also militate against relying on the officers' alleged selective enforcement as a

7   ground for dismissal.  First, the United States cannot defend the SFPD against allegations of the kind of

8   systematic or specific racism that defendants allege.  Only the SFPD and individual SFPD officers can

9   do that, and the SFPD is not a party to this motion.  In fact, defendants' motion alleges racism

10  throughout the SFPD and in San Francisco generally, and such an allegation is far beyond the scope of

11  this motion.  Second, the discovery sought by the defendants in support of their motion is

12  overwhelmingly directed at the law enforcement agencies: of the 20 requests for discovery, 15 seek

13  information from law enforcement agencies, and six seek information solely from the SFPD.[3]

14       Dismissing the criminal prosecutions for the law enforcement officers' alleged racial misconduct

15  would also give the defendants a windfall for conduct that plainly violates the drug statutes.  And,

16  dismissal would have a negative impact on the Tenderloin, because the defendants would suffer no

17  consequences for selling drugs in that neighborhood.  For these reasons, dismissal would not remedy

18  alleged selective enforcement of the law enforcement officers and would carry a high societal cost,

19  especially for the Tenderloin.  *See United States v. Morrison*, 449 U.S. 361, 364 (1981) (citing "the

20  general rule that remedies should be tailored to the injury suffered from the constitutional violation and

21  should not unnecessarily infringe on competing interests"); *see also Lafler v. Cooper*, 132 S. Ct. 1376,

22  1388 (2012) (remedy for constitutional violation should "not grant a windfall to the defendant"); *United

23  States v. Stoltz*, 720 F.3d 1127, 1133 (9th Cir. 2013) (quoting *Morrison* and applying rule that remedies

24  should be tailored to constitutional violation); *United States v. Haynes*, 216 F.3d 789, 796 (9th Cir.

25  2000) ("dismissal of the indictment…is drastic, disfavored, and thus used only in the most egregious

26  cases").

27

28       [3]  In large part, the subpoenas that defendants wish to direct to the SFPD do not seek "discovery"
     at all, because the subpoenas seek information that is not in the possession of the United States.

### B. Precedent from other circuits makes clear that selective enforcement is not a ground for dismissing a criminal case.

As the Sixth Circuit has stated, "the proper remedy" for a selective enforcement equal protection violation is a civil action under 42 U.S.C. § 1983 against the officers, not a motion in a criminal case.[4] *United States v. Nichols*, 512 F.3d 789, 794 (6th Cir. 2008), *overruled on other grounds as recognized by United States v. Buford*, 632 F.3d 264 (6th Cir. 2011). Several district courts likewise have expressly stated that a selective enforcement claim should be redressed solely by an action under Section 1983. *See United States v. Harmon*, 785 F. Supp. 2d 1146, 1170 (D.N.M. 2011) (quoting *Nichols* and finding that the appropriate remedy for a selective enforcement equal protection violation is a civil action under 42 U.S.C. § 1983); *United States v. Foster*, 2008 WL 1927392, at *5 (M.D. Ala. 2008) ("the proper remedy for [the alleged selective enforcement] violation is a 42 U.S.C. § 1983 action"); *see also United States v. Williams*, 431 F.3d 296, 299-300 (8th Cir. 2005) (suggesting that dismissal is not proper remedy for racial profiling); c*f. United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1261-66 (10th Cir. 2006) (discussing motion to dismiss based on selective enforcement but not considering whether dismissal is appropriate remedy for selective enforcement); *United States v. Barlow*, 310 F.3d 1007, 1010-11 (7th Cir. 2002) (discussing discovery in support of a selective enforcement motion to dismiss).[5] As defendants appear to concede (Mot. at 91), no court has squarely held that selective enforcement, as opposed to selective prosecution, can be remedied by dismissal of the indictment.

*Nichols* raised the question whether an equal protection violation should result in the suppression

---

[4] Defendants misstate *Nichols* in saying (Mot. at 94), "the court in *Nichols* addressed only whether the exclusionary rule was 'the proper remedy' for an equal protection violation." As set forth in the text, the court in *Nichols* squarely held that "the proper remedy" for a selective enforcement equal protection violation is a civil action under Section 1983 against the officers, not a motion in a criminal case. *See Nichols*, 512 F.3d at 794.

[5] The Seventh Circuit may allow a selective enforcement claim to proceed even if the prosecutors did not participate in the decision to investigate or target a particular defendant. *See United States v. Davis*, 793 F.3d 712, 720-21 (7th Cir. 2015) (en banc); *but see United States v. Spears*, 159 F.3d 1081, 1087 (7th Cir. 1998) ("it is well settled that the actions of an investigating agency will not be imputed to a federal prosecutor"). The Ninth Circuit has made clear, however, that the actions of law enforcement officers cannot be imputed to the federal prosecutors. Moreover, as set forth in Part II below, even if the Ninth Circuit followed *Davis*, declarations filed by the Drug Enforcement Administration agents who supervised Operation Safe Schools foreclose any selective enforcement claim.

1   of evidence.  As the Sixth Circuit explained, 512 F.3d at 794, "the exclusionary rule is typically applied

2   as a remedy for Fourth Amendment violations."  But, as the Ninth Circuit has made clear, an officer's

3   subjective intent is irrelevant under the Fourth Amendment.  *See United States v. Ibarra*, 345 F.3d 711,

4   714 (9th Cir. 2003).  For that reason, allowing suppression for an equal protection violation in the

5   enforcement of criminal laws would impose a remedy in an area usually governed by the Fourth

6   Amendment and based on a consideration (the officers' subjective intent) that is irrelevant under the

7   Fourth Amendment.[6]  In the same vein, the Supreme Court has explained that "exclusion may not be

8   premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence"

9   and that "but-for causality is only a necessary, not a sufficient, condition for suppression."  *Hudson v.*

10  *Michigan*, 547 U.S. 586, 592 (2006).  Here, that necessary condition is not satisfied, because there is no

11  dispute that the officers videotaped the defendants selling drugs and then arrested them.  Any alleged

12  racial discrimination by the officers could only have come in targeting the defendants for federal

13  prosecution, not in the gathering of evidence from defendants who plainly violated the law.  In light of

14  the "costly toll upon truth-seeking and law enforcement objectives," suppression is not warranted.

15  *Hudson*, 547 U.S. at 591; *see also Herring v. United States*, 555 U.S. 135, 141 (2009) ("[T]he

16  [exclusionary] rule's costly toll upon truth-seeking and law enforcement objectives presents a high

17  obstacle for those urging [its] application.") (internal quotation marks and citation omitted); s*ee Hudson*,

18  547 U.S. at 597-99 (finding civil action for Fourth Amendment knock-and-announce violation is

19  exclusive remedy).

20      Defendants argue (Mot. at 94) that *Nichols* and the district courts following it are "of no

21  moment" because they addressed the suppression of evidence, not dismissal of the indictment.  In fact,

22  suppression is a less draconian remedy than dismissal.  *See United States v. Lin Lyn Trading, Ltd.*, 149

23  F.3d 1112, 1117-18 (10th Cir. 1998); *Colon v. United States Attorney for District of Puerto Rico*, 576

24

25  ────────────
    [6]  Several district courts have followed *Nichols* and declined to require suppression for an equal
26  protection violation.  *See United States v. Turrentine*, 2012 WL 729348, at *3 (W.D. Okla. 2012) ("no
    authority suggesting suppression of evidence is a criminal trial is warranted based upon a violation of
27  the Equal Protection Clause"); *United States v. Barrett*, 2011 WL 4443432, at *5 n.8 (D.V.I. 2011)
    (citing *Nichols* for the proposition that the exclusionary rule does not apply to equal protection
    violations); *United States v. Cousins*, 2010 WL 338087, at *5 (E.D. Tenn. 2010) (stating that *Nichols*
28  "clearly determined" that the proper remedy for an equal protection violation is a civil suit under 42
    U.S.C. § 1983)

1   F.2d 1, 4 n.2 (1st Cir. 1976).  In addition, here, there is no difference between dismissal and suppression.

2   If the defendants had sought suppression, they would claim that the officers' gathering of all the

3   evidence against them was the result of racial bias; suppression would therefore be equivalent to

4   dismissal.  Accordingly, cases finding that suppression is not an appropriate remedy for an equal

5   protection violation likewise demonstrate that the Court should not order dismissal based on selective

6   enforcement.  Put another way, if selective enforcement will not support suppression of evidence, it also

7   will not support the more disruptive remedy of dismissal of an indictment.

