Pages 1 - 76

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | NO. CR 14-00643 EMC |
| | ) | |
| MATTHEW MUMPHREY, DAVID DESEAN | ) | |
| MADLOCK, LATONYA CAREY, | ) | |
| CHRYSTAL ANTHONY, DARLENE | ) | |
| FRANCINE ROUSE, ACACIA MCNEAL, | ) | |
| ANITA DIXON, AARON LEE MATHEWS, | ) | |
| NIJAH REED, TIANA REDDIC, | ) | |
| TIFFANY CROSS, and SHOLANDA | ) | |
| ADAMS, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

San Francisco, California
Monday, May 9, 2016

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

BRIAN J. STRETCH
United States Attorney
450 Golden Gate Avenue
San Francisco, California  94102
BY:  **J. DOUGLAS WILSON**
**SARAH K. HAWKINS**
**ASSISTANT UNITED STATES ATTORNEYS**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY: Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
Official Reporter

1  **APPEARANCES**:  (CONTINUED)

2  For Defendants Latonya Carey, Darlene Francine Rouse, Nijah
   Reed, and Tiana Reddic:

3                           STEVEN KALAR
                            Federal Public Defender

4                           450 Golden Gate Avenue
                            San Francisco, CA  94102

5                     BY:  **GALIA AMRAM**
                            **ASSISTANT FEDERAL PUBLIC DEFENDER**

6

7  Specially Appearing for Daniel Blank for Defendants Chrystal
   Anthony, Acacia McNeal, and Anita Dixon:
                            STEVEN KALAR

8                           Federal Public Defender
                            450 Golden Gate Avenue

9                           San Francisco, CA  94102
                      BY:  **GALIA AMRAM**

10                          **ASSISTANT FEDERAL PUBLIC DEFENDER**

11 Specially Appearing for Candis Mitchell for Defendant Sholanda
   Adams:

12                          STEVEN KALAR
                            Federal Public Defender

13                          450 Golden Gate Avenue
                            San Francisco, CA  94102

14                    BY:  **GALIA AMRAM**
                            **ASSISTANT FEDERAL PUBLIC DEFENDER**

15

16 For Defendant David Desean Madlock:
                            LAW OFFICES OF RANDY SUE POLLOCK
                            120 Montgomery Street, Suite 1800

17                          San Francisco, CA  94104
                      BY:  **RANDY SUE POLLOCK**

18                          **ATTORNEY AT LAW**

19 For Defendants Matthew Mumphrey and Aaron Lee Mathews:
                            STEVEN KALAR

20                          Federal Public Defender
                            450 Golden Gate Avenue

21                          San Francisco, CA  94102
                      BY:  **ELLEN LEONIDA**

22                          **ASSISTANT FEDERAL PUBLIC DEFENDER**

23 Also Present:           **Waqar Hasib, Assistant U.S. Attorney**

24

25

```
 1   Monday - May 9, 2016                        10:05 a.m.

 2                  P R O C E E D I N G S

 3                     ---oOo---

 4        THE CLERK:  Calling case CR 14-0643, U.S.A. versus

 5   Matthew Mumphrey, David Desean Madlock, Latonya Carey,

 6   Chrystal Anthony, Darlene Rouse, Acacia McNeal, Anita Dixon,

 7   Aaron Lee Mathews, Nijah Reed, Tiana Reddic, Tiffany Cross,

 8   Sholanda Adams.

 9        Counsel, please come to the podium and say your name for

10   the record.

11        MR. WILSON:  Doug Wilson on behalf of the

12   United States.  With me is Sarah Hawkins.

13        THE COURT:  All right.  Good morning --

14        MS. HAWKINS:  Good morning, Your Honor.

15        THE COURT:  -- Mr. Wilson, Ms. Hawkins.

16        MS. AMRAM:  And Galia Amram on behalf of Latonya

17   Carey, Nijah Reed, Tiana Reddic, and Darlene Rouse.  I'm also

18   specially appearing for Dan Blank for Chrystal Anthony, Anita

19   Dixon, and Acacia McNeal.

20        THE COURT:  All right.  Thank you, Ms. Amram.

21        MS. LEONIDA:  Good morning, Your Honor.  Ellen Leonida

22   for Mr. Mathews and Mr. Mumphrey.  They're both present out of

23   custody.

24        THE COURT:  All right.  Thank you, Ms. Leonida.

25        MS. POLLOCK:  Good morning, Your Honor.  Randy Sue
```

1   Pollock on behalf of David Madlock, who is present.

2         **THE COURT:**  All right.  Good morning, Ms. Pollock.

3         **MS. AMRAM:**  And, Your Honor, I will also stand in for

4   Candis Mitchell for Sholanda Adams.  All the people I'm

5   standing in for are present and out of custody.

6         And I wanted to ask the Court if the Court would like

7   everyone to keep standing or if they can sit down.

8         **THE COURT:**  They can sit down.  Thank you for

9   appearing.

10        All right.  We are on, obviously, this morning on

11   defendants' motion to compel discovery, and the briefing has

12   been extensive, at least in terms of volume, but I have a

13   series of questions.  I don't need to start with formal

14   presentations.  I'm just going to start reading the questions.

15        The first one, the Z-score, which is a statistical measure

16   of the significance of the fact that we have out of 37 people

17   charged, all 37 being African American or black; and do you

18   have sort of a layperson's explanation whether it's the score

19   of 17.5 or 4.75 or 5.23?

20        I understand it relates to the standard deviation and all

21   that; but, you know, when we have DNA evidence, typically you

22   get the statistic, well, the chances of a random match are one

23   out of 3 billion or some number like that.

24        Do you have a plain-language explanation of if you have a

25   plain Z-score of 4.75, what are the chances that 37 -- given

1    the statistics we know and making certain assumptions about the

2    population in the Tenderloin and who's been arrested and who --

3    what the demographics of drug dealing looks like, what are the

4    chances?

5            MS. AMRAM:  I don't have, like, a one-in-quadrillion

6    number.  The way I understand it and it was explained to me is

7    that the Z-score, whether it's 4.74 or 17, that basically it is

8    so high that there is -- the difference between those is

9    irrelevant.  It's basically the difference between saying a DNA

10   match is 1 in, you know, 20 quadrillion versus 1 in a

11   quintillion.  It doesn't matter because there's only 9 billion

12   people on earth, so either way it's a match.

13       So the difference between what the Government's footnote

14   Z-scoring is and then what the revised Defense Z-score and the

15   original Z-score, none of that matters.  It is significantly --

16   it is statistically incredibly significant regardless, but I

17   don't have a -- it's not like DNA in the sense that I can say

18   what is the chance that it was -- that it would be -- you know,

19   it's 1 in 10 million, it's the result of chance.

20       My understanding is that these Z-scores are extremely high

21   regardless and basically this is not the result of chance.

22           THE COURT:  All right.  Does the Government have any

23   comment, Mr. Wilson?

24           MR. WILSON:  Well, Your Honor, two comments.  One,

25   first, their calculation of the Z-score and the Government's

1  calculation of the Z-score are far apart, which I think

2  undercuts their expert's analysis.

3          THE COURT:  Remind me what your calculation is.

4          MR. WILSON:  Our calculation is 4.76.  Theirs is, I

5  believe, 17.

6          THE COURT:  And you would -- yes, it's far apart, but

7  what about the comment that anything over 2 is statistically

8  significant, and this is way over 2?  Do you have a sense of

9  the magnitude?  What does it mean, 4.75?

10         MR. WILSON:  Well, I'm not precisely sure what it

11 means because I'm not a mathematician or a statistician, but I

12 do think it is -- that 4.76 is statistically significant.  The

13 Supreme Court has said that more than 2 is significantly

14 significant.

15     The only thing that I would say undercuts the Z-score is

16 that the Defendants' presentation is based on the fact that all

17 37 defendants were arrested basically at the same time at the

18 same place, and that is not true; and that skews the -- that

19 doesn't affect the Z-score, but it skews the Defendants'

20 allegation that there was racial discrimination involved in the

21 arrest and prosecution of these people.

22         THE COURT:  I'm not sure I understand that argument.

23 I thought your argument was that temporal and geographic

24 grouping could distort the analysis because you're not getting

25 a full random sampling.  That's not your argument?

1          **MR. WILSON:**  That is our argument, and the Court has

2     put it better than we have.

3          **THE COURT:**  Okay.  Then my question is:  Is there

4     something about the grouping that you can point out that would

5     actually cause that distortion?

6          So let me give you an example.  There's some evidence here

7     that certain parts of the Tenderloin tend to be dominated by

8     certain groups, whether ethnic groups or -- that Latino dealers

9     happen to be, you know, in this block, and African American

10    dealers in this block, and white dealers over here.  Is there

11    some evidence here of specifically some grouping that would

12    distort the numbers or is it just the fact of grouping?  Is

13    there anything specific?

14         **MR. WILSON:**  Well, the defendants were arrested at

15    different times, and there is a grouping as to different places

16    that they were arrested.  So I'm not sure that answers the

17    Court's question.

18         **THE COURT:**  Well, what I want to know from the

19    Government is the places they were arrested, were they not fair

20    cross-sections of the Tenderloin, for instance?

21         **MR. WILSON:**  Well, I don't believe there is a fair

22    cross-section of the Tenderloin.  My understanding of the

23    Tenderloin is that certain corners are owned, for want of a

24    better word, by certain gangs and those gangs are the ones that

25    sell drugs on those corners.

1    **THE COURT:**  Well, do you have evidence that of the 37

2    who were prosecuted, all of them tend to be in that zone where

3    there were predominantly more blacks than other parts of the

4    Tenderloin?

5    **MR. WILSON:**  We have -- there's no evidence of that as

6    far as I'm aware of, Your Honor.

7    **THE COURT:**  Because you can theorize that the Z-score

8    could be distorted as a result of some kind of grouping like

9    what I just mentioned; or, let's say, night and day.  Everybody

10   was arrested at night instead of day, and at night one group

11   happens to come out more often.  I mean, I could see that.

12   But absent some specific evidence that that actually

13   happened here, I don't see why one could presume -- because any

14   time you do some kind of sampling, there's going to be

15   inherently some grouping.  You can't arrest everybody, you

16   know, exactly spaced apart or, you know, there's going to be

17   some pattern.  The question is:  Is there any evidence that

18   that particular pattern may have affected the integrity of the

19   Z-score?

20   **MR. WILSON:**  Well, there is evidence that the -- and

21   perhaps I'm just repeating what I said before, but there is

22   evidence that defendant -- that the defendants were arrested at

23   different places at different times, and that affects the

24   Defendants' allegation that all of the -- that you cannot

25   distinguish among the 37 people for that reason.

1          **THE COURT:**  Okay.  I guess I don't understand that

2     argument.

3          **MR. WILSON:**  Well, let me see if I can put it better.

4     The fact that there was not 37 individual choices of a black

5     person that was arrested, the arrests were -- I'm sorry.  Let

6     me take that back.

7          There were not -- the 37 defendants were not arrested all

8     because -- I'm not explaining this very well.

9          The decision to arrest all 37 was made at different times,

10    and so -- and at different places, and that affects the

11    Defendants' showing that one decision was made to arrest all

12    black people.

13         **THE COURT:**  What's your response to that?

14         **MS. AMRAM:**  So a couple things.  First of all, the

15    Defense did revise the Z-score in the reply, so it's -- and our

16    expert did a supplemental declaration about that explaining the

17    revised Z-score, which is more in line with the Government's,

18    and it's still hugely statistically significant.

19         As to the independence argument, that would mean that one

20    could never do statistical analysis on arrest data because

21    there is always going to be this issue of the fact that people

22    are arrested at different times and in slightly different

23    places.