8          Defendants point out (Mot. at 91) that in *Lacey v. Maricopa County*, 693 F.3d 896 (9th Cir.

9   2012) (en banc), and *Rosenbaum v. City and County of San Franciso*, 484 F.3d 1142 (9th Cir. 2007), the

10   Ninth Circuit has "plainly recognized the viability of an Equal Protection claim based on selective

11   enforcement in the civil rights (§ 1983) context."  But that is exactly the government's point: because, in

12   this case, the prosecutors did not – and could not – supervise the law enforcement agents and did not

13   know that the law enforcement agents were presenting only African-Americans for prosecution, it makes

14   no sense to dismiss these cases based on the law enforcement officers' conduct.  Instead, *Lacey* and

15   *Rosenbaum* provide a model of how to bring claims against law enforcement officers in a Section 1983

16   action.

17          Finally, defendants note that in some cases the courts have considered selective enforcement

18   claims without discussing whether selective enforcement can be raised in a criminal case.  In particular,

19   defendants point to the so-called "stash-house" cases in the Northern District of Illinois in which

20   defendants allege "the government has not even raised the argument that dismissal is not an appropriate

21   remedy for selective enforcement."  Mot. at 93.  First, it is far from clear from the cases that the United

22   States Attorney's Office in the Northern District of Illinois was not actively involved in the stash-house

23   cases described.  If the government in those cases knew whom the law enforcement agents were

24   targeting and brought prosecutions based on that knowledge, then the prosecutors are party to the

25   decision, and the argument that dismissal is an inappropriate remedy loses force.  Second, even if the

26   United States Attorney's Office was not involved in the stash house cases, the government did not

27   concede that dismissal is a proper remedy for selective enforcement, and the government's failure to

28   make a particular argument in one case is not a waiver of that argument in this case.  *See United States*

*v. Williams*, 504 U.S. 36, 44-45 (1992).  Third, district courts in the Northern District of Illinois ordered discovery even though the defendants did not meet the *Armstrong* standard; as a result, those decisions have been criticized both in that district and in other districts applying the *Armstrong* standard.  *See United States v. Lamar*, 2015 WL 4720282, at *6-*16 (S.D.N.Y. Aug. 7, 2015) (finding Northern District of Illinois decision "not persuasive" and rejecting request for discovery in stash house case); *United States v. Viera*, 2015 WL 3833797, at *2-*4 (S.D.N.Y. June 19, 2015) (in stash house case, rejecting approach of Northern District of Illinois court and defendants' request for discovery); *United States v. Delacruz*, 2015 WL 2211943, at *4 (S.D.N.Y. May 12, 2015) (finding no evidence "statistical or otherwise" that supports selective prosecution claim); *United States v. Alexander*, 2015 WL 1523910, at *7 (N.D. Ohio April 3, 2015) (rejecting Northern District of Illinois approach and finding that defendants in stash-house case had not carried their burden under *Armstrong*); *United States v. Colon*, 71 F. Supp. 3d 269, 283 n.8 (D. Conn. 2014) (in stash house case, noting that decision from Northern District of Illinois granting discovery is not consistent with *Armstrong*); *United States v. Cousins*, 2014 WL 5023485, at *3-*6 & n.3 (N.D. Ill. Oct. 7, 2014) (declining to follow decision granting discovery in stash house case and granting only discovery already ordered); *United States v. Washington*, 2014 WL 2959493, at *4-*7 (E.D. Pa. June 30, 2014) (denying discovery and criticizing contrary decisions in Northern District of Illinois); *see also United States v. Whitfield*, 29 F. Supp. 3d 503, 515 (E.D. Pa. 2014) (finding in a stash house case that defendants have not met their burden of obtaining discovery); *United States v. Alexander*, 2013 WL 6491476, at *4 (N.D. Ill. Dec. 10, 2013) (refusing to order discovery in a stash house case).  In fact, the Seventh Circuit in *United States v. Davis*, 793 F.3d 712, 719-20 (7th Cir. 2015) (en banc), rejected the discovery approach taken by district courts in the stash-house cases, stating flatly that the decision to allow discovery "is inconsistent with *Armstrong*."  *Id.* at 719.

## II.   DECLARATIONS FROM LAW ENFORCEMENT PERSONNEL ESTABLISH THAT NO SELECTIVE ENFORCEMENT OCCURRED.

Even if, contrary to Ninth Circuit decisions, defendants could pursue a selective enforcement claim in this action, they could not succeed.  With this response, the government is submitting declarations from the Drug Enforcement agents who supervised each of the two phases of Operation

1   Safe Schools.  *See* Declaration of Katie Dorais, Declaration of Charles Atakora (both attached as Exhibit

2   3).  In Agent Dorais's declaration, she explains that she had the "lead investigator role in Operation Safe

3   Schools" and "worked closely with Assistant United States Attorney (AUSA) Waqar Hasib," who

4   supervised Phase I of Operation Safe Schools.  Dorais Decl. ¶ 1.  She states that she did not consider

5   race during the investigation and was unaware of any investigator considering race.  Dorais Decl. ¶ 3.

6   Similarly, in his declaration, Agent Atakora states that he was the case agent for Operation Safe Schools.

7   Atakora Decl. ¶ 1.  Agent Atakora also states that he did not consider race during the Operation Safe

8   Schools investigation and is unaware of any investigator considering race.  Atakora Decl. ¶ 2.

9          In *United States v. Turner*, 104 F.3d 1180 (9th Cir. 1997), the government submitted declarations

10  from the investigating FBI agents in response to a claim that it had engaged in selective prosecution.

11  One agent explained the operation that had led to the selective prosecution claim and declared, "At no

12  time is race or ethnicity ever a factor in any decision by the FBI."  104 F.3d at 1183.  The court of

13  appeals overturned the district court's grant of discovery in support of the motion, noting, among other

14  reasons, that the FBI investigators had denied "under oath" that they had any racial motivation.  The

15  court also noted that defendants had given "no reason to doubt the integrity of prosecutors and

16  investigators whose honesty, good faith, and absence of racial bias are unimpaired by anything in

17  evidence before the court."  104 F.3d at 1185.  The court of appeals criticized the district court for

18  failing to give "credence to the affidavits that the government placed before it" and found that the

19  government had come forward with evidence rebutting any charge of racial discrimination.  *Id.*  On that

20  basis, the court of appeals found that the district court engaged in an abuse of discretion in granting

21  defendants' discovery requests.

22         As in *Turner*, the submission of affidavits by the DEA agents who supervised both phases of

23  Operation Safe Schools forecloses defendants' selective enforcement claim.  The DEA agents have

24  unambiguously stated that they did not consider race in any part of the investigation, and there is no

25  reason to question their honesty.  Although the government is unable to obtain declarations from the

26  SFPD officers, the supervising DEA agents also stated that they are unaware of any consideration of

27  race during either phase of Operation Safe Schools.  *See also* Farnham Supp. Decl. ¶ 4 ("I never

28  discussed the race of any suspect with agents or officers that were involved in the operation."); Hawkins

Supp. Decl. ¶ 4 (same); Barry Supp. Decl. ¶ 2 ("I never instructed any DEA agent or SFPD officer at any time to videotape any particular person or persons of any particular race or ethnicity"); Kaleba Supp. Decl. ¶ 2 (same as Barry Supp. Decl.); Hasib Decl. ¶ 6 ("At no time did I advise law enforcement personnel to take race into consideration when targeting defendants."). Because the DEA agents supervised both phases of Operation Safe Schools, and there is no direct evidence showing that defendants' prosecutions were the result of racial discrimination by SFPD officers, their declarations establish that no racial discrimination occurred.

The investigators' affidavits distinguish this case from the Seventh Circuit's decision in *Davis*. As set forth in footnote 5 above, the Ninth Circuit has rejected the Seventh Circuit's approach in *Davis*, but even if *Davis* represented the law in this Circuit, the DEA agents' declarations are sufficient. In *Davis*, the en banc majority stated that the district court may allow some discovery of ATF and FBI agents in support of a claim that the agents engaged in racial discrimination in selecting targets for stash house cases. But the court specifically stated that the district court could "determine whether forbidden selectivity occurred or plausibly could have occurred" by requesting "affidavits or testimony of the case agents." *Davis*, 793 F.3d at 723. In this case, the case agents for both phases of Operation Safe Schools have submitted declarations stating under oath that they did not consider race in selecting targets. Under *Turner*, those declarations are sufficient to show that no "forbidden selectivity" occurred. Accordingly, defendants cannot show selective enforcement.

## III.   DEFENDANTS HAVE FAILED TO IDENTIFY ANY PERSON WHO IS SIMILARLY SITUATED TO THE DEFENDANTS CHARGED IN OPERATION SAFE SCHOOLS.