24         Despite that, social scientists do do statistical analysis

25    of arrest data and Dr. Beckett explained that in her reply

1    supplemental declaration.

2        We did a mapping analysis of the similarly situated

3    persons as well as the 37 defendants.  Those maps were

4    presented in our opening brief -- and I can just hand them up

5    here -- but they're intermingled coextensively -- the 37 are

6    intermingled coextensively with the hundreds of similarly

7    situated people that we identified.

8        So the Court doesn't have the issue before it of were they

9    allowed to focus on a particular block that was dominated by

10   African Americans as opposed to the next block over that was

11   dominated by Hondurans, for example.  That being said, there

12   would be issues of selectivity if that were the Government's

13   argument because why would they be choosing a block that was

14   dominated by African Americans as opposed --

15           **THE COURT:**  You're saying the map does not show that

16   pattern?

17           **MS. AMRAM:**  It doesn't show that pattern.  They were

18   intermingled.

19       And also if the Court looks at the Government's stated

20   reasons for the operation, they didn't say, "We're focusing on

21   this one block."  They said, "We're focusing on children in the

22   Tenderloin, and all of the similarly situated people we

23   identified were within a thousand feet of a school, a park,

24   et cetera."

25       The other thing to highlight for the Court is that they

1    did not get an expert declaration that would support any of the

2    concerns the Government has.  So they have a footnote about the

3    Z-score.  They raised an argument about independence.  They did

4    not cite an expert declaration.  So why?  I don't know.

5    Perhaps there was not an expert who could say this is not

6    statistically significant, this is not indicative of racism.

7        They did not actually present an expert declaration who

8    would say that.  So our expert declaration remains uncontested

9    in terms of admissible evidence that this Court can consider.

10       **THE COURT:**  All right.  Let me ask another question.

11   The data that was presented by the defendants here suggests, if

12   you look at the San Francisco Superior Court drug trafficking

13   crime data on arrests and charged during the 2013 through early

14   2015 time period, suggests that of those arrested, about

15   61 percent were African American, the needle exchange study

16   suggests that 56 percent of the Tenderloin drug transactions

17   involved African Americans as opposed to other groups, and then

18   there's some more qualitative descriptors in here.

19       But does the Government have anything to suggest that the

20   actual number percentage of those dealing drugs in the

21   Tenderloin who are African American is significantly greater

22   than 56, 61, 65, whatever that number is?

23       **MR. WILSON:**  No, Your Honor, we have no statistics

24   that contradict or that in any way shed light on what the

25   Defense has presented.  Our presentation is based on the

1    showing that race was not a basis for selecting defendants for

2    either enforcement or prosecution.

3          THE COURT:  For either enforcement or prosecution?

4          MR. WILSON:  Yes, Your Honor.

5          THE COURT:  Well, then, let me ask you.  Given that

6    it's undisputed that the numbers here, 37 out of 37 of the OSS

7    defendants who were charged federally, are black and that it is

8    clear that it's highly, highly, highly unlikely this was due

9    solely to chance, how did this happen?

10          MR. WILSON:  How did it happen, Your Honor?

11          THE COURT:  Yeah.  How did we get to this point?

12          MR. WILSON:  Well, first of all, the fact that every

13    defendant is black is not in itself a ground for finding that

14    racial discrimination occurred.

15          THE COURT:  No, I'm not getting into the legal part.

16    I understand we're not going to talk about that and we're

17    talking about *Armstrong.*  I'm just asking you a simple

18    question.  If it wasn't by chance -- and I don't think you're

19    arguing it's by chance given even your own calculation of the

20    Z-score -- how did it happen?

21          MR. WILSON:  It happened because we focused on certain

22    corners to start with.  We planned to do -- as the declarations

23    of Mr. Kaleba and Mr. Barry state, we planned to do additional

24    corners, but we focused on certain corners initially.  Those

25    corners are corners where African Americans deal drugs, and so

 1   that's -- I mean, that's how it happened, I think.

 2          THE COURT:  Okay.  Well, your map seemed to suggest

 3   that's not true?

 4          MS. AMRAM:  Well, here's the map, and I can pass this

 5   forward.  This is the map that was attached to the August

 6   Sommerfeld declaration about the 37, and then here's the map

 7   about the similarly situated.

 8        So there is some, as the Court can tell from this map,

 9   some clustering on certain corners but it's hardly one corner,

10   two corners, three corners, four corners.  There's multiple

11   corners.  So I don't think -- if you look at the actual data of

12   where the locations of the arrests were, that does not support

13   the Government's argument, A.

14        B, even if it did, you'd still have the problem about how

15   is it not a race-based decision to focus on one corner if that

16   corner is dominated by African Americans and the next corner

17   over is dominated by Hondurans if they're both selling within

18   1,000 feet of a school.

19          THE COURT:  So these two maps -- tell me -- summarize

20   what you think these maps show.

21          MS. AMRAM:  So the -- and we can -- also if the Court

22   wants, we can also blow these up and submit them to the Court,

23   but what we did was plot the location of every arrest for the

24   37 defendants, Operation Safe School defendants, for the

25   similarly situated.

1      We also -- this was all using Google Earth Pro and various

2   other programs -- mapped the arrest location or the selling

3   location of the similarly situated, and we got that data either

4   because the open source data had GPS coordinates in it and then

5   that was cross-referenced with the San Francisco Superior Court

6   data that had the race and the incident number -- so both sets

7   had the incident number so we were able to cross-reference

8   them -- or we looked through every individual police report to

9   see what the police said was the location, and then went out,

10  got GPS coordinates for that, and mapped it.

11      So the Court has the map of the similarly situated and

12  the map of the 37, and you can see that they're all throughout

13  the Tenderloin.  So there are similarly situated who were

14  around the exact same areas as the 37 and vice versa.

15      So there's a number of problems with the Government's

16  argument.  One, it actually does not hold up when you look at

17  the maps; two, it would be a race-based decision even if it did

18  hold up because the one block over is still within the

19  Government's charging priorities.  It's still selling drugs

20  within 1,000 feet of a school.

21      Three, this was not actually put in any of the

22  declarations by the two supervising DEA agents or by the AUSAs

23  that "We were focusing on X block, and that's why we didn't

24  arrest any of the -- you know, any of the Mexicans or the

25  Hondurans or the Caucasians one block over."

1          So this is the first time we're hearing about this.  If

2     that was really the basis for the decision, I think we would

3     have heard about this earlier.

4          **THE COURT:**  Let me take one at a time.

5          So there's no declaration describing how blocks were

6     selected, how targets were selected.

7          And, in fact, let me make this comment:  I found it quite

8     astounding that with all the briefing that's been done, we

9     have -- unless I missed it -- no declaration from any

10    San Francisco Police Department officer --

11         **MR. WILSON:**  That's correct, Your Honor.

12         **THE COURT:**  -- or somebody on the ground -- there are

13    10 DEA agents involved -- anybody on the ground who was

14    actually involved.  Why isn't there a declaration saying

15    exactly what you said, that "We selected the corner of Turk and

16    Taylor"?

17         **MR. WILSON:**  Your Honor, this is not a case where the

18    Government is affirmatively using police officers in support of

19    a prosecution.

20         **THE COURT:**  No.  You have an opportunity to respond to

21    an allegation here, and I have to assess whether or not a

22    *prima facie* case sufficient to warrant discovery has been made.

23    So you have a full opportunity to say, "No, it hasn't been done

24    in other cases where declarations were submitted to explain how

25    we got to this result."  Why is there no declaration from a

1    single San Francisco police officer?

2        **MR. WILSON:**  Because the defendants are making

3    allegations of racism and in some cases criminal conduct, and

4    it would be inappropriate for the SFPD officers to come forward

5    and defend themselves when they're not parties to this

6    prosecution in a case like this.  This is -- as I said before,

7    this is not a case where the Government is using the SFPD

8    officers affirmatively.

9        **THE COURT:**  Why isn't it appropriate?  If there's a

10   claim of racially selective enforcement as distinguished from

11   prosecution, why is it inappropriate for those who enforce the

12   law to come forward and explain what happened?

13       As we sit here now, I don't even know how it worked.  All

14   I know is that it came from above.  Your office decided that

15   this was going to be a good project to do.  Something happened

16   obviously.  DEA got together with San Francisco Police and some

17   other law enforcement agencies, but there's no description

18   about what happened on the street.  How were people selected

19   for videotape?  How were they selected for arrest?  How were

20   they selected for a buy/bust operation, sting operation?  How

21   were they selected in terms of who was going to be referred to

22   this office for prosecution?

23       There's not a single declaration unless I missed it; and

24   I'm, frankly, astounded that in the face of all this data and a

25   Z-score that is through the roof from what I can see, there's

1    not an explanation.

2         **MR. WILSON:**  Well, there is an explanation from two

3    DEA agents and from the --

4         **THE COURT:**  Yes.  There was, "I didn't give them

5    orders to engage in racism."  That's very helpful.

6         **MR. WILSON:**  Well, the Court is being sarcastic, but I

7    believe it is helpful in that --

8         **THE COURT:**  How about a little more detail?  How were

9    these people selected?  How was this corner selected?  How was

10   Turk and Taylor selected?  How about that for a start?

11        **MR. WILSON:**  We do not have that information.

12        **THE COURT:**  Why?

13        **MR. WILSON:**  Because the SFPD is unwilling to

14   cooperate in allegations of racism against them.  This is an

15   area where --

16        **THE COURT:**  Are you saying that you've made an inquiry

17   to the SFPD and they refused to cooperate with the

18   U.S. Attorney's Office?

19        **MR. WILSON:**  I'm saying that the -- well, I don't

20   really want to go outside the record, Your Honor; but we have

21   no declarations from the SFPD, and I think that is because the

22   SFPD is being accused of racism in a lot of different contexts

23   and a lot of different --

24        **THE COURT:**  All the more reason why there ought to be

25   a response.

1          **MR. WILSON:**  Well, the response should come to the

2   inquiries that are being made politically, by the inquiries

3   that are being made by --

4          **THE COURT:**  This is a liberty case.  There's people's

5   liberties that are at stake.  If we have a trial and this was

6   put on -- if we're past discovery, let's say we're in trial and

7   I were to find -- and I know this is in dispute -- that one

8   legal remedy for selective enforcement as opposed to

9   prosecution is dismissal of an Indictment, so it becomes an

10  issue at trial, are you saying that the San Francisco Police

11  Department would refuse to respond to a subpoena?

12         **MR. WILSON:**  I don't know what the San Francisco

13  Police Department would do, Your Honor.  I have no insight into

14  that.  I cannot say.

15      I can say that if we bring a prosecution, we will

16  certainly -- and we have to call SFPD officers, we will put

17  them on the stand and allow them to be cross-examined about an

18  individual case; but they are not -- they're not here to defend

19  themselves against allegations of racism, especially, in our

20  view, when the defendant has not met its burden of showing

21  racism.

22         **THE COURT:**  Well, that begs the question.  Whether

23  they met their burden may depend on what the counter-

24  explanation is.  As you can see from any of these other cases

25  where there's been an explanation, like in *Armstrong* itself,

 1   there was some explanation.

 2         **MR. WILSON:**  I disagree with Your Honor.  There is --

 3   the defendants have the initial burden.  We have to -- the

 4   Government has no obligation to come forward with anything

 5   unless the defendants satisfy that burden.

 6         **THE COURT:**  All right.  So then you stand on the

 7   record and you stand on whether or not they've met their burden

 8   based on a record that is largely factually undisputed?

 9         **MR. WILSON:**  Largely factually undisputed, that's

10   correct, Your Honor.

11         **THE COURT:**  Okay.  What's your response to the map

12   question?  I mean, looking at this map, it does appear that the

13   37 arrests tended to be in an area, you know, north and south

14   of Turk but also Turk, but also kind of, you know, Taylor,

15   Leavenworth.  And if you look at the map, it's quite disperse

16   but you do see dots in those intersections of others.