To show a selective enforcement or selective prosecution claim, defendants must show that similarly situated persons were not prosecuted in federal court. As set forth below, none of the defendants were similarly situated to other Tenderloin drug sellers because (a) in none of the cases cited by defendants did the government have the same overwhelming evidence of drug dealing that it had for the defendants prosecuted in Operation Safe Schools; and (b) none of the cases were presented to the government for prosecution, and therefore no prosecutor "selected" the defendants chosen over those not chosen. In addition, many of the allegedly similarly situated individuals identified by the defendants are not similarly situated for other reasons.

### A.   Standards for selective prosecution

"A selective-prosecution claim is not a defense on the merits of the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996).  To show selective prosecution, the defendants must meet a "demanding" or "rigorous" standard.  *Armstrong*, 517 U.S. at 463, 468; *see United States v. Sutcliffe*, 505 F.3d 944, 954 (9th Cir. 2007) (standard "is particularly demanding").  That is because "[a] selective-prosecution claim asks a court to exercise judicial power over a 'special province' of the Executive," the "broad discretion" that the government has to enforce criminal law.  *Armstrong*, 517 U.S. at 464 (quoting *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)); *accord Wayte v. United States*, 470 U.S. 598, 607 (1985); *see United States v. Arenas-Ortiz*, 339 F.3d 1066, 1068 (9th Cir. 2003) ("We must exercise a high degree of deference to the decision of prosecuting authorities to bring charges, because the Constitution assigns that decision to the executive branch of government.").  For this reason, prosecutorial decisions are supported by a presumption of regularity.  *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14-15 (1926).  In *Wayte v. United States*, for example, the Court noted that a court should not second guess a decision to prosecute because it may rest on "[s]uch factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan."  470 U.S. at 607 (1985).  As long as the prosecutor has probable cause to believe that the accused committed a crime, "the decision whether or not to prosecute . . . generally rests entirely in [the prosecutor's] discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978).

Accordingly, the defendants must present "clear evidence" showing that a prosecution is "'directed so exclusively against a particular class of persons' . . . that the system of prosecution amounts to 'a practical denial' of equal protection of the law."  *Armstrong*, 517 U.S. at 464-65 (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886)).  That "clear evidence" must include evidence "of both discriminatory effect and discriminatory intent."  *United States v. Bass*, 536 U.S. 862, 863 (2002) (per curiam); *see Armstrong*, 517 U.S. at 465 ("claimant must demonstrate that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose").  To show a discriminatory effect, "the claimant must show that similarly situated individuals of a different race were not prosecuted."  *Armstrong*, 517 U.S. at 465.

To prove discriminatory purpose, a defendant must show that the government undertook a particular course of conduct "at least in part because of . . . its adverse effects upon an identifiable group." *Wayte*, 470 U.S. at 610.  As the Supreme Court has held, "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation." *Oyler v. Boles,* 368 U.S. 448, 456 (1962).  For example, awareness of the consequences of prosecution is not sufficient to show discriminatory intent, *Turner*, 104 F.3d at 1184; nor is a prosecutor's knowledge of the difference in penalties in state and federal court for a given offense.  *United States v. Nelson*, 137 F.3d 1094, 1106 (9th Cir. 1998).

Finally, as defendants' discovery requests show, discovery imposes substantial costs on the government because "the Government must assemble from its own files documents which might corroborate or refute" the defendants' claim.  *Armstrong*, 517 U.S. at 468.  Accordingly, "[t]he justifications for a rigorous standard for the elements of a selective-prosecution claim . . . require a correspondingly rigorous standard for discovery in aid of such a claim."  *Id.*; *see id.* at 464 ("the showing necessary to obtain discovery should . . . be a significant barrier"); *Arenas-Ortiz*, 339 F.3d at 1069 (discovery standard is "rigorous" because it is "designed to minimize interference with the prosecutorial function"). [7]

As the Court stated in *Wayte*, 470 U.S. at 607, the "strength of the case" may be a legitimate reason for the government to bring charges against one defendant and to decide against bringing charges against another violator.  *See Armstrong*, 517 U.S. at 465 (quoting *Wayte*); *see also United States v. Lewis*, 517 F.3d 20, 27 (1st Cir. 2008) (court may consider "the equivalency of the evidence against each prospective defendant"); *United States v. Smith*, 231 F.3d 800, 809 (11th Cir. 2000) ("There can be all kinds of practical reasons, including differences in evidence or in the progress of an investigation,

---

[7]  In Defendants' Motion (at 69), they assert that "the Supreme Court never stated that a defendant needs to produce 'some evidence' of the discriminatory intent element to obtain discovery of a selective prosecution claim."  That assertion is both wrong and irrelevant.  In *Armstrong*, in considering "the showing necessary to obtain discovery" of a selective prosecution claim, the Court specifically endorsed the view of the courts of appeals that a defendant must produce "some evidence tending to show the existence of the essential elements of the defense."  *Armstrong*, 517 U.S. at 468 (internal quotation marks and citation omitted).  Even if defendants were correct, moreover, there is no reason to allow discovery in this case because the AUSAs involved in defendants' prosecution have stated under oath that they did not engage in racial discrimination.  *See* Part V.

1   which cause the government to prosecute some criminals before others for the same crime."); *United*

2   *States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996) ("[p]rosecutorial decisions may also be legitimately

3   influenced by the strength of the case").  Similarly, the government may rely on "the amount of

4   resources required to convict a defendant."  *Olvis*, 97 F.3d at 744.  As the Fourth Circuit has explained,

5   "Making decisions based on the myriad of potentially relevant factors and their permutations require the

6   very professional judgment that is conferred upon and expected from prosecutors in discharging their

7   responsibilities."  *Olvis*, 97 F.3d at 744.  Put another way, the "strength of the case" and "the amount of

8   resources required to convict a defendant" constitute grounds for showing that one defendant or group of

9   defendants is not similarly situated to another defendant or group of defendants.  *See United States v.*

10  *Nelson*, 137 F.3d at 1105 (relying in part on strength of evidence against non-prosecuted individuals to

11  find a lack of racial discrimination).

      **B.**      **Because the government has a stronger case against the charged Operation Safe Schools defendants, other defendants are not similarly situated.**

12  Here, as the declarations and supplemental declarations of AUSAs Farnham, Hawkins, and

13  Hasib and the declarations of Agents Dorais and Atakora explain, the government possessed a videotape

14  of each defendant prosecuted in both versions of Operation Safe Schools selling drugs on at least one

15  occasion to another person.[8]  For each case, therefore, the government had a videotaped record of the

16  drug sales.  That videotaped evidence constituted proof beyond a reasonable doubt of drug charges and

17  saved (or could have saved) the United States Attorney's Office substantial resources in prosecuting the

18  Operation Safe Schools defendants.  In fact, 13 of the 14 defendants in the first Tenderloin phase of

19  Operation Safe Schools pleaded guilty,[9] and all 11 of the 23 defendants charged in the second

20  Tenderloin phase who have not joined defendants' motion have also pleaded guilty.  The sole defendant

21  from the first phase – Ivan Speed – who initially sought relief for alleged discriminatory treatment has

22  withdrawn from the motion, and one of the defendants in the second phase – Darrell Powell – pleaded

---

[8]   The government has lodged with the Court under seal the videotapes of all the defendants charged in Phase II of Operation Safe Schools, although one defendant in the second round, Darell Powell, has pleaded guilty and withdrawn from the motion since the government lodged the videotapes. The government has no objection to unsealing the videotapes.

[9]   Only Ivan Speed went to trial.  Although he initially sought to join defendants' motion, he has since opted to be sentenced on his conviction.

1    guilty after defendants announced their intention to file this motion.  By contrast, the defendants do not

2    cite to a videotaped drug sale in any of the 42 John and Jane Doe cases set forth in their motion for

3    discovery.  *See* Motion at 24-56.[10]

4           In short, the evidence was stronger, and of a particular type, against each of the defendants

5    prosecuted in Operation Safe Schools than in other cases, including the cases cited by defendants.  The

6    government accordingly could anticipate that it would use fewer resources in prosecuting each

7    defendant in Operation Safe Schools.  That conclusion is also consistent with the nature of the Operation

8    Safe Schools prosecutions in federal court.  As set forth above, the purpose of Operation Safe Schools

9    was to decrease drug dealing around children in the Tenderloin.  To that end, the government prosecuted

10   37 street-level drug dealers.  It intended to do so quickly and efficiently, without clogging this Court or

11   taking prosecutorial time with substantial Fourth Amendment litigation or other proceedings.