17         I mean, so, again, it begs the question these are not --

18   maybe you can say these corners were more predominantly African

19   American centric than others, but it's not 100 percent.

20         **MR. WILSON:**  But, Your Honor, our understanding is

21   that certain individuals, perhaps certain gangs, control

22   certain corners and that is the basis for our going forward.

23         And I have --

24         **THE COURT:**  So are you saying -- of the 37 folks

25   arrested, are you saying they're all members of a gang?

1     **MR. WILSON:**  I'm not saying they're all members of the

2  same gang or that --

3     **THE COURT:**  What gangs do they represent?

4     **MR. WILSON:**  Let me back up, Your Honor.  I'm not

5  saying that necessarily any of them are members of a gang.  All

6  I'm saying --

7     **THE COURT:**  Because I didn't see any of that.  I

8  didn't see any gang allegations, at least the ones that have

9  come before me.

10     **MR. WILSON:**  Well, Your Honor, there wouldn't be any

11  gang allegations in an 860 prosecution.  But I have the data

12  for most of the Operation Safe Schools, too, and they are

13  pretty clustered if you ask me.  They are in the same areas and

14  on the same corners.

15     **THE COURT:**  Well, you say that -- of course, now

16  there's no evidence of this -- but that they selected certain

17  corners because of gang affiliations intensity.  Tell me more

18  about that.  What do you know about that?  What about the

19  corner of -- who occupies and who controls Taylor and Turk?

20     **MR. WILSON:**  Your Honor, that is not part of the

21  record.  I do not -- we have no information on that.  All I'm

22  saying is, my understanding is that certain corners were

23  selected; certain people, certain races, if you will, own

24  certain corners for purposes of drug dealing.

25     **THE COURT:**  So that is at this point, although there's

1    no evidence, you're -- the Government's sole explanation is

2    because certain corners were selected and those are corners

3    dominated -- heavily dominated by African American and that's

4    how we got to the 37 out of 37?

5          **MR. WILSON:**  That is correct, Your Honor.  In

6    addition, I would point out, as the declarations point out,

7    that this operation was not intended to be over, and we may --

8    we would have done additional corners in the future.

9          **THE COURT:**  Well, then, why didn't it continue?

10         **MR. WILSON:**  Because the defendants announced that

11   they were planning to bring this motion.

12         **THE COURT:**  Well, I'm not sure I understand.  If, in

13   fact, you firmly believe and all of those firmly involved, you

14   know, assessed believe that they did not engage in selective

15   enforcement or prosecution and that this motion lacks merit,

16   why would you stop if this is an important public safety

17   concern?

18         **MR. WILSON:**  We stopped because we did not want to be

19   accused of -- we did not want to engage in a further operation

20   when we were being accused of racism, Your Honor.

21         **THE COURT:**  But it's a mere accusation.

22         **MR. WILSON:**  Nevertheless, it's an unusual accusation

23   and one that we don't think has any precedent in this district.

24         **THE COURT:**  Can you explain, because I don't see it in

25   the papers, what was the process of targeting suspects for a

1  sting for buy/busts and having a videotape as opposed to the

2  other arrests that didn't get federally prosecuted?  Who

3  selected the folks?

4  　　　　MR. WILSON:  The people on the street, Your Honor.  I

5  can only say that the officers who were on the street did the

6  selection.

7  　　　　THE COURT:  Did the U.S. Attorney's Office have any

8  role other than providing general criteria, like prior arrests,

9  histories, known drug dealing?

10  　　　　MR. WILSON:  Not to my knowledge, Your Honor.

11  　　　　THE COURT:  What about the DEA?

12  　　　　MR. WILSON:  The DEA, I believe, was involved in

13  the -- some of the street-level -- some street-level

14  enforcement action; but the DEA supervisors, as we've put

15  forward in the declarations, have instructed them not to engage

16  in racism or not to use racism as a determining factor.

17  　　　　THE COURT:  Well, but what did -- I mean, did the DEA

18  agents have some role in saying, "Let's pick this person and

19  set it up for this person," or did they have a role in that

20  selection process along with the street officers of the SFPD?

21  　　　　MR. WILSON:  Just a minute, Your Honor.

22  　　　　　　　　(Government counsel conferring.)

23  　　　　MR. WILSON:  Your Honor, the record doesn't reflect

24  that and we can't say for sure.

25  　　　　THE COURT:  Well, they're your agents in a sense.  I

 1   mean, so putting aside the problem of potential noncooperation

 2   of SFPD, why don't we have some information about the role the

 3   DEA played in selecting folks for buy/bust -- videotape

 4   buy/busts and then OSS prosecution?

 5          MR. WILSON:  We only have the supervisors'

 6   declarations that say they did not use race as a determining

 7   factor.

 8                    (Government counsel conferring.)

 9          MR. WILSON:  And Ms. Hawkins tells me that

10   Agent Atakora was involved in the ground prosecution, and he

11   has given a declaration saying that race was not a factor.

12          THE COURT:  Well, does he explain how -- what was his

13   role in selecting folks, how were they selected?

14          MR. WILSON:  He does not explain beyond saying that

15   race was not a factor.

16          THE COURT:  At least consciously in his mind.

17          MR. WILSON:  Well, Your Honor, I think if we're going

18   to start talking about unconscious bias, then we've opened up a

19   whole new can of worms in this area.  I do not think that the

20   courts have ever looked at unconscious bias in determining

21   whether a prosecution or an enforcement action was race based.

22   It has to be -- to show discriminatory intent, there has to be

23   overt discrimination.

24          THE COURT:  Well, I'm not sure that the law is so

25   clear in either direction.  This is a new phenomenon in terms

1   of jurisprudence.

2          MR. WILSON:  Well, Your Honor, I think the

3   Supreme Court has said that there has to be discriminatory

4   intent.  Intent is --

5          THE COURT:  Which means it has to be because of, not

6   merely in spite of, which is the classic formulation which was

7   used time and time again; but what is not clear is whether

8   "because of" can mean because of unconscious as well as

9   conscious factors.

10          MR. WILSON:  Respectfully, Your Honor, I think it is

11   clear.  The courts have said that there has to be bad faith on

12   behalf of -- on the part of --

13          THE COURT:  What case would you cite to reject the

14   notion that implicit bias can be a factor in purposeful -- in

15   the doctrine of purposeful discrimination?  Do you have a good

16   case to cite?

17          MR. WILSON:  I'm not aware of any case that says that

18   unconscious bias can be a ground for discrimination.  There are

19   cases, which I'm happy to provide to the Court, that say that

20   the discrimination has to be invidious and in bad faith; and

21   bad faith implies, in our view, a discriminatory animus.

22          THE COURT:  Do you have a comment on that?

23          MS. AMRAM:  Yes, Your Honor.

24      I think -- I don't think the Court needs to -- I don't

25   think it's been decided if implicit bias can be the basis of a

1  claim under *Armstrong* either for selective prosecution or

2  selective enforcement.  There was recently a Ninth Circuit case

3  on *Batson* that said that the Ninth Circuit was not yet

4  addressing the issue of whether implicit bias could be used in

5  a *Batson* challenge.

6      I don't think the Court -- the Court could certainly

7  decide that in this case.  I don't think the Court needs to

8  because of a substantial amount of evidence under far more

9  traditional -- more kind of established equal protection

10 principles that go to discriminatory intent.

11     And it's different for selective enforcement and selective

12 prosecution.  For selective enforcement, the Defense presented

13 a substantial amount of evidence of direct explicit racial

14 bias, and so I don't think the Court needs to address implicit

15 bias when it comes to selective enforcement.

16     There is nothing about the two supervisory DEA

17 declarations that do away with that argument.  For one thing,

18 if you actually read the declarations, they say they did not

19 direct anybody to consider race.  And Atakora says he was not

20 aware of anybody considering race.  Dorais doesn't even say

21 that.  They certainly don't say that nobody considered race.

22 They don't explain how it happened.

23     The Government failed to -- we've already discussed the

24 failure to present declarations from SFPD, but they failed also

25 to present declarations from the other line DEA agents and have

1   not presented any explanation for that.  All of the evidence of

2   explicit racial bias by law enforcement has gone uncontested.

3        So, first, in terms of selective enforcement, this is an

4   issue of exclusive bias clearly and under well-established

5   equal protection principles, and I don't think the Court needs

6   to address explicit bias.

7        **THE COURT:**  When you talk about the evidence of

8   explicit bias, besides the statistical information, you have

9   the one comment on the videotape about "fucking BMs," you have

10  the show of at least one Asian woman who wanted to do a deal

11  and was declined; but the other stuff you have about the racist

12  texts and things, they didn't involve any of the OSS officers,

13  did they?

14       **MS. AMRAM:**  No, not to the ones -- at least not the

15  Furminger ones.  We know they did not.  The more recently

16  disclosed racist texts which were since our opening brief was

17  filed, I don't know who all the officers were involved in that.

18       We also have the evidence in the declarations, which were

19  not only from the defendants in the motion but defendants who

20  were never in the motion about their experience with racism

21  with SFPD.

22       We had declarations from community members about what they

23  had seen from SFPD.

24       We have quote -- we also have a lot of -- we have all the

25  police reports that showed SFPD officers' knowledge and

1    familiarity with the similarly situated people.

2        We also -- if the Court -- and the strength of the

3    statistics.  If the Court recalls the *Belmontes* case, which is

4    a Ninth Circuit case on selective prosecution in regards to the

5    death penalty and what the Ninth Circuit said about the

6    statistics there and how compelling they were and left open the

7    issue about whether statistics that compelling could be

8    evidence alone of discriminatory intent, this Court doesn't

9    need to address that because of all the other evidence we have;

10   but these statistics are even more compelling than what the

11   Ninth Circuit considered in *Belmontes*.

12       So --

13           **THE COURT:**  Was there a Z-score calculated there?

14           **MS. AMRAM:**  No, there was not.  There was not a

15   Z-score calculated in any of the cases I'm aware of where

16   courts found statistics to be sufficient evidence of intent.

17           **THE COURT:**  Let me ask.  There were six people for

18   whom a prosecution was declined in the first sweep in 2013.

19   What do we know about the ethnicity of those six?

20           **MR. WILSON:**  We don't know anything, Your Honor.  All

21   we know is that the evidence was insufficient.  The prosecutor

22   deemed the evidence insufficient.

23           **THE COURT:**  Is there a record of who these six people

24   were?  I assume there is.

25           **MR. WILSON:**  There probably is, Your Honor.

1          **THE COURT:**  And nobody's looked to see what the race

2     of these six people were?

3          **MR. WILSON:**  We have not looked.

4          **THE COURT:**  Do we know if any nonblacks were presented

5     to the U.S. Attorney's Office for OSS prosecution?

6          **MR. WILSON:**  For OSS prosecution, no, Your Honor.

7               (Government counsel conferring.)

8          **MR. WILSON:**  So Ms. Hawkins tells me that there were

9     nonblacks in phase I who were declined for prosecution.

10          **THE COURT:**  There were?

11          **MR. WILSON:**  There were.

12          **THE COURT:**  Do you know how many?

13          **MR. WILSON:**  Just a minute, Your Honor.

14               (Government counsel conferring.)

15          **MR. WILSON:**  According to Mr. Hasib, there were two

16     defendants who were not African American who were not -- who

17     were part of the Operation Safe Schools who were not

18     prosecuted.

19          **THE COURT:**  Do we know if the videotaping that was

20     part of the criteria, were there nonblacks or non-African

21     Americans who were videotaped in terms of buy/bust other than

22     the 43 who were presented to the U.S. Attorney's Office?