12          Defendants contend (Mot. at 87) that law enforcement officers engaged in racial discrimination

13   by videotaping only African-American drug dealers, and they presented only those cases to the United

14   States Attorney's Office for prosecution in Operation Safe Schools.  But the Assistant United States

15   Attorneys did not tell the law enforcement officers to videotape only African-American drug dealers,

16   and there is no evidence that the AUSAs knew that the officers may have intended to do so.  To the

17   contrary, in supplemental declarations, the Assistant United States Attorneys involved in both phases of

18   Operation Safe Schools have affirmatively stated that they did not explicitly ask or implicitly seek to

19   have law enforcement officers target only African-Americans in Operation Safe Schools.  Farnhan Supp.

20   Decl. ¶ 4; Hawkins Supp. Decl. ¶ 4; Hasib Decl. ¶ 6; Hasib Supp. Decl. ¶ 3.  Likewise, the DEA agents

21   who supervised both phases of Operation Safe Schools have declared under oath that they did not

22   discuss race with the Assistant United States Attorneys who prosecuted the cases or the SFPD officers

23   who investigated them.  Dorais Decl. ¶ 3; Atakora Decl. ¶ 2.  Nor is there any evidence of a policy

24   within the United States Attorney's Office that law enforcement officers should only present African-

25

26          [10]  As the Supplemental Declaration of S. Waqar Hasib explains, the government did not charge
     some defendants in the first Tenderloin phase of Operation Safe Schools after viewing a videotape of
27   each suspect allegedly engaging in a drug deal because the videotape did not show the drug deal with
     sufficient clarity.  *See* Hasib Supp; Decl. ¶ 4; *see also* Declaration of Katie Dorais ¶ 4 ("The
28   determination to arrest and charge the defendants in Safe Schools depended on the strength of the
     evidence.").

American drug dealers for prosecution.  Accordingly, as set forth in Part I, the actions of the law

enforcement officers cannot be imputed to the prosecutors.  In any event, there is no direct evidence that

the law enforcement officers targeted only blacks for federal prosecution.

    **C.**    **None of the individuals cited by defendants are similarly situated because none was presented to the United States Attorney's Office for prosecution.**

As the Supreme Court stated in *Armstrong*, "'selective prosecution' implies that a selection has

taken place."  517 U.S. at 469 (internal quotation marks and citation omitted).  In this case, as the

Declaration of Agent Atakora states, the Assistant United States Attorneys assigned to Phase II of

Operation Safe Schools charged every individual presented to them who dealt drugs in the Tenderloin.

Atakora Decl. ¶ 1.  In Phase I, the government rejected some defendants but, as the Declaration of Agent

Dorais states, that rejection occurred only because the videotapes of particular drug sales did not clearly

show that a drug deal had occurred.  Dorais Decl. ¶ 4.  Nor have defendants made any showing that any

the John or Jane Does that they cited were rejected in Phase I.

In sum, no selection occurred in Phase II, and any selection that occurred in Phase I was based

on the evidence presented.  Therefore, the Assistant United States Attorneys assigned to Operation Safe

Schools did not discriminate among similarly situated individuals in determining which individuals

should be prosecuted.  For that reason, the AUSAs did not engage in selective prosecution.  As set forth

above, moreover, the declarations establish that the Assistant United States Attorneys did not know of,

or participate in, law enforcement decisions concerning the persons who should be prosecuted.

    **D.**    **Individuals cited by defendants are not similarly situated for other reasons.**

Finally, contrary to defendants' contention (Mot. at 78; *see* Mot. at 25) that "every non-Black

individual arrested for trafficking drugs in the Tenderloin during the relevant time period constitutes a

person similarly situated to the Operation Safe Schools defendants," many of the John and Jane Does

discussed in the motion and many of the individuals forming the basis for the defendants' statistical

analysis are distinguishable (and therefore are not similarly situated) for reasons other than the strength

of the evidence.  In particular, defendants have not shown that other individuals "committed the same

basic crime in substantially the same manner" as the defendants. *United States v. Smith*, 231 F.3d at 810.

Each of the Operation Safe Schools defendants sold drugs in a hand-to-hand drug deal on the street, either to a drug user or a confidential informant or undercover officer. But many of the Does cited in the defendants' motion were not observed engaged in street level dealing. Does 3, 5, 9, and 15 were investigated based on tips from confidential informants. Defense Ex. 1, Attachment A, Ex. 00019–00020, 000048, 00077, 00192–00194; 00357–00358; 00659–660. Officers executed warrantless search conditions on their person and/or their residences and found large amounts of narcotics. *Id.* Additionally, they were selling drugs out of their residences or an agreed-upon location such as a laundromat, not on the street. *Id.*

Officers also received information that Doe 16 was selling methamphetamine through a tip from a confidential informant. After receiving the tip, an officer called Doe 16 and placed an order for methamphetamine. Defense Ex. 1, Attachment A, Ex. 000342.

Doe 33 was observed selling drugs out of a car. Defense Ex. 1, Attachment A, Ex. 000624. A subsequent probation search of the car revealed heroin, methamphetamine, cocaine base, alprazolam, oxycodone, hydrochloride, and assorted other pills. *Id.*

Doe 39 was detained for riding his bike on the sidewalk and then searched pursuant to a warrantless search condition. During the search, officers found 4.9 grams of methamphetamine. Defense Ex. 1, Attachment A, Ex. 00664. Similarly, Doe 42 was cited for riding a bicycle against traffic. Defense Ex. 1, Attachment A, Ex. 00609- 00610. A search revealed that the defendant was in possession of heroin and methamphetamine. *Id.*

In addition to the distinctions between the individuals arrested by Operation Safe Schools and the Does profiled in the defendants' motion, there are individuals included in the defendants' statistical analysis who are not similarly situated. For example, the statistical analysis includes individuals who were initially stopped, searched, or arrested for crimes such as theft, robbery, and assault, and subsequently found to be in possession of large quantities of drugs (Defense Ex. 1, Attachment A, Ex. 00007, Ex. 00026, Ex. 00091); individuals arrested on outstanding warrants and found to be in possession of methamphetamine or other narcotics (Defense Ex. 1, Attachment A, Ex. 00256);

individuals who were searched pursuant to probation and parole search conditions (Defense Ex. 1,

Attachment A, Ex. 00284), individuals who were being investigated for domestic violence and found to

be in possession of methamphetamine (Defense Ex. 1, Attachment A, Ex. 00587, 00595); and one

individual who was initially investigated for failing to provide officers with his MUNI ticket (Defense

Ex. 1, Attachment A, Ex. 00331).

## IV.     MOST OF DEFENDANTS' SHOWING OF RACIAL DISCRIMINATION DOES NOT SHOW DISCRIMINATORY EFFECT OR INTENT.

Much of the evidence on which defendants rely to show discriminatory effect and discriminatory

intent shows neither.  Instead, defendants rely on statistics and information not related to this case in an

effort to establish racial discrimination or animus among the SFPD and the San Francisco District

Attorney's Office.  In the government's view, defendants' efforts to show racism in the SFPD or in the

San Francisco criminal justice system have no place in defendants' motion to dismiss.  If racism exists

in the SFPD or the San Francisco District Attorney's Office, it can be addressed politically, through an

investigation of the SFPD (as the San Francisco mayor and district attorney have both reportedly

sought), or, in an appropriate case, through a civil rights lawsuit.  Defendants, however, must show that

their targeting and prosecution resulted from racism.  Allegations and statistics that do not specifically

further these claims likewise do not show that the officers who conducted Operation Safe Schools

engaged in racism and are included in defendants' motion only to disparage the SFPD as a whole.  In

any event, much of the information on which defendants rely is flawed.

The racial make-up of the defendants in Operation Safe Schools

Defendants repeatedly note (Mot. 3, 5, 87) that all of the defendants federally charged in

Operation Safe Schools are black.  Standing alone, however, that fact does not show racial

discrimination.  *See Turner*, 104 F.3d at 1185 (fact that all defendants charged are one race does not

show racial discrimination); *see also United States v. James*, 257 F.3d 1173, 1179 (10th Cir. 2001)

(showing that a single racial group prosecuted for an offense does not show racial discrimination).  Even

if, as the court in *Turner* noted, it "is not entirely unnatural" to conclude that "a racial or ethnic prejudice

must be at work," defendants must support that conclusion with evidence of racial discrimination against

them.

1    The Needle Exchange Survey

2    According to defendants, the "needle exchange survey" shows that drug dealing in the

3    Tenderloin is conducted by people other than blacks.  To conduct this survey, researchers asked "active

4    drug users" "to recall up to six recent drug transactions that took place in the Tenderloin neighborhood

5    and to identify the race/ethnicity of the person from whom they obtained those drugs."  Mot. at 14.  Put

6    another way, the survey sought anecdotal evidence from drug users.  On that ground alone, it should be

7    found unreliable.  *See Armstrong*, 517 U.S. at 470 (rejecting "anecdotal evidence" of racial

8    discrimination because it "recounted hearsay and reported personal conclusions"); *United States v.*

9    *Hayes*, 231 F.3d 891, 895 (7th Cir. 2001) (rejecting anecdotal evidence of selective enforcement and

10   prosecution); *United States v. Michael*, 2007 WL 2712964, at *19 (D.N.M. June 27, 2007) ("Simply

11   providing anecdotal information from other cases which cannot be tested through cross-examination in

12   this case does not suffice to show selective enforcement.").