23          **MR. WILSON:**  My understanding is that that is the

24     universe of people who was presented to the U.S. Attorney's

25     Office.

1       **THE COURT:** All right.  So what do you do with that

2  statistic?  So now we have information, I guess it's not in the

3  record, but we have information by representation that there

4  were some, at least two, non-African Americans that were

5  referred for prosecution under OSS.  So it wasn't 37 out of 37;

6  it was 41 out of 43.

7       **MR. HASIB:** Your Honor, before Ms. Phillips [sic]

8  continues, may I interject?  I just wanted to clarify.

9       **THE COURT:** Yeah.

10      **MR. HASIB:** I was in charge of Operation Safe Schools

11  the first time.

12      I'm sorry.  Waqar Hasib for the record.

13      I was in charge of Operation Safe Schools the first sweep.

14      **THE COURT:** Yes.

15      **MR. HASIB:** And there were at least two defendants

16  that I recall who were not African American.  They were not

17  charged in the Tenderloin, but they were ultimately charged in

18  similar safe schools targeting particular school neighborhoods

19  cases.  So they were charged under the Safe Schools rubric;

20  they were not African American.

21      **THE COURT:** So you're saying they weren't charged as

22  part of OSS but another -- but the same charges were filed

23  against them?

24      **MR. HASIB:** They were charged as part of Operation

25  Safe Schools.  They were not in the Tenderloin.  They were not

1   African American.

2          THE COURT:  Oh.  So it wasn't that prosecution was

3   declined.

4          MR. HASIB:  No, that's correct, and that's where I

5   think I heard Your Honor say the prosecution was declined.

6   They were actually accepted for prosecution.

7          THE COURT:  Oh.  So -- but there were six people I

8   read for the -- who had been referred for potential

9   prosecution.  Out of 20, 14 were prosecuted.

10         MR. HASIB:  Six were declined in the first wave.

11         THE COURT:  Yes.

12         MR. HASIB:  I recall -- I recall declining some cases.

13  I don't, frankly, recall what their race was because we don't

14  keep track of that and we don't look at it, but I do recall

15  declining some cases.

16         THE COURT:  So we don't know and you don't know the

17  race of those who were declined then?

18         MR. HASIB:  It would be nowhere in any of our records,

19  I can say that 100 percent positive.

20         THE COURT:  One could reconstruct it because you know

21  who it was.

22         MR. HASIB:  We'd have to go back to the original

23  videotapes to look.

24         THE COURT:  All right.  So the two we're talking

25  about, that's a different situation?  That's not part of the 20

```
 1   who were presented out of the first 2013 sweep?

 2            MR. HASIB:  For Tenderloin cases, that's correct, but

 3   they do fall under the Operation Safe Schools rubric.

 4            THE COURT:  Where else did Operation Safe Schools

 5   operate?

 6            MR. HASIB:  Oakland, Hayward.

 7            THE COURT:  Oh.  All right.  So different departments.

 8   SFPD wasn't involved?

 9            MR. HASIB:  That's correct.

10            THE COURT:  Okay.  And for SFPD -- for San Francisco,

11   it was just Tenderloin?

12            MR. HASIB:  No, that's not correct, Your Honor.  There

13   was at least one case in the Mission in the first wave

14   involving SFPD, not in the Tenderloin.

15            THE COURT:  And the one in the Mission, is that one of

16   the 20 that were referred for prosecution?

17            MR. HASIB:  I'd have to go back to my numbers.  It is

18   one of the individuals that was not African American who was

19   ultimately charged.

20            THE COURT:  Well, all right.  In terms of the record

21   in this case, all we know is that 14 out of 20 were accepted

22   for prosecution the first time around.

23            MR. HASIB:  For the Tenderloin cases, that's correct.

24            THE COURT:  For the Tenderloin cases.

25            MR. HASIB:  And of the six that were declined, I
```

1    cannot recall what their race was.

2           THE COURT:  All right.  Do we know anything about the

3    process of presenting -- who made the selection process for

4    presentation to the U.S. Attorney's Office for prosecution?

5    Was that -- did it come from the team on the streets or who?

6    How did that happen?

7           MR. WILSON:  If Your Honor is asking who made the

8    decision who to target, it was the team on the street.

9           THE COURT:  Well, who to present to the -- who to

10   recommend for prosecution.  Like, who chose the 20?

11          MR. WILSON:  The team on the streets.

12          THE COURT:  Which included DEA?

13          MR. WILSON:  In the first round?

14          MR. HASIB:  Yes.

15          MR. WILSON:  Yes, it did.

16          THE COURT:  At what point -- or was there a point when

17   the U.S. Attorney recognized that there appeared to be a

18   pattern, a racially disparate pattern, in terms of the OSS

19   defendants?

20          MR. WILSON:  As far as we're aware, Your Honor, it was

21   when the defendants announced that they were going to file a

22   motion.

23          THE COURT:  So there was no awareness before that?

24          MR. WILSON:  That's correct, Your Honor.

25          THE COURT:  Is that because different prosecutors had

1  different responsibilities and broken up into subsets?

2      **MR. WILSON:**  Yes, Your Honor.  I think as the

3  declarations show, no one prosecutor was responsible for all of

4  the prosecutions involved in the two Operation Safe Schools

5  pushes in the Tenderloin.

6      **THE COURT:**  Was there anything in place in terms of

7  procedures to detect or recognize a pattern should one occur?

8  I guess evidently not.

9      **MR. WILSON:**  Well, Your Honor -- no, Your Honor, there

10  was nothing in place, although I'm not sure what -- I'm not

11  sure what Your Honor has in mind.

12      **THE COURT:**  I don't know.  For instance, somebody

13  supervised all these to look at the statistics to make sure

14  that there's not a troubling pattern.

15      **MR. WILSON:**  Well, Your Honor, there were supervisors.

16  They looked at -- they looked at the pros. memos, they looked

17  at the decision to prosecute, and they did not see a pattern.

18  No one detected a pattern in this particular case.

19      I would say that if a pattern was detected, then we would

20  probably take steps if we believed there was racial

21  discrimination; but as I've tried to point out, there was no

22  racial discrimination in this case.

23      **THE COURT:**  So I take it there's no policy or training

24  regarding discernment of patterns when it comes to a potential

25  ferreting out of, for instance, profiling by law enforcement?

1          **MR. WILSON:**  There's certainly no policy to prosecute

2    people based on race.  There's a policy --

3          **THE COURT:**  That wasn't what I asked.  Was there a

4    policy or any training to screen or ferret out a pattern?

5          **MR. WILSON:**  No, Your Honor, because the Government

6    does not believe that law enforcement officers act on the basis

7    of race.  These are reactive cases.  The defendants are guilty

8    of distributing drugs, and we don't --

9          **THE COURT:**  So you presume that the police are acting

10   in compliance with the law and do not engage in profiling?

11         **MR. WILSON:**  Absent some evidence to the contrary,

12   that's correct, Your Honor.

13         **THE COURT:**  Well, the Prosecution -- the Defense

14   raises the issue of, for instance, the text messaging issues,

15   which have become apparent at some point.  Did that raise any

16   flags in terms of need to implement screening procedures?

17         **MR. WILSON:**  Not in the Operation Safe Schools because

18   the text messages had nothing to do with Operation Safe

19   Schools, Your Honor, and it's a very, very, very small part of

20   the 2,000 officers in the SFPD.

21         **THE COURT:**  All right.  Do you have any comment on

22   that?

23         **MS. AMRAM:**  Your Honor, there's -- I mean, we briefed

24   this extensively, but there are certain legal standards for how

25   to discern discriminatory intent for equal protection

challenges that the Supreme Court has established; and if the

Court applies those standards to the selective prosecution

claim here, they show at least a *prima facie* case of

discriminatory intent both because of the absence -- of having

a policy that was basically susceptible to abuse and because of

comparative analysis of the Government's prosecution criteria

with the actual facts shows that they don't hold up.  It was

pretextual.

          The other issue we have --

          **THE COURT:**  Well, I think you're conflating selective

prosecution with selective enforcement.  So there it seems to

me that the data you have demonstrated in terms of those who

were targeted, those who were videotaped, those who were

referred, the fact that 37 out of 37 -- and perhaps it might

even be as high as 43 out of 43, we don't know -- were of one

race, that suggests something going on in the field.

          That does not necessarily suggest purposeful intent on the

part of prosecutors who were then presented with this, unless

you can show that there were -- that's why I asked the question

of the six.  For instance, if they're all white and none of

those are prosecuted but 14 who happen to be African American

were, well, one could say let's do a Z statistic on that one,

but that hasn't been presented.

          And the failure to have policies, while arguably, you

know, could present an issue if this were a civil case for

1   liability for negligence, maybe gross negligence, maybe even

2   deliberate indifference under certain doctrines, that's not the

3   same as intentional discrimination; that is, as defined by

4   doing something because of race not in spite of it.  This is

5   more of in spite of.  They either knew or didn't know or they

6   should have known and didn't do anything about it.

7          MS. AMRAM:  I think -- so I disagree and here's why.

8   I think the issue of discriminatory intent is a legal issue

9   that is not about did these prosecutors sit here with racism in

10  their hearts.  It is a legal term that, as the Supreme Court

11  said, has certain ways of discerning whether or not there's a

12  *prima facie* case.

13      In selective prosecution, that can include the intent of

14  law enforcement if it is not several steps removed from the

15  prosecutor.  So that's one thing, which is even if --

16         THE COURT:  So that's a delegation theory.

17         MS. AMRAM:  Yes.  Even if -- and that's under a series

18  of Ninth Circuit cases.  *Turner* talked about it, *Gomez-Lopez*.

19  But if the decision to prosecute was not several steps removed

20  from the prosecutor, then they are -- then the intent of law

21  enforcement is relevant to a selective prosecution.

22         THE COURT:  So the flip side -- what's the flip side

23  of that?  When will you ever not be able to delegate and impute

24  responsibility?  I mean, isn't it always the case that you'd

25  say, yeah, it goes from law enforcement on the streets making a

1    recommendation to the prosecutor, the prosecutor deciding

2    whether or not to prosecute.  It's always just one step away in

3    a sense.

4            MS. AMRAM:  Well, they didn't say one step.  The

5    Ninth Circuit said several steps, and the example they gave was

6    of the IRS agent where after the -- there was some argument

7    about whether or not the IRS agent had an animus -- this was a

8    vindictive prosecution case -- against the defendant, and the

9    Ninth Circuit noted that the decision to prosecute had gone

10   through several sets of reviews at the U.S. Attorney's Office.

11       I think there's also a difference between whether or

12   not --

13           THE COURT:  Well, that's several steps of review

14   within the U.S. Attorney's Office.

15           MS. AMRAM:  Yes.

16           THE COURT:  So it turns -- I mean, who are we looking

17   at as the ultimate decision-maker?

18           MS. AMRAM:  The other -- I mean, another example that

19   has been given about this is you have four people in a car.

20   This was -- it was not a Ninth Circuit case, but it was a case

21   in a different circuit where they talked about the several

22   steps removed.

23       They had four people in a car and they ended up federally

24   charging two of the people who were black and then there was

25   two other people -- I think they were black or they were

1    Latino -- and then two other people were in the car who were

2    white but not charged, and there was a selective prosecution

3    claim brought.  And there was an analysis of the fact that the

4    prosecutors had looked at those four people that were in the

5    car, and they had made the decision to charge two of the

6    people; and there was a series of reasons for why the

7    prosecutors had chosen to charge those two people instead of

8    the other two people in the car, and it had to do with the

9    particular priors that those people had, it had to do with the

10   particular role that they had in that crime.