13   The Court should also reject the survey because it is irrelevant to defendants' claim (other than

14   by demonstrating that federal prosecution of drug dealers in the Tenderloin is necessary to protect the

15   children who live there).  The needle exchange survey shows, at most, only that black and non-black

16   individuals sell drugs in the Tenderloin.  It says nothing about the percentage of non-black drug dealers

17   in the Tenderloin or whether Tenderloin drug dealers were the subject of federal and state prosecution.

18   Nor do defendants identify the race or ethnicity of the survey participants, a fact that may influence the

19   race or ethnicity of the dealers from whom the participants allegedly buy drugs.

20   As the Court in *Armstrong* noted with regard to evidence submitted in that case, the study is "not

21   relevant to an allegation of discrimination in decisions to prosecute," 517 U.S. at 470, or, for that matter,

22   to allegations of discrimination in targeting individuals for federal prosecution.  In addition, defendants

23   fail to show that each of the persons from whom the survey respondents bought drugs is similarly

24   situated to the defendants charged in Operation Safe Schools; in fact, defendants cite no evidence that

25   any of the persons who sold drugs to the survey respondents were ever prosecuted.  As the Supreme

26   Court stated in a related context, "raw statistics regarding overall charges say nothing about charges

27   brought against similarly situated defendants."  *United States v. Bass*, 536 U.S. 864 (2002); *see United*

28   *States v. Whitfield*, 29 F. Supp. 3d 503, 514-15 (S.D.N.Y. 2014) ("To be probative of bias . . . '[t]he

1  statistics proffered must address the crucial question of whether one class is being treated differently

2  from another class that is otherwise similarly situated." (quoting *Chavez v. Illinois State Police*, 251

3  F.3d 612, 638 (7th Cir. 2001)).

4  The Tenth Circuit in *James* rejected a similar statistical survey.  In that case, a prosecution for

5  selling crack cocaine, statistics from a drug counselor showed that the "persons who voluntarily

6  committed themselves for treatment of crack cocaine addiction" did not reflect the defendant's race.

7  The court found the statistics "unreliable" in part because the percentages cited by the drug counselor

8  did not show "the percentage of whites and blacks . . . who actually deal crack cocaine."  257 F.3d at

9  1181.  Similarly, the percentages cited by defendants from the needle exchange survey do not show the

10  percentages of black and non-black drug dealers or the percentages of state and federal prosecution.

11  <u>Interviews with Tenderloin workers or residents</u>

12  Defendants' motion also relies on interviews with five people who work in the Tenderloin and

13  who say that Hispanics deal drugs in that neighborhood.  *See* Mot. at 15-18.  This evidence has even less

14  probative value than the needle exchange survey.  First, it is anecdotal evidence and not a systematic

15  effort to determine anything about drug dealing in the Tenderloin.  *See United States v. Fares*, 978 F.2d

16  52, 59 (9th Cir. 1992) ("Mere assertions and generalized proffers on information and belief are

17  insufficient.").  In particular, the interviewed persons state only that Hispanics deal drugs in certain parts

18  of the Tenderloin.  Second, as with the needle exchange survey, it does not identify individual drug

19  dealers or make any effort to show that a specific drug dealer has been subject to state or federal

20  prosecution.  Third, again like needle exchange survey, it fails to show that any individual drug dealer is

21  similarly situated to the defendants charged in Operation Safe Schools.

22  <u>The Haywood Burns Institute Study</u>

23  The Haywood Burns Institute study on which defendants rely to show that the SFPD is

24  permeated with racism is not limited to the Tenderloin and extends to all of the City and County of San

25  Francisco.  *See* Mot. at 56-57.  It says nothing about racism among police officers in the Tenderloin,

26  much less the officers who conducted Operation Safe Schools surveillance, drug buys, or arrests.  As

27  with defendants' reliance on the racist texts (discussed below), use of the survey appears to be an effort

28  to slander all the police officers in San Francisco with the actions of a few.  More to the point,

1    videotapes exist of the defendants committing the crimes.  Accordingly, even if racism exists in the

2    SFPD (a fact that defendants have not shown), there is no doubt that defendants committed the offenses

3    charged.  Accordingly, it is irrelevant to defendants' motion that, as the study purports to show, "women

4    and men of color are disproportionately stopped or questioned by police."  (And, "women and men of

5    color" may well include Hispanics or Asians against whom the SFPD supposedly discriminated in this

6    case.)  It is similarly irrelevant to defendants' motion that blacks are more likely to be "cited for

7    resisting arrest," because the defendants are not charged with resisting arrest.  Finally, according to

8    defendants, the study purports to state that blacks are more likely to be convicted of a crime than whites.

9    But the decision to charge a person with a state crime is not made by the SFPD; instead, it is made by

10    the San Francisco District Attorney's Office.  In short, this study says nothing about the Tenderloin,

11    nothing about the defendants in this case, and nothing about the state or federal prosecution of

12    defendants.  To reiterate, inclusion of the study is simply an effort to tarnish the SFPD and San

13    Francisco, which, as set forth above, should not be part of this motion.

14         <u>The racist texts</u>

15         Defendants rely heavily on racist texts sent by officers before 2014 to show that the government

16    should have known of racism in the SFPD.  *See* Mot. 57-60.  As defendants implicitly concede, none of

17    the officers involved in Operation Safe Schools sent any of the racist texts that have surfaced, and the

18    government is unaware of any officer involved in Operation Safe Schools sending a racist text.

19    Accordingly, the texts do not show that the government knew that the officers involved in Operation

20    Safe Schools were racists.  Once again, defendants' reliance on the texts is an effort to tar the entire

21    SFPD with the actions of a very small number of police officers.  The texts show nothing about alleged

22    racism either by law enforcement agents or prosecutors in Operation Safe Schools.

23         <u>The fact that officers were investigating whether offenses occurred near schools</u>

24         Defendants appear to claim (Mot. 77) that the fact that SFPD officers "were actually

25    investigating whether a particular drug transaction occurred less than 1,000 feet of a school" somehow

26    shows that the officers exercised racial discrimination in determining to refer only blacks for federal

27    prosecution.  Defendants also note that in arresting a few of the John and Jane Does, SFPD officers

28    measured whether the defendants had been engaged in drug dealing within 1,000 feet of a school.  *See*

1    Mot. 2, 43).  Although this claim is not clear, it is also irrelevant to racial discrimination.  California law

2    makes it a crime subject to enhanced penalties to deal drugs within a 1,000 feet of a school, *see* Cal. H &

3    S Code § 11353.6(b), and, as a result, selling drugs within 1,000 feet of a school violates both state and

4    federal law.  *See* 21 U.S.C. § 860(b).  For that reason alone, the officers' measurement of the distance

5    between a particular defendant's drug deal and a school does not show racial discrimination.[11]

6                    The videotapes in Operation Safe Schools cases

7            Defendants rely on a portion of the videotaped surveillance of defendant Acacia McNeal in

8    which a SFPD officer referred to African-American males as "f------- BMs" during a surveillance of an

9    undercover controlled purchase of drugs.  Mot. at 60.  The officer's comment does not necessarily show

10   racial discrimination, because, taken in context, it appears to refer to the fact that specific African-

11   American males were preventing surveillance of, or interfering with the controlled purchase of narcotics

12   from, several women selling drugs in the area.  In addition, the use of the term "BM" is consistent with

13   the surveillance shorthand used by the officers to identify persons by race (for example, "WM," "WF,"

14   "BM," "BF,") during the undercover operations.  In any event, this single, allegedly racist reference by a

15   surveillance officer in one of 37 cases is not evidence of systematic racial discrimination in either phase

16   of Operation Safe Schools.  *See United States v. Lamar*, 2015 WL 4720282, at *16 (S.D.N.Y. Aug. 7,

17   2015) (rejecting claim that race-specific comments by confidential informant show that blacks were

18   impermissibly targeted).