11       So that is a decision where the prosecutors had four

12   people, and they made a decision to choose two.  So even if you

13   could say that the law enforcement officers who initiated the

14   traffic stop, or whatever, were racially biased, the decision

15   to prosecute was made by the prosecutors, and there was -- the

16   law enforcement bias was several steps removed.

17       Here, that is not the situation for a number of reasons.

18   First, it's not the situation because the Government says so.

19   They said multiple times in their brief, "There was no

20   selection when it came to the prosecutors.  We did not select."

21   The selection --

22           **THE COURT:**  You mean select on the base of race.  Did

23   they say, "We didn't engage in any selection"?

24           **MS. AMRAM:**  Yes.  They actually used that phrase in

25   their opposition, "There was no selection here," and I can find

1   that.

2       THE COURT:  Well, first of all, that's not true with

3   respect to the 2013.

4       MS. AMRAM:  2013, but for the 2014 they would use that

5   phrase they did not select.

6       THE COURT:  What page is that?

7       MS. AMRAM:  So it's page 18, Your Honor, and it's line

8   15.  So it starts with line 5 (reading):

9           "As the Supreme Court stated in *Armstrong*, selective

10          prosecution implies that a selection has taken place."

11      And then it goes to paragraph -- the second paragraph

12   talks about the 2014 sweep (reading):

13          "In sum, no selection occurred in phase II."

14      So I think they also said over and over again that they

15   only provided general criteria for prosecution.  They said it

16   today, they only provided general criteria for prosecution and

17   then the actual selection was done by the line officers.

18      THE COURT:  So your argument is if the prosecutor did

19   not exercise any discretion and it was done almost

20   mechanically, then at that point the delegation to law

21   enforcement gets sort of imputed to the prosecutor because

22   essentially then the law enforcement is making the prosecution

23   decision?

24      MS. AMRAM:  Yes.  I mean, that is --

25      THE COURT:  So the question is whether there's an

1   intervening exercise of prosecutorial --

2           **MS. AMRAM:**  Discretion.

3           **THE COURT:**  -- judgment.

4           **MS. AMRAM:**  Yes.  And that is my -- what I read the

5   Ninth Circuit as saying is the bias of law enforcement is not

6   relevant because -- unless -- because law enforcement was

7   several steps removed from the decision to prosecute; and, yet,

8   these are selective prosecution, not enforcement cases.

9   Selective prosecution they say bias of law enforcement is not

10  relevant because it's several steps removed.

11      Here, it was not several steps removed so bias of law

12  enforcement is relevant to both selective enforcement and

13  selective prosecution.

14          **THE COURT:**  All right.  Let me hear from Mr. Wilson.

15  What about the phase II?  Clearly there was some exercise of

16  discretion in phase I because six people were rejected --

17  declined for prosecution.

18          **MR. WILSON:**  There was exercise of discretion in both

19  phases, Your Honor, because the decision to prosecute was based

20  on the admissible evidence.  So the strength of the evidence

21  against each defendant was the basis for prosecution, not the

22  fact that they were presented to the Government.  That -- I

23  think, phase I shows that.

24      If the --

25          **THE COURT:**  So what does this mean, "No selection

```
 1   occurred in phase II"?  It's in your brief.  I don't know what
 2   that means.
 3            MR. WILSON:  Yes, Your Honor.
 4            THE COURT:  Is that a misstatement or an
 5   overstatement?
 6            MR. WILSON:  No, it's not an overstatement, but no
 7   selection of a defendant based on race occurred.
 8            THE COURT:  So it means -- it should say "No selection
 9   based on race," not that there was no selective process.
10            MR. WILSON:  Well, there is no selective process
11   because every single person that was presented had been
12   videotaped and the Government charged that person.  So there
13   was no -- there was no distinction between an African American
14   person and another person in making that determination.
15            THE COURT:  But was there an exercise of judgment
16   whether or not to prosecute, put aside race?
17            MR. WILSON:  Yes, Your Honor, of course, based on --
18            THE COURT:  So what declaration best states that?
19            MR. WILSON:  All the declarations state that.  The
20   declarations of Ms. Hawkins and Mr. Farnham both state that the
21   determination whether to prosecute a person was based on the
22   evidence -- the admissible evidence.
23            THE COURT:  And, conversely, had there not been
24   sufficient admissible evidence or strong evidence, one of the
25   23 or some or all of the 23 might not have been prosecuted?
```

1          **MR. WILSON:**  If there had not been admissible

2     evidence, I think it's a fair inference that defendants would

3     not have been -- people would not have been prosecuted.

4          **THE COURT:**  All right.

5          **MR. WILSON:**  And in every case the evidence consisted

6     of a videotape of the person selling drugs.

7          And one other point I would like to make, Your Honor, is

8     that the Defense can claim that we're being overly dramatic or

9     melodramatic but these declarations -- the declarations that

10    we've submitted foreclose, in our view, any selective

11    prosecution claim.  All of the prosecutors have disclaimed any

12    reliance on race in making the decision.  Defendants cannot

13    overcome those no matter what their statistical showing.  They

14    have to show that those declarations are lies, and they cannot

15    do that.

16          **THE COURT:**  Well, some of those are phrased in terms

17    of "I am not aware of," et cetera, et cetera.  That doesn't

18    necessarily foreclose other theories, like a delegation theory,

19    if the steps are sufficiently close between law enforcement and

20    Prosecution; but if there is an exercise of discretion and

21    judgment by Prosecution, in many other contexts, such as

22    malicious prosecution cases and others, then that breaks the

23    chain of proximate cause, and presumably here that would

24    prevent a delegation theory.

25          So what's your response to the evidence that even though

1    they approved prosecution of 23 out of 23 for the second -- is

2    that the right number?

3            **MS. AMRAM:**  24.

4          **THE COURT:**  -- 24 out of 24, that that -- nonetheless

5    that was based on an exercise of discretion, scrutiny of the

6    evidence, et cetera, et cetera?

7          **MS. AMRAM:**  It's -- Your Honor, what they're saying

8    today is belied by the wording in their opposition and the

9    wording in their declarations, and we cited it repeatedly in

10   the reply.

11      But they said in their opposition -- the paragraph that I

12   read to the Court about no selection occurred was not about

13   their selection on race.  It was specifically talking about the

14   decision to select targets.  That was also repeatedly said in

15   their brief about how they -- you know, distancing themselves

16   from the SFPD and saying, "We gave general criteria for

17   prosecution but the actual -- you know, everything else was

18   handled by the law enforcement."  And that was --

19         **THE COURT:**  Where do they say -- where's evidence that

20   they just blindly accept -- once it was presented to them in

21   phase II, they accepted it without any scrutiny of the evidence

22   whether it would stand up or not?

23        **MS. AMRAM:**  So the quote is, and this is a quote on --

24   I quoted it in the reply, but it was from Opposition

25   Number 4 --

1          **THE COURT:**  What page of the reply are you looking at?

2          **MS. AMRAM:**  It's page 49 of the reply brief (reading):

3              "No one in the United States Attorney's Office

4      supervised the law enforcement officers' selection of the

5      drug dealers who would be federally prosecuted, and the

6      Assistant United States Attorney's direction to those

7      officers extended only to giving the officers general

8      criteria for prosecution."

9      So --

10         **THE COURT:**  Well, that doesn't answer when the time

11 came to decide whether to prosecute when presented with a list

12 of 24 people, whether there was any exercise of discretion at

13 that point.

14         **MS. AMRAM:**  I don't think because this is a sting

15 operation that saying -- looking -- when you delegate

16 authority -- so you set up an operation, you delegate authority

17 to law enforcement to select targets for a sting operation, and

18 that's -- I think that's really crucial that this is a sting

19 operation.

20         And then the law enforcement -- there's no supervision on

21 the selection of targets.  And then law enforcement presents

22 people for prosecution and what you do is look at the video and

23 look at criminal history and say, "Okay.  We're going to

24 approve," that that is actually an exercise of discretion in

25 terms of prosecution.

1     I have repeatedly asked the Government over and over again

2 if they ever asked law enforcement, if they asked them, "Are

3 there people who met our criteria for prosecution who you have

4 not presented to us?"  And the U.S. Attorney's Office has

5 consistently refused to answer that in any pleadings.  So did

6 they ask if there were people who met the criteria for OSS

7 prosecution who were not presented?

8     The people that were presented did not meet at least some

9 of the Government's criteria as that is outlined by

10 declarations, by press releases, and by pleadings in this

11 litigation.

12          THE COURT:  So what's the strongest example of that?

13          MS. AMRAM:  The strongest example would be Jahnai

14 Carter who had no criminal history.  The strongest example

15 would be Alfred Craney who -- I'm sorry -- no.  It was the

16 wrong -- there's an example of the -- I'm forgetting his name

17 for a second, but he -- he was the one who was charged with

18 selling within 1,000 feet of San Francisco State University and

19 not in a school.

20     In the opposition brief, the Government said that they

21 were targeting people who were out selling on the streets but

22 Alfred Craney's occurred inside a store.  There were other

23 people.  Darlene Rouse had no adult criminal convictions.  So

24 there's a number of times where people were presented for

25 prosecution who --

1      **THE COURT:**  And isn't their response that even though
2 there wasn't a criminal conviction, there were previous arrests
3 or some evidence of prior involvement?

4      **MS. AMRAM:**  So there is that response.  That is very
5 different than what they said in press releases and in initial
6 pleadings about criminal history, and it's certainly belied by
7 the similarly situated who have oftentimes multiple, multiple,
8 multiple convictions by OSS officers.

9      **THE COURT:**  Well, but there's no evidence that the
10 U.S. Attorney's Office was aware of these other comparators.
11 There's evidence that they didn't -- as you say, there's no
12 evidence that they went out and tested it and questioned.
13 Perhaps they should have, particularly if someone were watching
14 and monitoring these statistics; but there's no evidence that
15 they were aware, and that's one of the critical things that the
16 courts have talked about.

17      **MS. AMRAM:**  But *Armstrong* doesn't say they need to be
18 aware, and that is really important.

19      **THE COURT:**  Well, how can you be selectively -- if
20 you're not aware, other than by legal imputation, how can you
21 be engaged -- if you weren't even aware of other folks, how can
22 you engage in impermissible selectivity?

23      **MS. AMRAM:**  Because that is what the Supreme Court
24 said in *Armstrong*, Your Honor.  And that's kind of the point we
25 keep on making, which is selective prosecution is not just --

```
 1   is not only about whether or not the prosecutors are themselves

 2   racist; it's whether or not a certain standard was met that

 3   shows racial discrimination, both effect and intent, as

 4   understood by binding authority on how one establishes intent.

 5        So if you look at Armstrong, there was --

 6        THE COURT:  Where is this important?  In Armstrong it

 7   says, for instance, respondents could have investigated whether

 8   similarly situated persons were prosecuted by the State of

 9   California and were known to federal law enforcement officers.

10        MS. AMRAM:  Right, not known to the U.S. Attorney's

11   Office.

12        THE COURT:  Wait.  What?

13        MS. AMRAM:  So if you look --

14        THE COURT:  They had to have been known and not

15   prosecuted.  That's an example of what would constitute a

16   problematic situation.

17        MS. AMRAM:  Right, but it does not say that they had

18   to be known by an AUSA.  That is not what the Supreme Court

19   said in Armstrong.  They said it has to have been known by a

20   federal law enforcement officer.

21        And so Armstrong never said, never once said that the

22   prosecutors have to know of a similarly situated, and it never

23   once said that a prosecutor submitting a declaration saying

24   that they are not racist forecloses a selective prosecution

25   claim.
```

1           If the Court considers this in a *Batson* context, if there

2    was --

3           **THE COURT:**  I don't understand your point.  *Armstrong*

4    is all about selective prosecution, not selective enforcement.