19           Defendants also rely on an incident from a videotaped drug sale by one of the Operation Safe

20   Schools defendants who has already pleaded guilty.  Mot. at 60-61.  In that videotape, a confidential

21   informant declines to buy drugs from an Asian woman and instead waits to buy drugs from the

22   defendant, an African-American woman who had ignored the informant's initial approach because she

23

24           [11]  Defendants state (Mot. 86) that by obtaining the indictment of one defendant for conduct near
25   a university, not a school where children are present, "the government did not adhere to its own stated
     basis for prosecution."  But the defendant in question pleaded guilty to drug trafficking near a school,
26   and there is no evidence that the government selected this defendant for federal prosecution for some
     reason other than his drug dealing near a school.  In any event, one defendant does not make out a claim
27   of selective prosecution,  Defendants also make the astounding claim (Mot. 86 n.59) that the prosecution
     of Lakeysha White was "pretextual" because she was prosecuted for dealing drugs near a playground,
28   not a school.  As defendants concede, however, "children play at playgrounds," and White pleaded
     guilty to distributing drugs within a 1,000 feet of a place where children play.

1     was on the telephone.  There is no evidence, however, that the "Asian woman" was a repeat or persistent

2     drug dealer whom the officers sought to arrest, that she sought to sell the informant the same type of

3     drugs that he sought to buy from the African-American woman, that the informant targeted the African-

4     American female because of her race and not because she was a known drug seller near Tenderloin

5     schools, or that the informant's actions resulted from discrimination on the part of SFPD officers.

6     Standing alone, therefore, the incident does not show racism.  And, the informant's actions do not bear

7     on the SFPD officers' targeting of individuals or the United States Attorney's Office decision to

8     prosecute.  Finally, the defendant to whom this allegedly racist action occurred apparently did not see

9     herself as the subject of racism because she has pleaded guilty.

10     <u>Incidents of racial bias in the Tenderloin</u>

11     Defendants claim that SFPD officers used racial slurs against black people in the Tenderloin

12     (Mot. 62-63), that SFPD officers engage in sexually inappropriate behavior in the Tenderloin (Mot. 63-

13     67), and that SFPD officers engage in threats or acts of violence in the Tenderloin (Mot. 67-69).  To

14     support these claims, defendants rely on declarations submitted by the defendants who are actually

15     challenging the SFPD's actions and other Operation Safe Schools defendants who have already pleaded

16     guilty.  Both sets of declarations are obviously suspect.  Defendants who seek to establish that SFPD

17     officers who arrested them on the charges that they seek to dismiss have a substantial basis for bias

18     against the SFPD and therefore may have exaggerated or fabricated their testimony.  And the defendants

19     who have already pleaded guilty have nothing to lose.  At the least, the Court should treat their

20     declarations the way it would treat declarations filed by any defendant in a criminal case and not credit

21     the declarations until it has seen the defendants testify and be cross-examined.

22     Second, the alleged conduct does not relate to the conduct charged in Operation Safe Schools.  If

23     true, therefore, the racial slurs, violence, and sexually inappropriate behavior should at most be the

24     subject of a civil rights action; such incidents do not show that the officers who selected defendants for

25     federal prosecution acted based on defendants' race.

26     Third, the United States does not represent the officers alleged to have committed misconduct.

27     Nor, to reiterate, is the SFPD a party to this action.  Accordingly, neither the SFPD officers, who are

28     identified by name, nor the SFPD can defend themselves in this proceeding.  And because these officers

1    did not select the defendants for federal prosecution, the officers have no reason to try to do so in

2    response to defendants' motion.

3         Finally, many of the incidents reported by the defendants in this case and other Operation Safe

4    Schools defendants have been given a highly subjective interpretation in the declarations.  For example,

5    one of the defendants, Erwin Mackey, states that "[p]olice patrols and arrests in the Tenderloin primarily

6    occur on blocks occupied by African American individuals."  Mot. 62 (quoting Mackey Decl. ¶ 4).  But

7    that is a wholly subjective interpretation of police activity that depends on Mackey's observation of the

8    police throughout the Tenderloin.  Similarly, the declarations use words such as "inappropriate,"

9    "thought," "seemed," "take pleasure," "sensed," and "uneasy."  All of these words report subjective

10   impressions and should not be the basis for a finding of racism absent cross-examination.

11        <u>Defendants' statistical analysis</u>

12        The defense statistical analysis contains at least two flaws.  First, the defense sociologist tests for

13   a "difference in proportions" to determine whether the proportion of black arrestees under Operation

14   Safe Schools differed simply by chance from the proportion of blacks that would have been arrested if

15   the selection of 37 arrestees was done at random from the pool of drug traffickers in the Tenderloin.  But

16   the Operation Safe Schools arrests were concentrated in a relatively small number of areas on a limited

17   number of days.  As a result, the defendants err in assuming Operation Safe Schools selected 37

18   individuals for prosecution on 37 independent occasions.  Rather, there was clear temporal and

19   geographic clustering, which undermines the assumption of independence across the 37 arrests.

20   Because that is a key assumption in the test that the defendants employ, the defendants have exaggerated

21   the number of independent arrests.  Accordingly, the defendants' test leads to an exaggerated level of

22   statistical significance of any "difference in proportions."

23        Second, defendants state that the Z score for their statistical analysis of "the Proportion of

24   Operation Safe Schools Arrestees and SFPD Arrestees Charged in Superior Court who are Black" is

25   17.5.  *See* Mot. at 22, Table 1.  Using the same formula that the defense sociologist used, the

26   government expert's analysis of the data yields a Z score of 5.76.  Similarly, the defense sociologist

27   produced a Z score of 13.7 in Table 2, which sets forth her analysis of the Statistical Significance of

28   Difference between the Proportion of Operation Safe Schools Arrestees and Drug Dealers Identified by

UNITED STATES' OPPOSITION TO DISCOVERY MOTION
NO. CR 14-643 EMC                              26

1  Syringe Exchange Survey Respondents who are Black.  *See* Attachment M to Amran Declaration at 10.

2  Again, using the same formula as the defense sociologist, the government's expert produced a Z score of

3  5.23.[12]  Because defendants' statistical analysis is flawed, their showing that similarly situated

4  individuals were not prosecuted is similarly flawed.

5  **V.    DEFENDANTS HAVE FAILED TO SHOW THAT THE PROSECUTORS LIED IN
        THEIR DECLARATIONS WHEN THEY STATED UNDER OATH THAT THEY DID

6        NOT ENGAGE IN RACIAL DISCRIMINATION.**

7        In its Motion Seeking Ruling on Defendants' Claim that the Government Engaged in Selective

8  Enforcement and Selective Prosecution filed on July 16, 2015, the government presented sworn

9  declarations from five Assistant United States Attorneys.  Assistant United States Attorneys Farnham

10  and Hawkins stated under oath that each recommended prosecution of defendants in Phase II of

11  Operation Safe Schools because "the evidence [showed] that each individual's conduct constituted a

12  violation of [21 U.S.C. §§ ] 841(a)(1) and 860."  Both AUSAs Hawkins and Farnham stated

13  unequivocally that neither "consider[ed] the defendant's race in [the] review of the evidence or in [the]

14  determination to prosecute any individual."  Hawkins Decl. ¶¶ 4-5; Farnham Decl. ¶¶ 4-5.  AUSAs

15  Barry and Kaleba, who supervised AUSAs Hawkins and Farnham, stated under oath that in authorizing

16  prosecution of the second phase defendants, each was "unaware of any individual's race at the time I

17  authorized presentation to the grand jury, and I remained unaware of their race at the time the grand jury

18

19  [12] The defense sociologist states that she used this formula:

20  $$z = \frac{(\hat{\pi}_2 - \hat{\pi}_1)}{\hat{\sigma}_{\hat{\pi}_2 - \hat{\pi}_1}}$$

21

22  The numerator of this equation is the difference between the observed proportion of black Operation
   Safe Schools arrests (1.0) minus the benchmark proportion (the defense sociologist begins with .614

23  which is the proportion of blacks arrested by the SFPD for the same offense of drug trafficking).  In
   other words, the numerator is 1.0 - .614 = .386.  The denominator is supposed to be a pooled sample

24  proportion standard error.  This standard error is defined as SE = sqrt{p * (1-p) * [1/n1 + 1/n2]}—where
   n1 and n2 are the sample sizes (37 and 796 for the number of OSS and San Francisco police arrests,

25  respectively), and p is the overall proportion of the pool that is black (equal to (37 + 489)/(37 + 796) =
   .631).  Doing the arithmetic yields a denominator of .081.  The resulting Z-score for Table I should be

26  .386/.081 = 4.76.  Table 2 used a second benchmark proportion of .56 based on the percent of black drug
   sellers identified in a survey of 425 respondents and computed a Z-score of 13.7.  A comparable

27  calculation (again based on the formula above) should generate a value of 5.23 for Table 2.