5    So now you're saying because they use the words "federal law

6    enforcement officers," they obviously just meant the street

7    officers in the field that had nothing to do with prosecution.

8    That would totally conflate selective prosecution and

9    enforcement, and obviously that's not what the Supreme Court

10   was talking about.

11          **MS. AMRAM:**  Well, I think the Supreme Court was not

12   addressing selective enforcement.  The Supreme Court was

13   addressing selective prosecution.

14          **THE COURT:**  Yes.

15          **MS. AMRAM:**  And their quote, and this is a quote from

16   the *Armstrong*, is (reading):

17          "Respondents could have investigated whether

18       similarly situated persons of other races were prosecuted

19       by the State of California and were known to federal law

20       enforcement but were not prosecuted in Federal Court."

21   That is a direct quote from *Armstrong*.  It is not "and

22   were known to the U.S. Attorney's Office and were not

23   prosecuted in Federal Court."

24          **THE COURT:**  Well, what else could they have meant?

25          **MS. AMRAM:**  I think if they meant "were not known to

```
 1    U.S. Attorneys," then they would have written "You were not
 2    known to U.S. Attorneys."  I think that there is --
 3            THE COURT:  Well, what if a law enforcement agency was
 4    involved and the whole focus was on the prosecutors?
 5            MS. LEONIDA:  I understand -- because I think that the
 6    selective prosecution includes actions by law enforcement
 7    officers in certain contexts.  And the reason --
 8            THE COURT:  Where does it say that?  This is all about
 9    prosecution.  The whole gist and then the subsequent cases like
10    Davis in distinguishing Armstrong makes a very compelling and I
11    think powerful distinction between law enforcement and
12    prosecution --
13            MS. AMRAM:  Right, but --
14            THE COURT:  -- and this case is all about prosecution.
15            MS. AMRAM:  I understand.  But, Your Honor, this
16    case -- Armstrong says -- Armstrong is concerned with how do
17    you show selective prosecution, not -- and they were -- and
18    what Armstrong said over and over and over again is that you
19    need to show similarly situated persons.  Armstrong never said,
20    "You need to show that the prosecutors are perjuring themselves
21    when they say that race was not taken into account."
22            They say --
23            THE COURT:  It doesn't say that, but it does certainly
24    suggest in order to be engaged in selective prosecution, intent
25    within the meaning of the narrow definition of "intent" as has
```

1    been adopted by the Supreme Court.  How can you have intent

2    without knowledge?

3        I mean, that's basic equal protection jurisprudence.  If

4    the person didn't know that the applicant was of a particular

5    religion, race, whatever, that's usually the end of the case.

6        MS. AMRAM:  Your Honor, the whole reason for the

7    comparative analysis doctrine is that we need a way for

8    discerning discriminatory intent that is other than an

9    admission by the person that, "Yes, I was a giant racist."  So

10   we have a system set up in place for discerning discriminatory

11   intent that is separate from --

12       THE COURT:  From which you can infer discriminatory

13   intent.  Sometimes statistics, sometimes behavior,

14   circumstantial evidence can show what was going on -- whether

15   consciously, perhaps unconsciously -- in the mind of the

16   decision-maker.

17       If the decision-maker didn't even know the race, wasn't

18   presented with anything from which to select, that's a pretty

19   hard argument to make that that constitutes discriminatory

20   intent within the meaning of *Armstrong* and the equal protection

21   clause.

22       MS. AMRAM:  No.  I think what the Supreme Court is

23   saying in *Armstrong*, because they wrote this and they said

24   federal law enforcement not AUSAs, is that if you have

25   similarly situated people and they were known to federal law

1   enforcement, then you can make out a claim of selective

2   prosecution.

3        Does that mean that we're saying that the prosecutors

4   harbored racial animus?  No, it doesn't; but it means that you

5   can make out a *prima facie* showing and get discovery, because

6   that's -- again, we're not arguing dismissal here.  We're not

7   arguing whether or not selective prosecution -- we win on

8   selective prosecution.  We're arguing discovery.

9        **THE COURT:**  Well, why wouldn't it be true in every

10  case where there's selective enforcement and you have any

11  federal agents, let's say the lowest federal agent involved who

12  saw it happening but didn't say anything, automatically that's

13  a case of selective prosecution, not just enforcement, that

14  becomes a case of selective prosecution?

15       **MS. AMRAM:**  So I feel like the Court is worried that

16  this is expanding selective prosecution, but there has actually

17  never been a situation in which someone has identified, I don't

18  think, a similarly situated individual the way we have here

19  that was actually known to federal law enforcement.

20       So this is still -- there's actually, Your Honor,

21  yesterday a Third Circuit case that came out on this in which

22  it talked about *Armstrong* being super-aware of selective

23  prosecution claims because of the similarly situated

24  requirement.  So this only applies if you find someone who's

25  similarly situated.

1          In *Davis*, the selective enforcement case, they did not

2     identify similarly situated persons.  So *Davis* -- the *en banc*

3     decision in *Davis* is talking about how even when you don't have

4     a similarly situated showing, you can still get discovery on

5     selective enforcement because of the statistical disparity.

6          We here have --

7          **THE COURT:**  *Davis* is significant because it

8     essentially says the *Armstrong* test, at least for the effects

9     test, does not apply because of policy reasons.  Why the court

10    in *Armstrong* applied a very rigorous and sort of a

11    super-showing of -- *prima facie* showing was because of all the

12    reasons in terms of prosecutorial discretion, separation of

13    powers, the immunities that apply, reluctance to engage and

14    interject into the kind of policy -- broad policy decisions

15    that are made by prosecutors when they decide to prosecute,

16    which is not just based on strength of evidence but resources,

17    priorities, other things, which don't necessarily -- at least

18    by the *Davis* court's eyes, does not necessarily apply to the

19    law enforcement on the streets.

20         So that's a distinction there, but it never got to the

21    question about whether you can show discriminatory intent of

22    prosecutors just by showing that law enforcement, federal law

23    enforcement, knew about -- I mean, why would it matter --

24    apparently this is a state prosecution, and you can say the

25    same thing.  So long as it's known to state law enforcement,

1     you can impute that to state prosecutors.

2          MS. AMRAM:   Your Honor, I understand the Court's

3     concern, but this is actually what *Armstrong* said, which is

4     that if you identify similarly situated people and they are

5     known to federal law enforcement officers, that is relevant for

6     selective prosecution.   This does not make -- open like a

7     wellspring of meritorious selective prosecution claims.

8     Clearly, the similarly situated barrier has been proven to be

9     fairly insurmountable, and that's what the Third Circuit case

10    that was issued yesterday said.

11         Here we have identified similarly situated individuals.

12         THE COURT:   What did the Third Circuit rule?

13         MS. AMRAM:   It was -- it was a very summary -- I

14    actually have it here, but it basically -- this was

15    selective -- it was another stash-house robbery case and it was

16    selective enforcement, but there was a footnote.   It's

17    Footnote 11.   And this is 2016 Westlaw 2587175, *U.S. v.*

18    *Whitfield*, and at Footnote 11 it talks about *Armstrong*, and the

19    quote that I am talking about is (reading):

20              "We acknowledge that the *Armstrong* standard poses a

21         hurdle that is in most cases effectively insurmountable.

22         This seems especially true in reverse sting cases like

23         this one.   Even assuming defendants were targeted because

24         of their race, it defies reality to think that they could

25         ever make a credible showing that similarly situated

1        persons of other races could have been targeted for the

2        offenses for which the defendants were targeted but were

3        not so targeted."

4    And then they talk about how they think that is what

5 motivated the Seventh Circuit's *en banc* decision in *Davis*.

6        **THE COURT:**  So what's the conclusion?  This is the

7 Third Circuit.

8        **MS. AMRAM:**  They just say (reading):

9         "We do not address" --

10    They end by saying (reading):

11         "Whether or not the court in *Davis* was correct that

12        *Armstrong* should not apply, the selective enforcement

13        claim is a question for another day.  We simply note our

14        concern regarding law enforcement tactics."

15    But they --

16        **THE COURT:**  Well, what did the court rule?  What's the

17 holding?

18        **MS. AMRAM:**  They denied the selective enforcement

19 claim.

20        **THE COURT:**  On the ground that what?

21        **MS. AMRAM:**  On -- oh, but that it was forfeited

22 because it was not raised before trial.

23        **THE COURT:**  So they didn't reach the question whether

24 there is, for instance, a criminal justice remedy?

25        **MS. AMRAM:**  Correct.  They did not -- they didn't --

1  Whitfield hadn't raised it until after trial, so they didn't

2  address it, but I just brought up that case just to talk about

3  how the *Armstrong* standard remains incredibly hard to meet even

4  with similarly situated people being known to federal law

5  enforcement.

6          **THE COURT:**  Well, let me ask.  I think the critical

7  question here, at least with respect to selective enforcement,

8  I mean, it appears to me -- perhaps you can tell from my

9  comments -- that even if *Armstrong* were the applicable test

10  here, that there appears to be substantial evidence suggesting

11  selective enforcement, not just based on the statistic, which

12  itself is very powerful in this case, but on the background

13  evidence that's been supplied that was missing and it was

14  deemed totally anecdotal and not reliable in *Armstrong*, the

15  data from State Courts, the data from the needle exchange, as

16  well as the narratives and observations of others, it seems to

17  me -- and the fact that it appears that there were comparators;

18  that is, those who would have qualified at least facially for

19  prosecution under OSS because they had histories, et cetera,

20  et cetera -- drug dealing histories, convictions -- who were

21  not black who are in the same neighborhood and many of whom who

22  were arrested by San Francisco Police in the same time period

23  of the two sweeps.

24      I mean, I know some of the data was wide from 2013 to

25  2015; but if you look at the dates -- the date ranges of many

of those who actually were arrested, some 40 or 50 -- I forget
how many -- they fall within the same time period, same place,
basically same crime.  That seems to me to meet the *Armstrong*
standard, but it goes to selective enforcement particularly in
light of the lack of any evidence to the contrary, no
disputation on the facts by the actual law enforcers.

But that does not necessarily show prosecutorial
selectivity and selective prosecution.  And if that's the case,
then the critical question is:  What's the remedy?  Is there a
potential remedy?  Because if there's not, then there's no
basis for discovery in the criminal context.

And, you know, here we have a split.  The Ninth Circuit,
in my view, has not opined on this.  You have the
Seventh Circuit's decision in *Davis en banc* which assumes there
is a right of -- there is a dismissal action, otherwise why go
through this whole discussion about discovery in the criminal
context.

You have the Third Circuit's decision in the
*Alcarez-Arellano* case, which also, without much discussion,
assumes that there is relevance within the criminal law
prosecution context.

And then you have the Sixth Circuit's decision in *Nichols*
which rejects it.

And that seems to me the state of the law.  Unless there
are other appellate decisions that I'm not aware of, you have

1    three appellate decisions that have touched on this issue, the

2    most sort of -- the one that goes into great detail is the

3    *Davis* case and in contrary to that is the *Nichols* case.  Is

4    there any other law out there I'm not aware of?

5         **MR. WILSON:**  There are the District Court decisions,

6    Your Honor, all of which -- every judge who has been presented

7    with the argument that the selective enforcement should not be

8    a basis for dismissal of a criminal case or actually

9    suppression of evidence in a criminal case, which would be the

10   same in all of these cases, has held that suppression is not a

11   remedy and that the proper remedy is a 1983 civil rights

12   action.

13        So there is -- the Court says there's a split, but there

14   is -- but every court that has actually been presented with the

15   argument has held that there is -- that the remedy is a 1983

16   action.

17        **THE COURT:**  Well, is there contrary -- isn't there

18   some contrary District Court authority?

19        **MR. WILSON:**  I'm not aware of any, Your Honor.