28

returned its indictments."  Barry Decl. ¶ 5; Kaleba Decl. ¶ 5.  AUSA Barry further declared that he saw only two of the 23 videotapes of Operation Safe Schools defendants selling drugs, and he does "not have an independent recollection of who was featured in these videos."  Barry Decl. ¶ 6.  AUSA Kaleba declared that he "did not see any surveillance video related to these cases prior to authorizing the indictments."  Kaleba Decl. ¶ 5.  Finally, AUSA Hasib, who, as a supervisor, "authorized indictments" in the first phase of Operation Safe Schools" also declared under oath that he "authorized prosecution of these individuals because it appeared to me that each person's conduct constituted a federal offense" and that "at no time did [he] consider the individual's race as a factor in prosecution."  Hasib Decl. ¶ 4.  AUSA Hasib added that "in the large majority of cases, [he] was entirely unaware of any particular individual's race when [he] authorized presentation to the grand jury."  Hasib Decl. ¶ 4.

These declarations establish that the government did not engage in racial discrimination in prosecuting defendants.  As the Supreme Court has explained, "a defendant who alleges an equal protection violation has the burden of proving 'the existence of purposeful discrimination.'"  *McCleskey v. Kemp*, 481 U.S. 279, 292 (quoting *Whitus v. Georgia*, 385 U.S. 545, 550 (1967)); *see also Armstrong*, (defendants must show discriminatory intent because "'selective prosecution' implies that a selection has taken place" (internal quotation marks omitted)).  The declarations foreclose defendants from carrying that burden to the extent that they claim that they are the victims of selective prosecution.  *See Belmontes v. Brown*, 414 F.3d 1094, 1127-29 (9th Cir. 2005), *reversed on other grounds*, *Ayers v. Belmontes*, 549 U.S. 7 (2006) ("even if [the defendant's] statistics were sufficient to raise a prima facie case of purposeful discrimination, the State has successfully rebutted it by offering the prosecutor's legitimate race-neutral explanation for its actions").  In fact, in *Turner*, the court of appeals rejected a selective prosecution claim in which the government introduced affidavits from the prosecutors, noting that the district court had not "explained why the affidavits were not credible."  104 F.3d at 1185.  The *Turner* court noted that by introducing the affidavits, the government had provided "precisely" the information that the district court needed to decide a selective prosecution claim.

Nevertheless, the defendants claim that the AUSAs lied under oath.  In particular, defendants assert that because of the "strength of the evidence of racial bias among law enforcement officers in Operation Safe Schools, and the public nature of it," "[t]he race-neutral reasons provided by the AUSAs

1    for their charging decisions (outlined in their July 2015 declarations) do not hold up" (Mot. 5); that the

2    AUSAs' sworn assertions that they had non-racial reasons for bringing the prosecutions are

3    "pretextual"[13] (Mot. 83); and that supervisory AUSAs must have lied when they declared under oath

4    "that they were not aware of the race of any defendant before authorizing prosecution" (Mot. 89); *see*

5    *also* Mot. 11 (implicitly casting doubt on AUSAs Barry's, Kaleba's, and Hasib's assertion that they did

6    not know the race of the Operation Safe Schools defendants because "the rap sheet – and often the

7    police incident report – state the race of the defendant").

8         The FPD has failed to show that the AUSAs committed perjury.  There is not one scintilla of

9    direct evidence that the prosecutors lied in their declarations, and the FPD's allegations ignore the

10   Supreme Court's repeated direction that prosecutors act with a "presumption of regularity" in making

11   prosecutorial decisions, *United States v. Chemical Foundation*, 272 U.S. at 14-15, and that courts should

12   presume "that a prosecutor has not violated equal protection."  *Armstrong*, 517 U.S. at 465; see *id*.

13   (courts should not "unnecessarily impair the performance of a core executive function"); *Wayte*, 470

14   U.S. at 608 ("[e]xamining the basis of a prosecution . . . threatens to chill law enforcement by subjecting

15   the prosecutor's motives and decisionmaking to outside inquiry").  As the Supreme Court stated in the

16   death penalty context, "Because discretion is essential to the criminal justice process, we would demand

17   exceptionally clear proof before we would infer that the discretion has been abused."  *McCleskey v.*

18   *Kemp*, 481 U.S. at 297.  Defendants have not supplied that "exceptionally clear proof."

19        Defendants' claim also seeks to hold the government prosecutors accountable for selective

20   prosecution in violation of the Supreme Court's direction that "[d]iscriminatory purpose . . . implies

21   more than . . . intent as awareness of consequences.  It implies that the decisionmaker . . . selected or

22   reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of,' its adverse

23   effects upon an identifiable group."  *Wayte*, 470 U.S. at 610 (quoting *Personal Administrator of*

24   *Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979)).  Defendants allege that the AUSAs who made the

25   decision to prosecute the defendants must have known of each defendant's race (a fact conclusively

26

27

28
---
[13]  Black's Law Dictionary defines the term "pretext" as meaning "A false or weak reason or
motive advanced to hide the actual or strong reason or motive."  Black's Law Dictionary at 1225 (8th
ed. 1999).

1   rebutted in the declarations), but even if the prosecutors knew that every Operation Safe Schools

2   defendant was black, defendants do not allege – and could not adduce proof – that these prosecutors

3   made the decision to prosecute because the defendants were black.  Accordingly, even if defendants'

4   claims are taken as true, they show no more than that the prosecutors were aware that defendants were

5   black, not that the prosecutors selected them for prosecution because they were black.

6          In any event, the government has now filed supplemental declarations that conclusively rebut

7   defendants' claims.  In supplemental declarations, AUSAs Farnham and Hawkins state that they did not

8   discuss or describe the suspect's race in presenting each case to their supervisors; never discussed race

9   with any of the agents or officers involved with Operation Safe Schools; and did not know the race of

10  every defendant charged in Phase II.  Farnham Supp. Decl. ¶¶ 3-4; Hawkins Supp. Decl. ¶¶ 3-4.  AUSAs

11  Barry and Kaleba, who supervised AUSAs Farnham and Hawkins, have likewise stated under oath that

12  they never instructed any DEA or SFPD agents to take race into consideration when targeting

13  defendants and did not themselves consider race when authorizing indictments.  Barry Supl. Dec. ¶ 2;

14  Kaleba Supp. Decl. ¶ 2.  In addition, both AUSAs Barry and Kaleba state that the U.S. Attorney's Office

15  would have continued Operation Safe Schools if defendants had not filed their motion.  Although it is

16  impossible for AUSAs Barry and Kaleba to identify the race or ethnicity of the drug dealers who would

17  have been targeted if Operation Safe Schools had continued, the intention to continue that operation is

18  strong evidence that the government did not engage in racial discrimination in the first two Tenderloin

19  rounds.  Finally, AUSA Hasib, who was responsible for conceiving Operation Safe Schools in the

20  Tenderloin and supervised Phase I, also has offered a supplemental declaration stating that he did not

21  instruct any agent or officer to consider race and did not consider race himself.  Hasib Supp. Decl. ¶¶ 3-

22  4; *see also* McCarthy Decl. ¶ 2 (stating that AUSA McCarthy did not consider race in assessing AUSA

23  Hasib's prosecution memoranda).

24         Moreover, the evidence on which defendants rely does not show that the prosecutors engaged in

25  racial discrimination.  As set forth above, much of that evidence shows only that black and non-black

26  individuals sell drugs in the Tenderloin, is anecdotal evidence on which this Court should not rely, or is

27  irrelevant or flawed.  But, to reiterate, even if taken as true, defendants' evidence nowhere supports the

28  conclusion that the prosecutors relied on race in prosecuting the defendants in Operation Safe Schools.

UNITED STATES' OPPOSITION TO DISCOVERY MOTION
NO. CR 14-643 EMC                    30

1   Defendants cite "[t]he statistical disparity between the racial demographics of Tenderloin drug

2   traffickers in state court . . . and those charged federally" to "explain the failure to include any non-

3   Black drug traffickers in Operation Safe Schools."  Mot. 3-4.  But as set forth above, the Ninth Circuit

4   made clear in *Belmontes* and *Turner* that statistics alone do not overcome a prosecutor's sworn

5   declaration that he or she has not engaged in racial discrimination.  *See Belmontes*, 414 F.3d at 1125-20;

6   *Turner*, 104 F.3d at 1185; *see also United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1265 (10th Cir.