20        **MS. AMRAM:**  Your Honor, I would have -- there are --

21   let me -- if I could just have a minute.  I'm trying to --

22   there are a number of -- I believe that the District Court

23   cases that were cited all cited *Nichols*.  So I'm looking at the

24   Government's opposition, and I believe there were cases that

25   cited *Nichols*.

1          I'm trying to think if there was any District Court cases

2    that independent of *Nichols* addressed an argument for dismissal

3    of selective enforcement and held that it was not a cognizable

4    claim.  I'm not aware of any.

5          I also believe that all or at least most of the

6    District Court cases that cited *Nichols* predated *Davis*.

7          **THE COURT:**  Well, let me ask this:  The *amicus* brief

8    cites -- discusses *Yick Wo* as an example of selective

9    enforcement by, I guess it was, a Board of Supervisors, if I

10   recall correctly, in terms of what to allow and not to allow

11   and then enforced by the police.  It was not framed as a

12   prosecution selectivity.

13         Of course, that doctrine hadn't been articulated back then

14   but, nonetheless, the facts suggest it was an administrative

15   matter of enforcement based on race, not Prosecution decisions;

16   and yet the Court in granting the writ of habeas essentially

17   said that these folks could not be criminally prosecuted in

18   violation of the equal protection clause.

19         So why isn't that -- even though that predates all the

20   contemporary cases, why isn't that an example of the

21   Supreme Court saying, "Yes, there are criminal justice

22   consequences for racist law enforcement"?

23         **MR. WILSON:**  Well, Your Honor -- excuse me -- I don't

24   think that -- *Yick Wo* was, I believe, decided in 1886 perhaps,

25   and at that point the distinction between selective prosecution

1   and selective enforcement had not been developed.  As I tried

2   to point out, every court that has considered that distinction

3   has held for the Government.

4       More importantly, it's not clear that that is only a

5   selective enforcement case.  The distinction was between those

6   who were prosecuted for, I believe, having a laundry -- I can't

7   remember -- a wooden laundry --

8       **THE COURT:**  A wooden laundry without a permit from the

9   Board of Supervisors.

10      **MR. WILSON:**  -- as opposed to those who were not

11  prosecuted, so I believe it was a selective prosecution case.

12  So --

13      **THE COURT:**  But I didn't see anything in there

14  suggesting that the discrimination occurred at the prosecution

15  level.  It seemed like --

16      **MR. WILSON:**  And I haven't reread the case for this

17  argument.  I read it --

18      **THE COURT:**  I'm thinking about the Board of

19  Supervisors because every time a person of Chinese descent

20  would apply for a license applying for a wooden laundry, the

21  board said no; and every time Caucasians applied for that same

22  license with the same wooden structure, as I recall, they said

23  yes with one exception, and that's when the Court said, "Well,

24  even though it's neutral on its face, there's clearly something

25  going on here in the way it's being administered."

1    So it does -- unless I'm wrong, you can correct me, I

2    thought there was a pretty clear case of discriminatory

3    administration of the law by the Board of Supervisors.

4        **MR. WILSON:**  And also in that case if it was the Board

5    of Supervisors -- and I do not remember the procedural

6    context -- there was a selection made.  There was a distinction

7    between those who received permits and those who did not.

8        As far as we're aware, every person who was prosecuted in

9    safe schools, there was a videotape made.  So no selection was

10   made by the prosecutor certainly.

11       **THE COURT:**  Well, that begs the question whether there

12   was a selection made by law enforcement because it begs the

13   question of, well, why were these people selected for the

14   videotape in the first place.  That doesn't quite answer the

15   question.

16       But getting back to this critical question here about

17   whether there should be a remedy or not -- well, first of all,

18   do you have any other cases besides *Davis* and the Third -- I

19   forget what circuit -- the *Alcaraz* case?

20       **MS. AMRAM:**  So there's *Yick Wo*, *Ah Sin*, and *Armstrong*;

21   but in terms of selective enforcement, you have to look at

22   *Yick Wo* and *Ah Sin*, which are still good law.  *Yick Wo* was

23   cited by *Armstrong* and decided by the Ninth Circuit in *Peele*,

24   including in *Belmontes*.

25       So *Yick Wo* I do think was selective enforcement.  It is,

as the Court said, a case in which the person was put in jail because the person had been denied a laundry permit; and so the Supreme Court -- and admittedly it took me like 40 read-throughs to understand what *Yick Wo* was saying -- but it was 200 applications by Chinese launderers and 80 applications by non-Chinese people.  All the Chinese applications were denied, and then the person was put in jail because of that.

And so the Supreme Court spent its entire time talking about the administration of that ordinance, which was facially neutral on its face; but in there you have the quotes about having an ordinance which clothes a single individual with such power and because it permits action from prejudice and partisan zeal, from animosity, favoritism, severance.

So *Yick Wo* was concerned with the fact that the statute otherwise neutral on its face was applied invidiously to discriminate on the basis of race.  So though neither term -- "selective enforcement" nor "prosecution" -- was used, it was a selective enforcement case.

There was no evidence of any sort of intent other than just the fact that all the Chinese applications were denied and the others were -- so it was a stats alone case that has been cited both -- in subsequent decisions, including by the Ninth Circuit in *Belmontes*.

*Ah Sin* was somewhat similar, but a denial by the Supreme Court on selective enforcement, and that was because

 1  that was gambling.  There was this ordinance that basically

 2  meant you couldn't be in a gambling facility that had a door

 3  that was blocked, and it turned out that all the people who

 4  were -- who ended up being in custody -- this was also a habeas

 5  petition -- were Chinese, but they didn't have any evidence

 6  about enforcement against people who were not Chinese; and for

 7  that reason the Supreme Court denied the petition in *Ah Sin*.

 8      There was no argument in *Ah Sin* -- there was no -- the

 9  Supreme Court did not say, "Well, it doesn't matter because you

10  can't get -- there is no relief in a criminal case for this."

11  So that's a second Supreme Court case on enforcement, though

12  the term "selective enforcement" and "selective prosecution"

13  were not used.  That's a 1905 case.

14      And, you know, in the Ninth Circuit there has been no

15  selective enforcement decision.  There are selective

16  prosecution decisions, but no selective enforcement; and so --

17  and then I think the Court has accurately stated the law in

18  terms of you have the Seventh Circuit, you have the *Arellano*

19  case.

20      It's not just -- you know, it's not only the

21  Seventh Circuit and the Sixth Circuit.  There are other

22  circuits that have addressed selective enforcement.  None has

23  held -- none have -- others than *Davis* have not really

24  struggled with the issue.

25          **THE COURT:**  Let me ask a policy -- or not a policy but

1    I mean a fundamental question.  Why would there be a

2    distinction between selective prosecution and selective

3    enforcement in terms of a remedy being available or not in the

4    criminal justice system?

5          MR. WILSON:  Because the prosecutors have -- in this

6    case we have established that the prosecutors had no knowledge

7    of what the law enforcement agents were doing; and, therefore,

8    you would be giving the defendants a dismissal of an

9    Indictment, they would go free for -- after dealing drugs --

10   and there's no dispute that they were dealing drugs in this

11   case -- based on actions that had nothing to do with their

12   prosecution.

13         THE COURT:  But if it had everything to do with their

14   selection by the police, that's still the Government acting.

15   That's still an equal protection violation potentially.

16         MR. WILSON:  And --

17         THE COURT:  So why -- isn't the -- look at it from the

18   perspective of the victim of discrimination.  Does it matter

19   whether discrimination occurred on the streets or in the

20   offices of the prosecutor?  The same thing happens.  At the end

21   of the day, they were selected out by somebody who represents

22   the Government and forced to then defend themselves in a case

23   and possibly go to jail, because they may well be guilty as

24   charged; but doing so, because they were either selected on the

25   basis of race -- I know this is all presumption, so bear with

1  me -- selected by the police or by the prosecutor.  What

2  difference does it make to the person who's been victimized by

3  that discrimination?

4       MR. WILSON:  Well, Your Honor, we're not saying that

5  this is not -- this is a right without a remedy.  The remedy,

6  in our view --

7       THE COURT:  Yeah, I understand, 1983 civil rights.

8  I'm asking you why the distinction.  The Supreme Court has

9  already -- and, of course, in a footnote.  They didn't actually

10 say that there is a remedy for selective prosecution.  They

11 assumed that there was, so that perhaps is still an open

12 question.

13      But assume that they've held that, why would there be a

14 distinction in terms of scope of remedy within the criminal

15 justice system between selective enforcement and selective

16 prosecution?  Give me a logical policy, a reason.

17      MR. WILSON:  The reason --

18      THE COURT:  Why is one more egregious than the other?

19 Why is one more deserving of a criminal justice remedy than the

20 other?

21      MR. WILSON:  Your Honor, it's not just a criminal

22 justice remedy.  The defendants are saying that these

23 defendants should not have been prosecuted in Federal Court.

24 Our submission is that because the federal prosecutors had no

25 knowledge, did not know of any racial discrimination by the

1  SFPD, it would be unfair to the prosecutors to dismiss a

2  criminal case based on this; in other words, to dismiss a

3  federal case.

4      **THE COURT:**  I'm asking what's fair to the people being

5  arrested, not what's unfair to the prosecutors.  I know you put

6  time in and you don't want to put time and effort into

7  something, make it a priority and now you can't prosecute it.

8  I'm asking a different question.  From the perspective of the

9  victim of discrimination, what difference does it make whether

10  it was the police or the prosecutor?

11      **MR. WILSON:**  It makes no difference, but they're going

12  to be prosecuted one way or another, either in State Court or

13  Federal Court.  So they violated --

14      **THE COURT:**  Well, do we know that?  If there were an

15  evidentiary hearing in this court and it's found that the

16  San Francisco Police Department engaged in racial selectivity,

17  it's not clear to me they could be -- these charges could then

18  be rebrought in State Court.

19      **MR. WILSON:**  Well, I'm not -- we're not talking about

20  these charges in particular.  I thought the Court's question

21  went to whether a given person could object based on whether

22  they went to Federal or State Court.

23      **THE COURT:**  No.  Actually, my question is not about

24  state or federal.  I'm just saying as a general proposition.

25  This could all be state prosecution.  Same issues -- right? --

1  it seems to me.

2      But, in any event, why shouldn't there be a remedy --

3  because it's the Constitution, the question is:  Does the equal

4  protection clause afford a criminal justice remedy where the

5  selection is by the law enforcement in any court versus

6  prosecutor in any court?  Why the distinction that you want to

7  draw between Prosecution and law enforcement discrimination?

8      **MR. WILSON:**  And our answer is simply that the

9  Prosecution is different than enforcement, and the prosecutors

10  in this case did not know and were completely unaware of any

11  selection-based or any targeting based on race; and it would

12  not be -- it would not be fair to the prosecutors --

13      **THE COURT:**  Let me ask the question -- let me ask the

14  question this way:  Why should there even be a dismissal remedy

15  for someone who's selectively prosecuted?

16      **MR. WILSON:**  Because the prosecutor, the person who's

17  responsible for bringing the charges, has engaged in -- is

18  racially discriminating.

19      **THE COURT:**  But the person is guilty.  What if they

20  committed murder?

21      **MR. WILSON:**  Well, the Supreme Court has said that

22  that prosecution based on an invidious racial equal protection

23  violation results in dismissal.

24      **THE COURT:**  But why?

25      **MR. WILSON:**  Because our society does not tolerate

1   race in the prosecution of people.

2        **THE COURT:**  Is it because the taint of the conduct is

3   so egregious that that weighs more than the enforcement of the

4   criminal justice system?

5        **MR. WILSON:**  I wouldn't say that, Your Honor.  I

6   just -- I don't think the taint -- the court -- no court has --

7   well, I shouldn't say that.