7   2006) ("sheer disparity" in statistical showing cannot outweigh sworn testimony).  In fact, some courts

8   have stated that statistics alone do not show the discriminatory intent necessary to establish a selective

9   prosecution claim.  *See United States v. Olvis*, 97 F.3d at 745 ("statistical evidence of racial disparity is

10  insufficient to infer that prosecutors in a particular case acted with a discriminatory purpose"); *United*

11  *States v. Cousins*, 2014 WL 5023458, at *5 (statistics may not serve as the "'sole proof'" of intentional

12  discrimination (quoting *Chavez*, 251 F.3d at 647-48)).  As set forth above, moreover, defendants have

13  not pointed to a single defendant who is similarly situated to the defendants charged federally in

14  Operation Safe Schools, and they have included many individuals in their list of John and Jane Does

15  who are plainly not similarly situated.  Defendants' claim also rests on the premise – refuted by the

16  supplemental declarations – that the government did not intend to charge others if Operation Safe

17  Schools continued.

18        Contrary to defendants' claim (Mot. 88), AUSAs Hawkins and Farnham did not make any

19  decisions, only recommendations to their supervisors.  *See* Hawkins Decl. ¶ 4; Farnham Decl. ¶ 4.

20  Likewise, as AUSA Hasib's declaration makes clear, the line AUSAs in the first phase of Operation

21  Safe Schools did not make prosecution decisions, only recommendations to AUSA Hasib.  *See* Hasib

22  Decl. ¶ 4.  Nor is there a shred of evidence that the AUSAs who authorized the prosecutions in the first

23  phase of Operation Safe Schools knew of the race of the defendants when they authorized the

24  prosecutions or that AUSA Hasib lied when he declared that "[i]n the large majority of cases, [he] was

25  entirely unaware of any particular individual's race" when he authorized a prosecution.  *See Id.* ¶ 4.

26  Knowledge of the racial mix in the Tenderloin or among drug dealers in the Tenderloin is not sufficient

27  to show discriminatory intent.

28        Defendants focus on the government's assertion in its prior motion and the declarations in

UNITED STATES' OPPOSITION TO DISCOVERY MOTION
NO. CR 14-643 EMC                          31

1    support of it that Phase II of Operation Safe Schools targeted "persistent, recidivist, and repeat

2    offenders."  *See* Mot. 84-85  Defendants equate this term only with suspects who have some "criminal

3    history" and claim that it does not apply to Operations Safe Schools defendants who have no adult

4    criminal history.[14]  *See* Mot. at 84.  In effect, defendants' interpretation reads "persistent" or "repeat"

5    out of this phrase.  A "persistent" or "repeat" offender is not necessarily someone with a criminal

6    history, and the SFPD could have targeted individuals who persistently or repeatedly sold drugs in the

7    Tenderloin but had not been through the criminal justice system.  That conclusion is confirmed by the

8    declarations of the DEA agents who supervised both phases of Operation Safe Schools.  Agent Dorais

9    states that Phase I "focused on repeat offenders and/or known drug traffickers who were selling drugs

10   near schools in the Tenderloin."  Dorais Decl. ¶ 1.  In Phase II, according to Agent Atakora, the

11   investigation "focused on repeat offenders, prior arrestees, and/or known narcotics dealers in the

12   Tenderloin."  Atakora Decl. ¶ 2.  In other words, the agents who supervised Operation Safe Schools

13   differentiated between those with a criminal history and those who were known drug dealers.  Finally,

14   there is no evidence that the Assistant United States Attorneys prosecuted individuals because they were

15   black, and not because they were presented as "persistent" or "repeat" drug dealers in the Tenderloin.

16           Defendants' analysis also misstates the law.  Defendants argue that both the Supreme Court and

17   the Ninth Circuit use comparative analysis to show racial discrimination "in the context of a

18   prosecutor's decision to strike a prospective juror."  Mot. at 83.  But defendants do not point to a single

19   case – in this circuit or otherwise – in which a court has used comparative analysis in determining

20   whether selective enforcement or selective prosecution occurred.  Presumably, that is because the

21   Supreme Court in *Armstrong* specifically rejected any reliance on *Batson v. Kentucky*, 476 U.S. 79

22   (1986), in determining whether a person is similarly situated to a person who was prosecuted.  The

23

24   _____

        [14]  Defendants selectively portray the circumstances of the defendants they cite as not qualifying
25   as "persistent, recidivist, and repeat offenders."  For example, although it is true that Janai Carter had no
     prior criminal convictions, she was arrested after conducting a drug sale with Andre Patterson, who had
26   six prior convictions, and has pleaded guilty.  William Brown had one prior conviction – for possession
     of cocaine base for sale – and he was on probation for that conviction at the time of his arrest; he also
27   had at least seven prior arrests.  Ashley Pharr had three prior arrests, two of which were in the
     Tenderloin.  Matthew Mumphrey had at least eight prior arrests.  Darrell Powell had four adult
     convictions and three juvenile felony convictions, and was on probation and parole when he committed
28   the Operation Safe Schools offense.  Carter, Brown, Pharr, and Powell have pleaded guilty and are not
     part of this motion.

1    Court explained that jury selection occurs before a single judge, who is "well situated to detect whether

2    a challenge to the seating of one juror is part of a 'pattern' of singling out members of a single race."

3    *Armstrong*, 517 at 467-68.  By contrast, that is not true when a defendant claims that racial

4    discrimination infected the selection and prosecution of defendants.  Put another way, the Supreme

5    Court in *Armstong* made clear that, contrary to defendants' claim, "*Batson* is not instructive on the issue

6    of whether a prosecutor's facially race-neutral explanation is a pretext for discrimination."  Mot. at 84

7    n.57.

8    There is also a critical factual flaw with the defendants' reliance on the *Batson* line of cases to

9    establish that the prosecutors engaged in intentional discrimination.  Those cases assume that a lawyer

10   exercising a peremptory challenge is actually being faced with the choice of striking one of two or more

11   similarly situated potential jurors.  *See, e.g.*, *Crittenden v. Chappell*, 804 F.3d 998, 1012 (9th Cir. 2015)

12   (discussing the prosecutor's ratings of all prospective jurors as "a useful basis for a comparative juror

13   analysis").  When considering whether a proffered race-neutral explanation for a decision is pretextual,

14   the court looks at whether that explanation applies to a similarly situated juror who was not removed,

15   comparing the potential jurors using the information available to the lawyers and the court.  *See Miller-*

16   *El v. Dretke*, 545 U.S. 231, 241 (2005) (relying on "side-by-side comparisons of some black venire

17   panelists who were struck and white panelists allowed to serve").  Therefore, under *Batson*, the

18   comparative analysis is between two jurors in the venire who were actually before the court and

19   considered by the lawyer exercising the strikes – in other words a finding of intentional discrimination

20   relies on the lawyer being aware of the similarly situated juror remaining on the jury.  In this case there

21   is no evidence that any of the allegedly similarly situated Does were presented to the U.S. Attorney's

22   office or the Operation Safe Schools prosecutors for possible prosecution, and no evidence that the

23   prosecutors accused of intentional discrimination in this case were aware of the arrests of the Does.

24   Without any evidence to support this factual showing, the *Batson* comparative analysis test for

25   intentional discrimination fails.

26   Finally, defendants argue that "[i]f the USAO established policies that permitted racial profiling

27   (or failed to put into place any policies to prevent racial profiling), that is sufficient evidence of

28   discriminatory intent whether or not the prosecutors are themselves motivated by racial animus."  Mot.

87.  Apparently, defendants' argument is that even if no prosecutor selected a defendant because he or she was African-American, the United States Attorney's Office can nevertheless be guilty of selective prosecution if it had a policy requiring racial discrimination or did not have a policy forbidding racial discrimination.  At the outset, the only relevant policy in the United States Attorney's Office is to abide by the law; neither the Department of Justice nor the United States Attorney's Office tolerates racial discrimination in any case.  *See* U.S. Attorney's Manual 9-27.260.

In any event, defendants' claim is contrary to Supreme Court cases defining selective prosecution.  To reiterate, in *Armstrong*, the Court specifically stated that "'selective prosecution' implies that a selection has taken place."  517 U.S. at 469 (internal quotation marks and citation omitted).  Here, defendants apparently are claiming that the prosecutors have engaged in selective prosecution without having selected anyone for prosecution.  In *Wayte*, the Court stated that to engage in racial discrimination, a prosecutor must have "selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of,' its adverse effects upon an identifiable group."  *Wayte*, 470 U.S. at 610 (internal citation omitted).  Defendants appear to claim, however, that a prosecutor is liable for selective prosecution even if the he or she had no racial animus and did not act "because of" the action's adverse effects on African-Americans.  That contention is contrary to existing law and should be rejected.

1

**CONCLUSION**

2

For the foregoing reasons, defendants' motion should be denied.

3 Dated:          March 11, 2016                              Respectfully submitted,

4                                                             BRIAN J. STRETCH
                                                              Acting United States Attorney
5

6                                                                            /s/

7                                                             _____

                                                              LLOYD FARNHAM
8                                                             SARAH K. HAWKINS
                                                              J. DOUGLAS WILSON
                                                              Assistant United States Attorneys
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28