8      It's not because the taint is so egregious.  It's because

9   prosecutors should not rely on race.  Race has a special place

10  in the United States.

11       **THE COURT:**  The same thing could be said about police.

12  The police should not be relying on race.  They should not

13  engage in racial profiling.  The Attorney General has talked

14  about that.  There are reports on that.  I mean, that's a major

15  problem.  Why is that any less egregious than when the

16  prosecutor engages in selectivity?

17       **MR. WILSON:**  Well, it's less -- it's not less

18  egregious, and we're saying that there is a remedy.  As I said

19  several times, there is a remedy for this.

20       **THE COURT:**  Why should that remedy be different than

21  when there's selectivity by the prosecutor?  That's my

22  question.  That's what I keep coming back to.

23       **MR. WILSON:**  And the only answer I can give is that

24  the prosecutor did not know about the race, and it would be

25  unfair to the prosecutor to dismiss a case that the prosecutor

1    brought based on racial discrimination by the law enforcement

2    officers.

3            **THE COURT:**  Do you have any comment on that?

4            **MS. AMRAM:**  Just that this court dismisses cases all

5    the time for constitutional violations by law enforcement

6    officers, and there's not an argument that it's unfair to the

7    prosecutors, and that is in motions to suppress.  So when the

8    court suppresses a gun in a 922(g), the Government does not

9    argue that they can't suppress the gun and thereby cause

10   dismissal of the case because it would be unfair to the

11   prosecutors because they did not know that at the time the

12   police illegally searched the person's car for the gun, that

13   they were committing a constitutional violation.

14       So there is no legal support whatsoever for the concern

15   about being unfair to the prosecutors.  The Court looks at a

16   constitutional violation and tailors a remedy to that

17   constitutional violation without regards to whether or not it

18   is inconvenient to the prosecutors, as it is every time a Court

19   grants a suppression motion.

20           **MR. WILSON:**  But, Your Honor, not every case, not

21   every violation of the Constitution results in dismissal of the

22   Indictment.  The Supreme Court has said in the *Hudson* case that

23   certain Fourth Amendment violations do not result in

24   suppression of the evidence.  The Ninth Circuit has said that

25   dismissal is a disruptive and unfavored remedy.

1          And the distinction between the cases in which this court

2     suppresses evidence and those that it does not is that there,

3     objectively speaking, the law enforcement officers acted

4     improperly.

5          Here there's no objective -- there's no objective

6     component to this.  This depends on the intent of the law

7     enforcement officers, something that the prosecutors cannot and

8     do not know.  In other words, the prosecutors can evaluate the

9     objective circumstances surrounding a search or a statement,

10    but they can --

11          THE COURT:  Well, wait a minute now.  I mean, your

12    typical motion to suppress based on probable cause often turns

13    on the veracity of the officer.  Same thing with *Miranda* when

14    somebody's in custody:

15          What warnings did you give to the person?  What did you

16    say to the person before the tape was turned on?  What did you

17    know, what information, you know, for a warrantless arrest

18    before you arrest somebody?  What tips did you really get?  Did

19    you really know the person, you know, fit the description or

20    what?

21          I mean, that -- so veracity of -- you may call it

22    objective, but the subjective veracity of the affiant is often

23    at issue in motions to suppress.  So if your argument is that,

24    well, it's a matter of objective clarity, the prosecutor is in

25    a clear position to decide whether or not to go forward, that's

```
 1   not true.  Often it doesn't come out until they're on the
 2   stand.
 3        MR. WILSON:  But, Your Honor, the Court only
 4   suppresses evidence if it finds an objective violation of the
 5   Fifth or Fourth Amendments or the Sixth Amendment.  It does not
 6   look at the intent of the law enforcement officers.  It may
 7   find that the law enforcement officers were not truthful; but
 8   based on that finding, it determines whether objectively --
 9        THE COURT:  I don't understand why that matters.  I
10   mean, it seems to me that what's more important is how
11   important is the right at issue, what's the societal balance.
12   You know, is the right so important that we're going to enforce
13   it through a deterrence mechanism, i.e., the exclusionary rule;
14   or is it too collateral and the cost to society and public
15   safety is too high we don't enforce it?  And that's the line
16   that's been drawn, not based on whether there is subjective
17   intent or not.
18        MR. WILSON:  Well, I would disagree with Your Honor.
19   I think the Supreme Court has specifically said that subjective
20   intent of officers has no bearing on Fourth Amendment
21   violations.  It said that in *Wren*.
22        THE COURT:  Well, that has no bearing on whether or
23   not ultimately there's a Fourth Amendment violation.  You're
24   saying that then informs the question whether the suppression
25   rule applies or not.
```

1          **MR. WILSON:**  It informs the rule whether a

2   Fourth Amendment violation occurred.

3          **THE COURT:**  Which is not the issue.  I'm saying

4   assuming there is a Fourth Amendment violation, the suppression

5   rule applies sometimes and sometimes not.  In discerning

6   whether the suppression remedy should be available, it seems to

7   me it doesn't turn on the subjective or objective nature of the

8   violation as much as it does on the importance to society and

9   the value of deterrence or not.

10          **MR. WILSON:**  Well, the objective -- the fact that

11   objectively a violation occurred is a predicate to the Court's

12   determination.  I mean, there is no violation unless

13   objectively the officers violated the Fourth or

14   Fifth Amendment.

15          **THE COURT:**  Let me ask you a factual question to

16   backtrack for a second.  Were some of the San Francisco Police

17   Department officers cross-designated as federal agents?

18          **MR. WILSON:**  I believe that they -- yes, two of them

19   were, Your Honor.

20                  (Government counsel conferring.)

21          **MR. WILSON:**  Just one?

22       I'm sorry.  Just one was cross-designated as an officer.

23          **THE COURT:**  Does that change the analysis at all?

24       Well, first of all, that raises the question at least for

25   that person:  Why not get a declaration?  I mean, I understand

1    you say, "Well, the SFPD doesn't want to respond to charges of

2    racism and they're not parties."  But if one of the officers

3    was, in fact, cross-designated as a federal agent, you

4    certainly have greater grounds to compel his or her

5    cooperation, don't you?

6         MR. WILSON:  Well, we have -- no, Your Honor, we

7    don't.  That person still works for the San Francisco Police

8    Department, and we cannot -- he has to defend himself

9    against -- or the San Francisco Police Department has to defend

10   itself against charges of racism.

11        THE COURT:  I guess I'm still having trouble with

12   that; and as our opening discussion, I don't understand why, if

13   confronted with some statistics that appear to be quite

14   significant with testimony that appears to be substantial, why

15   wouldn't the San Francisco Police Department want to respond

16   and give its side of the story?  I don't understand.

17        MR. WILSON:  All I could answer, Your Honor, is that

18   there are many allegations of racism against the San Francisco

19   Police Department right now.  There are many investigations,

20   and the officers have -- well, the administration of the

21   San Francisco Police Department has stated that the officers

22   will not -- given that background, the officers will not give

23   us declarations.

24        THE COURT:  So there's been a statement -- a position

25   taken by the administration of the San Francisco Police

Department that they will not give statements in conjunction
with this motion?

    **MR. WILSON:**  Not publicly but, yes, Your Honor.

    **THE COURT:**  Well, then the record is the record as it
is; and I think as you acknowledged at the outset, I think many
things are at least factually undisputed.  Then the question
is:  You know, what do we make of this?  What is the legal
standard here?  What are the legal ramifications?

    And if there is a potential ramification in terms of
dismissal, then this does become relevant.  At least for law
enforcement, selectivity -- selective enforcement comes into
play.

    I am more skeptical of the -- I understand -- I understand
the defendants' claim about selective prosecution, but it seems
to me, absent an adoption, delegation, sort of legal imputation
theory, without evidence that there was some selectivity based
on race here, I think it's -- I think it's problematic to say
that that's been shown to a degree that is necessary to satisfy
the *Armstrong* standard; but I will, of course, look at the
record and issue a ruling on that.

    **MS. AMRAM:**  Okay.

    **THE COURT:**  All right.  I will take the matter under
submission.  As I stated, I think one of the critical issues
here is this one in which the Appellate Courts appear to be
divided and on which the Ninth Circuit really has not spoken;

1   and so I don't have a whole lot of guidance here, but that

2   seems to be at least one of the looming legal issues.  So with

3   that, I'll take that under submission.

4        Do we have future status dates in this?

5             THE CLERK:  No.

6             THE COURT:  We should set a future date and also talk

7   about a time waiver.

8        I guess time continues to be excluded while this Court has

9   it under submission, but I know there's a time limit.  I ran

10  into that one time before, and I don't remember --

11            MR. WILSON:  It's 30 days, Your Honor --

12            THE COURT:  30 days.

13            MR. WILSON:  -- once the case is under submission.

14            THE COURT:  Okay.  Shall we set a further status four

15  weeks from now?

16            MS. AMRAM:  Your Honor, if the Court would like more

17  time, I am willing to waive time for the Court to have a longer

18  time to make a decision considering the volume of the briefing.

19            THE COURT:  All right.  Does the Government have any

20  problem with that?

21            MR. WILSON:  That's fine, Your Honor.

22            THE COURT:  Well, why don't we set a further status 60

23  days out, and then waive time between now and then.

24            THE CLERK:  June 6 at 9:30.

25            THE COURT:  That's 60 days out, Betty.  That would put

 1   us into July; wouldn't it?

 2         **THE CLERK:**  I'm sorry, Judge.  How about July 18?  We

 3   can special set.

 4                       (Pause in proceedings.)

 5         **THE COURT:**  No, we can set it -- what about July 6?

 6         **THE CLERK:**  Yeah, July 6.

 7         **THE COURT:**  Is that our normal law and motion?

 8         **THE CLERK:**  Yeah.  July 6 at 9:00.

 9         **THE COURT:**  That can be on our normal law and motion

10   calendar, our criminal law and motion calendar.

11               (Courtroom deputy and the Court conferring.)

12         **THE CLERK:**  The 29th of June?

13         **MS. AMRAM:**  July 18th was fine with me.

14         **THE COURT:**  You prefer the 18th?

15         **MS. AMRAM:**  I could do -- July 18th is fine with me or

16   June 29th.

17         **THE CLERK:**  How about June 28th, Tuesday?  June 28th?

18         **THE COURT:**  Okay.

19         **MR. WILSON:**  That's fine with the Government,

20   Your Honor.

21         **MS. AMRAM:**  That's fine.

22         **THE CLERK:**  10:00 a.m.

23         **THE COURT:**  What time?

24         **THE CLERK:**  10:00 o'clock.

25         **MS. AMRAM:**  Your Honor, if the Court is not -- if

1  that's going to be a status where something is going to be

2  continued, is it possible -- almost all of the defendants are

3  working -- for me to waive people's appearance?

4          **THE COURT:**  Yes.

5          **MS. AMRAM:**  Okay.

6          **THE COURT:**  All right.  No objection?

7          **MR. WILSON:**  No objection, Your Honor.

8          **THE COURT:**  All right.  Time is excluded between now

9  and the 28th of June?

10          **MS. AMRAM:**  Yes.

11          **THE COURT:**  Both in terms of time needed for effective

12  preparation of defense and because of the motion that is

13  pending before the Court, I find that the ends of justice

14  outweighs the public's and the defendants' interest in a speedy

15  trial.  So time will be excluded until then.

16      All right.  Until then I will take the matter under

17  submission.

18          **MS. AMRAM:**  Thank you.

19          **THE COURT:**  Thank you.

20          **MR. WILSON:**  Thank you, Your Honor.

21          (Proceedings adjourned at 11:43 a.m.)

22          ---oOo---

23

24

25

1

2

3                    **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:   Friday, August 26, 2016

8

9

10

11   _____

12         Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                  U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25